## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Janet Malam,

                      Petitioner,

v.

Rebecca Adducci, *et al.*,

                      Respondents.

_____/

Case No. 20-10829

Judith E. Levy
United States District Judge

Mag. Judge Anthony P. Patti

## AMENDED OPINION AND ORDER GRANTING IN PART PETITIONER'S EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER [2][1]

This is an emergency petition challenging Janet Malam's mandatory detention pursuant to 8 U.S.C. § 1226(c) because of danger posed to her by the COVID-19 pandemic. Petitioner claims that her continued detention violates her Fifth Amendment rights by exposing her to substantial risk of illness and death. She requests a temporary restraining order (TRO) requiring that Respondents release her on her

---

[1] On April 6, 2020 the Court amended its April 5, 2020 Order to include additional terms of supervision.

own recognizance and refrain from re-detaining her for the pendency of her immigration proceedings.

For the foregoing reasons, the Court GRANTS IN PART this emergency application for relief.

## BACKGROUND

Petitioner Janet Malam, born in the United Kingdom, is a lawful permanent resident. (ECF No. 1, PageID.3.) She was legally admitted to the United States in 1967 at the age of four and is now fifty-six years old. (*Id.*) Petitioner has been detained since March 4, 2020, in the Calhoun County Correctional Facility[2] in conjunction with removal proceedings at the Detroit Immigration Court. (*Id.*) She brings suit against the following Respondents: Rebecca Adducci, the Detroit District Director of United

---

[2] The parties each refer to the Calhoun County Correctional Facility with different terminology. *See Jail/Corrections Division*, Calhoun County, https://www.calhouncountymi.gov/departments/sheriffs_office/jail.php (last visited Apr. 5, 2020) ("Calhoun County Correctional Facility"); *Detention Facilities*, U.S. Immigrations and Customs Enforcement, https://www.ice.gov/detention-facility/calhoun-county-correctional-center (last visited Apr. 5, 2020) ("Calhoun County Correctional Center"); *Calhoun County Jail*, Google Maps, at https://www.google.com/maps/place/Calhoun+County+Jail/@42.3166565,-85.1757947,15z/data=!4m2!3m1!1s0x0:0x4f8faa7bcca370c4?sa=X&ved=2ahUKEwiR wvHM3NHoAhUQmHIEHWeUCl4Q_BIwCnoECA4QCA (last visited Apr. 5, 2020) ("Calhoun County Jail"). The Court will refer to Petitioner's current place of detention as the Calhoun County Correctional Facility or CCCF.

States Immigration and Customs Enforcement (ICE); Matthew Albence, Deputy Director of ICE; Chad Wolf, Acting Secretary of the U.S. Department of Homeland Security; William Barr, Attorney General of the United States; ICE; and Heidi Washington, Director of the Michigan Department of Corrections (MDOC). (*Id.*)

Petitioner alleges that she suffers from a number of health conditions, including: multiple sclerosis; bipolar disorder; pain; anemia; essential primary hypertension; hypothyroidism; chronic obstructive pulmonary disease; fibromyalgia; mild cognitive impairment; carpal tunnel syndrome; severe major depressive disorder; opioid addiction; nicotine dependence; and polyneuropathy. (ECF No. 1, PageID.7.) According to Petitioner's extensive medical records, these diagnoses are current and accurate as of March 3, 2020. (ECF No. 1-4, PageID.31.)

Because Petitioner has committed two or more crimes involving moral turpitude, her detention is mandatory pursuant to 28 U.S.C. § 1226(c).[3] On March 30, 2020, Petitioner filed a petition requesting

---

[3] Petitioner does not specify the nature of these crimes in either her petition or this application. In their response to Petitioner's application for a temporary restraining order, Respondents note that Petitioner's charge of removal is based on a 2003 Michigan state conviction of Larceny from the Person, Mich. Comp. Laws § 750.737, a 2008 conviction of Larceny $100 or Less in violation of a Taylor City,

emergency relief in either one of two forms: a writ of habeas corpus or an injunction "ordering Defendants to immediately release [Petitioner], with appropriate precautionary public health measures, on the grounds that her continued detention violates the Due Process Clause [of the Fifth and Fourteenth Amendments]." (*Id.* at PageID.17.) Petitioner simultaneously filed an Application for Temporary Restraining Order requesting that the Court order Petitioner's release during the pendency of her immigration proceedings due to the substantial risk to her health posed by COVID-19 as a result of Petitioner's continued detention in the enclosed group environment endemic to the Calhoun County Correctional Facility. (ECF No. 2.)

For the reasons stated below, the Court GRANTS Petitioner's application for a temporary restraining order requiring her immediate release from detention for the duration of the COVID-19 State of Emergency in Michigan or until further Court order.

## LAW AND ANALYSIS

Michigan ordinance, a 2009 conviction of Retail Fraud in violation of a City of Flat Rock, Michigan ordinance, a 2011 conviction of Attempted Simple Larceny in violation of a City of Tyler, Michigan ordinance, and a 2012 conviction of Retail Fraud 3rd Degree $200 or less in violation of a City of Southgate, Michigan ordinance. (ECF No. 11-1, PageID.192.)

## I.    Jurisdiction

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress." *Hamama v. Adducci,* 912 F.3d 869, 874 (6th Cir. 2018) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). All courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (citing *Ruhgras AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). A court must determine whether it has jurisdiction before deciding a cause of action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998).

