## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Janet Malam,

               Petitioner,     Case No. 20-10829

and                               Judith E. Levy
                                    United States District Judge

Ruby Briselda Escobar and Amer
Toma,                          Mag. Judge Anthony P. Patti

            Plaintiff-Intervenors,

v.

Rebecca Adducci, *et al.*,

              Respondents.

_____/

## OPINION AND ORDER CONVERTING TEMPORARY RESTRAINING ORDER INTO PRELIMINARY INJUNCTION [23]

On April 6, 2020, the Court issued an amended order granting a Temporary Restraining Order and requiring Petitioner Janet Malam's immediate release from ICE Custody. (ECF No. 23.) The TRO was set to expire on April 17, 2020, at 6:30pm EST. (*Id.* at PageID.575.) The Court

ordered Respondent Adducci[1] to show cause why the TRO should not be converted to a preliminary injunction. (*Id.*) On April 10, 2020, Respondent filed a response to the Court's order to show cause. (ECF No. 30.) On April 16, 2020, Petitioner filed her reply. (ECF No. 32.) The Court now transforms the TRO into a preliminary injunction.

## I.    Factual Background

Petitioner Janet Malam, born in the United Kingdom, is a lawful permanent resident. (ECF No. 1, PageID.3.) She was legally admitted to the United States in 1967 at the age of four and is now fifty-six years old. (*Id.*) Prior to her release on April 6, 2020, Petitioner had been detained in the Calhoun County Correctional Facility in conjunction with removal proceedings at the Detroit Immigration Court. (*Id.*)

Petitioner alleges that she suffers from a number of serious health conditions, including: multiple sclerosis; bipolar disorder; pain; anemia;

---

[1] Petitioner initially named as Respondents: Rebecca Adducci, the Detroit District Director of United States Immigration and Customs Enforcement (ICE); Matthew Albence, Deputy Director of ICE; Chad Wolf, Acting Secretary of the U.S. Department of Homeland Security; William Barr, Attorney General of the United States; ICE; and Heidi Washington, Director of the Michigan Department of Corrections (MDOC). In its April 6, 2020 Amended Order, the Court found that it had jurisdiction under 28 U.S.C. § 2241. (ECF No. 23, PageID.536.) Only Respondent Adducci is a proper respondent for Petitioner's petition for habeas corpus. (ECF No. 23, PageID.549.)

essential primary hypertension; hypothyroidism; chronic obstructive pulmonary disease; fibromyalgia; mild cognitive impairment; carpal tunnel syndrome; severe major depressive disorder; opioid addiction; nicotine dependence; and polyneuropathy. (ECF No. 1, PageID.7.) According to Petitioner's extensive medical records, these diagnoses are current and accurate as of March 3, 2020. (ECF No. 1-4, PageID.31.)

On March 30, 2020, Petitioner filed a petition requesting emergency relief in either one of two forms: a writ of habeas corpus or an injunction "ordering Defendants to immediately release [Petitioner], with appropriate precautionary public health measures, on the grounds that her continued detention violates Due Process Clause [of the Fifth and Fourteenth Amendments]." (ECF No. 1, PageID.17.) Petitioner simultaneously filed an Application for Temporary Restraining Order requesting that the Court order Petitioner's release during the pendency of her immigration proceedings due to the substantial risk to her health posed by COVID-19 as a result of Petitioner's continued detention. (ECF No. 2.) The Court granted Petitioner's application on April 5, 2020 (ECF No. 22) and issued an amended order (ECF No. 23) on April 6, 2020

Because Petitioner continues to show that she will be subject to irreparable injury absent an injunction, a high likelihood of success on the merits, and that the balance of equities and public interest weigh in favor of granting an injunction, the Court now converts its TRO into a preliminary injunction.

## II.   Legal Standard

In determining whether to grant a preliminary injunction, courts evaluate four factors: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant would suffer irreparable injury absent an injunction; 3) whether granting the injunction would cause substantial harm to others; and 4) whether the public interest would be served by granting the injunction. *Northeast Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell,* 467 F.3d 999, 1009 (6th Cir. 2006). These four factors "are not prerequisites that must be met, but are interrelated considerations that must be balanced together. For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Id.* (internal quotations omitted). "[P]reliminary injunctions are extraordinary and drastic

remedies [] never awarded as of right." *Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015). Nonetheless, each of the four factors weighs in Petitioner's favor, and the Court converts the temporary restraining order into a preliminary injunction.

