UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

JANET MALAM,

Petitioner,

and

RUBY BRISELDA ESCOBAR and AMER
TOMA,

Plaintiff-Intervenors,

- against -

REBECCA ADDUCCI, in her official capacity as
Detroit District Director of U.S. Immigration &
Customs Enforcement; MATTHEW T.
ALBENCE, in his official capacity as Deputy
Director and Senior Official Performing the Duties
of the Director of the U.S. Immigration &
Customs Enforcement; CHAD WOLF, in his
official capacity as Acting Secretary, U.S.
Department of Homeland Security; WILLIAM P.
BARR, in his official capacity as Attorney
General, U.S. Department of Justice; U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT; HEIDI E. WASHINGTON, in
her capacity of Director of Michigan Department
of Corrections Calhoun Correctional Center,

Respondents.

No. 2:20-cv-10829-JEL-APP

## DECLARATION OF DORA SCHRIRO

I, Dora Schriro, declare as follows:

**Background and Qualifications**

1.     I am a career public servant who has served as an executive-level administrator, policy maker, and homeland security advisor. I was appointed to lead a number of city and state agencies and a federal office.

2.     I was the Commissioner of the Connecticut Department of Emergency Services and Public Protection encompassing six state agencies including the Connecticut State Police and Homeland Security and Emergency Management, from 2014 through 2018. I served concurrently as Connecticut's Homeland Security Advisor from 2016 through 2018. My Department of Homeland Security (DHS) security clearance was Top Secret. During my tenure as Director, we grappled with Ebola and through our Division of Emergency Management and Homeland Security, developed a protocol specifically for first responders – including the Connecticut State Police, all the state's local Police Departments, career and volunteer fire fighters and other first responders, all of whom we served through the Department's six divisions including the Connecticut State Police, Police Officer Standards and Training (POST), the Connecticut Fire Academy, Emergency Management and Homeland Security, Scientific Services (the state's crime lab), and Statewide Telecommunications. Additionally, as the state's Homeland Security Advisor, I interfaced with many of the DHS offices and agencies on an ongoing basis including the Federal Emergency Management Agency with which we had an active and ongoing partnership.

3.     I was Senior Advisor to DHS Secretary Janet Napolitano on U.S. Immigration and Customs Enforcement (ICE) Detention and Removal, and the founding Director of the ICE Office of Detention Policy and Planning in 2009. During my tenure, I authored the report Immigration Detention Overview and Recommendations, DHS' template for immigration detention reform. My report included a number of recommendations specific to risk assessments, the continuum of control, pre-release planning, alternatives to detention, and healthcare. Specific to healthcare, I found the assessment, treatment, and management of pandemic and contagious diseases was inconsistent across Division of Immigration Health Services (DIHS)-staffed and non-dedicated Intergovernmental Service Agreement (IGSA) facilities and recommended improvements should be made to ensure that all facilities are capable of managing large-scale outbreaks. Unfortunately, these

findings have recency today.[1] At the invitation of DHS Secretary Jeh Johnson, I also served in 2015 and 2016 as a member of the DHS Advisory Committee on Family Residential Facilities and co-authored its report.

4.      I was the Commissioner of two city jail systems: the St. Louis City Division of Corrections, which included the St. Louis Police Department Prison Intake Facility, from 2001 to 2003; and the New York City (NYC) Department of Correction from 2009 to 2014. I was also the Warden of the Medium Security Institution, a jail in St. Louis City, Missouri, from 1989 to 1993. During my tenure as Warden, I routinely released pretrial inmates, conditioned upon daily check-in and random drug testing, to comply with a court-ordered facility population cap. During my tenure as Commissioner of the NYC Department of Correction, I opened NYC's first centralized reception and diagnostic facility in which comprehensive risk assessment, custody classification, and gang identification were completed, and discharge planning was initiated. I also created pre-trial and post-plea diversion opportunities for the mentally ill and seriously mentally ill jail population and special housing for the young adult population. During an earlier appointment to the NYC Department of Correction as Assistant Commissioner for Programs Services from 1985 to 1989, I also oversaw the city's work release program for pre-trial and city-sentenced inmates.

5.      I was the Director of two state correctional systems: the Missouri Department of Corrections, which encompasses state prisons, probation, and parole, from 1993 to 2001; and the Arizona Department of Corrections, which encompasses state prisons and parole, from 2003 to 2009. During my tenure as Director of the Arizona Department of Corrections, the department was the first correctional system to be selected Winner of the Innovations in American Government awards program, for a prison-based reform we named Parallel Universe—pre-release preparation in which all inmates participated from the first to the last day of their incarceration guided by norms and values closely mirroring those of the community. As Director of the Missouri Department of Corrections, I also served on the state's Sentencing Commission.

6.      I was a member of the adjunct faculties of University of Missouri-St. Louis Department of Criminology from 1990 to 1998, St. Louis University School of Law from 2000 to 2002, and Arizona State University Sandra Day O'Connor

---

[1] DORA SCHRIRO, IMMIGRATION DETENTION OVERVIEW AND RECOMMENDATIONS (2009), *available at* https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.

School of Law from 2005 to 2008, during which time I taught graduate-level Criminology and Correctional Law courses and led Sentencing Seminars.

7.      I have served continuously on the Women's Refugee Commission since 2012, and the American Bar Association (ABA) Commission on Immigration since 2014.

8.      I am knowledgeable about both the American Correction Association and ICE Performance-Based and National Detention Standards, including Medical Care, Disability Identification, Assessment and Accommodations, and Classification Systems, which is premised on objective, evidence-based risk assessments and the least restrictive housing and community-based assignments consistent with those assessments. I have also participated in the development of ABA professional standards for both correctional systems and ICE detention facilities. I am familiar with the California Board of State and Community Corrections Title 15 Minimum Standards for Local Detention Facilities. I am also familiar with bond procedures in state, federal, and immigration courts.

9.      I am knowledgeable about the operation of civil detention and criminal pre-trial and sentenced correctional facilities, and the individuals in the custody of both systems.

10.      I have served as a Corrections expert to the California Department of Justice, Disability Rights California, and the Hampton County, Massachusetts Sheriff's Department. I am currently engaged by the California Department of Justice, the American Civil Liberties Union, the Southern Poverty Justice Center, and the St. Louis University School of Law Legal Clinics.

11.      A complete and correct Resume, which includes a list of my publications from the last ten years, is attached as Appendix A.

12.      In the previous four years, I have testified as an expert at trial or by deposition in the following case: *Endicott v. Hurley*, No. 2:14-cv-107 DDN (E.D. Mo.).

**Expert Assignment**

13.      Plaintiffs' counsel has asked me, based on my expertise in the operation of civil and criminal detention systems, including those used to house ICE detainees, to address whether conditions in immigration detention place detainees at risk of contracting COVID-19 and whether alternatives to detention

can be used to release medically vulnerable and low-risk individuals from immigration detention while maintaining public safety and ensuring compliance with court orders.

**Findings and Conclusions**

14.     According to the World Health Organization, COVID-19 has reached pandemic status.[2] There is no vaccine to prevent transmission, and there is no cure for COVID-19.[3] The likelihood of its recurrence is great.[4] The World Health Organization, the Centers for Disease Control and Prevention, and other public health experts recommend the use of social distancing and other preventive strategies to control the virus.[5] The Vera Institute of Justice and Community-Oriented Correctional Health Services further recommend that authorities in correctional and immigration detention settings "[u]se their authority to release as many people from their custody as possible."[6]

---

[2] European Regional Office, *WHO Announces COVID-19 Outbreak a Pandemic*, WHO (Mar. 12, 2020), http://www.euro.who.int/en/health-topics/health-emergencies/coronavirus-covid-19/news/news/2020/3/who-announces-covid-19-outbreak-a-pandemic.

[3] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last updated Mar. 21, 2020).

[4] Ed Yong, *How the Pandemic Will End*, ATLANTIC (Mar. 25, 2020), https://www.theatlantic.com/health/archive/2020/03/how-will-coronavirus-end/608719/.

[5] *Coronavirus Disease Advice for the Public*, WHO, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public (last updated Mar. 18, 2020); *How to Protect Yourself*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (last updated Mar. 18, 2020); Saralyn Cruickshank, *Now Is not the Time to Ease Social Distancing Measures, Experts Say*, HUB JOHNS HOPKINS U. (Mar. 24, 2020), https://hub.jhu.edu/2020/03/24/no-time-to-ease-social-distancing/.

[6] COMMUNITY-ORIENTED CORRECTIONAL HEALTH SERVICES & VERA INSTITUTE OF JUSTICE, GUIDANCE FOR PREVENTIVE AND RESPONSIVE MEASURES TO CORONAVIRUS FOR JAILS, PRISONS, IMMIGRATION DETENTION AND YOUTH FACILITIES 2 (Mar. 18, 2020), *available at* https://cochs.org/files/covid-19/covid-19-jails-prison-immigration.pdf.

