## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Janet Malam,

    Petitioner-Plaintiff,

         Case No. 20-10829

and

         Judith E. Levy

Qaid Alhalmi, *et al.*,   United States District Judge

    Plaintiff-Intervenors, Mag. Judge Anthony P. Patti

v.

Rebecca Adducci, *et al.*,

    Respondent-Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AS A PRELIMINARY INJUNCTION [44]

This opinion marks the seventh time the Court has assessed the constitutionality of continued detention of medically vulnerable noncitizen civil detainees at the Calhoun County Correctional Facility during the pendency of the COVID-19 pandemic. The legal issues before the Court are narrow: whether four civil detainees face a high risk of

irreparable injury from COVID-19, whether Defendants[1] have shown deliberate indifference to the medical needs of these Plaintiffs in crafting and implementing their response to the pandemic, and whether the public interest favors Plaintiffs' release. So too is the relief requested: Plaintiffs do not, at this time, seek sweeping injunctive relief that would insert the Court into the day-to-day management of either U.S. Immigration and Customs Enforcement (ICE) or the Michigan Department of Corrections (MDOC); instead, Plaintiffs request the immediate release of four individuals currently detained at the Calhoun County Correctional Facility. Because the Court finds that Plaintiffs Alhami and Cardona Ramirez have shown a high risk of irreparable injury absent relief, a likelihood of success on the merits, and that the public interest favors their release, the Court grants a preliminary injunction ordering their immediate release. The Court orders supplemental briefing with respect to Plaintiffs Rodriguez Salabarria

---

[1] The individuals bringing this action are Petitioners for purposes of habeas relief and Plaintiffs for purposes of injunctive and declaratory relief. Those against whom the action is brought are Respondents for purposes of habeas relief and Defendants for purposes of injunctive and declaratory relief. For simplicity, the terms Plaintiffs and Defendants will be used throughout. (ECF No. 43, PageID.918.)

and Rosales Borboa's health conditions. The Court denies Plaintiffs' requests for additional relief not initially requested in Plaintiffs' motion.

## FACTUAL BACKGROUND

### Qaid Alhalmi

Plaintiff Qaid Alhalmi is a fifty-four-year-old[2] Yemeni citizen. (ECF No. 44, PageID.1022.) He was admitted to the United States on a B-2 nonimmigrant visitor visa on July 27, 1995. On July 8, 1999, after an unsuccessful request for asylum, the Immigration and Naturalization Service (INS), the predecessor to the Department of Homeland Security, initiated removal proceedings against Alhalmi, charging him as removable from the country as a nonimmigrant overstay. (*Id.*) He has been detained at the Calhoun County Correctional Facility since September 17, 2019 based on a finding that Alhalmi faced a significant likelihood of removal in the reasonably foreseeable future. (ECF No. 52-1, PageID.1547.) Alhalmi suffers from Type 2 diabetes, for which he takes a daily oral medication to control blood sugar and which requires a four-

---

[2] Defendants allege that Plaintiff Alhalmi is fifty-eight-years-old. (ECF No. 52-1, PageID.1545).

times-daily blood sugar test to determine if insulin is needed. (ECF No. 57, PageID.1670.)

### Tomas Cardona Ramirez

Plaintiff Tomas Cardona Ramirez is a thirty-seven-year-old citizen of Guatemala. (ECF No. 52, PageID.1515.) He was detained by ICE officers on January 31, 2020, and was charged on February 5, 2020, for being present in the United States without having been admitted or paroled. (ECF No. 52-2, PageID.1552.) Cardona Ramirez suffers from Type 1 diabetes, hypertension, and hyperlipidemia, each of which requires daily medications to control. (ECF No. 57, PageID.1670.)

### Damary Rodriguez Salabarria

Plaintiff Damary Rodriguez Salabarria is a forty-six-year-old citizen of Cuba. (ECF No. 52, PageID.1516.) She was detained in Texas by U.S. Border Patrol on August 1, 2019. (ECF No. 52-4, PageID.1563.) On August 10, 2019, Plaintiff Rodriguez Salabarria was transferred due to a housing shortage in Texas to the Calhoun County Correctional Facility. (*Id.*) She suffers from hypertension, chronic gastritis, a peptic ulcer, and gastroesophageal reflux, for which she takes a daily medication for each. (ECF No. 44, PageID.1023.) Her medical records

show a recent diagnosis of chronic localized mucocutaneous candidiasis, which the Court understands to be a yeast infection. (ECF No. 57, PageID.1675.) Additionally, Plaintiff Rodriguez Salabarria has a history of hospitalizations for acute pancreatitis, an appendectomy, cholecystectomy, and kidney infections. (*Id.*)

### Emanuel Rosales Borboa

Plaintiff Emanuel Rosales Borboa is a thirty-five-year-old citizen of Mexico. (ECF No. 52, PageID.1516.) On June 24, 2014, Rosales Borboa applied for—and on December 16, 2014, U.S. Citizenship and Immigraiton Services denied him—Deferred Action for Childhood Arrivals status. (ECF No. 52-5, PageID.1568.) Although he was initially released on bond on May 15, 2017 after United States Border Patrol initiated removal proceedings on April 27, 2017 (*id.* at PageID.1568–1569), Rosales Borboa was subsequently arrested by the Detroit Police Department and has been in ICE custody at the Calhoun County Correctional Facility since March 10, 2020. (*Id.* at PageID.1569.) Rosales Borboa suffers from asthma, for which he was hospitalized for two days approximately ten years ago. (ECF No. 44, PageID.1023.) At various times, the frequency of which the parties contest, Rosales Borboa has

5

required the use of an inhaler and steroids to control his asthma. (*Id.* at PageID.1024; ECF No. 64, PageID.1812.)

### **Defendants**

Plaintiffs bring suit against Rebecca Adducci, in her official capacity as Detroit District Director of U.S. Immigration & Customs Enforcement; Matthew T. Albence, in his official capacity as Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration & Customs Enforcement; Chad Wolf, in his official capacity as Acting Secretary, U.S. Department of Homeland Security; William P. Barr, in his official capacity as Attorney General, U.S. Department of Justice; and U.S. Immigration and Customs Enforcement. (ECF No. 43.)

## PROCEDURAL HISTORY

On March 30, 2020, Petitioner Janet Malam filed an Emergency Petition for Writ of Habeas Corpus.[3] (ECF No. 1.) On April 3, 2020, the Court allowed Plaintiff-Intervenors Amer Toma and Ruby Briselda

---

[3] The Court subsequently granted Petitioner Malam's motion for a temporary restraining order (ECF No. 23), which the Court then converted into a preliminary injunction. (ECF No. 33.)

Escobar to intervene. On April 5, 2020, Plaintiffs Toma and Escobar filed an Emergency Petition for Habeas Corpus and Complaint for Injunctive Relief. (ECF No. 17.) On April 26, fifteen named Plaintiffs filed an amended class action complaint. (ECF No. 43.)