Petitioner pleads that "[t]he Court has subject matter jurisdiction over this case pursuant to Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause); the Due Process Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution; 28 U.S.C. § 1331 (federal question); 28 U.S.C. §1651 (All Writs Act); and 28 U.S.C. § 2241 (habeas corpus)." (ECF No. 1, PageID.5.) The Court has jurisdiction to adjudicate Petitioner's claims under 28 U.S.C. § 2241. Moreover, even if

Petitioner's claims could not be heard under 28 U.S.C. § 2241, 28 U.S.C. § 1331 provides an independent source of jurisdiction.

### A. 28 U.S.C. § 2241 Jurisdiction

28 U.S.C. § 2241 provides a district court with jurisdiction over petitions for habeas corpus where a petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). *See INS v. St. Cyr*, 533 U.S. 289, 298 (2001) (recognizing 28 U.S.C. § 2241 as a jurisdictional statute). For over 100 years, habeas corpus has been recognized as the vehicle through which noncitizens may challenge the fact of their detention. *See Chin Yow v. U.S.¸* 208 U.S. 8, 13 (1908) ("Habeas corpus is the usual remedy for unlawful imprisonment.") In 2001, the Supreme Court recognized the continued viability of the writ in cases involving the detention of noncitizens: "§ 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention." *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001). In 2018, the Court ruled on the merits of a habeas petition challenging the validity of pre-removal detention. *Jennings v. Rodriguez,* 138 S. Ct. 830 (2018).

Respondents claim, citing *Luedtke v. Berkebile*, that the Court lacks jurisdiction to grant habeas relief because 28 U.S.C. § 2241 "is not the proper vehicle for a prisoner to challenge conditions of confinement." *Luedtke v. Berkebile*, 704 F.3d 465, 466 (6th Cir. 2013). Though the Supreme Court has left as an open question "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement," *Boumedienne v. Bush*, 553 U.S. 732, 792 (2006), the Sixth Circuit, conversely, has held that "a § 2241 habeas petition is not the appropriate vehicle for challenging the conditions of . . . confinement." *Velasco v. Lamanna*, 16 F. App'x 311, 314 (6th Cir. 2001). In 2018, the Sixth Circuit reiterated this holding, affirming a district court that dismissed a § 2241 petition raising an Eighth Amendment challenge to subpar prison conditions because such a claim must be brought in a civil-rights action such as one under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *Solano-Moreta v. Fed. Bureau of Prisons*, No. 17-1019, 2018 WL 6982510 (6th Cir. Sep. 24, 2018); *but see Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ("Habeas corpus tests not only the fact but also the form of detention.") (internal citation

omitted); *Roba v. U.S.*, 604 F.2d 215 (2d Cir. 1979) (holding that § 2241 petition may be used to challenge conditions of confinement).

The Respondents argue that "there is no dispute that Petitioner brings a challenge to the conditions of her confinement." (ECF No. 11, PageID.175.) On its face, the application appears to concern Petitioner's conditions of confinement. Petitioner titles her claim for relief: "Freedom from Cruel Treatment and Conditions of Confinement." (ECF No. 1, PageID.16.) But Petitioner may nonetheless bring her claim under 28 U.S.C. § 2241 because she seeks immediate release from confinement as a result of there being no conditions of confinement sufficient to prevent irreparable constitutional injury under the facts of her case.

Supreme Court and Sixth Circuit precedent support the conclusion that where a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas. In *Nelson v. Campbell*, the Supreme Court held that a death-row inmate's challenge to the method of his upcoming execution constituted a challenge to the conditions—not the fact or duration—of his execution, and therefore his claim fell outside the "core"

of habeas corpus. 541 U.S. 637, 644-45 (2004). However, the Court speculated that if the challenged method "were a statutorily mandated part of the lethal injection protocol, or if as a factual matter petitioner were unable or unwilling to concede acceptable alternatives," there would be a "stronger argument that success on the merits, coupled with injunctive relief, would call into question the death sentence itself," bringing the claim into the core of habeas corpus. *Id.* at 645. In *Adams v. Bradshaw*, the Sixth Circuit relied on *Nelson* to uphold habeas jurisdiction over a claim where a petitioner challenged the method of his execution but did not concede that any acceptable alternative existed. 644 F.3d 481, 483 (6th Cir. 2011) ("Adams has not conceded the existence of an acceptable alternative procedure. . . . Thus, Adams's lethal-injection claim, if successful, could render his death sentence effectively invalid.") Here, Petitioner has not conceded the existence of acceptable alternative conditions of her confinement; her Fifth Amendment claim, if successful, would render her continued detention invalid.

In contrast to this case, claims which the Sixth Circuit has held noncognizable in habeas are those in which the petitioner seeks relief other than release from custody: *See Solano-Moreta*, 2018 WL 6982510,

at *1 (seeking transfer); *Luedtke v. Berkebile*, 704 F.3d 465, 465–66 (6th Cir. 2013) (challenge to lack of compensation and conditions of work performed in prison); *Hodges v. Bell*, 170 F. App'x 389, 390 (6th Cir. 2006) (seeking amelioration of conditions or transfer to mental health facility); *Sullivan v. United States*, 90 Fed. App'x 862, 862 (6th Cir. 2004) (seeking medical treatment in prison); *Lutz v. Hemingway*, 476 F.Supp. 2d 715, 718 (E.D. Mich. 2007) (seeking restoration of mail privileges in prison); *see also Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004) (seeking transfer). Indeed, in *Preiser v. Rodriguez*, the Supreme Court distinguished conditions of confinement claims from claims seeking immediate or speedier release. 411 U.S. 475, 500 (1973) (distinguishing habeas case seeking good-time credits from § 1983 conditions of confinement cases on the grounds that "none of the state prisoners in those cases was challenging the fact or duration of his physical confinement itself, and none was seeking immediate release or a speedier release from that confinement—the heart of habeas corpus.")