### III.  Analysis

The Court granted emergency injunctive relief because Petitioner had shown: a high likelihood of irreparable injury absent an injunction, both in the form of substantial risk to her health and life from COVID-19 and due to her alleged constitutional violations (ECF No. 23, PageID.551–562); a strong likelihood of success on the merits with respect to both the objective and subjective components of a deliberate indifference claim (*Id.* at PageID.562–571); and that the balance of equities and public interest favored her immediate release (*Id.* at PageID.571–574).

Respondent Adducci now argues that 1) the Court erred in finding a high likelihood of irreparable harm because "Malam has not shown that she has a substantial risk of exposure to COVID-19 at CCDC" (ECF 30, PageID.648); 2) Petitioner has not demonstrated a likelihood of success

on the merits because she "has not shown that Respondent is deliberately indifferent in light of the precautions taken at CCDC to reduce exposure to COVID-19" (*Id.* at PageID.653); and 3) "Malam cannot show that her continued detention amounts to impermissible punishment" (*Id.* at PageID.658).

From this Court's perspective, Respondent turns a blind eye to the weight of public health evidence recognizing Petitioner's release as the only reasonable response to an extraordinary and deadly pandemic. Respondent concedes that "[i]t is undisputed that individuals with certain underlying health conditions, like Malam, are at an increased risk of adverse health consequences from COVID-19." (ECF No. 30, PageID.653.) And as the Court found, "in the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors, a 'generalized risk' is a 'substantial risk' of catching the COVID-19 virus for any group of human beings in highly confined conditions, such as Petitioner within the CCCF facility." (ECF No. 23, PageID.559.) No conditions of confinement at the Calhoun County Correctional Facility will be

6

sufficient to protect this Petitioner's health, life, and constitutional rights. A preliminary injunction is warranted.

## A. Petitioner's Risk of Exposure to COVID-19

Respondent argues that while there is some risk that Petitioner will contract COVID-19 should she return to the Calhoun County Correctional Facility, that risk is not high enough to constitute irreparable harm. In *Helling v. McKinney*, the Supreme Court found that the petitioner had stated an Eighth Amendment deliberate indifference claim where he alleged an "unreasonable risk of serious damage to his future health." 509 U.S. 25, 35 (1993). The thrust of Respondent's argument appears to be that until there is a confirmed case of COVID-19, or perhaps an outbreak of the illness it causes, in the Calhoun County Correctional Facility, Petitioner cannot show that COVID-19 poses an unreasonable risk of infection:

- "Malam simply has not shown that she has a substantial risk of exposure to COVID-19 at CCDC." (ECF No. 30, PageID.645.)

- "Malam has not shown anything about CCDC, in light of the precautions taken, that puts her at a substantial risk of exposure." (ECF No. 30, PageID.650.)

- "While the precautions do not eliminate the risk, the constitution does not require as much." (ECF No. 30, PageID.645.)

7

- "There are no suspected cases of COVID-19 at CCDC, which tends to suggest the measures are reasonably effective." (ECF No. 30, PageID.652.)

- "[T]o state a constitutional claim, she cannot rely on the general bad effects of a deadly virus[;] she has to show that she is specifically at a substantial risk for exposure by some condition at CCDC." (ECF No. 30, PageID.650.)

- "Nowhere in the decision did the *Helling* Court hold *potential* for exposure to a serious disease sufficient to establish a constitutional violation. New mutations and strains of viruses are a part of the human condition." (ECF No. 30, PageID.649.)

Respondent's arguments fly in the face of public health evidence regarding the COVID-19 pandemic, which identifies communal detention facilities as creating an unacceptably high risk of contracting COVID-19. The Calhoun County Correctional Facility is a communal detention facility; Petitioner's return would place her at an unreasonable and substantial risk of COVID-19 infection.

Despite repeated opportunities to do so, Respondent to date has failed to address the public health evidence in the record and on which Petitioner relies. Petitioner submitted the declarations of two medical experts assessing the risk of COVID-19 in detention facilities. Because any decision regarding relief must be grounded in scientific and public

8

health evidence, the Court includes the most relevant sections of the two declarations in their entirety.

Dr. Joseph Amon, Director of Global Health and Clinical Professor at the Drexel Dornsife School of Public Health and Associate Professor of Epidemiology at the Johns Hopkins University Bloomberg School of Public Health, declares the following:

- The conditions of immigration detention facilities pose a heightened public health risk to the spread of COVID-19, even greater than other non-carceral institutions. (ECF No. 6-2, PageID.82.)