15.     I have reviewed the relevant guidance released by ICE and the CDC: The ICE Health Service Corps (IHSC) Interim Guidance, issued on March 6, 2020;[7] the updated ICE statement on changes to enforcement operations, issued on March 18, 2018;[8] the ICE memorandum on COVID-19, issued on March 27, 2020;[9] the ICE guidance on release of medically vulnerable individuals, issued on April 4, 2020;[10] the ICE Enforcement and Removal Operations COVID-19 Pandemic Response Requirements issued on April 10, 2020 ("ERO COVID-19 PRR");[11] and the CDC guidance on managing coronavirus disease 2019 in correctional and detention facilities, issued March 23, 2020.[12]

16.     It is my opinion, based on years of my experience as Warden and then Commissioner of four correctional systems and Director of the ICE Office of Detention Policy and Planning, and my continuing oversight and assessments of correctional and immigration detention facilities in the capacity as an Expert, that the plans that ICE has put forth are insufficient to protect the detained population, detention staff, and the public at-large. ICE, a federal agency, requires a robust

---

[7] ICE HEALTH SERVICE CORPS, INTERIM REFERENCE SHEET ON 2019-NOVEL CORONAVIRUS (COVID-19) (Mar. 6, 2020) [hereinafter IHSC Interim Reference Sheet].

[8] *Updated ICE Statement on COVID-19*, ICE NEWS RELEASES (Mar. 18, 2020), https://www.ice.gov/news/releases/updated-ice-statement-covid-19 [hereinafter March 18 ICE Statement].

[9] *See* ICE Enforcement and Removal Operations, *Memorandum on Coronavirus Disease 2019 (COVID-19) Action Plan, Revision 1*, ICE (Mar. 27, 2020), https://www.ice.gov/doclib/coronavirus/attF.pdf [hereinafter March 27 ICE Memorandum].

[10] Email from Peter B. Berg, Assistant Dir. of Field Operations, ICE, to Field Office Dirs. and Deputy Field Office Dirs., ICE (Apr. 4, 2020, 5:17 PM) (detailing ICE's protocols for the release of medically vulnerable detainees) [hereinafter ICE Release Guidance].

[11] IMMIGRATION AND CUSTOMS ENFORCEMENT, ENFORCEMENT AND REMOVAL OPERATIONS, COVID-19 PANDEMIC RESPONSE REQUIREMENTS 11 (Apr. 10, 2020) [hereinafter ERO COVID-19 PRR].

[12] Centers for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html [hereinafter CDC, *Interim Guidance*].

national response to COVID-19, a plan that encompasses all detention facilities, is supported by a unified system of health care, one that meets all CDC requirements, and contemplates a continuum of control that includes alternatives to detention.

17.    Jails, prisons, and immigration detention facilities are known notorious amplifiers of infectious disease.[13] A large number of state and local correctional systems recognizing the harm they can cause by failing to act timely and effectively, have taken affirmative actions to reduce the size of their systems to curb the spread of the coronavirus disease and are realizing positive results. ICE, which operates the largest system of incapacitation in the country, has lagged in its efforts to lower its census and to address conditions of detention for those detainees who remain in its custody.

18.    These are the primary measures ICE has taken to date, and their outcomes.

19.    The IHSC issued Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19), Version 6.0, March 6, 2020, informing its health care staff that revised CDC guidance expanded testing to a wider group of symptomatic patients. However, it directed that providers should use their judgement to determine if a patient has signs and symptoms compatible with COVID-19 and whether the patient should be tested. They were strongly encouraged to test for other causes of respiratory illness including infection such as influenza.[14] The memorandum appeared to achieve its intended effect. In the same period of time that the Bureau of Prisons was testing extensively and reported 337 confirmed cases of COVID-19 and eight deaths,[15] the NYC Department of Correction, confirmed 287 cases,[16] and Cook County jails, over 350.[17] ICE has reported on April 18th that 124 detainees

---

[13] Kelsey Kauffman, *Why Jails Are Key to "Flattening the Curve" of Coronavirus*, APPEAL (Mar. 13, 2020), https://theappeal.org/jails-coronavirus-covid-19-pandemic-flattening-curve/.

[14] IHSC Interim Reference Sheet, *supra* note 7.

[15] *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last updated Apr. 17, 2020).

[16] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last updated Apr. 17, 2020, 8:24 AM).

[17] *Report: Cluster of COVID-19 Cases at Cook County Jail the Largest in Nation*, NBC CHI. (Apr. 7, 2020), https://www.nbcchicago.com/news/local/report-cluster-of-covid-19-cases-at-cook-county-jail-the-largest-in-the-nation/2252000/ (accessed Apr. 17, 2020).

have tested positive,[18] climbing from 89 cases reported on April 15th.[19] ICE has refused to provide confirmed cases of vendors and contractors.[20]

20.     The ICE newsroom issued Updated Statement on COVID-19 on March 18, 2018. ICE Enforcement and Removal Operations (ERO) will focus enforcement on public safety risks and individuals subject to mandatory detention based on criminal grounds. ICE notified Congress that it will halt arrests except for those deemed "mission critical" to "maintain public safety and national security."[21,22] In essence, ICE has acknowledged its prosecutorial discretion and committed to exercise it. For those individuals who do not fall into those categories, ERO will exercise discretion to delay enforcement actions until after the crisis or utilize alternative to detention, as appropriate. Public safety risks casts a wide net and individuals subject to mandatory detention based on criminal grounds includes persons charged but not convicted, and persons who could have been charged.[23]

21.     ERO issued a subsequent memorandum, COVID-19 Detained Docket Review, to Field Office Directors and Deputy Directors, on April 4, 2020, providing additional guidance on the release of medically vulnerable individuals pursuant to the March 18 announcement. The field was informed the categories of cases had been expanded and that the presence of a medical risk factor should be considered a "significant discretionary factor weighing in favor of release."

---

[18] *ICE Guidance on COVID-19: Confirmed Cases*, ICE, https://www.ice.gov/coronavirus (last updated Apr. 17, 2020, 12:04 PM).

[19] Nina Shapiro, *ICE Releases Some Detainees from Tacoma Center, but Advocates Say Coronavirus Outbreak Is Inevitable*, SEATTLE TIMES (Apr. 16, 2020, 1:07 PM), https://www.seattletimes.com/seattle-news/immigrant-advocates-say-outbreak-at-northwest-detention-is-a-matter-of-time/.

[20] Monique O. Madan, *ICE Refuses to Say if its Contractors Have COVID-19. A Federal Judge Just Ordered it to.*, MIAMI HERALD (Apr. 15, 2020), https://www.miamiherald.com/news/local/immigration/article242022731.html.

[21] Maria Sacchetti &Arelis R. Hernández, *ICE to Stop Most Immigration Enforcement Inside U.S., Will Focus on Criminals During Coronavirus Outbreak*, WASH. POST (Mar. 18, 2020), https://www.washingtonpost.com/national/ice-halting-most-immigration-enforcement/2020/03/18/d0516228-696c-11ea-abef-020f086a3fab_story.html.

[22] Ian Kullgren, *ICE to Scale Back Arrests During Coronavirus Pandemic*, POLITICO (Mar. 18, 2020), https://www.politico.com/news/2020/03/18/ice-to-scale-back-arrests-during-coronavirus-pandemic-136800.

[23] March 18 ICE Statement, *supra* note 8.

However, the guidance provides that risk factors may not always be determinative and detainees subject to mandatory detention shall not be released. On April 17, ICE's posture hardened. Acting Director Albence, acknowledging that only 400 detainees have been tested – of whom over 100 have tested positive for the coronavirus disease – asserted that continued detention during the pandemic is a necessary deterrent to avert a "rush at the borders."[24] Detention for the express purpose of deterrence for any reason is impermissible; to knowingly fail to protect at-risk individuals from contracting a deadly disease is unconscionable.

22.    Based on my experience at DHS, ICE exercises discretion to release or decline to detain medically vulnerable individuals, even when those individuals are, per statute, mandatorily detained. Regardless of statute, ICE has the capacity to, and in fact does, release medically vulnerable individuals when necessary for public health. The recent memoranda released on March 18 and April 4 to field office directors and deputy field office directors regarding mandatory detention requirements are unnecessarily restrictive.[25]

23.    ERO issued Memorandum on Coronavirus Disease 2019 (COVID-19), Action Plan, Revision 1, on March 27, 2020. The revision was applicable only to ICE's 42 IHSC-staffed and non-IHSC staffed, ICE-dedicated facilities.[26] With regards to the remaining 192 locations, all non-dedicated facilities, ICE deferred to local, state, tribal, territorial and federal public health authorities but recommended that actions contained in this memo be considered best practices.[27]  The impact of differentiating expectations is significant. The conditions of detention for a detainee in a national system of incapacitation varies not by his or her assessed

---

[24] U.S. House of Representatives, House Committee on Oversight and Reform, *DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus*, OVERSIGHT.HOUSE.GOV (Apr. 17, 2020), https://oversight.house.gov/news/press-releases/dhs-officials-refuse-to-release-asylum-seekers-and-other-non-violent-detainees [hereinafter *DHS Officials Refuse to Release Asylum Seekers*].