Plaintiffs' proposed class consists of "all noncitizens who are detained in ICE custody at Calhoun." (*Id.* at PageID.994.) The putative class seeks declaratory relief that continued detention under current conditions at the Calhoun County Correctional Facility constitutes impermissible punishment under the Fifth Amendment. (*Id.* at PageID.999.) Named Plaintiffs additionally seek injunctive relief. (*Id.*)

Plaintiffs also seek certification of a subclass of "medically vulnerable individuals," defined as "all noncitizens who are detained in ICE custody in the Calhoun County Correctional Center, and who have one or more risk factors placing them at heightened risk of severe illness or death if exposed to COVID-19." (*Id.* at PageID.994 –995). The subclass seeks habeas relief and declaratory relief that continued confinement at the Calhoun County Correctional Facility constitutes impermissible punishment and cannot guarantee reasonable safety for medically vulnerable detainees. (*Id.* at PageID.1000.) Named Plaintiffs Alhalmi,

Cardona Ramirez, Escobar, Medina Euceda, Rodriguez Salabarria, Rosales Borboa, Toma, and Zhang additionally seek injunctive relief on this claim. (*Id.*)

Also on April 26, 2020, six named Plaintiffs filed an emergency motion for a temporary restraining order. (ECF No. 44.) Four of these six Plaintiffs—Qaid Alhalmi, Tomas Cardona Ramirez, Damary Rodriguez Salabarria, and Emanuel Rosales Borboa—claim that because of their age and/or underlying medical conditions, their continued civil detention violates their Fifth Amendment rights by exposing them to a substantial risk of serious illness and death related to COVID-19. Accordingly, these Plaintiffs seek a temporary restraining order requiring their immediate release from confinement. (*Id.* at PageID.1043.) Two Plaintiffs— Julio Fernando Medina Euceda[4] and Min Dan Zhang[5]—seek alternative forms

---

[4] In their May 5, 2020 reply brief, Plaintiffs informed the Court that Plaintiff Medina Euceda has been transferred to a detention center in Louisiana and is scheduled to be removed on May 11, 2020. (ECF No. 57, PageID.1670.) Plaintiffs argue that "the Court should order Defendants to provide the information as to what steps Defendants took and plan to take to prevent infection (a) during the transfer; (b) once Mr. Medina Euceda arrived in Louisiana; and (c) during removal." (*Id.*)

[5] In their May 5, 2020 reply brief, Plaintiffs informed the Court that Plaintiff Zhang "is no longer pursuing immediate release." (ECF No. 57, PageID.1667.) Instead, Plaintiffs request that "the Court order that, within the next twenty-four hours, Ms. Zhang be tested for COVID-19 and seen by a physician." (*Id.*)

of relief. Defendants responded on April 29, 2020 (ECF No. 52), and Plaintiffs replied on May 5, 2020. (ECF No. 57.) The Court granted Defendants leave to file a sur-reply, which Defendants filed on May 6, 2020. (ECF No. 64.) On May 7, 2020, the Court held a hearing by video teleconference and heard oral argument on Plaintiffs' motion.

For the reasons stated below, the Court grants a preliminary injunction requiring Plaintiffs Alhami and Cardona Ramirez' immediate release from detention for the duration of the COVID-19 State of Emergency in Michigan or until further Court order. The Court orders supplemental briefing with respect to Plaintiffs Rodriguez Salabarria and Rosales Borboa's health conditions and the applicability of a punishment standard to Plaintiffs' claims. The Court denies Plaintiffs' motion with respect to their requests for additional relief.

**LAW AND ANALYSIS**

> **I.    Jurisdiction**

In its April 6, 2020 Opinion and Order, the Court found that it had jurisdiction pursuant to 28 U.S.C. § 2441. (ECF No. 23, PageID.535.) In the alternative, the Court found that it had jurisdiction pursuant to 28 U.S.C. § 1331. (*Id*. at PageID.536.) The Court held that sovereign

9

immunity did not apply (*id.* at PageID.544) and that no other statute deprived the Court of jurisdiction. (*Id.* at PageID.547.) Plaintiffs' current motion presents the same jurisdictional questions; Defendants raise no new jurisdictional arguments. With respect to jurisdiction, the Court adopts its April 6, 2020 Opinion and Order in full.

## II. Legal Standard

Plaintiffs seek a temporary restraining order. (ECF No. 54.) Nonetheless, Plaintiffs gave notice to Defendants and did not seek a ruling before Defendants could respond. A temporary restraining order (TRO), which can be issued without notice to the adverse party, is meant to preserve the status quo until a court can make a reasoned resolution of a dispute. Fed. R. Civ. P. 65(b)(1); *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). Here, because the Defendants are on notice and the Court allowed time for extensive briefing and heard oral argument on Plaintiffs' motion, the Court will treat the motion as one for a preliminary injunction rather than for a temporary restraining order. *See Perez-Perez v. Adducci,* No. 20-10833, 2020 WL 2305276, at *3 (E.D. Mich. May 9, 2020) (doing the same).

10

"Preliminary injunctions are extraordinary and drastic remedies [] never awarded as of right." *Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015). In determining whether to grant such an order, courts evaluate four factors: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant would suffer irreparable injury absent an injunction; 3) whether granting the injunction would cause substantial harm to others; and 4) whether the public interest would be served by granting the injunction. *Northeast Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). These four factors "are not prerequisites that must be met, but are interrelated considerations that must be balanced together. For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Id.* (internal quotations omitted).

## III.  Application

Because the Court finds that Plaintiffs Alhami and Cardona Ramirez have shown a high risk of irreparable injury absent relief, a likelihood of success on the merits, and that the public interest favors

11

their release, the Court grants in part Plaintiffs' motion. The Court orders supplemental briefing with respect to Plaintiffs Rodriguez Salabarria and Rosales Borboa's health conditions and the applicability of a punishment standard to Plaintiffs' claims. The Court denies Plaintiffs' new requests for additional relief not contained within Plaintiffs' motion.

### A. Likelihood of Irreparable Injury

Plaintiffs Alhalmi and Cardona Ramirez are likely to experience irreparable injury absent an injunction, both in the form of loss of health or life and in the form of an invasion of their constitutional rights. *See Fofana v. Albence*, Case No. 20-10869, 2020 WL 1873307, at *10 (E.D. Mich. Apr. 15, 2020) (citing *Thakkur v. Doll*, No. 1:20-cv-480, 2020 WL 1671563, at *8 (M.D. Pa. Mar. 31, 2020)) ("There can be no injury more irreparable than lasting illness or death."); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed.")

### 1. Loss of Health or Life from COVID-19

In five prior opinions in this case, the Court has held that although there was then no current COVID-19 outbreak at the Calhoun County

Correctional Facility, noncitizen civil detainees nonetheless face a high risk of infection from COVID-19 in the coming weeks, months, and possibly years. (*See* ECF Nos. 23 (granting Petitioner Malam TRO), 29 (granting Plaintiff Toma TRO), 33 (converting Malam TRO into preliminary injunction), 41 (converting Toma TRO into preliminary injunction)); *Zaya v. Adducci*, Case No. 20-10921, 2020 WL 1903172 (E.D. Mich. Apr. 18, 2020) (granting Petitioner Zaya TRO). Evaluating the significant body of public health, medical, and other evidence on the record regarding the pandemic, the Court concluded that "in the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors, a 'generalized risk' is a 'substantial risk' of catching the COVID-19 virus for any group of human beings in highly confined conditions, such as [Plaintiffs] within the CCCF facility." (ECF No. 23, PageID.559.)