Although Petitioner here titles her claim for relief "Freedom from Cruel Treatment and Conditions of Confinement," her Petition is a challenge to the continued validity of her confinement, regardless of its

conditions. Petitioner argues that the only adequate relief is her release from confinement. As Petitioner explains,

> [S]ocial distancing and hygiene measures [are] Janet's only defense against COVID-19. Those protective measures are exceedingly difficult, if not impossible, in the environment of an immigration detention center, where Janet shares toilets, sinks, phones, and showers, eats in communal spaces, and is in close contact with the many other detainees and officers.

(ECF No. 1, PageID.16.) At the Court's March 31, 2020 status conference for this case, counsel for Respondents conceded that social distancing between prisoners of at least six feet would be impossible at the Calhoun County Correctional Facility. This concession supports the conclusion of multiple doctors and public health experts: that "[t]he only viable public health strategy available is risk mitigation. . . . [T]he public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety" (ECF No. 6-1, PageID.87 (Declaration of Infectious Disease Epidemiologist Joseph Amon)); the only way to "prevent serious illness including death" in ICE facilities is to "release all people with risk factors." (ECF No. 20-3, PageID.374 (Declaration of Dr. Robert B. Greifingert).)

In this case, Petitioner does not take issue with the steps taken at the Calhoun County Correctional Facility to mitigate the risk of detainees contracting COVID-19. Rather, she says that no matter what steps are taken, due to her underlying serious health conditions, there is no communal holding facility where she could be incarcerated during the Covid-19 pandemic that would be constitutional. Petitioner's claim must therefore be considered as a challenge to the continued validity of confinement itself. Accordingly, Petitioner's claim is properly brought under 28 U.S.C. § 2241, and the Court has jurisdiction.

## B. 28 U.S.C. § 1331 Jurisdiction

Even if the Court were to lack jurisdiction under 28 U.S.C. § 2241, the Fifth Amendment provides Petitioner with an implied cause of action, and thus 28 U.S.C. § 1331 would offer an independent source of jurisdiction.

28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Petitioner properly framed her pleading as a civil rights action "[i]n the alternative." In addition to her request for a writ of habeas corpus, Petitioner requests "injunctive relief

12

ordering Defendants to immediately release Janet, with appropriate precautionary public health measures, on the grounds that her continued detention violates the Due Process Clause." (ECF No. 1, PageID.17.) She titles her single claim for relief "Violation of Fifth Amendment Right to Substantive and Procedural Due Process (Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement." (*Id.* at PageID.16.)

Should Petitioner's habeas petition fail on jurisdictional grounds, the Fifth Amendment provides Petitioner with an implied cause of action, and accordingly 28 U.S.C. 1331 would vest the Court with jurisdiction. In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, the Supreme Court first upheld the proposition that the Constitution itself provided an implied cause of action for claims against federal officials. 403 U.S. at 388. In 2017, the Supreme Court held that federal courts should not extend a *Bivens* remedy into new contexts if there exist any "special factors counseling hesitation." *Ziglar v. Abassi*, 137 S.Ct. 1843, 1857 (2017). However, there is no corresponding limitation on the Constitution as a cause of action to seek injunctive or other equitable relief. *See Ziglar*, 137 S. Ct. at 1862 (declining to extend

*Bivens* to conditions of confinement claim, but noting that "Respondents . . . challenge large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners. To address those kinds of decisions, detainees may seek injunctive relief."). Instead, there is a "presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Hubbard v. E.P.A.*, 809 F.2d 1, 11 (D.C. Cir. 1986) (citing *Bivens*, 403 U.S. at 404 (Harlan, J., concurring)). Indeed, "the power of the federal courts to grant equitable relief for constitutional violations has long been established." *Mitchum v. Hurt*, 73 F.3d 30, 35 (3d Cir. 1995). Here, Petitioner seeks only injunctive and declaratory relief. Accordingly, she may bring her claim directly under the Fifth Amendment, and the Court has jurisdiction to hear the claim under 28 U.S.C. § 1331.

At oral argument, counsel for Respondent raised the question of whether the United States may be entitled to sovereign immunity if Petitioner brought this case under the Fifth Amendment. Sovereign immunity does not apply in this instance, and even if it did, it has been statutorily waived. Federal courts may exercise the traditional powers of equity in cases within their jurisdiction to enjoin violations of

constitutional rights by government officials. In *Ex Parte Young*, the Supreme Court first articulated the principle that state government officials may be sued for acting unconstitutionally, even if an ensuing injunction would bind the state. 209 U.S. at 123. In *Philadelphia Co. v. Stimson*, the Supreme Court recognized the applicability of that principle to suits against federal officials. 223 U.S. 605, 620 (1912) ("in case of an injury threatened by his illegal action, the officer cannot claim immunity from injunction process"). More recently, the Supreme Court affirmed this principle in *Dalton v. Specter*: "sovereign immunity would not shield an executive officer from suit if the officer acted either 'unconstitutionally or beyond his statutory powers.'" 511 U.S. 462, 472 (1994) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949)). In *Malone v. Bowdoin*, the Court called this principle the "constitutional exception to the doctrine of sovereign immunity." 369 U.S. 643, 647 (1962). Petitioner here raises a constitutional challenge to her detention as the result of actions taken by Respondent Adducci, a federal officer. Sovereign immunity does not apply.

Even absent this constitutional exception, the Administrative Procedure Act (APA) provides a statutory waiver to any defense of sovereign immunity. 5 U.S.C. § 702 provides that:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

In 2013, the Sixth Circuit recognized that this waiver extends beyond suits brought under the APA:

> [W]e now join all of our sister circuits who have done so in holding that § 702's waiver of sovereign immunity extends to all non-monetary claims against federal agencies and their officers sued in their official capacity, regardless of whether plaintiff seeks review of "agency action" or "final agency action" as set forth in § 704.

*Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 673 (6th Cir. 2013); *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."). ICE is a federal agency, of which Respondent Adducci is an officer or employee thereof. Petitioner challenges

Respondent's actions made in her official capacity. Accordingly, the APA provides a statutory waiver of sovereign immunity.

### C. Petitioner's Status as a Noncitizen

Petitioner's status as a noncitizen who is undergoing removal proceedings does not affect the Court's jurisdiction to hear this case. Although several statutes limit a district court's authority to hear cases in the immigration context, none apply here, as set forth below.

28 U.S.C. § 1252(b)(9) provides that judicial review of:

> all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter [including §§ 1225 and 1226] shall be available only in judicial review of a final order under this section.

28 U.S.C. § 1252(b)(9). Petitioner does not have a final order of removal. In *Jennings v. Rodriguez*, the Supreme Court held that 1252(b)(9) did not strip jurisdiction from courts to hear challenges to detention pending removal because detention was not an action taken to remove a noncitizen from the United States. 138 S. Ct. 830, 841 (2018). Petitioner challenges her continued detention; accordingly, 28 U.S.C. § 1252(b)(9) does not strip this Court of jurisdiction.

8 U.S.C. § 1226(e) bars federal court review of any discretionary decision made by the Attorney General regarding detention, release, bond, or parole in an immigration case. However, in *Demore v. Kim*, 123 S. Ct. 1708, 1713–14 (2003), the Supreme Court held that § 1226(e) did not prevent noncitizens from raising constitutional challenges to mandatory detention under § 1226(c). Petitioner here raises a Fifth Amendment challenge to her continued mandatory detention under § 1226(c); thus, § 1226(e) does not prevent this Court from exercising jurisdiction.

Finally, 8 U.S.C. § 1252(f), titled "Limit on Injunctive Relief," provides that:

> [N]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). But as the Supreme Court recognized in *Reno v. Amer.-Arab Anti-Discrim. Comm.*, "this ban does not extend to individual cases." 525 U.S. 471, 481–82 (1999). Petitioner seeks individual relief.

Therefore, 8 U.S.C. § 1252(f) does not affect this Court's jurisdiction to enter injunctive or declaratory relief.

## II.    Proper Habeas Respondent

Petitioner names as Respondents: Rebecca Adducci, the Detroit District Director of ICE; Matthew Albence, Deputy Director; Chad Wolf, Acting Secretary of the U.S. Department of Homeland Security; William Parr, Attorney General of the United States; U.S. Immigration and Customs Enforcement; and Heidi Washington, Director of the Michigan Department of Corrections. Only Respondent Rebecca Adducci is properly named with respect to the petition for a writ of habeas corpus.

"Historically, the question of who is 'the custodian,' and therefore the appropriate respondent in a habeas suit, depends primarily on who has power over the petitioner and . . . on the convenience of the parties and the court." *Roman v. Ashcroft*, 340 F.3d 314, 319 (6th Cir. 2003) (citing *Henderson v. INS*, 157 F.3d 106, 122 (2d Cir. 1998)). In *Roman*, the Sixth Circuit held that for habeas petitions in immigration contexts, "the INS District Director for the district where a detention facility is located 'has power over' alien habeas corpus petitioners." *Id.* at 320. The court, in finding that the Attorney General was not a proper respondent

for a noncitizen's habeas claim and that a habeas claim could properly have only one respondent, reiterated 28 U.S.C. § 2243's requirement that a writ of habeas corpus "shall be directed to *the* person having custody of the person detained." *Id.* at 321. Michigan only has one ICE District, located in Detroit. *See Enforcement and Removal Operations Field Offices*, https://www.ice.gov/contact/ero. Accordingly, Rebecca Adducci, the Detroit District Director, is the proper Respondent for Petitioner's request for a writ of habeas corpus.

### III. Petitioner's Application for a Temporary Restraining Order

Petitioner, along with her complaint, filed an emergency application for a temporary restraining order. (ECF No. 3.) In determining whether to grant such an order, courts evaluate four factors: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant would suffer irreparable injury absent an injunction; 3) whether granting the injunction would cause substantial harm to others; and 4) whether the public interest would be served by granting the injunction. *Northeast Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). These four factors "are not prerequisites that must be met,

20

but are interrelated considerations that must be balanced together. For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Id.* (internal quotations omitted). "[P]reliminary injunctions are extraordinary and drastic remedies [] never awarded as of right." *Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015). Nonetheless, each of the four factors weighs in Petitioner's favor, and the Court grants Petitioner's motion for a temporary restraining order.

## A. Irreparable Harm

Petitioner is likely to experience irreparable injury absent an injunction, both in the form of loss of health or life, and in the form of an invasion of her constitutional rights.

### 1. Loss of Health or Life from COVID-19

The ongoing COVID-19 pandemic creates a high risk that absent an injunction by this Court, Petitioner will suffer irreparable harm in the form of loss of health or life as a result of contracting the COVID-19 virus.

On March 22, 2020, the Governor of Michigan issued the following statement: "The novel coronavirus (COVID-19) is a respiratory disease

that can result in serious illness or death. It is caused by a new strain of coronavirus not previously identified in humans and easily spread from person to person. There is currently no approved vaccine or antiviral treatment for this disease." Executive Order, No. 2020-20 (Mar. 22, 2020).