- Immigration detention facilities are enclosed environments, much like the cruise ships that were the site of the largest concentrated outbreaks of COVID-19. Immigration detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care. People live in close quarters and are also subject to security measures which prohibit successful "social distancing" that is needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection. Staff arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection. (*Id.*)

- The lack of daily tests of staff who have ongoing community contacts presents a risk of introduction of the virus into the

9

detention facility. The possibility of asymptomatic transmission means that monitoring fever of staff or detainees is also inadequate for identifying all who may be infected and preventing transmission. This is also true because not all individuals infected with COVID-19 report fever in early stages of infection. The lack of widespread testing in communities and the current presence of COVID-19 in all 50 states means that it is impractical to ask detainees about their travel history— all communities should be assumed to have community transmission which is why statewide and national restrictions on movement and gatherings have been put in place. The crowded conditions, in both sleeping areas and social areas, and the shared objects (bathrooms, sinks, etc.) will facilitate transmission. (*Id.* at PageID.85–86.)

• Procedures that may have worked for other outbreaks, like flu, will not be sufficient to control COVID-19 and physical distancing is essential. (*Id.* at PageID.86.)

• The only viable public health strategy available is risk mitigation. Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of individuals who can be considered at high-risk of severe disease if infected with COVID-19 is a key part of a risk mitigation strategy. In my opinion, the public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage. (*Id.*)

Dr. Jonathan Golob, an Assistant Professor at the University of Michigan School of Medicine who specializes in infectious diseases and internal medicine, further declares the following:

- A lack of proven cases of COVID-19 in the context of a lack of testing is functionally meaningless for determining if there is a risk for COVID-19 transmission in a community or institution. (ECF No. 6-3, PageID.111.)

- Given the avid spread of COVID-19 in skilled nursing facilities and cruise ships, it is reasonable to expect COVID-19 will also readily spread in detention centers, particularly when residents cannot engage in social distancing measures, cannot practice proper hygiene, and cannot isolate themselves from infected residents or staff. With new individuals and staff coming into detention centers who may be asymptomatic or not yet presenting symptoms, the risk of infection rises even with symptom screening measures. (*Id.* at PageID.112.)

- This information provides many reasons to conclude that vulnerable people . . . living in an institutional setting, such as an immigration detention center, prison, or jail, with limited access to adequate hygiene facilities, limited ability to physically distance themselves from others, and exposure to potentially infected individuals from the community are at grave risk of severe illness and death from COVID-19. (*Id.*)

Respondent's briefing mentions neither declaration. Respondent is free to disagree with the conclusions drawn by these declarations, but to contest them in this case, she must present public health evidence of her

11

own demonstrating either that the risk is not as significant as Petitioner's evidence shows or that it can be mitigated through precautions. But Respondent does not offer any public health evidence of her own beyond the CDC Guidance, which makes recommendations for precautionary measures but does not assess the resulting risk of COVID-19 infection once those measures have been implemented.

The Court acknowledges that ICE and the Calhoun County Correctional Facility have employed some precautionary measures, including: "tracking the disease, screening incoming detainees, isolating and testing symptomatic detainees, quarantining detainees who test positive, screening incoming staff, suspending in-person social visitation and limiting professional visitation to non-contact, increasing sanitation, educating all staff and detainees, providing detainees with toilet paper, personal soap, and disinfectants, and increasing handwashing stations." (ECF No. 23, PageID.513-14.) Furthermore, the Court is aware of updated guidance regarding precautionary measures within ICE detention facilities. *See* Case No. 20-10921, *Zaya v. Adducci* (E.D. Mich. Apr. 15, 2020), ECF No. 7-5 (*COVID-19 Pandemic Response Requirements*, U.S. Immigration and Customs Enforcement (Apr. 10,

12

2020)). This new guidance calls for: requiring inmates with symptoms to wear a cloth face mask, reducing detainee populations to seventy-five percent capacity, housing of detainees in individual cells, instructing detainees to sleep "head to foot," extending recreation, law library, and meal hours to allow staggering and reduce crowd size, and rearranging beds in housing units to ensure sufficient distance. *Id.* These are undoubtedly important additional precautions. But the public health evidence in the record explains why these precautionary measures ultimately fall short of protecting this Petitioner's health and constitutional rights. Given the asymptomatic nature of transmission, the impossibility of adequate social distancing in communal detention spaces, and the inability or unwillingness to test all inmates and staff, Petitioner remains at an unreasonable and substantial risk of infection and consequently of dire health consequences, including death.