[25] ICE Release Guidance, *supra* note 10.

[26] A dedicated facility is an immigration detention center that houses only ICE detainees. A non-dedicated facility hosts more than one confined population.  ICE utilizes 234 facilities to detain persons in its custody of which 42 are dedicated and 192 are non-dedicated. IHSC staffs 21 of the 42 dedicated detention facilities.

[27] March 27 ICE Memorandum, *supra* note 9.

needs or risk but by location, treating similarly situated detainees differently. Additionally, this Plan references the CDC Interim Guidance[28] but does not require its adoption by either the dedicated or non-dedicated facilities.

24.     ERO issued COVID-19 Pandemic Response Requirements, Version 1.0, on April 10, 2020. The Pandemic Response Requirements (PPR) reaffirmed ICE's different performance expectations for dedicated and non-dedicated facilities but it also directed all detention facilities to comply with the CDC's guidance some of which is contrary to or omitted in the instructions issued by ICE. These inconsistencies are significant and impede compliance. ICE headquarters failed to produce one complete and accurate set of instructions. It is unrealistic to expect that the field has the time or expertise to recognize and reconcile the many substantive differences.

   a.   *Intake screening*. The CDC requires a screening at intake for signs and symptoms, whereas ICE directs a verbal screening, basically, several questions concerning recent travel and contact. ICE makes no mention of taking the detainee's temperature although it directed that the facilities take that of their staff at the beginning of each shift. The CDC also believes screening should be ongoing whereas ICE expects it would occur at intake only. With an average length of stay of 56 days this year to date, ICE overlooked the majority of the population.

   b.   *Monitoring and management, suspected exposures*. ICE directs monitoring occur in a single cell "depending on the space available" and otherwise in a unit with others,[29] which is most frequently the case. It is unclear whether ICE issues masks.

   c.   *Social distancing*. The facilities are densely populated. The housing units usually have 50 to 100 or more beds. The population eats, sleeps, and recreates in large groups. Detainees are shackled to one another during transports and sit or stand shoulder to shoulder on benches in Intake and the medical unit, and the pill line.  ERO's PRR acknowledges that "strict social distancing may not be possible in

---

[28] CDC, *Interim Guidance*, *supra* note 12.
[29] ERO COVID-19 PRR, *supra* note 11, at 15.

congregate settings such as detention facilities," and requires facilities to implement suggested measures to enhance social distancing only "to the extent practicable."[30]

d. *Intra- and inter-facility movement*. The CDC addressed limiting transmission between facilities as well as within by restricting transfers unless absolutely necessary. The DOJ Bureau of Prisons limited its inter-facility transfers on March 13;[31] ICE adopted its own restriction on April 14 but with latitude for unspecified security considerations.

e. *Cleaning and sanitation*. CDC guidelines provide clear details about the types of cleaning agents and applications that should be adopted; ICE has none. That is unfortunate. Detainees are responsible for cleaning their own living area and are "employed" by the facility as porters to clean common areas in their housing units and throughout the facility. Most often, they perform these duties without any training and only limited supervision and cleaning supplies and no protective gloves, glasses, and gowns or coveralls. The facilities also rely on detainees to perform most of the food preparation and cooking as well as the laundry and sanitation, but there is no universal health screening protocol to ensure that everyone preparing and serving the meals and laundering the clothes and bedding as well as cleaning the facility are not sick or symptomatic.

f. *Focus and Press*. ICE is an enforcement agency that promulgated requirements to address a pandemic disease that threatens its workforce, all the persons in its custody, and the communities to which they return at the end of their shifts or upon their release from custody. Some requirements are conditioned "as practicable," for example, offering "the seasonal influenza vaccine to all detained

---

[30] *Id.* at 13.
[31] *Federal Bureau of Prisons COVID-19 Action Plan: Agency-Wide Modified Operations*, BOP (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp.

persons . . . throughout the influenza season, where possible."[32] Other recommendations are couched as "make an effort to," notably, to reduce number of persons systemwide who are detained.[33] There is no clear path to compliance; for example, the circumstances under which detainees can expect to be tested for COVID-19 remains unclear. The guidance continues to rely on the quarantine of persons who may have been exposed or evidence symptoms. Also, troubling there is no assurance of quarantine in a single cell; most are quarantined as a group, increasing the likelihood of their exposure. Flattening the curve is an undertaking which ERO, a network of over 200 detention facilities, an average daily population of 33,000 and year-to-date admissions approaching 140,000, must succeed. It is my opinion, the equivocation expressed throughout the PRR and preceding instruction, about most matters but mandatory detention, conveys a lack of urgency when nothing is needed more than to focus and press quickly and comprehensively towards full implementation.

**Conditions in Immigration Detention**

25.     As a matter of law, immigration detention is unlike criminal incarceration. Yet immigration detainees and pre-trial inmates and sentenced prisoners tend to be seen by the public as comparable which is to say, dangerous, and both confined populations are typically managed in similar ways, as if they are dangerous.[34] All three categories of confined people are ordinarily assigned to secure facilities with hardened perimeters in remote locations at considerable distances from counsel and their families as well as a hospital with an emergency room or intensive care beds. With just a few exceptions, the facilities that ICE uses to detain immigrants were originally built, and currently operate, as jails and prisons to confine pre-trial and sentenced prisoners. Their design, construction, staffing plans, and population management strategies are based largely upon the principles of command and control. Additionally, ICE adopted detention standards based on corrections law, which are largely not applicable to immigration detainees and which were promulgated by a correctional organization, the

---

[32] ERO COVID-19 PRR, *supra* note 11, at 6, 8.
[33] *Id.* at 13.
[34] Zadvydas v. Davis, 533 U.S. 678, 609 (2001).

American Correctional Association, to guide the operation of correctional facilities.[35]

26.    Based on my years of experience overseeing and managing secure facilities, conditions in immigration detention facilities place people in close contact with one another and allow disease to spread freely. The facilities to which ICE detainees are assigned vary in age and architecture. Most are premised upon restricted movement and management by groups. Quite a few do not have windows that open and ventilation is poor. The housing units consist of single and double cells, cells with as many as four or five bunkbeds, or dormitories of varying size, usually 50 to 100 beds or more in size. Even to the extent that facilities are able to reduce population sizes to 75 percent capacity, as ICE recommends, individuals must still come into frequent contact and are still likely to live and sleep in multi-person dorms or cells.

27.    Detainees spend the majority of time in their housing area. A recreation deck is often adjacent to the housing unit in facilities built in the past 25 years, while older facilities utilize a yard. Detainees access the recreation yard, religious services, the law library, and visitation under officer escort. In the course of a day, they can be staged in multi-person holding tanks and waiting rooms in Intake, the Medical Unit, and other areas, escorted as whole housing units, and transported en masse in buses shackled to one another, and they routinely eat their meals together. None of these circumstances permit detained people to maintain social distancing of at least six feet, as recommended by public health experts. Staggering meal and recreation times, as suggested by ICE and CDC guidance,[36] would be useful in limiting the number of people in each area but doing so would require greater staffing and therefore is not generally feasible. Doing so also would not ensure that people are able to keep six feet apart in cafeterias or recreation rooms in which tables and chairs are bolted down close together and people may have to line up to get trays or equipment or use the restroom.  Extended hours may also impact turnout with fewer detainees rising for breakfast before sunrise or outdoor recreation after dark.

28.    Segregation cells intended for disciplinary and administrative purposes are frequently used to detain special populations whose unique medical,

---

[35]   AM. CORR. ASS'N, PERFORMANCE-BASED STANDARDS FOR ADULT LOCAL DETENTION FACILITIES (4th ed. 2004); AM. CORR. ASS'N, 2016 STANDARDS SUPPLEMENT (2016).
[36] *Id.* at 13; CDC, *Interim Guidance*, *supra* note 12.

mental health, and protective custody requirements cannot be accommodated in general population housing including medical isolation.

29.     It is also important to note that the demeanor of the immigration detention population is distinct from the criminally incarcerated population. Despite the characterization by ICE that the majority are criminal aliens, that term has changed over the past several years to include persons charged but not pled or proven guilty and persons who may have been charged but were not. The majority of the population is eligible for housing in a dormitory, signifying a low propensity for violence.