On May 11, 2020, counsel for Defendants informed the Court by email that one detainee at the Calhoun County Correctional Facility has tested positive for COVID-19. According to counsel, the detainee was quarantined at intake and was isolated when he became symptomatic. For Plaintiffs, the emergence of COVID-19 at the Calhoun County

Correctional Facility transforms a generalized yet substantial risk into a specific and immediate risk.

The rapid rise in COVID-19 cases within ICE detention centers since the Court first ruled on this issue further demonstrates the risk to Plaintiffs: on April 4, 2020, ICE had confirmed thirteen cases of COVID-19 among immigration detainees and seven cases among detention center employees (ECF No. 23, PageID.553); despite precautionary measures, as of May 12, 2020, 881 immigration detainees have tested positive (of 1,736 tested detainees), while ICE has confirmed forty-two cases of COVID-19 among detention center employees. ICE Guidance on COVID-19, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (updated May 12, 2020 at 5:40pm). This exponential growth represents a doubling rate of approximately six days.

The number of COVID-19 cases in detention facilities nationwide further highlights the stark reality that communal confinement, even with the precautions Defendants have employed, creates a significant risk of COVID-19 infection. Although the serious outbreak at the Cook County Jail—quickly recognized as the then single greatest source of COVID-19 infections in the United States, *see* Timothy Williams &

Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, NY Times (Apr. 8, 2020), nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html—does not directly increase the risk to Petitioner, it shows how a pandemic can sweep into communal detention environments despite precautionary measures being taken prior to any confirmed cases. *See Sheriff Dart Expands Precautionary Measures for COVID-19 at Cook County Department of Corrections*, Cook County Sheriff's Office (Mar. 12, 2020), https://www.cookcountysheriff.org/sheriff-dart-expands-precautionary-measures-for-covid-19-at-cook-county-department-of-corrections (noting significant precautionary measures similar to those at Calhoun County Correctional Facility); *Update on Efforts to Reduce Population at Cook County Jail and Ongoing Precautions to Prevent COVID-19*, Cook County Sheriff's Office (Mar. 18, 2020), https://www.cookcountysheriff.org/update-on-efforts-to-reduce-population-at-cook-county-jail-and-ongoing-precautions-to-prevent-covid-19 (noting expansion of precautionary measures). Despite precautionary measures, cases of COVID-19 among inmates in the Cook County Jail exploded from two to 167 in eight days. (ECF No. 29,

PageID.635.) Likewise, on April 1, 2020, the Rikers Island jail complex's chief physician acknowledged that "infections are soaring" despite the facility's "following Centers for Disease Control and Prevention guidelines and having moved mountains to protect our patients." Miranda Bryant, *Coronavirus Spread at Rikers is a 'Public Health Disaster', Says Jail's Top Doctor*, The Guardian (Apr. 1, 2020), https://www.theguardian.com/us-news/2020/apr/01/rikers-islandjailcoronavirus-public-health-disaster. As of mid-April, the nationwide curve of COVID-19 infections among Federal Bureau of Prison inmates showed no sign of flattening, again despite significant precautionary measures. *See* Walter Pavlo, *Federal Bureau of Prisons Institutions Not Showing Any Signs of "Flattening Curve,"* Forbes (Apr. 15, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/15/federal-bureauofprisons-institutions-not-showing-any-signs-offlatteningcurve/#46f2999f54dd.

The Court commends Defendants for taking what precautions they have, but the record before the Court indicates that at the Calhoun County Correctional Facility, precautionary measures may exist as policy only. Plaintiffs submit the declaration of Dr. Homer Venters, a physician,

internist and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. (ECF No. 44-4.) Dr. Venters, having reviewed the declarations of Plaintiffs' attorneys, finds that Plaintiffs' experiences at the Calhoun County Correctional Facility show that adequate social distancing remains impossible, access to sanitation and personal protective equipment is scarce, rules regarding the use of masks for staff are lax or nonexistent, and ICE and MDOC are testing neither asymptomatic detainees nor all detainees who present with symptoms. (ECF No. 44-4, PageID.1092–1094.) The widespread lack of testing is of particular concern given that COVID-19 can spread through asymptomatic transmission. Of the 3,277 inmates who tested positive for COVID-19 in Arkansas, North Carolina, Ohio, and Virginia, ninety-six percent were asymptomatic. Linda So & Grant Smith, *In Four U.S. State Prisons, Nearly 3,300 Inmates Test Positive for Coronavirus -- 96% Without Symptoms*, Reuters (Apr. 25, 2020), https://www.reuters.com/article/us-healthcoronavirus-prisons-testing-in/in-four-u-s-state-prisons-nearly-3300-inmates-test-positive-for-coronavirus-96-without-symptomsidUSKCN2270RX. The Calhoun County Correctional Facility's

s failure to successfully implement even general precautionary measures increases the risk of COVID-19 infection to all Plaintiffs.

For Plaintiffs Alhalmi and Cardona Ramirez, this high risk of infection constitutes a high risk of irreparable injury in the form of loss of health or life absent injunctive relief. For Plaintiffs Rosales Borboa and Rodriguez Salabarria, the Court orders supplemental briefing on their underlying health conditions.

### **Plaintiffs Alhalmi and Cardona Ramirez**

Alhalmi suffers from Type 2 diabetes, for which he takes a daily oral medication to control blood sugar and a four-times-daily blood sugar test to determine if he needs insulin. (ECF No. 57, PageID.1670.) Cardona Ramirez suffers from Type 1 diabetes, hypertension, and hyperlipidemia, each of which requires daily medications to control. (ECF No. 57, PageID.1670.) The CDC recognizes diabetes as a risk factor that increases risk of serious complications from COVID-19, including death. *See Groups at Higher Risk for Severe Illness,* Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last reviewed Apr. 17, 2020). Dr. Venters concludes that both Plaintiffs Alhalmi and Cardona Ramirez are

18

at "a high risk of severe illness or death if [they contract] COVID-19." (ECF No. 44-1, PageID.1091–1092.) Defendants do not contest that Plaintiffs Alhalmi and Cardona Ramirez have established that their pre-existing medical conditions place them at a serious risk of substantial harm from COVID-19. (ECF No. 52, PageID.1529 (arguing only that Plaintiffs "Euceda, Salabarria, Borboa, and Zhang fail to establish they have a substantial risk of serious harm from exposure to COVID-19").)

The Court concludes that because of their diabetes, both Plaintiffs Alhalmi and Cardona Ramirez are at sufficiently heightened risk of severe complication from COVID-19 such that a high risk of exposure translates into high risk of irreparable injury. Because Plaintiff Alhami's diabetes is sufficient to find that a high risk of COVID-19 infection constitutes a high risk of irreparable injury in the form of severe illness or death, the Court need not address the extent to which Alhalmi's age further increases the risk of irreparable injury.