Since March 4, 2020, the date of Petitioner's detention at the Calhoun County Correctional Facility, the exceptionally dangerous nature of the COVID-19 pandemic has become apparent. On March 10, 2020, the Governor of Michigan announced the state's first two cases of COVID-19 and simultaneously declared a State of Emergency. Executive Order, No. 2020-4 (Mar. 10, 2020). The number of new cases then began to grow exponentially. As of April 5, 2020, there are now 15,718 confirmed cases of COVID-19 and 617 known related deaths, with 238 confirmed cases within the Michigan Department of Corrections system specifically. *See* *Coronavirus*, Michigan.gov, https://www.michigan.gov/coronavirus/0,9753,7-406-98163-520743--,00.html. COVID-19 has a high risk of transmission, and the number and

rate of confirmed cases indicate broad community spread.[4] Executive Order, No. 2020-20 (Mar. 22, 2020). Nationally, ICE detention facilities across our country are experiencing the same thing. As of April 4, 2020, ICE has confirmed at least 13 cases of COVID-19 among immigration detainees and 7 cases among detention facility employees and personnel. *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (updated Apr. 4, 2020 at 8:00pm).

On March 23, 2020, the Centers for Disease Control and Prevention (CDC) acknowledged that correctional and detention facilities "present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control (Mar. 23, 2020),

---

[4] Indeed, since the time of Respondent's brief, the numbers have continued to grow. Respondent reported that, as of April 3, 2020, Calhoun County alone had 25 cases. (ECF No. 11, PageID.169) By the time the Court held oral argument later that day, that number had grown to 31, with 1 reported death. On April 5, the date of this Order, the number of confirmed cases is now 42, with 1 reported death. *Coronavirus*, https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html.

https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. [Hereinafter "CDC Guidance 3/23/2020"]. Specifically, the CDC noted that many detention conditions create a heightened risk of danger to detainees. These include: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing). *Id.*

Though the CDC has recommended public health guidance for detention facilities, and though the Calhoun County Correctional Facility has indeed implemented measures designed to prevent spread of the disease, these measures are inadequate to sufficiently decrease the substantial likelihood that Petitioner will contract COVID-19. As prison officials are beginning to recognize around the country, even the most stringent precautionary measures—short of limiting the detained population itself—simply cannot protect detainees from the extremely high risk of contracting this unique and deadly disease. For example, on April 1, 2020, the Rikers Island jail complex's chief physician

acknowledged that "infections are soaring" despite the facility's "following Centers for Disease Control and Prevention guidelines and having moved mountains to protect our patients." Miranda Bryant, *Coronavirus Spread at Rikers is a 'Public Health Disaster', Says Jail's Top Doctor*, The Guardian (Apr. 1, 2020), https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster. In the immigration context specifically, despite Respondents' argument that the federal government has effectively incorporated appropriate and effective precautions, medical experts at the Department of Homeland Security have warned that detention confinement creates a "tinderbox scenario" where rapid outbreak is extremely likely, and extremely likely to lead to deadly results as resources dwindle on an exponential level. Catherine E. Shoichet, *Doctors Warn of 'Tinderbox Scenario' if Coronavirus Spreads in ICE Detention*, CNN (Mar. 20, 2020), https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/index.html.

Petitioner is 56 years old and suffers from the following conditions, almost all of which place her at an increased risk of a dire outcome from

contracting the COVID-19 virus: multiple sclerosis, bipolar disorder, anemia, essential primary hypertension, hypothyroidism, chronic obstructive pulmonary disease, fibromyalgia, severe major depressive disorder, opioid addition, and polyneuropathy. (ECF No. 1-4, PageID.31.) *See* Centers for Disease Control, *Groups at Higher Risk for Severe Illness*, (Apr. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (noting that "people of all ages with underlying medical conditions are at higher risk for severe illness, particularly if the underlying medical conditions are not well controlled"). Additionally, Respondents have confined Petitioner in an environment where she "shares toilets, sinks, phones, and showers, eats in communal spaces, and is in close contact with the many other detainees and officers." (ECF No. 1, PageID.16.) Petitioner's involuntary interaction with purportedly asymptomatic guards who rotate shifts is also a significant exposure factor. *How COVID-19 Spreads*, CDC (April 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-

covidspreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2
Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html.[5]

These are many of the conditions that the CDC has identified as being particularly likely to increase COVID-19 transmissions in detention facilities. CDC Guidance 3/23/2020. For these reasons, Petitioner's confinement at the Calhoun County Correctional Facility renders her substantially likely to contract COVID-19, and Petitioner's severe health conditions render her substantially likely to suffer irreparable harm or death as a result.

Respondents focus on one particular issue: whether Petitioner is more likely to contract COVID-19 if released than if she remains confined in their jail. Respondents acknowledge that "there is a health risk posed by COVID-19 and that Petitioner is in the category of people identified to be at higher risk for serious health consequences if she contracts COVID-

---

[5] On April 3, 2020, after Petitioner filed her emergency application for a temporary restraining order, the CDC updated its guidance in light of new evidence of asymptomatic transmission of COVID-19 to recommend that all individuals wear cloth face coverings "in public settings where other social distancing measures are difficult to maintain." *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission*, CDC (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

19." (ECF No. 11, PageID.178.) Respondents also acknowledge that Petitioner "does not have to wait until she has COVID-19 to claim that the precautions taken to reduce exposure were insufficient." (*Id.* at PageID.179.) Indeed, the crux of Respondents' argument is not that COVID-19 does not pose a deadly threat to Petitioner if contracted. Rather, Respondents' argument relies on the proposition that Petitioner does not have a substantial risk for *exposure* at the Calhoun County Correctional Facility, and her risk of exposure in the community may be greater. (*Id.* at PageID.178.)