Respondent also critiques the Court's use of illustrative examples at other detention facilities: "this Court found harm was imminent based on conditions at other facilities that are not specific to Malam." (ECF No. 30, PageID.650.) Respondent argues that in order to prevail, Petitioner must show risks specific to the Calhoun County Correctional Facility.

She cites to this Court's opinion in *Awshana v. Adducci*, where the Honorable David M. Lawson held that "the petitioners have leveled only generalized allegations; if those were deemed sufficient, then all inmates would be entitled to release until the pandemic subsides." (ECF No. 30, PageID.650 (citing *Awshana v. Adducci*, Case No. 20-10699 (E.D. Mich. April 9, 2020), ECF No. 19).)

The Court's references to other facilities illustrate the risk of infection at communal detention facilities, of which Calhoun County Correctional Facility is one. By example, although the serious outbreak at the Cook County Jail—now recognized as the single greatest source of COVID-19 infections in the United States, *see* Timothy Williams & Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, NY Times (Apr. 8, 2020), nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html— does not directly increase the risk to Petitioner, it shows how a pandemic can sweep into communal detention environments despite precautionary measures being taken prior to any confirmed cases. *See Sheriff Dart Expands Precautionary Measures for COVID-19 at Cook County Department of Corrections*, Cook County Sheriff's Office (Mar. 12, 2020),

14

https://www.cookcountysheriff.org/sheriff-dart-expands-precautionary-measures-for-covid-19-at-cook-county-department-of-corrections (noting significant precautionary measures similar to those at Calhoun County Correctional Facility); *Update on Efforts to Reduce Population at Cook County Jail and Ongoing Precautions to Prevent COVID-19*, Cook County Sheriff's Office (Mar. 18, 2020), https://www.cookcountysheriff.org/update-on-efforts-to-reduce-population-at-cook-county-jail-and-ongoing-precautions-to-prevent-covid-19 (noting expansion of precautionary measures). Despite precautionary measures, cases of COVID-19 among inmates in the Cook County Jail exploded from two to 167 in eight days. (ECF No. 29, PageID.635.) On a nationwide level, the curve of COVID-19 infections among Federal Bureau of Prison inmates shows no sign of flattening, again despite significant precautionary measures. *See* Walter Pavlo, *Federal Bureau of Prisons Institutions Not Showing Any Signs of "Flattening Curve,"* Forbes (Apr. 15, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/15/federal-bureau-of-prisons-institutions-not-showing-any-signs-of-flattening-curve/#46f2999f54dd. ICE facilities in Michigan have also seen a rise of

15

COVID-19 cases. As Petitioner notes, "on March 31, 2020, when this case was filed, there were no cases of COVID-19 in Michigan ICE detentions, but within a matter of 2 weeks, there are 3 cases confirmed of detainees in Michigan that have contracted COVID-19 in ICE custody." (ECF No. 32, PageID.695.)

> The Court's finding regarding risk of infection is worth repeating:
>
> [I]n the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors, a 'generalized risk' is a 'substantial risk' of catching the COVID-19 virus for any group of human beings in highly confined conditions, such as Petitioner within the CCCF facility.

(ECF No. 23, PageID.559.)

The Court can only conclude that Respondent, in continuing to challenge Petitioner's release, is ignoring the risks of the COVID-19 pandemic—the asymptomatic nature of its spread, the exponential character of its growth, and the deadliness of its impact—to Calhoun County Correctional Facility's most vulnerable inmates, thereby jeopardizing the health and lives of those in her custody. The Court finds that Petitioner, were she to be returned to the Calhoun County Correctional Facility, would be at an unreasonable and substantial risk

of COVID-19 infection; Petitioner therefore has demonstrated a high likelihood of irreparable injury.

## 2. Respondent's Deliberate Indifference

Respondent hinges her deliberate indifference argument on the fact that ICE has taken some precautions consistent with CDC guidance to reduce the risk of infection at the Calhoun County Correctional Facility:

- Because the precautions taken at CCDC are reasonable under the circumstances, Malam cannot establish a constitutional violation. (ECF No. 30, PageID.654.)

- While the measures taken at CCDC may not eliminate all potential for exposure to COVID-19, they significantly reduce the potential, and are, therefore, reasonable, and preclude a finding of deliberate indifference. (ECF No. 30, PageID.654.)

Respondent cites to the Supreme Court in *Farmer v. Brennan*, which held that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." (ECF No. 30, PageID.653 (citing 511 U.S. 825, 844 (1994)).) But the public health evidence above mandates the Court's earlier conclusion: "the only reasonable response by Respondent[] is the release of Petitioner; any

other response demonstrates a disregard of the specific, severe, and life-threatening risk to Petitioner from COVID-19."