30.     It is my experience that the majority of detainees are motivated by the desire for repatriation or relief, and exercise exceptional restraint under the most difficult of circumstances in custody as well as the community on their recognizance, bond, or community supervision. While working at ICE and having reviewed hundreds of detainee institutional files since then, only a few detainees file grievances, and fewer are disciplined for an infraction, particularly any serious infraction.

31.     It is also my experience that many detainees are fearful for their health and well-being in the custody of ICE. Under ordinary circumstances, they have difficulty accessing healthcare. They often wait days for appointments for emergent and urgent matters. The formulary is limited, and all off-site specialty services must be pre-approved by IHSC. Once a prescription is ordered, it can take days before it is filled and is often discontinued without notice. Health care consistent with community expectations such as prescription glasses, dental cleanings, and filling cavities is frequently denied.

32.     Sanitation practices at immigration detention facilities generally do little to curb the spread of illness. Issuance of cleaned clothing, sheets, towels, and blankets are regulated, and the quantity of each item in a detainee's possession at any time limited in number. As a rule, the beds, mattresses, and personal property containers are not sanitized between detainees' assignments. Detainees are responsible for cleaning their own living areas. They are also employed by the facility as porters to clean common areas including their dayrooms and restrooms, facility corridors, the medical unit, recreation areas, kitchen, and mess hall. In either instance, they usually perform these duties without any training, and are

provided only limited supervision, cleaning materials and supplies, and no protective gloves, glasses, and gowns or coveralls as recommended by the CDC.[37]

33.    Objects with which many detainees come in contact frequently—notably, the phones, tables and chairs, paperback books, decks of cards and board games, the boxes in which they deposit kites to staff members, and other high-touch surfaces in the housing units—are not sanitized or replaced routinely. Similarly, the equipment issued in recreation areas, the kiosks and other furnishing and equipment in the law library, and the various staging and holding areas in Intake and Medical Unit, as well as the courtrooms and attorney and regular visit areas, receive limited attention.

34.    Under ordinary circumstances, little to no instruction regarding sanitation is provided to the population at large or to detainees with work assignments. Instruction when given on any subject is most often in English and sometimes Spanish, and far less frequently in any other of detainees' native languages.

35.    In general, tissues are not provided, handkerchiefs are unauthorized articles of clothing, and access to toilet paper and paper towel is limited, leaving detainees with nowhere to sneeze, cough, or wipe their noses other than into their own clothes, sheets, blankets, or towels, none of which is replaced daily. Additionally, detainees' access to hand soap, toothpaste and toothbrushes, and shampoo is limited, particularly for the indigent who are dependent upon the facility for their replenishment. A minority of detainees have an institutional job and most of them earn a dollar a day. Most of the items sold including hygiene products, are marked up. A bar of soap can cost as much as two dollars.

36.    Also of concern, ICE facilities often rely on detainees to perform most of the cooking and cleaning in the facility, but neither ICE nor the ICE Health Service Corps (IHSC) has a universal health screening protocol to ensure that all the persons preparing and serving meals and cleaning the area are not sick or symptomatic. Some facilities also utilize detainees to distribute meal trays that are delivered to the housing units. In these locations, disposable plastic gloves are sometimes available but not hairnets or masks. It does not appear that practices employed in the kitchen and mess hall carry over to meal service in the dayrooms.

---

[37] CDC, *Interim Guidance, supra* note 12.

37.     It is also my experience that the population is especially alarmed about the spread of the coronavirus to and through the facilities to which they are confined. Hotlines are fielding calls from detainees who have underlying health conditions including diabetes, cancer, kidney issues, asthma, or are otherwise medically vulnerable especially the elderly, mentally ill and transgender persons. One recent caller, who has asthma and reported a fever and serious cough, told the ABA hotline that the facility tested him for tuberculosis but not for COVID-19 and released him back to his pod. Many have expressed concern about their inability to stay physically distant from one another, the lack of precautions being taken by their facilities, the frequency with which detainees are being transferred in from other facilities, the lack of personal protection equipment (PPE) for them and facility staff, and that as the census drops the facility is closing housing units not, spreading out the remaining detainees to every other bed or more. The hotline has also received reports that detainees are being told to clean their housing units, but they are not being given cleaning solutions or are permitted to clean more frequently than once a day and that they have not been issued hand soap or hand sanitizer.

38.     There are other disparities that are imbedded in ICE's site and facility selection process including whether there is a hospital nearby the detention facility and if it has any intensive care beds.  Presently, about a third of all detainees are housed in a facility outside a 25- mile radius of hospital with an ICU bed.[38]

39.     It is my opinion that the detainees' concerns are real, and their reports are credible. Any one of these circumstances, make it more likely that respiratory diseases such as COVID-19 will spread quickly once they are introduced into any of ICE's detention facilities.

40.     It is also my opinion that ERO's Pandemic Response Requirements, its plan to protect the population and the public, will not suffice. Basically, ICE proposes "[e]fforts should be made to reduce the detained population to approximately 75% of capacity" and for all those who remain detained, "[w]henever possible, all staff and detainees should maintain a distance of six feet from one another" and otherwise adhere to CDC guidelines, where practicable.[39]

---

[38] Kristina Cooke, Mica Rosenberg & Ryan McNeil, *As Pandemic Rages, US Immigrants Detained in Areas with Few Hospitals*, REUTERS (Apr. 3, 2020), https://www.reuters.com/article/us-health-coronavirus-usa-detention-insi/as-pandemic-rages-u-s-immigrants-detained-in-areas-with-few-hospitals-idUSKBN21L1E4.
[39] ERO COVID-19 PRR, *supra* note 11, at 13-14.

41.    It is now clear that ICE is unwilling  to identify infected individuals and refused to release to release asylum seekers and other non-violent detainees despite the spread of coronavirus through its detention facilities.[40]  In stark contrast,  best correctional and correctional health care practice  requires, at a minimum, the preemptive release of individuals who are at-risk of serious illness or death if they become infected with COVID-19. As Dr. Scott Allen and Dr. Josiah Rich, medical experts to the Department of Homeland Security, recommended in their recent letter to Congress on the pandemic, "[m]inimally, DHS should consider releasing all detainees in high risk medical groups such as older people and those with chronic diseases." Dr. Allen and Dr. Rich concluded that "acting immediately will save lives not of only those detained, but also detention staff and their families, and the community-at-large."[41]

**Alternatives to Detention**

42.    Initally, ICE proposed only one population, persons medically vulnerable primarily due to age or other infirmity and not subject to mandatory detention, for consideration for release. Now, ICE will no longer consider any detainees for release whether to protect those who are medically vulnerable or to lower the census to prevent the spread of the coronavirus through the facilities and into the community. This posture can have a devasting effect nationwide. To protect medically vulnerable persons who are detained today, and to reduce the likelihood of infecting others in the weeks and months to come, ICE should reduce the census as quickly as possible and then, sustain it. The most effective way in which to accomplish this is by enlarging not shrinking the pool, which in this instance should include those who are medically vulnerable as well and other, low-risk individuals who would be successful on community supervision.

43.    Based on my experience operating state and local correctional systems that included probation and parole departments and working in various capacities within DHS including to make an assessment of ICE's alternative to detention program, it is my opinion that alternatives to detention can be used effectively and safely to ensure that immigrant detainees are not subjected to unnecessary risk

---

[40] *DHS Officials Refuse to Release Asylum Seekers*, *supra* note 24.
[41] *See* Letter from Scott A. Allen, MD, FACP, Professor Emeritus, Univ. of Cal. Riverside Sch. of Med., & Josiah Rich, MD, MPH, Professor, Brown Univ, to House and Senate Comms. on Homeland Sec. (Mar. 19, 2020), https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-Congress.pdf [hereinafter Allen & Rich].

from COVID-19 while ensuring public safety and appearance for court hearings and other appointments.

44.     The research literature and government oversight agencies concur. Alternatives to detention, including supervised release, informed by individualized risk assessment, are a highly effective method of managing immigration cases without either unnecessary pretrial detention or risk to public safety or risk of failure to appear for court hearings. Compliance rates with supervised release are extremely high; for example, a recent Government Accountability Office report found that 99 percent of immigrant participants in ICE's alternative to detention program appeared at scheduled court hearings.[42] ICE also operated a very successful Family Case Management Program until recently.[43] According to the DHS Inspector General report, overall compliance was 99 percent for ICE check-ins and appointments, and 100 percent for attendance in court hearings.[44] Two percent of participants absconded during the process.[45]

45.     Doctors serving as subject matter experts for DHS agree that ICE should release at least medically vulnerable people in light of the current COVID-19 pandemic.[46]

46.     However, small and incremental changes in admissions or releases do not fully protect currently detained people from contracting or spreading COVID-19—and especially those who are at-risk of serious illness or death. Instead, ICE can ensure their safety by making full use of its alternatives to detention program. Alternatives to detention include release on personal recognizance, and release on conditions such as phone call check-ins or, when absolutely necessary, electronic surveillance. These alternatives also include the Intensive Supervision Appearance

---

[42] U.S. GOV'T ACCOUNTABILITY OFF., GAO-15-26, *ALTERNATIVE TO DETENTION; IMPROVED DATA AND COLLECTION AND ANALYSIS NEEDED TO BETTER ASSESS PROGRAM EFFECTIVENESS* 30 (2014).