### **Plaintiff Rodriguez Salabarria**

Plaintiff Rodriguez Salabarria suffers from hypertension, chronic gastritis, a peptic ulcer, and gastroesophageal reflux, for which she takes a daily medication for each. (ECF No. 44, PageID.1023.) Her medical

records show a recent diagnosis of chronic localized mucocutaneous candidiasis (CMC). (ECF No. 57, PageID.1675.) Additionally, she has a history of hospitalizations for acute pancreatitis, an appendectomy, cholecystectomy, and kidney infections. (*Id.*) Dr. Venters, upon reviewing Plaintiff's medical records, concluded that she is "at elevated risk of serious illness or death from COVID-19 based on the CDC guidelines." (ECF No. 57-2, PageID.1695.) In particular, Dr. Venters found that "the CDC has identified both hypertension and conditions that can cause a person to be immunocompromised to put a person at higher risk of illness severity and outcomes from COVID-19." (*Id.* at PageID.1694.)

The record does not support a finding that Plaintiff's chronic gastritis, peptic ulcer, gastroesophageal reflux, history of hospitalizations, or CMC increase her risk of severe complications from COVID-19. Dr. Venters, without citation to CDC guidance or any other medical study, broadly concluded that Plaintiff Salabarria's "medical conditions place her at a high risk of severe illness or death if she contracts COVID-19." (ECF No. 44-4, PageID.1092.) In his supplemental declaration, Dr. Venters pointed only to Plaintiff's hypertension and CMC as being risk factors: "the CDC has identified both hypertension

and conditions that can cause a person to be immunocompromised to put a person at higher risk of illness severity and outcomes from COVID-19." (ECF No. 57-2, PageID.1694.) Absent guidance from the CDC or another public health source that chronic gastritis, peptic ulcer, gastroesophageal reflux, and a history of hospitalizations constitute risk factors, Plaintiffs must provide more than this conclusory statement that Plaintiff Rodriguez Salabarria is at increased risk from these conditions.

With respect to Plaintiff's CMC, Dr. Venters declared that "CMC involves an abnormal, localized reaction of immune cells and requires evaluation for an underlying problem with the immune system that may be more widespread." (ECF No. 57-2, PageID.1694.) Dr. Venters' conditional language—that an evaluation *may* show a more widespread problem with the immune system—does not support a finding that Plaintiff *is* immunocompromised.

Accordingly, the Court will assess whether Plaintiff's hypertension increases her risk of severe complication from COVID-19 such that a high risk of exposure constitutes a high risk of irreparable injury.

Defendants argue that the evidence does not show that Plaintiff's hypertension increases her risk of serious complications from a COVID-

19 infection. As Defendants note, the CDC recognizes "pulmonary hypertension," but not general hypertension, as a "serious heart condition." *See Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last reviewed Apr. 17, 2020). At best, evidence regarding non-pulmonary hypertension is unclear. In another publication, the CDC has referred to general hypertension as a risk factor. *See Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020*, Centers for Disease Control and Prevention (Apr. 3, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm. On May 9, 2020, the Honorable David M. Lawson held that non-pulmonary hypertension constituted a risk-factor for severe negative outcomes from COVID-19. *Perez-Perez*, 2020 WL 2305276, at *8. But on a March 27, Georgina Peacock, the lead of the CDC's COVID-19 Response At-Risk Task Force, described the following with respect to hypertension: "We do have observational knowledge that there is an increased risk with hypertension, but we don't know whether having hypertension alone does

22

increase that risk for severe illness from COVID-19 . . . We are working to understand whether hypertension is an independent risk factor." Caralyn Davis, *CDC: Protect Staff With Underlying Conditions Against COVID-19*, iAdvance Senior Care (Apr. 7, 2020), https://www.iadvanceseniorcare.com/cdc-protect-staff-with-underlying-conditions-against-covid-19/.

The Court cannot conclude, based on the record, that Plaintiff Rodriguez Salabarria's hypertension increases her risk of severe complications such that a high risk of exposure to COVID-19 constitutes a high risk of irreparable injury absent an injunction. Nonetheless, the Court is concerned about the public health data suggesting that hypertension is the single most frequent comorbidity[6] for patients hospitalized from COVID-19. *See Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020,*

---

[6] At oral argument, counsel for Defendants argued that "comorbidity" in this instance referred not to the simultaneous presence of COVID-19 and hypertension, but rather to the presence of hypertension *and* another underlying health condition alongside COVID-19. The Court does not share Defendants' understanding of this term, and it reads the medical evidence to show that for patients hospitalized with COVID-19, hypertension was the most frequently occurring underlying health condition, with or without any other underlying health conditions.

Centers for Disease Control and Prevention (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm (identifying hypertension as most common underlying condition in adult patients hospitalized from COVID-19); Safiya Richardson *et al.*, *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, J. of the Am. Medical Ass'n (last updated Apr. 24, 2020), https://jamanetwork.com/journals/jama/articlepdf/2765184/jama_richardson_2020_oi_200043.pdf (identifying same).

Accordingly, the Court will order supplemental briefing on whether Plaintiff's hypertension places her at increased risk of severe illness and/or death from a COVID-19 infection. The parties should focus their briefing on medical and scientific evidence released after March 27, 2020. The parties may also provide additional briefing on Plaintiff's medical history and other underlying conditions.

### **Plaintiff Rosales Borboa**

Plaintiff Rosales Borboa suffers from asthma, for which he was hospitalized for two days approximately ten years ago. (ECF No. 44, PageID.1023.) At various times, the frequency of which the parties

contest, Rosales Borboa has required the use of an inhaler and steroids to control his asthma. (*Id*. at PageID.1024; ECF No. 64, PageID.1812.)

The CDC explains that moderate to severe asthma increases the risk of severe illness and/or death from COVID-19. *People with Moderate to Severe Asthma*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last updated Apr. 2, 2020). The parties disagree as to whether Plaintiff Rosales Borboa's asthma is moderate to severe.

Plaintiffs allege that "[t]o treat his asthma, Mr. Rosales Borboa was prescribed an Albuterol inhaler, which he used multiple times per week prior to his detention, and Prednisone, an immunosuppressant medication used to treat breathing problems." (ECF No. 57, PageID.1676.) According to Dr. Venters, "[t]he frequency with which [Plaintiff Rosales Borboa] relies on his inhaler, and the recent need for oral steroids indicates that his asthma is not well controlled." (ECF No. 57-2, PageID.1692.) Dr. Venters implies but does not conclude that asthma which is not well controlled is moderate to severe. (*Id*.) Defendants argue that "while detained for the last two months, he has

not had any treatment for asthma, nor has he requested any." (ECF No. 64, PageID.1812.) Moreover, Defendants explain that "Borboa's asthma, as he stated at intake, is situational when he plays sports or gets too warm." (*Id.*)

Critically, neither party provides a definition, medical or otherwise, of the phrase "moderate to severe." The Court cannot apply traditional modes of statutory interpretation to discern the medical meaning of "moderate to severe," and therefore the Court cannot make a finding with respect to the severity of Rosales Borboa's asthma. Accordingly, the Court will order supplemental briefing on the meaning of "moderate to severe" and whether Plaintiff's asthma qualifies as such. The parties may also address Plaintiff's medical history and any other underlying health conditions.