To this end, Respondents posit the following: Petitioner has not established that she has either been exposed to COVID-19, or that her exposure is "imminent," because there are currently no cases in the facility in which she is detained "and only 25 cases in the surrounding county."[6] (ECF No. 11, PageID.179.) Additionally, Respondents argue that their facility has implemented "numerous precautions to reduce the risk of exposure and spread of COVID-19,"[7] and that even if Petitioner is

---

[6] Hours later, due to the exponential nature of COVID-19's spread, this statistic was already out of date. *See supra* fn.2.

[7] Specifically, Respondents note that the ICE and CCCF precautions are as follows: tracking the disease, screening incoming detainees, isolating and testing

at a "generalized risk" of contracting COVID-19, that does not mean that she is at a "substantial risk" for purposes of her constitutional claim. (*Id.* at PageID.179-180, citing *Wooler v. Hickman Cty.*, 377 Fed. Appx. 502, 505 (6th Cir. 2010)).

Respondents' arguments fail to address the stark reality of this particular global public health crisis. In the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors, a "generalized risk" *is* a "substantial risk" of catching the COVID-19 virus for any group of human beings in highly confined conditions, such as Petitioner within the CCCF facility. In acknowledgment of this simple truth, both the United States Attorney General and the Governor of Michigan have issued independent directives to consider early release for detainees who do not pose a public safety risk, as minimizing crowded populations is the only known way to mitigate spread of this pandemic. *Prioritization of*

---

symptomatic detainees, quarantining detainees who test positive, screening incoming staff, suspending in-person social visitation and limiting professional visitation to non-contact, increasing sanitation, educating all staff and detainees, providing detainees with toilet paper, personal soap, and disinfectants, and increasing hand-washing stations. (ECF No. 11, PageID.172.)

*Home Confinement as Appropriate in Response to COVID-19 Pandemic*, Att'y Gen. (Mar. 26, 2020); Executive Order, No. 2020-29 (COVID-19) (Mar. 26, 2020). Moreover, Petitioner's risk of contracting COVID-19 outside of Respondents' custody has no bearing on whether they have exposed her to the likelihood of irreparable harm. Though the Court commends Respondents for the steps they have taken to prevent spread of the disease, as prisons and courts around the country are beginning to recognize, such measures are insufficient to stem deadly prison outbreaks. *See, e.g.*, *New York City Board of Correction Calls for City to Begin Releasing People From Jail as Part of Public Health Response to COVID-19*, N.Y.C. Bd. of Corr. (Mar. 17, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/News/2020.03.17%20-%20Board%20of%20Correction%20Statement%20re%20Release.pdf (arguing that, despite the "heroic work" of Department of Correction and Correctional Health Services staff "to prevent the transmission of COVID-19 in the jails and maintain safe and humane operations, the City must drastically reduce the number of people in jail right now and limit new admissions to exceptional circumstances."). Even the Calhoun County Correctional Facility's additional measure of screening incoming

shift workers for high temperatures is insufficient to stem the spread of disease, as COVID-19 spreads asymptomatically. *How COVID-19 Spreads*, CDC (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covidspreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html.

Accordingly, the Court concludes that Petitioner's continued confinement at the Calhoun County Correctional Facility exposes her to a substantial risk of contracting COVID-19, which due to her specific underlying health conditions exposes her to a substantial risk of irreparable harm to her health or life.

## 2. Violation of Constitutional Rights

Petitioner's Fifth Amendment claim triggers a finding that Petitioner will suffer irreparable harm absent an injunction. Petitioner alleges that in "subjecting Janet to detention conditions that amount to punishment and that fail to ensure her safety and health," Respondent is "subjecting [her] to a substantial risk of serious harm, in violation of [her] rights under the Due Process Clause." (ECF No. 1, PageID.17.) The alleged violation of a constitutional right is sufficient for a court to find

irreparable harm. *See Overstreet v. Lexington-Fayette Urban Cty. Gov.*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Covino v. Patrissi*, 967 F.2d 73, 77; *McDonell v. Hunter*, 746 F.2d 785, 787 (8th Cir. 1984) ; *see also Rhinehart v. Scutt*, 408 F. App'x 510, 514 (6th Cir. 2018) (suggesting that allegation of "continuing violation of . . . Eighth Amendment rights" would trigger a finding of irreparable harm). Below, the Court finds Petitioner is likely to succeed on the merits of this Fifth Amendment claim. Accordingly, "no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

## B. Likelihood of Success on the Merits

Petitioner is likely to succeed on the merits of her claim that her continued confinement during the COVID-19 pandemic violates her Fifth Amendment rights.

The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the government from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend.

V. The protection applies to "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). As it pertains to Petitioner, the Due Process Clause prohibits the government from imposing torture or cruel and unusual confinement conditions on non-convicted detainees. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt."). This type of Fifth Amendment claim is analyzed "under the same rubric as Eighth Amendment claims brought by prisoners." *Villegas v. Metropolitan Government of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).

Eighth Amendment claims require a showing of deliberate indifference, *see Farmer v. Brennan*, 511 U.S. 825, 835 (1994), which has both an objective and a subjective component. *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

1. Objective Component

The objective component is satisfied by showing that, "absent reasonable precautions, an inmate is exposed to a substantial risk of

serious harm." *Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016) (citing *Amick v. Ohio Dep't of Rehab. & Corr.*, 521 Fed.Appx. 354, 361 (6th Cir.2013)). Respondents argue that the precautions they have taken at the Calhoun County Correctional Facility combined with the lack of a confirmed outbreak of COVID-19 at the facility show that Petitioner is unable to demonstrate she is at substantial risk of serious harm. (ECF No. 11, PageID.180.) Instead, Respondents argue that Petitioner merely has a "generalized risk" of contracting COVID-19, which is insufficient to prevail on a Fifth Amendment constitutional claim. (*Id.*) But as noted above, in Petitioner's case, a generalized risk is a substantial risk.