Respondent points to two cases in which a Circuit court found no deliberate indifference where detention facilities took precautions to reduce the risk of infection; this precedent does not shield Respondent here.

In *Wooler v. Hickman County¸* the Sixth Circuit found that a county jail, sheriff, nurse, and physician were not deliberately indifferent, based on the information available to each, to a prisoner's risk of amethicillin-resistant staphylococcus aureus (MRSA) infection from an infected cellmate. 377 F. App'x 502 (6th Cir. 2010). The court found that absent knowledge of a specific infection, general knowledge of the possibility of MSRA among inmates was too generalized to show knowledge of a substantial risk to the plaintiff. *Id.* at 505. Additionally, the court found that the jail nurse took reasonable precautions in response to an MRSA infection in the jail: "[S]he cleaned every cell, quarantined the infected inmates, and distributed information about MRSA. No reasonable jury could conclude that those actions constituted deliberate indifference." *Id.* at 506. In response to the plaintiff's argument that the nurse should have

18

done more, the court noted that the plaintiff did not provide "any evidence

showing that Nurse Tarver did, in fact, have other options." *Id*.

*Wooler* is distinguishable from the current case. As this case and

related litigation in the Eastern District of Michigan and across the

country demonstrates, Respondent is fully aware of the scope and

magnitude of the COVID-19 pandemic. The risk that COVID-19 will

make its way into the Calhoun County Correctional Facility is far from

hypothetical. **As of April 17, 2020, 105 ICE detainees and twenty-five**

**detention center employees have tested positive for COVID-19.** *ICE*

*Guidance on COVID-19*, U.S. Immigration and Customs Enforcement

(Apr. 16, 2020), https://www.ice.gov/coronavirus (last updated Apr. 17,

2020). The public health evidence before the Court shows that, even given

current precautionary measures, the risk is substantial and

unreasonable. Additionally, Respondent, unlike the nurse in *Wooler*, has

additional precautionary measures at her disposal: the release of

Petitioner. ICE has released other detainees due to the risks of COVID-

19. In this case, Respondent released Plaintiff-Intervenor Ruby Briselda

Salguero-Escobar subject to an Order of Supervision on April 6, 2020.

(ECF No. 26-1, PageID.595.) Nationwide, ICE has released more than

160 detainees. *See* Matt Katz, *ICE Quietly Releases Hundreds of Local Immigrants as COVID-19 Tears Through Jails*, Gothamist (Apr. 14, 2020), https://gothamist.com/news/ice-quietly-releases-hundreds-local-immigrants-covid-19.

Respondent also points to *Butler v. Fletcher*, in which the Eighth Circuit found that a county jail sheriff was not deliberately indifferent to the risk of a tuberculosis infection where the county adopted "policies [that] specifically acknowledged the risk and promulgated detailed procedures for the diagnosis, segregation, and treatment of . . . inmates infected with active cases of TB." 465 F.3d 340, 345 (8th Cir. 2006). *Butler* is distinguishable—and *Wooler* further distinguishable—because of the scope of the situation today. COVID-19 is neither MRSA nor tuberculosis. *Wooler* and *Butler* suggest precautions can reasonably mitigate the risk of tuberculosis or MRSA in conditions of communal confinement. COVID-19 is a global pandemic of unparalleled scope, and the public health evidence available to the Court suggests that communal confinement cannot ensure detainees reasonable safety from infection.

Accordingly, any response short of authorizing release from the Calhoun County Correctional Facility for this Petitioner, whose

underlying health conditions expose her to a high risk of an adverse outcome if infected by COVID-19, demonstrates deliberate indifference to a substantial risk. Respondent pleads that "[t]he Court seeks to hold CCDC to a standard that is more than the [C]onstitution requires." (ECF No. 30, PageID.654.) To the contrary, Petitioner is likely to succeed on the merits of her Fifth Amendment deliberate indifference claim. The Constitution requires Petitioner's continued release.