[43] Frank Bajak, *ICE Shutters Helpful Family Management Program Amid Budget Cuts*, ASSOCIATED PRESS (June 9, 2017), https://www.csmonitor.com/USA/Foreign-Policy/2017/0609/ICE-shutters-helpful-family-management-program-amid-budget-cuts.

[44] DHS OFFICE OF INSPECTOR GEN., U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S AWARD OF THE FAMILY CASE MANAGEMENT PROGRAM CONTRACT (REDACTED) 5 (2017), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-22-Nov17.pdf.

[45] *Id.*

[46] Allen & Rich, *supra* note 41.

Program (ISAP), in which staff maintains contact with participants with reminder calls and letters and coaching towards meeting all the upcoming reporting requirements and follows up within 48 hours after each court appearance. Under ISAP, when a participant, or the government, files an appeal in the person's removal case and while that appeal is pending, monitoring is modified as necessary to include the addition or removal of GPS or Voice-ID technology, and to increase or decrease in-office and home visit frequency. And if reinstated, alternatives to detention could include a program modeled on ICE's Family Case Management Program, offering orientation and education for participants about their legal rights and responsibilities; individualized service plans; assistance with transportation logistics; tracking and monitoring of immigration obligations (to include ICE check-ins, attendance at immigration court hearings); and safe repatriation and reintegration planning for participants who are returning to their home countries.[47]

47.    GPS monitoring when recommended, requires minimal physical contact and does not pose risk to the officer or the detainee taking routine precautions. The contact necessary to place an ankle monitor on an individual is minimal, and necessary precautions to avoid spread of COVID-19 are easily implemented and commonly done.  Moreover, after initial installation there is little need for future physical contact. On-going communication by phone is routine. In my opinion, supervision by means of GPS affords appreciably more social distancing for persons in ICE's custody and ICE personnel than does any interaction between a detainee and detention officer in the confines of detention setting.

48.    Alternatives to detention are effective because they are tailored to an individual depending on their levels of need and risk in the community. Such tailored alternatives maximize medically vulnerable and low-risk people's ability to remain healthy in the community while protecting public safety and the integrity of court proceedings and other legal requirements. When there is a threat to our health and well-being, especially one as serious as COVID-19, we count on the government to protect us from undue harm. The government assumes the same responsibility for those in its custody who lack the autonomy to care for themselves. Today, "flattening the curve" so that the infection rate for COVID-19 stays below the healthcare system capacity is key both to controlling the pandemic in the United States and to preventing undue harm to those of us in custody. As

---

[47] U.S. IMMIGRATIONS AND CUSTOM ENF'T, FACT SHEET: STAKEHOLDER REFERRALS TO THE ICE/ERO FAMILY CASE MANAGEMENT PROGRAM 1 (2016), *available at* https://www.aila.org/infonet/ice-fact-sheet-family-case-management-program.

individuals, our responsibility to ourselves and others is to limit our social interactions and maintain rigorous personal hygiene practices. For government and institutions, "flattening the curve" requires focusing on densely populated places in which its inhabitants cannot isolate themselves. That is why increasingly more governors have closed all but the essential governmental agencies and businesses and are focusing now on jails and prisons, widely recognized by the healthcare community to be "amplifiers of infectious diseases" such as COVID-19.[48] They do so because they recognize the conditions that can keep diseases from spreading— such as social distancing and rigorous sanitation—are nearly impossible to achieve in correctional and immigration detention facilities.

49. Numerous state and local systems have acted to reduce detention in light of COVID-19, both by decreasing pretrial detention and by releasing detained and sentenced individuals. These measures demonstrate that people can be protected from COVID-19 consistent with public safety needs.

50. At the local level, leaders have been swift to act:

- District attorneys in San Francisco, California[49] and Boulder, Colorado[50] have taken steps to release people held pretrial, with limited time left on their sentence, and charged with non-violent offenses.
- Ohio courts in Cuyahoga County[51] and Hamilton County[52] have begun to issue court orders and conduct special hearings to increase the number of

---

[48] *Responses to the COVID-19*, PRISON POL'Y INITIATIVE (Mar. 26, 2020), https://www.prisonpolicy.org/virus/virusresponse.html.

[49] Darwin Bond Graham, *San Francisco Officials Push to Reduce Jail Population to Prevent Coronavirus Outbreak*, APPEAL (Mar. 11, 2020), https://theappeal.org/coronavirus-san-francisco-reduce-jail-population/.

[50] Elise Schmelzer, *Denver, Boulder Law Enforcement Arresting Fewer People to Avoid Introducing Coronavirus to Jails*, DENVER POST (Mar. 16, 2020), https://www.denverpost.com/2020/03/16/colorado-coronavirus-jails-arrests/.

[51] Kevin Freeman, *Cuyahoga County Jail Releasing Some Inmates Early to Help Minimize Potential Coronavirus Outbreak*, FOX 8 (Mar. 14, 2020), https://fox8.com/news/coronavirus/cuyahoga-county-jail-releasing-some-inmates-early-to-help-minimize-potential-coronavirus-outbreak/.

[52] Kevin Grasha, *Order to Authorize Hamilton County Sheriff to Release Low-Risk, Nonviolent Jail Inmates*, CINCINNATI ENQUIRER (Mar. 16, 2020), https://www.cincinnati.com/story/news/crime/crime-and-

people released from local jails. On a single day, judges released 38 people from the Cuyahoga County Jail, and they hope to release at least 200 more people charged with low-level, non-violent crimes.

- The Los Angeles County Sheriff's Department[53] has reduced their jail population by 10% in the past month to mitigate the risk of virus transmission in crowded jails. To reduce the jail population by 1,700 people, the Sheriff reports releasing people with less than 30 days left on their sentences and is considering releasing pregnant people and older adults at high risk.
- In Travis County, Texas,[54] judges have begun to release more people from local jails on personal bonds (about 50% more often than usual), focusing on preventing people with health issues who are charged with non-violent offenses from going into the jail system.
- Court orders in Spokane, Washington[55] and in three counties in Alabama[56] have authorized the release of people being held pretrial and some people serving sentences for "low-level" misdemeanor offenses.

---

courts/2020/03/16/coronavirus-hamilton-county-sheriff-release-low-risk-inmates/5062700002/.

[53] Justin Carissimo, *1,700 Inmates Released from Los Angeles County in Response to Coronavirus Outbreak*, CBS NEWS (Mar. 24, 2020), https://www.cbsnews.com/news/inmates-released-los-angeles-county-coronavirus-response-2020-03-24/.

[54] Ryan Autullo, *Travis County Judges Releasing Inmates to Limit Coronavirus Spread*, STATESMAN (Mar. 16, 2020), https://www.statesman.com/news/20200316/travis-county-judges-releasing-inmates-to-limit-coronavirus-spread?fbclid=IwAR3VKawwn3bwSLSO9jXBxXNRuaWd1DRLsCBFc-ZkPN1INWW8xnzLPvZYNO4.

[55] Chad Sokol, *Dozens Released from Spokane County Custody Following Municipal Court Emergency Order*, SPOKESMAN (Mar. 17, 2020), http://www.courts.wa.gov/content/publicupload/eclips/2020%2003%2018%20Dozens%20released%20from%20Spokane%20County%20custody%20following%20Municipal%20Court%20emergency%20order.pdf.

[56] Marty Roney, *Coronavirus: County Jail Inmates Ordered Released in Autauga, Elmore, Chilton Counties,* MONTGOMERY ADVERTISER (Mar. 18, 2020), https://www.montgomeryadvertiser.com/story/news/crime/2020/03/18/county-jail-inmates-ordered-released-autauga-elmore-chilton-counties/2871087001/.

- In Hillsborough County, Florida,[57] over 160 people were released following authorization via administrative order for people accused of ordinance violations, misdemeanors, traffic offenses, and third-degree felonies.
- In Arizona, the Coconino County[58] court system and jail have released around 50 people who were held in the county jail on non-violent charges.
- In Salt Lake County, Utah,[59] the District Attorney reported that the county jail plans to release at least 90 people this week and to conduct another set of releases of up to 100 more people the following week.
- The New Jersey Chief Justice signed an order calling for the temporary release of 1,000 people from jails (almost a tenth of the entire state's county jail population) across the state of New Jersey[60] who are serving county jail sentences for probation violations, municipal court convictions, "low-level indictable crimes," and "disorderly persons offenses.
- The New York City Department of Correction has released approximately 1,600 people from its jails.[61]

---

[57] WFTS Digital Staff, *164 "Low Level, Nonviolent" Offenders Being Released from Hillsborough County Jails*, ABC NEWS (Mar. 19, 2020), https://www.abcactionnews.com/news/region-hillsborough/164-low-level-nonviolent-offenders-being-released-from-hillsborough-county-jails.