### 2. Violation of Constitutional Rights

Plaintiffs Alhalmi and Cardona Ramirez have additionally shown a high risk of irreparable injury in the form of infringement on their Fifth Amendment rights. Plaintiffs argue that "because of their underlying medical conditions which make them especially susceptible to severe infection from COVID-19, [they] confront immediate danger in violation

of their Due Process rights." (ECF No. 44, PageID.1042.) The finding that a constitutional violation is likely is sufficient for a court to find irreparable harm. *See also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."); *Overstreet v. Lexington-Fayette Urban Cty. Gov.*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)); *see also Rhinehart v. Scutt*, 408 F. App'x 510, 514 (6th Cir. 2018) (suggesting that allegations of "continuing violation of . . . Eighth Amendment rights" would trigger a finding of irreparable harm).

Below, the Court finds Plaintiffs Alhalmi and Cardona Ramirez are likely to succeed on the merits of their Fifth Amendment claim. Accordingly, "no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.")

Because the success of Plaintiffs' Fifth Amendment claim hinges on the extent to which Plaintiffs' underlying health conditions put them at increased risk of severe illness and/or death from COVID-19, the Court

will determine whether Plaintiff Rodriguez Salabarria and Rosales Borboa have shown irreparable injury in the form of deprivation of their Fifth Amendment rights upon receiving the parties' supplemental briefing.

### B. Likelihood of Success on the Merits

Plaintiffs bring a claim for "Violation of Fifth Amendment Right to Substantive Due Process: Impermissible Punishment and Inability to Ensure Reasonable Safety For the Medically Vulnerable." (ECF No. 43, PageID.1000.) Because the Court orders supplemental briefing with respect to Plaintiff Rodriguez Salabarria and Rosales Borboa's health conditions, the Court will address the likelihood of success on the merits only with respect to Plaintiffs Alhalmi and Cardona Ramirez.

### 1.    Legal Standard

The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the government from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend. V. The protection applies to "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

### a. Punishment or Deliberate Indifference

Plaintiffs claim that their continued confinement violates their Fifth Amendment rights both as a form of "impermissible punishment" and for its "inability to ensure reasonable safety." (ECF No. 43, PageID.1000.) In *Bell v. Wolfish*, the Supreme Court held that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." 441 U.S. 520, 535 (1979). The Court explained that "if a restriction or condition is not reasonably related to a legitimate goal–if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees." *Id.* at 539. In *Helling v. McKinney*, the Supreme Court held that the Eighth Amendment guarantees inmates "reasonable safety." 509 U.S. 25, 34 (1993). The Sixth Circuit has held that "pretrial detainees have a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners," *Watkins v. City of Battle Creek*, 273 F.3d 682, 685–86 (6th Cir. 2001), and, accordingly, this type of Fifth Amendment claim is analyzed "under the same rubric as Eighth Amendment claims brought by prisoners." *Villegas v. Metropolitan Gov't*,

709 F.3d 563, 568 (6th Cir. 2013). Eighth Amendment claims require a showing of deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

The Court has previously analyzed identical claims under only the deliberate indifference standard. In converting Petitioner Malam's temporary restraining order into a preliminary injunction, the Court reasoned:

> The Eighth Circuit in *Butler* found that the deliberate indifference test, not the freedom from punishment test, applied to a plaintiff's claim challenging the adequacy of precautionary measures to reduce the risk of infection: "The governmental duty to protect at issue in this case is not based on a pretrial detainee's right to be free from punishment but is grounded in principles of safety and general well-being." 465 F.3d at 344. The court cited to the Supreme Court in *DeShaney v. Winnebago County Dept. of Soc. Serv.*, which held: ["][W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.["] 489 U.S. 189, 200. The deliberate indifference standard applies in this case.

(ECF No. 33, PageID.724–725.)

Importantly, however, the Court also noted that because Petitioner Malam was likely to succeed on her deliberate indifference claim, "the Court need not determine whether the freedom from punishment standard also applies, and if it does, whether and to what extent it differs from the deliberate indifference standard." (*Id.* at PageID.725.)

For the same reasoning reproduced above, the Court will analyze Plaintiffs' claim through the lens of deliberate indifference. However, the Court will order supplemental briefing on whether and to what extent a freedom from punishment standard applies to Plaintiffs' claims independent of a deliberate indifference standard.

### b. Objective and Subjective Components

Additionally, there remains an open question as to what the deliberate indifference standard requires Plaintiffs to show. In *Villegas*, the Sixth Circuit recognized that under *Farmer v. Brennan*, deliberate indifference requires a showing of an objective substantial risk of serious harm and a subjective culpable mental state. *Villegas v. Metro. Gov't*, 709 F.3d 563, 568 (6th Cir. 2013) (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)). In 2016, the Supreme Court held that a pretrial detainee raising a Fourteenth Amendment excessive force claim satisfied his

burden by showing "the force purposely or knowingly used against him was objectively unreasonable," without regards to the mental state of any prison official. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). In *Richmond v. Huq*, the Sixth Circuit held that "this shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether [a plaintiff] need even show that the individual defendant-officials were subjectively aware of [the plaintiff's] serious medical conditions and nonetheless wantonly disregarded them." 885 F.3d 928, 938 n.3 (6th Cir. 2018). And in *Martin v. Warren Cty.*, the Sixth Circuit reiterated that "[w]hether an objective standard applies to pretrial detainee claims of deliberate indifference and what the standard entails are open questions." No. 19-5132, 2020 WL 360436, at *4 n.4 (6th Cir. Jan. 22, 2020), reh'g denied (Feb. 4, 2020).

Despite this uncertainty, the Sixth Circuit has applied both objective and subjective analysis to deliberate indifference claims in at least two cases post-*Kingsley*. *See J.H. v. Williamson Cty.*, 951 F.3d 709, 717, 722–23 (applying an objective test for solitary confinement claim but two-part objective and subjective test for deliberate indifference claim); *Winkler v. Madison Cty*, 893 F.3d 877 (2018) (applying two-part standard

for deliberate indifference claim without citing *Kingsley*). The Court is unaware of any Sixth Circuit precedent applying *Kingsley* to hold that a deliberate indifference claim only requires an objective component. Absent more guidance from the Sixth Circuit, the Court will require Plaintiffs to show both the objective and subjective components of a deliberate indifference claim.

### 2.    Objective Component

The objective component of a deliberate indifference claim is satisfied by showing that "absent reasonable precautions, an inmate is exposed to a substantial risk of serious harm." *Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016) (citing *Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F. App'x. 354, 361 (6th Cir.2013))."

Above, the Court found that Plaintiffs Alhalmi and Cardona Ramirez showed a high risk of irreparable injury in the form of severe illness and/or death from COVID-19 absent an injunction. The Court need not dwell on the distinctions between a high likelihood of irreparable harm and a substantial risk of serious harm—to the extent the former comes in the form of a risk to health or life, it satisfies the latter.

Nonetheless, Defendants raise three arguments as to why Plaintiffs cannot satisfy the objective component.