As the Supreme Court explained in *Helling v. McKinney*, "[w]e have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." 509 U.S. 25, 33 (1993). "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Id.* "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening

condition in their prison on the ground that nothing yet had happened to them." *Id.*

Respondents attempt to distinguish this case from *Helling* on the grounds that the Petitioner in *Helling* alleged a sufficiently imminent danger from "actual exposure to high levels of cigarette smoke because his former cellmate was a five-pack a day smoker." (ECF No. 11, PageID.179 (citing *Helling*, 509 U.S. at 29).) Respondents argue that "Petitioner has not established that she either has been exposed to COVID-19, or that her exposure is "imminent."" (*Id.*) But as the above analysis regarding the risk of irreparable injury to Petitioner demonstrates, the Respondents grievously underestimate the seriousness of the risk to Petitioner, in spite of precautionary measures and despite the lack of confirmed CCCF outbreak to date. The ever-growing number of COVID-19 outbreaks in prisons and detention facilities,[8] despite a range of precautionary measures, demonstrates that

---

[8] *See, e.g.*, Ted Rod Roelofs, *Coronavirus Cases Surge in Michigan's Crowded Prisons*, Bridge (Mar. 27, 2020), https://www.bridgemi.com/michigan-government/coronavirus-cases-surge-michigans-crowded-prisons; *Oregon Inmate in Salem Tests Positive for COVID-19, the First in the State Prison System*, SalemReporter (Apr. 3, 2020), https://www.salemreporter.com/posts/2168/oregon-inmate-in-salem-tests-positive-for-covid-19-the-first-in-the-state-prison-system (noting outbreak despite precautionary measures); Ames Alexander and Jessica

the risk of a COVID-19 outbreak in Respondent's facility is significant. Nor, given the percentage of asymptomatic COVID-19 cases and the virus' incubation period of up to fourteen days, can Respondents reasonably assert, as they do, that there are no COVID-19 cases in CCCF; they can only allege that there are no confirmed cases. By the time a case is confirmed, it will almost certainly be too late to protect Petitioner's constitutional rights. Petitioner, so long as she remains detained, is therefore exposed to a substantial risk of serious harm.

2. <u>Subjective Component</u>

The subjective component is demonstrated by showing that "(1) the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner, (2) the official did in fact draw the inference, and (3) the official then disregarded that risk." 819 F.3d at 915–16 (citing *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)). "Because government officials do not readily admit the subjective

---

Banov, *In NC Prisons, Five Employees and Four Inmates Have Now Tested Positive for COVID-19*, Charlotte Observer (Apr. 1, 2020), https://www.charlotteobserver.com/news/coronavirus/article241675886.html; Alexandra Kelley, *Louisiana Prison Records Third Inmate Death as a Result of the Coronavirus*, The Hill (Apr. 1, 2020), https://thehill.com/changing-america/well-being/prevention-cures/490839-louisiana-prison-records-third-inmate-death-as-a.

component of this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence. . . . " *Richko,* 819 F.3d at 916 (citing *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009)). Additionally, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

Respondents concede the COVID-19 risk to Petitioner: "The government does not dispute that there is a health risk posed by COVID-19 and that Petitioner is in the category of people identified to be at higher risk for serious health consequences if she contracts COVID-19." (ECF No. 11, PageID.178.) Rightfully so: the above analysis pertaining to the risk of irreparable harm reveals that the substantial risk to Petitioner is obvious. *Farmer*, 511 U.S. at 842.

Respondents instead argue that Calhoun County Correctional Facility's precautionary measures preclude a finding of deliberate indifference because government officials cannot be said to have disregarded the risk to Petitioner. As noted above, officials at the Calhoun County Correctional Facility have taken a range of precautionary measures to protect against a potential outbreak. (*See*

ECF No. 11-3.) But as Plaintiff's pleadings and the above analysis regarding irreparable injury demonstrate, even with these precautionary measures, in light of Petitioner's underlying health conditions, she is not ensured anything close to "reasonable safety." *Farmer*, 511 U.S. at 844. (*See* ECF No. 6-3, PageID.112 (Declaration of Doctor Golob stating, "[V]ulnerable people, people over the age of 50 and people of any age with lung disease . . . living in an institutional setting . . . are at grave risk of severe illness and death from COVID-19."); ECF No. 6-1, PageID.87 (Declaration of Infectious Disease Epidemiologist Joseph Amon, stating "The only viable public health strategy available is risk mitigation. . . . [T]he public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety.").) Based on the record before the Court, the only reasonable response by Respondents is the release of Petitioner; any other response demonstrates a disregard of the specific, severe, and life-threatening risk to Petitioner from COVID-19.

For the same reasons, Petitioner's continued detention cannot "reasonably relate[] to any legitimate government purpose." *Bell v. Wolfish*, 441 U.S. 520, 536-39 (1979) (holding that pretrial detention not

reasonably related to a legitimate government purpose must be considered punishment and therefore contrary to the Fifth Amendment). In their response, Respondents do not directly address the justification for Petitioner's continued detention. The Court notes that Petitioner is in civil detention pending removal proceedings pursuant to 28 U.S.C. § 1226(c). Petitioner faces significant risk of death due to COVID-19; accordingly, her continued confinement at the Calhoun County Correctional Facility is both unrelated and contrary to the government purpose of carrying out her removal proceedings.