### 3. Continued Confinement as Punishment

Due to the expedited nature of this case, the Court and the parties have applied two legal standards. The Court has analyzed Petitioner's Fifth Amendment claim "under the same rubric as Eighth Amendment claims brought by prisoners." *Villegas v. Metropolitan Government of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013). Eighth Amendment claims require a showing of deliberate indifference, *see Farmer v. Brennan*, 511 U.S. 825, 835 (1994), which has both an objective and a subjective component. *Villegas v. Metro. Gov't*, 709 F.3d 563, 568 (6th Cir. 2013) (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

Additionally, the Court, in its April 6, 2020 Amended Order, cited to the standard the Supreme Court set forth in *Bell v. Wolfish*: "[U]nder

21

the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt." 441 U.S. 520, 535 (1979). (ECF No. 23, PageID.563.) Petitioner is a civil detainee. Respondent concedes that Petitioner can show she was subjected to unconstitutional punishment "by showing that a restriction or condition is not rationally related to a legitimate government objective or is excessive in relation to that purpose." (ECF No. 30, PageID.658 (citing *J.H. v. Williamson Cty.,* 951 F.3d 709, 717 (6th Cir. 2020).)

The Eighth Circuit in *Butler* found that the deliberate indifference test, not the freedom from punishment test, applied to a plaintiff's claim challenging the adequacy of precautionary measures to reduce the risk of infection: "The governmental duty to protect at issue in this case is not based on a pretrial detainee's right to be free from punishment but is grounded in principles of safety and general well-being." 465 F.3d at 344. The court cited to the Supreme Court in *DeShaney v. Winnebago County Dept. of Soc. Serv.,* which held:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits

> on state action set by the Eighth Amendment and the Due Process Clause.

489 U.S. 189, 200.

The deliberate indifference standard applies in this case. Petitioner has satisfied her burden under that test. Accordingly, the Court need not determine whether the freedom from punishment standard also applies, and if it does, whether and to what extent it differs from the deliberate indifference standard.

Regarding Respondent's third argument, the Court will only note that Respondent's assertion regarding Petitioner's criminal history is irrelevant. Respondent states, "not only does Malam's criminal history and present behavior suggest detention is not excessive, it also suggests she is unlikely to comply with a shelter in place order or maintain social distancing even if released." (ECF No. 30, PageID.660.) Petitioner was released on April 6, 2020; Respondent has provided no evidence that Petitioner has failed to comply with the terms of her release or the requirements of Michigan's executive orders since her release. Respondent's argument is conclusory and does not relate to Petitioner's claim regarding the risks posed by her continued detention.

The Court finds that Petitioner continues to show that she would face a high likelihood of irreparable harm absent a preliminary injunction, a significant likelihood of success on the merits, and that the balance of equities and public interest favor her release.[2] The Court will convert its temporary restraining order into a preliminary injunction.

## IV.  Conclusion

As of April 17, 2020, 105 ICE detainees and twenty-five detention center employees have tested positive for COVID-19. *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (last updated Apr. 17, 2020). Sadly, and regrettably, over the coming weeks and months some ICE detainees will die of COVID-19. Equally sadly and regrettably, some detention center employees will die as well. Given the nature of this pandemic, those results are inevitable.

The Court deeply hopes that time will prove the Government right: that the TRO and permanent injunction were stronger protections than

---

[2] Respondent does not address the balance of equities or public interest in her response brief. The Court finds that the analysis from its April 6, 2020 Amended Opinion and Order applies and that these two factors favor granting injunctive relief. (ECF No. 23, PageID.571–574.)

necessary for a fifty-six-year-old woman with fourteen underlying health conditions in the face of a deadly pandemic. But before the Court now is a record which shows 1) Petitioner is at unreasonable risk of contracting COVID-19 should she remain in the Calhoun County Correctional Facility, regardless of precautions taken, and 2) Petitioner is at serious risk of severe illness and death should she contract COVID-19. To order Petitioner's continued civil detention would be to play Russian roulette with her rights and with her life. A preliminary injunction requiring Petitioner's continued release is both appropriate and necessary. Accordingly,

The Court **GRANTS** a preliminary injunction mandating Petitioner Malam's continued release.

Petitioner remains subject to the following restrictions: she is subject to a total of fourteen days of home quarantine; she must comply with all Michigan Executive Orders; and she must appear at all hearings pertaining to her immigration proceedings. Respondent may impose other reasonable nonconfinement terms of supervision.

Respondent is further **RESTRAINED** from arresting Petitioner for civil immigration detention purposes until the State of Emergency in

Michigan (related to COVID-19) is lifted or until further Court Order stating otherwise.

IT IS SO ORDERED.

Dated: April 17, 2020                    s/Judith E. Levy
Ann Arbor, Michigan                      JUDITH E. LEVY
                                         United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 17, 2020.

                                         s/William Barkholz
                                         WILLIAM BARKHOLZ
                                         Case Manager

26