[58] Scott Buffon, *Coconino County Jail Releases Nonviolent Inmates in Light of Coronavirus Concerns*, ARIZONA DAILY SUN (Mar. 20, 2020), https://azdailysun.com/news/local/coconino-county-jail-releases-nonviolent-inmates-in-light-of-coronavirus/article_a6046904-18ff-532a-9dba-54a58862c50b.html.

[59] Jessica Miller, *Hundreds of Utah Inmates Will Soon Be Released in Response to Coronavirus*, SALT LAKE CITY TRIBUNE (Mar. 20, 2020), https://www.sltrib.com/news/2020/03/21/hundreds-utah-inmates/?fbclid=IwAR3r8BcHeEkoAOcyP3pmBu9XWkEj4MMsDC_LUH4YZn2QGd18hALk4vM9X1c.

[60] Kathleen Hopkins, *Coronavirus in NJ: Up to 1,000 Inmates to Be Released from Jails*, ASBURY PARK PRESS (Mar. 23, 2020), https://www.app.com/story/news/2020/03/23/nj-coronavirus-up-1-000-inmates-released-jails/2897439001/.

[61] CITY OF N.Y., NEW YORK CITY JAIL POPULATION REDUCTION IN THE TIME OF COVID-19 2 (2020), *available at* http://criminaljustice.cityofnewyork.us/wp-content/uploads/2020/04/MOCJ-COVID-19-Jail-Reduction.pdf.

51.     At the state level, state correctional systems are also taking steps to reduce the prison population in the face of the pandemic:

- The North Dakota parole board[62] granted early release dates to 56 people held in state prison with expected release dates later in March and early April.
- The director of the Iowa Department of Corrections[63] reported the planned, expedited release of about 700 incarcerated people who have been determined eligible for release by the Iowa Board of Parole.
- In Illinois,[64] the governor signed an executive order that eases the restrictions on early prison releases for "good behavior" by waiving the required 14-day notification to the State Attorney's office. The executive order explicitly states that this is an effort to reduce the prison population, which is particularly vulnerable to the COVID-19 outbreak.
- Illinois' governor signed a second executive order suspended all admissions to the Illinois Department of Corrections ("IDOC") from Illinois county jails, with exceptions solely authorized by the IDOC Director.[65]
- The CA Department of Corrections & Rehabilitation released to parole 3,500 nonviolent offenders with 60 days or less left on their sentences.[66]

---

[62] Arielle Zionts, *DOC, Gov. Noem Not Planning Special Coronavirus Releases from Prisons*, RAPID CITY J. (Mar. 21, 2020), https://rapidcityjournal.com/news/local/crime-and-courts/doc-noem-not-planning-special-coronavirus-releases-from-prisons/article_d999f510-7c7c-5d19-ab3a-77176002ef99.html.

[63] Linh Ta, *Iowa's Prisons Will Accelerate Release of Approved Inmates to Mitigate COVID-19*, TIMES-REPUBLICAN (Mar. 23, 2020), https://www.timesrepublican.com/news/todays-news/2020/03/iowas-prisons-will-accelerate-release-of-approved-inmates-to-mitigate-covid-19/.

[64] Rylee Tan, *Illinois Reaches 1,285 COVID-19 Cases, Gov. Pritzker Eases Restrictions on Prison Release*, LOYOLA-PHOENIX (Mar. 23, 2020), http://loyolaphoenix.com/2020/03/illinois-reaches-1285-covid-19-cases-gov-pritzker-eases-restrictions-on-prison-release/.

[65] Ill. Exec. Order No. 2020-13 (Mar. 26, 2020), *available at* https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-13.aspx.

[66] Justin Wise, *California to Release up to 3,500 Non-Violent Inmates Amid Coronavirus Outbreak*, HILL (Mar. 31, 2020), https://thehill.com/homenews/state-

- Kentucky's governor commuted 186 sentences and released 743 inmates within 6 months of completing their sentences.[67]
- New Jersey's governor signed an executive order to temporarily release nonviolent offenders.[68]

52.    In addition to releasing people from jail and prison, jurisdictions are reducing jail admissions, contributing to the reduction in average daily populations, alleviating overcrowding and reducing density.

- In Bexar County, Texas,[69] the Sheriff released a COVID-19 mitigation plan that includes encouraging the use of cite and release and "filing non-violent offenses at large," rather than locking more people up during this pandemic.
- The Baltimore, Maryland State's Attorney[70] will dismiss pending criminal charges against anyone arrested for drug offenses, trespassing, and minor traffic offenses, among other nonviolent offenses.

---

watch/490498-california-to-release-3500-non-violent-inmates-amid-coronavirus-outbreak.

[67] *Kentucky Plans to Release More Than 900 Prisoners Because of the COVID-19 Outbreak*, WDRB.COM (Apr. 2, 2020), https://www.wdrb.com/news/kentucky-plans-to-release-more-than-900-prisoners-because-of-the-covid-19-outbreak/article_aef84282-7541-11ea-8a18-efe5a8cf107d.html?eType=EmailBlastContent&eId=14e33471-26cd-4585-b9b6-e1e52182b91c.

[68] N.J. Exec. Order No. 124 (Apr. 10, 2020), *available at* http://d31hzlhk6di2h5.cloudfront.net/20200410/c0/64/ce/2c/0ef068b5d2c6459546c33a46/EO-124.pdf.

[69] Courtney Friedman, *Bexar County Sheriff Announces COVID-19 Prevention Plan for Jail Inmates, Deputies*, KSAT.COM (Mar. 14, 2020), https://www.ksat.com/news/local/2020/03/15/bexar-county-sheriff-announces-covid-19-prevention-plan-for-jail-inmates-deputies/.

[70] Tim Prudente & Phillip Jackson, *Baltimore State's Attorney Mosby to Stop Prosecuting Drug Possession, Prostitution, Other Crimes Amid Coronavirus*, BALT. SUN (Mar. 18, 2020), https://www.baltimoresun.com/coronavirus/bs-md-ci-cr-mosby-prisoner-release-20200318-u7knneb6o5gqvnqmtpejftavia-story.html.

- District attorneys in Brooklyn, New York[71] and Philadelphia, Pennsylvania,[72] have taken steps to reduce jail admissions by releasing people charged with non-violent offenses and not actively prosecuting low-level, non-violent offenses.
- Police departments in Los Angeles County, California,[73] Denver, Colorado,[74] and Philadelphia, Pennsylvania[75] are reducing arrests by using cite and release practices, delaying arrests, and issuing summons. In Los Angeles County, the number of arrests has decreased from an average of 300 per day to about 60 per day.
- The state of Maine[76] vacated all outstanding bench warrants (for over 12,000 people) for unpaid court fines and fees and for failure to appear for hearings in an effort to reduce jail admissions.
- State and federal courts in Connecticut have begun releasing sentenced prison and jail inmates vulnerable to complications from COVID-19 as well.[77]

---

[71] Andrew Denney & Larry Celona, *Coronavirus In NY: Brooklyn DA to Stop Prosecuting "Low-Level" Offenses*, N.Y. POST (Mar. 17, 2020), https://nypost.com/2020/03/17/coronavirus-in-ny-brooklyn-da-to-stop-prosecuting-low-level-offenses/.

[72] Samantha Melamed & Mike Newall, *With Courts Closed by Pandemic, Philly Police Stop Low-Level Arrests to Manage Jail Crowding*, PHILA. INQUIRER (Mar. 18, 2020), https://www.inquirer.com/health/coronavirus/philadelphia-police-coronavirus-covid-pandemic-arrests-jail-overcrowding-larry-krasner-20200317.html.

[73] Salvador Hernandez, *Los Angeles Is Releasing Inmates Early and Arresting Fewer People over Fears oftThe Coronavirus in Jails*, BUZZFEED NEWS (Mar. 16, 2020), https://www.buzzfeednews.com/article/salvadorhernandez/los-angeles-coronavirus-inmates-early-release.

[74] Schmelzer, *supra* note 50.

[75] Melamed & Newall, *supra* note 72.

[76] Judy Harrison, *Maine Courts Vacate Warrants for Unpaid Fines and Fees*, BANGOR DAILY NEWS (Mar. 16, 2020), https://bangordailynews.com/2020/03/16/news/state/maine-courts-vacate-warrants-for-unpaid-fines-and-fees.