### i. Imminence

Defendants argue that the risk of infection—regardless of its magnitude—cannot justify a finding that Plaintiffs will succeed on the merits because the risk is not imminent. Defendants point to the Supreme Court in *Helling v. McKinney*, on which this Court has previously relied. 509 U.S. 25 (1993). Defendants argue that *Helling* "requires that in order to pursue a constitutional claim for a future harm, the danger must be 'sufficiently imminent.'" (ECF No. 52, PageID.1524 (citing *Helling*, 509 U.S. at 33-34).) In Defendants' words,

> Although the Court did not require the plaintiff to show actual adverse effects from the secondhand smoke, it did require actual exposure to the allegedly harmful condition. . . . Nowhere in the decision did the *Helling* Court hold potential exposure to disease sufficient to establish standing for a constitutional violation, particularly where the risk of exposure would differ little from the risk if released.

(ECF No. 52, PageID.1525 (citation omitted).)

Defendants made this argument at a time when "there [were] no confirmed cases of COVID-19 at Calhoun." (ECF No. 52, PageID.1525.) But as of May 11, 2020, Calhoun County Correctional Facility has at least

34

one confirmed case of COVID-19. Moreover, given the percentage of asymptomatic COVID-19 cases and the virus' incubation period of up to fourteen days, Defendants cannot reasonably assert that the outbreak is—or will continue to be—limited to a single case. This change in factual circumstances alone is enough to rebut Defendants' argument.

But even if the Court were to find that a confirmed case of COVID-19 within the correctional facility did not constitute an imminent risk of exposure, Defendants misread *Helling* in two ways. First, they are wrong to insist that *Helling* "require[s] actual exposure." *Helling* dealt with a prisoner who faced actual exposure to secondhand smoke at the time he filed his complaint. The question of whether potential or future exposure would similarly be sufficient to state a claim was not at issue in the case. Accordingly, nowhere did the *Helling* Court hold potential exposure to a disease insufficient to establish standing for a constitutional violation.

Second, and to the contrary, the *Helling* opinion does suggest that potential exposure to a future harm would be—and is here—sufficient to state a constitutional claim and support a finding of irreparable injury. As *Helling* states, "a remedy for unsafe conditions need not await a tragic event," *Helling*, 509 U.S. at 33. The *Helling* Court cited favorably to *Gates*

35

*v. Collier*, a Fifth Circuit opinion addressing when the risk of future injury was sufficient to state an Eighth Amendment claim. 509 U.S. at 34. In *Gates*, the court held that a prison's insufficient inventory of firefighting equipment constituted an Eighth Amendment violation. 501 F.2d 1291 (5th Cir. 1974). The court noted that "[a]t most camps there is a lack of adequate firefighting equipment making it, as stated by the Penitentiary Superintendent, 'almost impossible to put out a fire at [the detention facility] with the present water system and the present fire-fighting equipment.'" *Id.* at 1301. It would almost be absurd to suggest that a prisoner would have needed to wait for a fire to break out in the facility prior to being able to allege irreparable injury. Instead, the *Gates* court recognized that the risk of fire itself was enough.

So too here. COVID-19 does not respect prison walls. The raging global pandemic outside of Calhoun County Correctional Facility and a confirmed case within the facility pose a serious risk to those inside. Accordingly, the Court concludes again that the risk of COVID-19 infection to Plaintiffs Alhalmi and Cardona Ramirez constitutes a substantial risk of serious harm.

### ii. Compliance with Policies

At oral argument, Defendants argued that the Court should not consider any failure of the Calhoun County Correctional Facility to implement CDC or ICE Guidance when determining whether Plaintiffs have shown the objective component of their deliberate indifference claim. If Plaintiffs were challenging only the issuance of Defendants' policy as deliberately indifferent, Defendants' argument might have merit. But Plaintiffs' challenge is broader than contesting ICE guidance: Plaintiffs challenge their continued detention on the grounds that no conditions of confinement can guarantee their reasonable safety. Accordingly, the question for the Court is not whether Defendants have been deliberately indifferent to Plaintiffs' health in creating COVID-19-related policies and precautions, but whether Defendants, who do not argue that Plaintiffs pose a danger to the community or would be flight risks, have been deliberately indifferent to Plaintiffs' medical needs by failing to release them given the actual conditions at the Calhoun County Correctional Facility. Accordingly, the exact level of the risk at the correctional facility, as informed by the level of compliance with any precautionary policies, goes both to the nature of the harm faced by Plaintiffs and to Defendants' state of mind in declining to release them.

### iii.     Society's Tolerance of Risk to Plaintiffs

Defendants properly note that in addition to weighing the seriousness of the risk faced by Plaintiffs, the Court must also "'assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency'—that is, it 'is not one that today's society chooses to tolerate.'" *Villegas v. Metro. Gov't,* 709 F.3d at 568-69 (citing *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). Defendants argue that "where society is beginning to reduce restrictions and subject society-at-large to that same risk of exposure to COVID-19," Plaintiffs may not be able to satisfy this requirement. (ECF No. 64, PageID.1814.)

Defendants argument is misguided. First, significant portions of the country remain on lockdown. In Michigan, where Plaintiffs are detained and which now reports a total of 48,021 COVID-19 cases and 4,674 deaths from COVID-19, *see Michigan Data*, Michigan.gov, https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html (last updated May 12, 2020), Governor Gretchen Whitmer recently extended the Stay Home, Stay Safe executive order, under which Michigan residents "must not leave their homes except to run critical

38

errands, to engage in safe outdoor activities, or to go to specified jobs," until May 28, 2020. *Governor Whitmer Extends Stay Home, Stay Safe Order, Reopens Manufacturing as Part of Her MI Safe Start Plan*, Michigan.gov (May 7, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90487-528452--,00.html.

Second, even where restrictions have been relaxed more broadly, there are continued protections for medically vulnerable people. Although Georgia's shelter-in-place order expired for most Georgia residents on April 30, 2020, Governor Brian Kemp issued a new executive order "requiring medically fragile and elderly Georgians to continue to shelter in place through June 12, 2020." *Gov. Kemp Extends Protections for Vulnerable Georgians, Releases Guidance for Businesses*, Georgia.gov (Apr. 30, 2020), https://gov.georgia.gov/press-releases/2020-04-30/gov-kemp-extends-protections-vulnerable-georgians-releases-guidance. Additionally, Governor Kemp ordered "long-term care facilities – including nursing homes, personal care homes, assisted living facilities, and similar community living homes – to utilize enhanced infection

control protocols, ensure safer living conditions, and protect residents and staff from coronavirus exposure." *Id.*

Finally, Plaintiffs are not at "the same risk of exposure" to COVID-19 as the general population. Plaintiffs are currently in communal confinement. As previously set forth, "in the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors, a 'generalized risk' is a 'substantial risk' of catching the COVID-19 virus for any group of human beings in highly confined conditions, such as [Plaintiffs] within the CCCF facility." (ECF No. 23, PageID.559.)

Defendants cannot show that society would tolerate Plaintiffs' exposure to COVID-19. To suggest that the public would tolerate this risk demeans Plaintiffs' dignity and humanity.

### 3.    Subjective Component

The subjective component is demonstrated by showing that "(1) the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner, (2) the official did in fact draw the inference, and (3) the official then disregarded that risk." *Richko*, 819 F.3d at 915–16 (citing *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th

Cir. 2014)). "Because government officials do not readily admit the subjective component of this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence. . . . " *Id.* at 916 (citing *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009)). Additionally, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

Defendants do not contest that Plaintiffs have satisfied the first two prongs of *Richko*'s subjective component test. The magnitude of the risk from COVID-19 to Plaintiffs Alhalmi and Cardona Ramirez, considering their underlying health conditions, leads the Court to conclude that it is obvious and, consequently, that Defendants are aware of it.