Both the objective and subjective components are met; Petitioner has shown a likelihood of success on the merits. The Court reiterates that at this early stage in the litigation, Petitioner need not show a certainty of success on the merits. Indeed, "the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Northeast Ohio Coalition for Homeless and Service Employees Intern. Union, Local 1199*, 467 F.3d at 1009 (6th Cir. 2006). Given the risk and severity of irreparable harm to Petitioner and the weight of public health evidence indicating release

as the only reasonable option under these facts, Petitioner has met her current burden with respect to the merits of her claim.

Respondents nonetheless cite to some authority that release is an inappropriate remedy for Petitioner's claim. *See Glaus v. Anderson,* 408 F.3d 382, 387 (7th Cir. 2005) (noting release is not among the proper remedies for Eighth Amendment deliberate indifference claims, which are limited to injunctive relief for proper treatment and damages); *Heximer v. Woods*, No. 08-14170, 2018 WL 1193368, at *2 (E.D. Mich. Mar. 8, 2018) (noting that "release from custody is not an available remedy for a deliberate indifference claim."). As explained above, Petitioner has shown a likelihood of success on the merits of her claim that given the extraordinary nature of the COVID-19 pandemic, no set of possible confinement conditions would be sufficient to protect her Fifth Amendment rights. Release from custody represents the only adequate remedy in this case, and it is within this Court's broad equitable power to grant it. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–16 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.")

3. Qualified Immunity

In its supplemental brief, Respondents note that to the extent Petitioner brings a civil rights case, Respondents are entitled to assert a defense of qualified immunity. (ECF No. 19, PageID.317.) Qualified immunity is unavailable as a defense in cases seeking injunctive relief. *See Pearson v. Callahan*, 555 U.S. 223, 242 (2009) (noting that qualified immunity defense is not available in "suits against individuals where injunctive relief is sought in addition to or instead of damages"); *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982) (describing qualified immunity as "immunity from suits for damages"). Because Petitioner here seeks only declaratory and injunctive relief, qualified immunity does not apply.

## C. Balance of Equities and Public Interest

When the government opposes the issuance of a temporary restraining order, as Respondents do here, the final two factors—the balance of equities and the public interest—merge, because "the government's interest is the public interest." *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The public interest favors Petitioner's release because of the risk that Petitioner's constitutional rights will be deprived absent an injunction. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge Inc. v. Mich. Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir.1994).

Additionally, Petitioner's release will protect public health. Given the highly unusual and unique circumstances posed by the COVID-19 pandemic and ensuing crisis, "the continued detention of aging or ill civil detainees does not serve the public's interest." *Basank,* 2020 WL 1481503, at \*6; *see also Fraihat v. U.S. Imm. and Customs Enforcement*, 5:19 Civ. 1546, ECF No. 81-11 (C.D. Cal. Mar. 24, 2020) ("the design and operation of detention settings promotes the spread of communicable diseases such as COVID-19"); *Castillo v. Barr*, CV-20-00605-TJH (C.D. Cal. 2020). Protecting public health and safety is in the public interest. *See Neinast v. Bd. Of Trustees*, 346 F.3d 585, 592 (6th Cir. 2003) (recognizing public health and safety as legitimate government interests).

Respondents argue that public interest favors Petitioner's continued detention because "the public interest in enforcement of the

United States' immigration laws is significant." (ECF No. 11, PageID.187 (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant.")).

Respondents point to only one immigration law that will see continued enforcement by denying relief to Petitioner. That law is 8 U.S.C. § 1226(c), and it authorizes Petitioner's continued detention. But as set forth above, Petitioner's continued detention is in violation of the United States Constitution, to which 8 U.S.C. § 1226(c) must give way.

The enforcement of the remainder of U.S. immigration laws against Petitioner will continue unabated should the Court grant Petitioner relief. A hearing on Petitioner's request for cancellation of removal is scheduled for April 14, 2020. (ECF No. 11, PageID.170). Respondents do not argue that Petitioner's release will jeopardize her appearance at that hearing, nor do they argue that Petitioner's release will undermine her removal from this country, should Petitioner's defense fail and should conditions allow such removal.

The public interest and balance of equities demand that the Court protect Petitioner's constitutional rights and the public health over the continued enforcement of a detention provision that, as applied to Petitioner, is unconstitutional. The remaining factors counsel granting Petitioner relief.

Because all four factors weigh in favor of issuing emergency injunctive relief, Petitioners motion for a temporary restraining order is granted.

## IV.   Conclusion

For the reasons stated above, Petitioner's Application for a Temporary Restraining Order is GRANTED IN PART. Respondent Adducci is ORDERED to release Petitioner on April 6, 2020 on her own recognizance. Petitioner will be subject to the following restrictions: Petitioner is subject to fourteen days of home quarantine; Petitioner must comply with all Michigan Executive Orders; and Petitioner must appear at all hearings pertaining to her removal proceedings. Respondents may impose other reasonable nonconfinement terms of supervision.

Respondents are further RESTRAINED from arresting Petitioner for civil immigration detention purposes until the State of Emergency in

Michigan (related to COVID-19) is lifted or until further Court Order stating otherwise.

The Temporary Restraining Order will expire on April 17, 2020, at 6:30 p.m. No later than April 10, 2020, at 12:00 p.m., Respondents must show cause why this Order should not be converted to a preliminary injunction. Petitioner may file a response no later than April 16, 2020, at 12:00 p.m.

IT IS SO ORDERED.

Dated: April 6, 2020     s/Judith E. Levy
Ann Arbor, Michigan    JUDITH E. LEVY
          United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 6, 2020.

     s/William Barkholz
     WILLIAM BARKHOLZ
     Case Manager