[77] Edmund H. Mahony, *Courts Ponder the Release of Low-Risk Inmates in an Effort to Block the Spread of COVID-19 to the Prison System*, HARTFORD COURANT (Mar. 24, 2020), https://www.courant.com/coronavirus/hc-news-covid-inmate-releases-20200323-20200324-oreyf4kbdfbe3adv6u6ajsj57u-story.html.

- In response to the Oklahoma Department of Corrections' decision not to admit any new people to state prisons, Tulsa and Oklahoma counties are trying to keep their jail population down by not arresting people for misdemeanor offenses and warrants, and by releasing 130 people this past week through accelerated bond reviews and plea agreements.
- In King County, Washington, Seattle jails are no longer accepting people booked for misdemeanor charges that do not present a public safety concern or people who are arrested for violating terms of community supervision. The Department of Adult and Juvenile Detention is also delaying all misdemeanor "commitment sentences" (court orders requiring someone to report to a jail at a later date to serve their sentence).

53.     Individuals with medical vulnerability to COVID-19 face irreparable harm if they continue to be detained and are unlikely to pose significant flight or public safety threats if they were released under conditions consistent with objective assessments of risk. The government, including local and federal officials responsible for ICE detainees, should release as many of these vulnerable individuals as possible, as quickly as possible, with only those conditions that are necessary to ensure participation in court proceedings or other appointments.

54.     Given the severity of COVID-19 and the rapidly escalating rate of infection and death in the United States, as well as the increased risks in facilities housing ICE detainees, I also recommend that any other individuals deemed likely to comply on appropriate conditions of supervision where necessary be released immediately, to protect themselves, other detainees, correctional and medical staff, and the general public, without impeding immigration court proceedings or other legally-required appointments.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day in April 2020, in New York City, NY.

_____
Dora Schriro

# Appendix A

## DORA B. SCHRIRO, Ed.D. J.D.
### EXECUTIVE EXPERIENCE

*State of Connecticut,* Middletown CT (2014–2018)

**CT Homeland Security Advisor** (2016–2018), DHS clearance, Top Secret, appointed by Gov. Dannel Malloy

**Commissioner,** Department of Emergency Services & Public Protection (2014–2018), appt. by Gov. Malloy

- Responsible for CT State Police, Emergency Management & Homeland Security, Scientific Services, Fire Prevention & Control, Police Officer Standards & Training, Statewide Telecommunications.
- FY2018 operating budget, $185M; federal grants, $348M; bond funding, $79M; 1817 employees
- Public Safety & Service, Homeland Security, and Emergency Response, Recovery & Resiliency
- Accomplishments: 1. Comprehensive procedural justice effort with body-worn cameras, all state police on patrol, civilian complaint process, 21st century curricula for state & local law enforcement, an investigative protocol for officer-involved shootings, annual reports of uses of force, traffic stops & police pursuits, mandatory police agency accreditation, and ICE-interface protocol; 2. Drug intervention & enforcement including a dark-web opioid taskforce, equipping all troopers and training first responders to administer naloxone; 3. Other harm reduction efforts including a multi-jurisdictional cybersecurity investigative unit, comprehensive gun control, community-focused active shooter preparedness, wrap-around DV safety & support, K-12 & post-secondary school safety planning, and Ebola & Zika first responder protocols

*City of New York,* New York, New York (2009–2014)

**Commissioner,** New York City Department of Correction, appointed by Mayor Michael Bloomberg

- Responsible for adult detention, prisoner processing, and operation of criminal court pens, an average of 12,000 inmates daily and 100,000 pretrial and city-sentenced inmate admissions annually
- FY2014 operating budget, $1.065B, capital budget, $691.9M; 10,440 employees
- Focus: Special Populations; Intake, Classification and Discharge Planning; Staff Accountability; Alternatives to Disciplinary Segregation; Alternatives to Detention
- Accomplishments: 1st U.S. Social Impact Bond funded program, adolescent pre-release initiative; Justice Reinvestment funded pre-release preparation for adults; pre-trial & post-plea diversion for the mentally ill; comprehensive reform of disciplinary segregation with clinical alternatives for special populations; centralized intake with risk & needs classification, gang identification, and discharge planning

*US Department of Homeland Security,* Washington DC (2009–2009)

**Senior Advisor to Secretary on ICE Detention and Removal,** appointed by DHS Sec. Janet Napolitano

**Director, ICE Office of Detention Policy and Planning,** appointed by ICE Asst. Sec. John Morton

- Focus: Design a civil detention system satisfying all safety and security needs and legal requirements
- Authored, *2009 Report on ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform,* DHS' adopted template for improving the operation of immigration detention
- Improved the efficiency and effectiveness and increased the transparency of ICE detention operations

*State of Arizona,* Phoenix, Arizona (2003–2009)

**Department Director,** Arizona Department of Corrections, appointed by Gov. Janet Napolitano

- Responsible for adult corrections and community supervision including 39,000 inmates and 7,200 parolees daily and 55,000 felons annually (21,000 admissions/11,500 case openings)
- FY2009 operating budget, $1.23B; 9,750 employees
- Focus: Systems reform, re-entry, victim services, strategic planning, privatization oversight
- Winner, 2008 Innovations in American Government, and first prison-based reform awards recipient

Dora B. Schriro, Ed.D. J.D.
Page 2

*City of St. Louis*, St. Louis, Missouri (2001–2003)

**Commissioner of Corrections**, St. Louis City Division of Corrections, appointed by Mayor Francis Slay

- Responsible for adult detention, prisoner processing, and city probation and parole including 1,500 jail inmates and 2,000 offenders on supervision daily (9,000 admissions/63,000 bookings annually)
- FY2003 operating budget, $68M; 615 employees
- Focus: Population management, alternative sentencing initiatives, staff development
- Opened and operated the city's first combined police prisoner processing and detention center

*State of Missouri*, Jefferson City, Missouri (1993–2001)

**Department Director**, Missouri Department of Corrections, appointed by Gov. Mel Carnahan

- Responsible for adult corrections and probation and parole services including 28,000 prisoners and 65,000 offenders on community supervision daily, 35,000 admissions/72,000 case openings annually
- FY2002 operating budget, $500M; 11,000 employees
- Focus: Systems and sentencing reform, litigation reduction, restorative justice, capital construction
- Winner, Council of State Governments Innovations award program; four-time Innovations in American Government Finalist and Semi-Finalist

*City of St. Louis*, St. Louis Missouri (1989–1993)

**Correctional Superintendent**, St. Louis City Division of Correction, appointed by Mayor Vince Schoemehl

- Responsible for 600 pre-trial and city sentenced inmates, 4,000 admissions annually
- FY1993 operating budget, $26M; 210 employees
- Focus: Court oversight, overcrowding, certified juveniles, community relations

*City of New York*, New York, New York (1984–1989)

**Assistant Commissioner**, New York City Department of Correction, appointed by Mayor Ed Koch

- Responsible for design and delivery of inmate programs services, programs development, grants
- Services provided to 100,000 pre-trial and city sentenced inmates annually by 200 employees
- Focus: Public-funded and accredited education, school-aged inmates; contracts management

**Assistant Deputy Director**, Office of the Mayor, Coordinator of Criminal Justice

- Grants administration, federal and state funded systems reforms, $189M annually
- Focus: Alternatives to detention, intermediate sanctions, policy analysis, applied research

CONSULTING SERVICES

Dora B. Schriro Consulting Services, LLC (est. 2013)

EDUCATION

St. Louis University, St. Louis, Missouri, Juris Doctorate, School of Law (2002)
Columbia University, New York, New York, Doctor of Education, Teachers College (1984)
University of Massachusetts at Boston, Massachusetts, Master of Education (1980)
Northeastern University, Boston, Massachusetts, Bachelor of Arts cum laude (1972)

MANAGERIAL PROGRAMS

Council of State Governments, Toll Fellowship (2018)
Harvard University, JFK School of Government, Innovations in Governance (2005)
Harvard University, JFK School of Government, Strategic Public Sector Negotiations (1996)
Harvard University, JFK School of Government, Senior Executives in State and Local Government (1992)

Dora B. Schriro, Ed.D. J.D.
Page 3

## HONORS AND AWARDS, INNOVATIONS

Innovations in American Government, 2008 Winner, Getting Ready: Keeping Communities Safe

Innovations in American Government, 2000 Semi-finalist, Correcting Corrections

Innovations in American Government, 1999 Semi-finalist, Constituent Services

Innovations in American Government, 1998 Semi-finalist, Pre-Promotional Training

Innovations in American Government, 1997 Finalist, Constituent Services

Council of State Governments, 1998 Innovations Award Winner, Waste Tire to Energy