Instead, Defendants argue that because they are responding reasonably to the COVID-19 pandemic, they cannot be said to have disregarded the risk to Plaintiffs. (ECF No. 52, PageID.1533.) Because Defendants have not taken specific precautions to protect medically vulnerable detainees, the Court finds that Defendants have acted unreasonably and have disregarded the risk of COVID-19 to Plaintiffs Alhalmi and Cardona Ramirez.

41

Since Defendants first filed a brief in this case on April 3, 2020, they have argued that the reasonability of their response precludes their liability. (*See* ECF No. 11, PageID.180 ("[T]he government has not been deliberately indifferent and instead has taken reasonable precautions to reduce the risk.").) Defendants argue that "the [C]onstitution does not require or allow judicial inquiry to determine the optimal policy that ICE can employ, assuming no resource constraints or competing governmental interests and priorities, to eliminate risk to Petitioners. The [C]onstitution only requires the precautions taken to be 'reasonable' under a deliberate indifference analysis." (ECF No. 52, PageID.1537)

Defendants rely on two Circuit Court cases for this proposition. See *Wooler v. Hickman Cty.*, 377 F. App'x 502, 503 (6th Cir. 2010) (finding "consistent efforts to reduce [the] risk" of contagion of an infectious skin disease precluded "a finding of deliberate indifference"); *Butler v. Fletcher*, 465 F.3d 340, 345-46 (8th Cir. 2006) (finding precautions to mitigate the risk of tuberculosis reasonable, even if there were other reasonable measures that could have been taken).

The Court has previously found *Wooler* and *Butler* distinguishable because of the scope of the situation today. COVID-19 is neither MRSA nor tuberculosis. *Wooler* and *Butler* suggest

42

> precautions can reasonably mitigate the risk of tuberculosis or MRSA in conditions of communal confinement. COVID19 is a global pandemic of unparalleled scope, and the public health evidence available to the Court suggests that communal confinement cannot ensure detainees reasonable safety from infection.

(ECF No. 33, PageID.702.)

Defendants' argument fails for the same reason that their argument regarding risk of irreparable injury fails: a reduction in risk does not automatically render Defendants' response reasonable. Instead, Plaintiffs have provided extensive evidence that the reduction in risk is insufficient for the precautions to be deemed reasonable with respect to medically vulnerable detainees[7]: Dr. Venters explains,

> The April 10 ERO Pandemic Response Requirements appear to identify patients at high-risk of serious illness from COVID-19 for the purpose of docket review, but critically fail to encourage or require any higher level of protection that facility officials must provide these detainees in order to protect them from contracting COVID-19.

---

[7] In limiting its finding of Defendants' mental state with respect to medically vulnerable detainees, the Court does not hold at this time that Defendants' precautions are a reasonable response to the risk posed to the general population. The Court will consider that question should it find that Plaintiffs Rodriguez Salabarria and Rosales Borboa are not at heightened risk of serious illness and/or death from COVID-19 or when it is otherwise presented to the Court for adjudication.

(ECF No. 44-4, PageID.1085); Dr. Jonathan Golob, Assistant Professor at

the University of Michigan School of Medicine specializing in infectious

diseases and internal medicine, writes that

> vulnerable people . . . living in an institutional setting, such
> as a prison, or jail, or an immigration detention center, with
> limited access to adequate hygiene facilities, limited ability to
> physically distance themselves from others, and exposure to
> potentially infected individuals from the community are at
> grave risk of severe illness and death from COVID-19.

(ECF No. 44-2, PageID.1052); Dr. Robert Greifinger, a physician

with more than thirty years of experience specific to correctional

facilities, declares that

> ICE's response has made abundantly clear that they do not
> plan to establish special protections for high-risk patients,
> instead waiting for them to become symptomatic. This will
> lead to unnecessary illness and death for the people most
> vulnerable to this disease. ICE is walking willingly into a
> preventable disaster by keeping high-risk and vulnerable
> patients in detention facilities during the rapid spread of
> COVID-19. . . . In my opinion, the public health
> recommendation is to release high-risk people from detention,
> given the heightened risks to their health and safety,
> especially given the lack of a viable vaccine for prevention or
> effective treatment at this stage.

(ECF No. 44-3, PageID.1064 –1065); Dora Schriro, a civil servant

with significant correctional and immigration experience, including

as former Senior Advisor to DHS Secretary Janet Napolitano, opines that

> [b]ased on my experience at DHS, ICE exercises discretion to release or decline to detain medically vulnerable individuals, even when those individuals are, per statute, mandatorily detained. Regardless of statute, ICE has the capacity to, and in fact does, release medically vulnerable individuals when necessary for public health.

(ECF No. 44-5, PageID.1161.) She concludes that "best correctional and correctional health care practice requires, at a minimum, the preemptive release of individuals who are at-risk of serious illness or death if they become infected with COVID-19." (*Id.* at PageID.1169.)

As the extensive body of public health evidence on the record clearly demonstrates, a failure either to implement precautions specific to medically vulnerable detainees or to release them constitutes an unreasonable response.

Defendants point to recent Fifth and Eleventh Circuit opinions to show that the record nonetheless does not include evidence of deliberate indifference. In *Valentine v. Collin*, the Fifth Circuit stayed a district court's preliminary injunction requiring a correctional facility to impose

specific precautionary measures against COVID-19. No. 20-20207, 2020

WL 1934431 (5th Cir. Apr. 22, 2020)) The court held,

> Though the district court cited the Defendants' general
> awareness of the dangers posed by COVID-19, it cited no
> evidence that they subjectively believe the measures they are
> taking are inadequate. To the contrary, the evidence shows
> that TDCJ has taken and continues to take measures—
> informed by guidance from the CDC and medical
> professionals—to abate and control the spread of the virus. . .
> . Although the district court might do things differently, mere
> "disagreement" with TDCJ's medical decisions does not
> establish deliberate indifference.

*Id.* at *4 (citations omitted). The court concluded that in finding

objectively "inadequate measures as dispositive of the Defendants'

mental state," "the district court . . . collapsed the objective and subjective

components of the Eighth Amendment inquiry."

In *Swain v. Junior*, the Eleventh Circuit cited to *Valentine* and

stayed a similar injunction on the grounds that "the district court cited

no evidence to establish that the defendants subjectively believed the

measures they were taking were inadequate." No. 20-11622, 2020 WL

2161317, at *4 (11th Cir. May 5, 2020).

Contrary to Defendants' suggestion and distinct from *Valentine* and

*Swain*, the record before the Court demonstrates that Defendants are

aware that medically vulnerable detainees require additional protection, but nonetheless have declined to act. "Because government officials do not readily admit the subjective component of this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence. . . . " *Richko*, 819 F.3d at 916 (citing *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009)).