Council of State Governments, 1997 Innovations Award Regional Finalist, Pre-Promotional Training

Council of State Governments, 1996 Innovations Award Finalist, Constituent Services

## OTHER HONORS AND AWARDS

U.S. Department of Justice, Office for Victims of Crime, Allied Professional Award, 2012

Florida Immigrant Advocacy Center, American Justice Award, 2011

Hofstra University (Hempstead, New York) Presidential Medal, 2010

National Governors Association, Distinguished Service to State Government Award, 2006

Arizona Parents of Murdered Children, Filling Empty Shoes, 2006 Honoree

Farmingdale Public Schools (Farmingdale, New York), Wall of Fame, 2001 Inductee

St. Louis Forum, Trailblazer Award, 2000

Association of Correctional Administrators, Michael Francke Award for Outstanding Leadership, 1999

Jefferson City (Missouri) Ten Most Influential Women, 1998

Missouri Governor Award for Quality and Productivity, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000

Missouri Governor Torch of Excellence Gold Award, 1999

Missouri Governor Torch of Excellence Award, 1997

International Association of Correctional Training Personnel Award, Pre-Promotional Training, 1996

Women's Self-Help Center, Twenty Distinguished Women, 1996

St. Louis (Missouri) YWCA Special Leadership Award for a Government Official, 1995

Jefferson City (Missouri) News Tribune Statesman of the Month, June 1995

## PUBLICATIONS, IMMIGRATION DETENTION REFORM

*Weeping in the Playtime of Others: The Obama Administration's Failed Reform of ICE Family Detention Practices*, in Journal on Migration and Human Security, The Law that Begot the Modern U.S. immigration Enforcement System: IIRIRA 20 Years Later (December 2018)

*Women and Children First: An Inside Look at the Impediments to Reforming Family Detention in the U.S.*, in Challenging Immigration Detention, ed. by Flynn and Flynn. Edward Elgar Publishing (September 2017)

*Afterword, Intimate Economies, Anomie and Moral Ambiguity*, in Intimate Economies of Immigration Detention: Critical Perspectives, ed. by Conlon and Hiemstra. Routledge Publishers (2016)

*Improving Conditions of Confinement for Immigrant Detainees: Guideposts toward a Civil System of Civil Detention* in The New Deportation Delirium, ed. by Kanstroom and Lykes. NYU Press (2015)

*Family Immigration Detention: The Past Cannot be Prologue*, co-author, ABA Commission on Immigration (2015)

*Envisioning a Civil System of Civil Detention: Our Opportunity, Our Challenge* (Foreword), in Outside Justice, ed. by Brotherton, Stageman and Leyro. Springer Press (2013)

Improving Conditions of Confinement for Criminal Inmates and Immigrant Detainees, American Criminal Law Review, Georgetown University Law Center (Fall 2010)

The 2009 Report on ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform, U.S. Department of Homeland Security (October 2009)

Rethinking Civil Detention and Supervision, Arizona Attorney (July–August 2009)

Dora B. Schriro, Ed.D. J.D.
Page 4

PUBLICATIONS, CORRECTIONS REFORM

*Smart and Safe: Making the Most of Adolescents' Time in Detention, the Physical Plant, Our Workforce, and the "What Works' Literature,* in The State of Criminal Justice, American Bar Association (2013)

*Corrections: The Justice-Involved Mentally Ill, A Practitioner's Perspective,* in The State of Criminal Justice, American Bar Association (2012)

*Good Science, Good Sense: Making Meaningful Change Happen – A Practitioner's Perspective,* Criminology & Public Policy, Vol. 11, No. 1, Special Issue (February 2012)

*Is Good Time a Good Idea?* Federal Sentencing Reporter, Vol. 21, No. 3 (February 2009)

*Correcting Corrections: The Arizona Plan: Creating Conditions for Positive Change in Corrections*, Confronting Confinement: A Report of the Commission on Safety and Abuse in American Prisons (2006)

*Missouri's Parallel Universe: Blueprint for Effective Prison Management*, Corrections Today (April 2001)

*Correcting Corrections: Missouri's Parallel Universe*, Papers from the Executive Sessions on Sentencing and Corrections, U.S. Department of Justice, Office of Justice Programs (May 2000)

*Avoiding Inmate Litigation: The 'Show-Me' State Shows How*, Sheriff's Magazine, (March–April 1999)

*Best Practices: Excellence in Corrections*, American Correctional Association (August 1998)

*Reducing Inmate Litigation*, Corrections Today (August 1998)

Corrections Management Quarterly, Issue Editor, Aspen Publications (1997)

Currents, Leadership St. Louis, Danforth Foundation (1992)

*What Makes Correctional Education Educational*, Journal of Correctional Education (September 1986)

Safe Schools, Sound Schools, ERIC Clearinghouse on Urban Education (January 1985)

*What Works with Serious Juvenile Offenders: US Experience*, Juvenile Delinquency in Australia (1984)

What Makes Correctional Education Educational: Ethnography of an Instructionally Effective School, University Microfilm (1983)


STANDARDS, SENTENCING AND RELATED CIVIL-CRIMINAL JUSTICE REFORM ACTIVITIES

Women's Refugee Commission, Commissioner (2012–2020)

American Bar Association, Commission on Immigration, Special Advisor (2019–2020)

American Bar Association, Commission on Immigration, Advisory Board Member (2017–2019)

American Bar Association, Commission on Immigration, Standards for the Custody, Placement and Care; Legal Representation, and Adjudication of Unaccompanied Alien Children in the United States (2018)

U.S. Dept. of Homeland Security, DHS Family Residential Ctr. Advisory Committee, member (2015–2016)

American Bar Association, Commission on Immigration, Commissioner (2014–2016)

American Bar Association, Commission on Immigration, Co-chair, Standing Subcommittee on Punitive Segregation, (2012–2014)

American Bar Association, Commission on Immigration, Civil Detention Standards Task Force (2011–2012)

American Bar Association, Criminal Justice Standards Subcommittee, ACA representative (2005–2008)

Arizona State University School of Law, Sentencing Policy Seminar (2004–2005)

Arizona Attorney General Sentencing Advisory Committee (2004–2008)

St. Louis University School of Law, Instructor, Sentencing Policy Seminar (2000–2002)

Missouri Sentencing Advisory Commission, Vice Chair (1994–2001)

U.S. Department of Justice Executive Sessions on Sentencing and Corrections, in conjunction with Harvard University JFK School of Government and University of Minnesota Law School (1997–2000)

Partnership for Criminal Justice Workshop, Institute on Criminal Justice, University of Minnesota Law School, State Partner (1997–2000)

State Sentencing and Corrections Program, Vera Institute of Justice, National Associate (1999–2002)

U.S. Dept. of Justice, Bureau of Justice Assist., Discretionary Grant Program, Peer Reviewer (1994–2002)

Dora B. Schriro, Ed.D. J.D.
Page 5

### PRE-DOCTORAL EMPLOYMENT, LECTURING AND RELATED EXPERIENCE

Employment
- Executive Director, Planned Parenthood of Bergen County, Hackensack, New Jersey (1983–1984)
- Director, Correctional Education Consortium, Long Island City, New York (1982–1983)
- Supervising Social Worker, Franklin Public Schools, Franklin, Massachusetts (1978–1981)
- Director, Adult and Continuing Education, Franklin Public Schools, Franklin, MA (1978–1981)
- Director, Staff Development, Wrentham State School, Wrentham, Massachusetts (1977–1978)
- Program Administrator, Medfield-Norfolk Prison Project, Medfield, Massachusetts (1974–1976)

Academic Experience
- Instructor, Arizona State University School of Law, Corrections Law Seminar (2005–2008)
- Instructor, St. Louis University School of Law, Sentencing Policy (2000–2002)
- Senior Policy Fellow, Public Policy Research Center, University of Missouri-St. Louis (2001)
- Visiting Lecturer, Strategic Planning, National Institute of Corrections (1998–2002)
- Adjunct Professor, Criminal Justice, University of Missouri-St. Louis (1990–1998)
- Adjunct Professor, Criminal Justice, Long Island University at CW Post (1986–1988)
- Instructor, Innovation, Open Center of New York City (1987)
- Teaching Assistant, Field Research Methodology, Administrative Intern to the School Superintendent, Franklin Public Schools, Franklin, Massachusetts (1979)
- Visiting Lecturer, Special Education, Framingham State College, Framingham, Massachusetts (1979)
- Adjunct Professor, Psychology, Fischer Junior College, Boston, Massachusetts (1978)

Related Activities
- Institutional Research Board, St. Louis University (2002–2003)
- Institutional Research Board, University of Missouri-St. Louis (2001–2003)

**Contact information**:

611 King Avenue
City Island, NY 10464
917-710-7029
dora.schriro@gmail.com

Professional References available upon request