At the Court's May 7, 2020 videoconference hearing, Defendants conceded that they have not implemented any policies specific to the protection of medically vulnerable detainees, arguing instead that general precautionary measures serve to protect the higher risk population. CDC guidance for correctional and detention facilities does not address the specific needs of medically vulnerable detainees; it only notes that "[i]f the number of confirmed cases exceeds the number of individual medical isolation spaces available in the facility, be especially mindful of cases who are at higher risk of severe illness from COVID-19." *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-

detention.html (last reviewed May 7, 2020). Nor does ICE guidance fill the gap; to the extent that ICE Guidance addresses medically vulnerable detainees, it contemplates considering release as an option:

> Upon being informed of a detainee who may potentially be at higher risk for serious illness from exposure to COVID-19, ERO will review the case to determine whether continued detention is appropriate. ICE will make such custody determinations on a case-by-case basis, pursuant to the applicable legal standards, with due consideration of the public health considerations implicated.

(ECF No. 52-7, PageID.1591.) Indeed, as of April 16, 2020, ICE had released almost 700 noncitizen civil detainees nationwide. Matt Katz, *ICE Releases Hundreds of Immigrants as Coronavirus Spreads in Detention Centers*, NPR (Apr. 16, 2020) https://www.npr.org/sections/coronavirus-live-updates/2020/04/16/835886346/ice-releases-hundreds-as-coronavirus-spreads-in-detention-centers.

On the one hand, Defendants are aware of the heightened risk posed by COVID-19 to medically vulnerable detainees, and as such ICE has already released hundreds of people from ICE custody. On the other, Defendants have not—and seemingly will not—adopt precautions specific to this vulnerable population that public health evidence shows

48

to be necessary. And despite five opportunities to do so in this case alone, Defendants have not provided the Court with the declarations of any medical professional or public health expert who can reconcile these two conflicting positions. As Defendants explained in another case challenging the constitutionality of civil detention at the Calhoun County Correctional Facility, "In issuing guidance, ICE relied on epidemiologists and also convened a working group between medical professionals, disease control specialists, detention experts, and field operators to identify additional enhanced steps to minimize the spread of the virus." *Zaya v. Adducci*, Case No. 20-10921 (E.D. Mich. Apr. 23, 2020), ECF No. 10 at PageID.700 (internal citation omitted). Defendants fail to acknowledge or address the evidence submitted by Plaintiffs and the weight of public health evidence recognizing that absent specific precautions, Plaintiffs' release constitutes the only reasonable response to an extraordinary and deadly pandemic. Plaintiffs Alhalmi and Cardona Ramirez have shown the subjective component of their deliberate indifference claim.

Finally, the Court reiterates that at this stage of the litigation, it employs a balancing test to determine if relief is warranted. "[The

49

probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Northeast Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) (internal quotations omitted). Plaintiffs have shown both a high likelihood of irreparable injury and a near certainty of success with respect to the objective component of their deliberate indifference claim; Defendants only raise a significant challenge to the claim's subjective component. Because the merits will turn on Defendants' state of mind, Plaintiffs need not continue to be exposed to conditions of confinement which present a substantial risk of serious harm while the Court further adjudicates that issue.

## C. Balance of Equities and Public Interest

When the government opposes the issuance of a temporary restraining order, as Defendants do here, the final two factors—the balance of equities and the public interest—merge. "The government's interest is the public interest." *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The Court finds that the public has an interest in preserving Plaintiffs' constitutional rights and in protecting public health. *See G & V Lounge Inc. v. Mich. Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir.1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights); *Neinast v. Bd. Of Trustees,* 346 F.3d 585, 592 (6th Cir. 2003) (recognizing public health and safety as legitimate government interests).

Defendants do not address the public interest in their response (ECF No. 52) or sur-reply (ECF No. 64). Nor do Defendants argue that any named Plaintiff would either pose a danger to the community or be a flight risk upon release.

Accordingly, "[t]he public interest and balance of equities demand that the Court protect [Plaintiffs'] constitutional rights and the public health over the continued enforcement of a detention provision that, as applied to [Plaintiffs'], is unconstitutional." (ECF No. 23, PageID.574.)

Because all four factors favor granting injunctive relief for Plaintiffs Alhalmi and Cardona Ramirez, the Court grants a preliminary injunction requiring their immediate release.

## IV.   Other Requested Relief

In their reply brief, Plaintiffs requested for the first time five additional forms of relief: first, that the Court order that "within the next twenty-four hours, Ms. Zhang be tested for COVID-19 and seen by a physician" (ECF No. 57, PageID.1667); second, that the Court order "the attending physician to provide a report to Court about whether, because of Ms. Zhang's medical condition, she should be released" (*id.*); third, that the Court "order Defendants to provide the information as to what steps Defendants took and plan to take to prevent infection (a) during the transfer; (b) once Mr. Medina Euceda arrived in Louisiana; and (c) during removal" (*id.* at PageID.1670); fourth, that the Court "require Defendants immediately to update the Court if there are any changes with respect to Mr. Medina Euceda's scheduled removal" (*id.* at PageID.1670–1671); and fifth, that the Court order "that Defendants not transfer any further named petitioners to a different detention center without the Court's permission, and that any request for such permission should include information about the conditions in the facility to which the person is being transferred, and precautions during transfer." (*Id.* at PageID.1671.)

The Court is unaware of legal authority that would allow it, in this instance, to grant relief unrelated to the merits of Plaintiffs' claims and not requested in a pleading or motion. The Federal Rules of Civil Procedure contemplate that a claim for relief must appear in a pleading. Fed. R. Civ. Proc. 8(a). This procedural requirement allows for the parties to fully brief any resultant issues and ensures that the Court can make a reasoned determination. Defendants have only had a brief opportunity to address Plaintiffs' new requests in a sur-reply. (ECF No. 64.)

Accordingly, each additional request for relief is denied without prejudice. Plaintiffs may refile their requests in the form of an amended pleading or a motion for injunctive relief or discovery, as they deem appropriate.

## V.    Conclusion

For the reasons stated above, the Court **GRANTS** a preliminary injunction requiring Plaintiffs Alhalmi and Cardona Ramirez' immediate release from ICE Custody. Plaintiffs will be subject to the following restrictions: Plaintiffs are subject to fourteen days of home quarantine; Plaintiffs must comply with all Michigan Executive Orders; and Plaintiffs must appear at all hearings pertaining to their removal

proceedings. Respondents may impose other reasonable nonconfinement terms of supervision.

Respondents are further **RESTRAINED** from arresting Petitioner for civil immigration detention purposes until the State of Emergency in Michigan (related to COVID-19) is lifted or until further Court Order stating otherwise.

The Court orders supplemental briefing with respect to Plaintiff Salabarria and Plaintiff Borboa's health conditions and the applicability of a freedom from punishment standard to Plaintiffs' claims. The parties may each submit a responsive filing, of no more than fifteen pages, by May 18, 2020.

The Court denies without prejudice Plaintiffs' requests for relief other than immediate release.

IT IS SO ORDERED.

Dated: May 12, 2020                     s/Judith E. Levy
Ann Arbor, Michigan                     JUDITH E. LEVY
                                        United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 12, 2020.

<u>s/William Barkholz</u>
WILLIAM BARKHOLZ
Case Manager