# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Janet Malam,

               Petitioner-Plaintiff,

                      Case No. 20-10829

and

                      Judith E. Levy

Qaid Alhalmi, *et al.*,         United States District Judge

         Plaintiff-Intervenors,  Mag. Judge Anthony P. Patti

v.

Rebecca Adducci, *et al.*,

         Respondent-Defendants.

_____/

## SECOND OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AS A PRELIMINARY INJUNCTION [44]

On April 26, 2020, six named Plaintiffs filed an emergency motion for a temporary restraining order. (ECF No. 44.) Four of these six Plaintiffs—Qaid Alhalmi, Tomas Cardona Ramirez, Damary Rodriguez Salabarria, and Emanuel Rosales Borboa—claimed that because of their age and/or underlying medical conditions, their continued civil detention violated their Fifth Amendment rights by exposing them to a substantial

risk of serious illness and/or death from COVID-19. Accordingly, these Plaintiffs sought a temporary restraining order requiring their immediate release from confinement. (*Id.* at PageID.1043.) On May 12, 2020, the Court granted relief for Plaintiffs Alhalmi and Cardona Ramirez, finding that both Plaintiffs had underlying medical conditions placing them at heightened risk of severe negative outcomes from a COVID-19 infection. (ECF No. 68, PageID.1920.) The Court ordered supplemental briefing on whether Plaintiff Rodriguez Salabarria's hypertension and Plaintiff Rosales Borboa's asthma placed them at increased risk of severe illness and/or death from a COVID-19 infection. (*Id.* at PageID.1925, 1927.) Both parties filed supplemental briefing on May 18, 2020. (ECF Nos. 80, 82.) The Court now grants Plaintiffs' motion with respect to Rodriguez Salabarria and Rosales Borboa.

**FACTUAL BACKGROUND**

### I. Damary Rodriguez Salabarria

Plaintiff Damary Rodriguez Salabarria is a forty-six-year-old citizen of Cuba. (ECF No. 52, PageID.1516.) She was detained in Texas by U.S. Border Patrol on August 1, 2019. (ECF No. 52-4, PageID.1563.) On August 10, 2019, Plaintiff Rodriguez Salabarria was transferred due

to a housing shortage in Texas to the Calhoun County Correctional Facility. (*Id.*) She suffers from hypertension, chronic gastritis, a peptic ulcer, and gastroesophageal reflux, for which she takes a daily medication for each. (ECF No. 44, PageID.1023.) Her medical records show a recent diagnosis of chronic localized mucocutaneous candidiasis, which the Court understands to be a yeast infection. (ECF No. 57, PageID.1675.) Additionally, Plaintiff Rodriguez Salabarria has a history of hospitalizations for acute pancreatitis, an appendectomy, cholecystectomy, and kidney infections. (*Id.*)

## II.   Emanuel Rosales Borboa

Plaintiff Emanuel Rosales Borboa is a thirty-five-year-old citizen of Mexico. (ECF No. 52, PageID.1516.) On June 24, 2014, Rosales Borboa applied for—and on December 16, 2014, U.S. Citizenship and Immigraiton Services denied him—Deferred Action for Childhood Arrivals status. (ECF No. 52-5, PageID.1568.) Although he was initially released on bond on May 15, 2017 after United States Border Patrol initiated removal proceedings on April 27, 2017 (*id.* at PageID.1568–1569), Rosales Borboa was subsequently arrested by the Detroit Police Department and has been in ICE custody at the Calhoun County

Correctional Facility since March 10, 2020. (*Id.* at PageID.1569.) Rosales Borboa suffers from asthma, for which he was hospitalized for two days approximately ten years ago. (ECF No. 44, PageID.1023.) At various times, the frequency of which the parties contest, Rosales Borboa has required the use of an inhaler and steroids to control his asthma. (*Id.* at PageID.1024; ECF No. 64, PageID.1812.)

## LAW AND ANALYSIS

### I.    Legal Standard

Plaintiffs seek a temporary restraining order. (ECF No. 54.) Nonetheless, Plaintiffs gave notice to Defendants and did not seek a ruling before Defendants could respond. A temporary restraining order (TRO), which can be issued without notice to the adverse party, is meant to preserve the status quo until a court can make a reasoned resolution of a dispute. Fed. R. Civ. P. 65(b)(1); *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). Here, because the Defendants are on notice and the Court allowed time for extensive briefing and heard oral argument on Plaintiffs' motion, the Court will treat the motion as one for a preliminary injunction rather than for a temporary restraining

order. *See Perez-Perez v. Adducci,* No. 20-10833, 2020 WL 2305276, at *3 (E.D. Mich. May 9, 2020) (doing the same).

"Preliminary injunctions are extraordinary and drastic remedies [] never awarded as of right." *Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015). In determining whether to grant such an order, courts evaluate four factors: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant would suffer irreparable injury absent an injunction; 3) whether granting the injunction would cause substantial harm to others; and 4) whether the public interest would be served by granting the injunction. *Northeast Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). These four factors "are not prerequisites that must be met, but are interrelated considerations that must be balanced together. For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Id.* (internal quotations omitted).

## II.   Application

5

Judges, by and large, are neither mathematicians nor medical experts, and the undersigned is neither. Still, adjudicating questions of constitutional law in relation to the ongoing COVID-19 pandemic requires mapping precise calculations of medical risk onto the more nebulous legal standards of high likelihood of irreparable injury and substantial risk of serious harm. To do so, the Court must rely on evidence submitted by the parties—declarations from medical experts, scientific publications, and guidance from public health agencies. For judicial determinations to have integrity and consistency, justice must be guided by science.

To date, the Court's opinions regarding the Fifth Amendment rights of noncitizens in immigration detention have largely tracked CDC guidance. The CDC has published—and regularly reviews—a list of factors and underlying health conditions that place a person at heightened risk of severe illness and/or death from COVID-19. *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last reviewed May 14, 2020). As the Supreme Court and Sixth Circuit have recognized, CDC public health

and medical determinations are to be given significant weight. *See Bragdon v. Abbott,* 524 U.S. 624, 650 (1998) ([T]he views of public health authorities, such as the . . . CDC . . . are of special weight and authority."); *Estate of Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 404 (6th Cir. 1998) (deferring to the "medical judgment expressed in the Report of the Centers for Disease Control in evaluating the district court's ruling on whether Mauro posed a direct threat in the essential functions of his job.").

Plaintiffs' complaint grants similar deference to CDC guidance. Plaintiffs seek certification of a subclass of medically vulnerable individuals, defined as "[a]ll noncitizens who are detained in ICE custody in the Calhoun County Correctional Center, and who have one or more risk factors placing them at heightened risk of severe illness or death if exposed to COVID-19." (ECF No. 43, PageID.995.) Plaintiffs' enumerated list of risk factors parallels the CDC's and ends with the catchall category of "any other condition identified by the CDC as putting a person at a higher risk." (*Id.*)

But while the Court treats the presence of a CDC risk factor as dispositive of a person's increased risk, the inverse is not true where

public health or other evidence on the record can show a Plaintiff is nonetheless at substantial risk. Although the CDC lists people over sixty-five as being at heightened risk of severe illness and/or death, the Court found that a fifty-five-year-old Plaintiff's age, combined with other factors, placed him at a substantial risk of severe illness and/or death from COVID-19. (ECF No. 41, PageID.905.) The Court relied on the declarations of two medical professionals concluding that people over fifty are at serious risk. (*Id.* at PageID.904.) Additionally, the Court noted that both CDC and WHO recognize that risk increases with age (*Id.* at PageID.904–905): CDC guidance acknowledges that "the older you are, the higher your risk of serious disease." *Groups at Higher Risk of Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last reviewed May 14, 2020); WHO guidance concludes that "[t]he risk of severe disease gradually increases with age starting from around 40 years. It's important that adults in this age range protect themselves and in turn protect others that may be more vulnerable." *Coronavirus Disease 2019 (COVID-19) Situation Report – 51*, World Health Organization (Mar. 11, 2020),

https://www.who.int/docs/defaultsource/coronaviruse/situationreports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_10.

While COVID-19 poses a threat to any person it infects, injunctive relief in the form of release demands a showing of irreparable injury and substantial risk of serious harm. In concert, the Court's earlier opinions reflect the holding that the presence of a risk factor for severe illness and/or death translates a high risk of infection into a high risk of irreparable injury and a substantial risk of serious harm such that no conditions of confinement at the Calhoun County Correctional Facility can ensure a civil detainee's reasonable safety. When the Court adjudicates claims brought by Plaintiffs without risk factors, the Court's inquiry will focus on what set of conditions are necessary to ensure their reasonable safety in confinement.

Because the CDC identifies diabetes as a risk factor increasing the likelihood of serious illness and/or death from COVID-19, the Court concluded that 1) Alhalmi and Cardona Ramirez, both of whom have diabetes, faced a high likelihood of irreparable injury from continued detention (ECF No. 68, PageID.1913–1920); 2) they had shown a likelihood of success on the merits of both the subjective and objective

components of a deliberate indifference claim (*Id.* at PageID.1929–1951); and 3) the public interest favored their release. (*Id.* at PageID.1951–1952.)

The Court now finds that Rodriguez Salabarria's hypertension and obesity and Rosales Borboa's asthma similarly increase their risk of severe illness and/or death from COVID-19, justifying injunctive relief.

### A.   Rodriguez Salabarria

In its May 12, 2020 Opinion, the Court found the evidence mixed as to whether hypertension is a risk factor. The Court noted that the CDC includes only pulmonary hypertension in its enumerated list of risk factors, *see Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last reviewed May 14, 2020), but that in a morbidity and mortality weekly report, the CDC stated that people with hypertension "might be at higher risk for severe disease or death from COVID-19." *See Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020*, Centers for Disease Control and Prevention (Apr. 3, 2020),

https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm.           Given

evidence that hypertension is the single most prevalent comorbidity for

patients hospitalized with COVID-19, *see Hospitalization Rates and*

*Characteristics of Patients Hospitalized with Laboratory-Confirmed*

*Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020*,

Centers for Disease Control and Prevention (Apr. 17, 2020),

https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm, the Court

ordered supplemental briefing to better evaluate the public health and

medical evidence. (ECF No. 68, PageID.1925.)

Plaintiffs rely largely on the declarations of Dr. Homer Venters, on

whose declarations the Court has relied in earlier opinions, and Dr.

Whitney Lieb, Assistant Professor of Obstetrics and Gynecology at the

Icahn School of Medicine at Mount Sinai Hospital, for the proposition

that hypertension places Plaintiff Rodriguez Salabarria at heightened

risk of severe illness and/or death from COVID-19. (ECF Nos. 82-8, 84.)

Drs. Venters and Lieb place significant weight on the extensive data

showing hypertension as the most frequent comorbidity for patients who

are hospitalized or die from COVID-19. (ECF No. 82-8, PageID.2492–

2494; ECF No. 84, PageID.2506.)

Defendants rebut this argument on the grounds that data showing a correlation between hypertension and adverse outcomes from COVID-19 does not prove a causal relationship. An article appearing in the May 2020 edition of the American Journal of Hypertension (but originally submitted March 30, 2020) concludes that "there is as yet no evidence that hypertension is related to outcomes of COVID-19, or that ACE inhibitor or ARB use is harmful, or for that matter beneficial, during the COVID-19 pandemic." (ECF No. 80-1, PageID.2382.) Defendants include the declaration of Dr. Kenneth Scissors, an internal medicine and emergency room physician. (ECF No. 80-2.) Dr. Scissors explains that "Hypertension must not be conflated with 'serious heart condition[,]' as they are somewhat related but distinct diagnoses." (ECF No. 80-2, PageID.2386.) Regarding studies showing hypertension as the most common comorbidity for patients who were hospitalized or died from COVID-19, Dr. Scissors writes,

> The authors of these studies explicitly explained that their studies are methodologically limited to only report baseline characteristics within the population they studied, and as such were inadequate to conclude that these baseline characteristics conferred specific risk for individual patients throughout the world. Although it is tempting to jump from a correlating baseline characteristic to a cause and effect

>relationship, to do so is speculative, not evidence-based, and
>commonly proves to be unfounded when subsequent studies
>designed to determine cause and effect are performed.

(ECF No. 80-2, PageID.2387.) Defendants' argument boils down to a
logical truism: correlation is not causation.

Developments in both CDC guidance and scientific publications
nonetheless demonstrate that Rodriguez Salabarria is at substantial risk
of severe illness and/or death from COVID-19. On April 16, 2020, the
CDC amended its guidance on serious heart conditions, advising that
"[p]eople with hypertension should continue to manage and control their
blood pressure and take their medication as directed." *Wayback Archive*,
Internet Archive (last accessed May 21, 2020),
https://web.archive.org/web/20200416200039/https://www.cdc.gov/coron
avirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html
(archiving April 16, 2020 snapshot of *Information for People Who Are at
Higher Risk for Severe Illness*, Centers for Disease Control and
Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
precautions/groups-at-higher-risk.html (last reviewed Apr. 15, 2020)).
Dr. Venters emphasizes that "[t]he CDC's guidance for groups at higher
risk for severe illness specifically addresses individuals with

hypertension." (ECF No. 82-8, PageID.2492.) At least one district court has found that these explicit references to high blood pressure and hypertension under CDC guidance for "[s]erious heart conditions" supports the finding that hypertension is a risk factor. See *Barbecho v. Decker*, No. 20-CV-2821, 2020 WL 2513468, at *3 (S.D.N.Y. May 15, 2020). Additionally, an April 23, 2020 CDC publication—issued after the American Journal of Hypertension article on which Defendants rely— both cites hypertension as a risk factor and notes that individuals with hypertension were six times more likely to die from COVID-19 than patients without any chronic health conditions. Mary Adams *et al.*, *Population-Based Estimates of Chronic Conditions Affecting Risk for Complications from Coronavirus Disease, United States*, Emerging Infectious Diseases (Apr. 23, 2020), https://wwwnc.cdc.gov/eid/article/26/8/20-0679_article.

The record can be summarized as follows: one doctor, reviewing the scientific literature, argues that it cannot be assumed based on a correlative relationship that hypertension causes adverse outcomes in COVID-19 patients. Two doctors, reviewing both the scientific literature and Rodriguez Salabarria's medical history, conclude that despite the

14

scientific uncertainty regarding a causal relationship, hypertension is a CDC-recognized risk factor and Rodriguez Salabarria is at heightened risk of severe illness and/or death from COVID-19. A recent CDC publication agrees. The Court finds that the weight of the evidence demonstrates that Plaintiff Rodriguez Salabarria's hypertension together with her other underlying medical conditions places her at substantially heightened risk of adverse outcome from COVID-19.

Plaintiffs also point to Rodriguez Salabarria's obesity as a risk factor. Rodriguez Salabarria has a Body-Mass Index (BMI) of thirty-one. (ECF No. 84, PageID.2506.) Although the CDC identifies a BMI greater than forty as a risk-factor for severe adverse outcomes from COVID-19, Dr. Lieb cites to an article showing that BMI, like age, poses a sliding scale of risk. Jennifer Lighter et al., *Obesity in Patients Younger than 60 Years Is a Risk Factor for Covid-19 Hospital Admission*, Clinical Infectious Diseases (Apr. 9, 2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa415/5818333. Patients under sixty years old with a BMI between thirty and thirty-four were twice as likely as patients with a BMI under thirty to be admitted to acute care due to a COVID-19 infection and 1.8 times as likely to be admitted to an intensive

care unit. *Id.* While the Court might require more evidence regarding the risk of obesity standing alone, these figures—and Dr. Lieb's conclusion that "Ms. Rodriguez Salabarria's obesity exacerbates the risk of severe infection or death" (ECF No. 84, PageID.2507)—further tilt the scales in favor of finding that Rodriguez Salabarria is at substantially heightened risk.

The Court now finds that Rodriguez Salabarria is at substantially heightened risk of severe illness and/or death from COVID-19 because of her hypertension and obesity.

### B.   Rosales Borboa

With respect to Rodriguez Salabarria, the parties disputed whether hypertension is a risk factor in the first instance. With respect to Rosales Borboa, the parties agree that moderate to severe asthma is a CDC-recognized risk factor, *see People with Moderate to Severe Asthma, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/asthma.html (last updated Apr. 2, 2020)*; they dispute only whether Rosales Borboa's asthma qualifies as moderate to severe.

16

In its May 12, 2020 Opinion, the Court noted that "neither party provides a definition, medical or otherwise, of the phrase 'moderate to severe.' The Court cannot apply traditional modes of statutory interpretation to discern the medical meaning of 'moderate to severe,' and therefore the Court cannot make a finding with respect to the severity of Rosales Borboa's asthma." (ECF No. 68, PageID.1927.) Accordingly, the Court ordered supplemental briefing on the meaning of "moderate to severe" and whether Plaintiff's asthma qualifies as such. *Id.*

The parties agree on the medical definitions for moderate and severe asthma. Defendants, citing to the National Asthma Education and Prevention Program, explain that "the levels of asthma severity are intermittent, mild, moderate, and severe. Level of severity is assigned based on different features including the frequency of symptoms and the amount of medication needed to control exacerbations." (ECF No. 80, PageID.2386.) Defendants provide as an exhibit a chart showing the nature and frequency of symptoms at each level. (ECF No. 80-3, PageID.2391.) Moderate asthma is characterized as daily symptoms, weekly nighttime awakenings, daily use of preventative medication, some limitation with respect to normal activity, and a Forced Expiratory

Volume in One Second (FEV) measurement of between sixty and eighty percent of the predicted value. (*Id.*) Severe asthma is characterized as symptoms throughout the day, as many as seven nighttime awakenings per week, use of preventative medication several times per day, extreme limitation with respect to normal activity, and an FEV measurement of less than sixty percent of the predicted value. (*Id.*)

Dr. Venters explains how to use this symptom chart to characterize an individual's asthma:

> In order to determine that an asthmatic patient is not at increased risk of serious illness and death from COVID-19 (i.e., the patient only has mild intermittent or mild persistent asthma), correctional health services need to document the following:
>
> a. Frequency of symptoms occur less than daily;
> b. Nighttime awakenings less than weekly;
> c. Use of rescue inhaler occurs less than daily;
> d. The patient has a FEV1 more than 60% expected with normal FVC ratio;
> e. Use of oral corticosteroids has occurred less than twice in past year.
>
> Patients with asthma who do not have all of these basic elements of their assessment completed should be considered high risk until a full risk assessment can be performed. This is especially true for patients whose medical records indicate that their asthma is not very well controlled, as exhibited by:

18

  a. Symptoms more than twice per week; and/or,
  b. Use of rescue inhaler more than twice per week.

(ECF No. 82-8, PageID.2491.)

Against this backdrop, Defendants argue that the record to date does not support a finding that Rosales Borboa's asthma is moderate to severe. Defendants acknowledge that Rosales Borboa claims to have used an inhaler multiple times per week since receiving a prescription ten years ago, but they contend that "medical records show that during his over two months of detention, he has not required an inhaler, nor has he made a single sick call to request evaluation or treatment for shortness of breath or asthma." (ECF No. 80, PageID.2386.) Moreover, Defendants argue that there is no evidence that Rosales Borboa required the use of steroids since his initial hospitalization. (*Id.*) Defendants do not address whether Rosales Borboa satisfies the other elements of moderate or severe asthma.

To the contrary, Plaintiffs argue that Rosales Borboa's asthma is moderate. Plaintiffs include Rosales Borboa's declaration. (ECF No. 83.) Rosales Borboa declares that his asthma moderately impairs day-to-day activities such as playing sports or going up stairs, and that it can be

triggered by his emotional state or even without a clear cause, such as when he is walking or watching a movie. (*Id.* at PageID.2499.) He has been hospitalized four times for asthma, after three of which he was prescribed steroids. (*Id.* at PageID.2498–2499.) Prior to his detention, he used an inhaler two to three times per week. (*Id.* at PageID.2499.) He describes being refused an inhaler multiple times while in immigration detention:

> Despite asking for an inhaler from staff at both Calhoun and Wayne County Jail, I have not been given one. Accordingly, I have been very careful to monitor my condition and avoid situations that will excite me and trigger breathing problems. I have even designated a corner of the jail where I go and practice breathing routines in order to return my breathing to a normal pace and avoid an attack.

(*Id.* at PageID.2499–2500.)

Plaintiffs provide the declaration of Dr. Katherine Peeler, medical expert for Physicians for Human Rights (PHR), instructor of pediatrics at Harvard Medical School, and a pediatric critical care physician at Boston Children's Hospital. (ECF No. 86.) Dr. Peeler reviewed Rosales Borboa's medical records while in immigration detention dated from March 10, 2020 to March 27, 2020, photographs of two of his asthma-related prescriptions dated June 4, 2016, his medical records as a child

20

from Community Health and Social Services Center from January 11,
1996 to March 14, 2002, the April 24, 2020 Declaration of Ms. Caterina
Amaro-Luedtke, and the May 17, 2020 Declaration of Mr. Emanuel
Rosales Borboa. (*Id.* at PageID.2618.) Dr. Peeler concludes that

> Mr. Rosales Borboa describes daily symptoms (needing an
> inhaler if he is doing "any level of physical activity . . . even
> going up the stairs") and use of a rescue inhaler 2-3 times per
> week and daily for some weeks. Either of these two features
> of his disease place him in the moderate persistent asthma
> category.

(ECF No. 86, PageID.2620.) Dr. Peeler also notes that "Mr. Rosales
Borboa's frequent need for corticosteroids is concerning, and indicates
that his asthma is not well-controlled. He would therefore also benefit
from consultation by a pulmonologist as he may benefit from an inhaled
controller medication (different from the rescue albuterol inhaler he
currently has)." (*Id.*)

Rosales Borboa's declaration is enough to rebut Defendants'
contention that he has not required the use of an inhaler since entering
immigration detention. The evidence is thus one-sided: Plaintiffs have
provided the declaration of a medical professional who, after reviewing
Rosales Borboa's medical history, medical records, and declaration,

concluded that his asthma is moderate. Defendants contest this conclusion but provide no medical declaration of their own. The Court reiterates that the undersigned is not a medical professional, and so the Court's opinion must be informed by the medical evidence on the record. That evidence demonstrates that Rosales Borboa's asthma must be considered moderate, placing him at substantially heightened risk of severe illness and/or death from COVID-19.

## C.   Irreparable Injury and Likelihood of Success on the Merits

Because the Court finds that both Rodriguez Salabarria and Rosales Borboa have underlying medical conditions that place them at substantially heightened risk of severe illness and/or death, the Court adopts in full the reasoning in its May 12, 2020 Opinion with respect to irreparable injury and the likelihood of success on the merits. The Court finds that both Rodriguez Salabarria and Rosales Borboa have a high likelihood of irreparable injury absent an injunction (ECF No. 68, PageID.1913–1920) and have shown a likelihood of success on the merits of both the subjective and objective components of a deliberate

indifference claim.[1] (*Id.* at PageID.1929–1951). The Court notes that the number of COVID-19 cases in ICE detention facilities continues to grow at an alarming pace: at the time of the Court's May 12 Opinion, as of May 12, 2020, 881 immigration detainees have tested positive (of 1,736 tested detainees), while ICE has confirmed forty-two cases of COVID-19 among detention center employees (*Id.* at PageID.1915); as of May 20, 1,163 immigration detainees have tested positive (of 2,328 tested detainees)[2], with forty-four positive cases among detention center employees. *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (updated May 20, 2020 at 5:30pm).

---

[1] The Court requested supplemental briefing on the appropriate legal standard for Plaintiffs' Fifth Amendment claim. (ECF No. 68, PageID.1932.) The parties provided helpful responses (ECF Nos. 80, 82), and the Court received a very thorough amicus brief. (ECF No. 81.) The emergency nature of Plaintiffs' motion, the irreparable injury Plaintiffs face absent relief, and the nuanced Constitutional reasoning involved precludes the Court from issuing a reasoned opinion on this issue at this early point in the litigation. It is sufficient to note that Plaintiffs Rodriguez Salabarria and Rosales Borboa have shown a likelihood of success on the strictest standard that could apply—a deliberate indifference standard requiring both an objective and subjective component. The Court will issue a reasoned opinion on the applicability of a punishment standard when it addresses Plaintiffs' claims on the merits.

[2] There are now two confirmed cases of COVID-19 among detainees at the Calhoun County Correctional Facility. *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (updated May 22, 2020 at 4:00pm). However, given the percentage of asymptomatic COVID-19 cases, the virus' incubation period of up to fourteen days, and a lack of widespread testing, Defendants cannot reasonably assert that the outbreak is—or will continue to be—limited to these two cases.

### D.    Public Interest

The public interest favors both Rodriguez Salabarria and Rosales Borboa's release. In addressing the government justification for Rosales Borboa's detention, Defendants note that in March 2020, "[a]n immigration judge found Borboa to be a danger and ordered him to remain detained pending his removal proceedings." (ECF No. 80, PageID.2379.) Defendants do not provide the immigration judge's reasoning for that determination, and Defendants do not now, nor have they ever, argued that either Rodriguez Salabarria or Rosales Borboa would be a danger to their communities or a flight risk upon release. Rodriguez Salabarria's criminal history is limited to one conviction of unlawful entry in violation of 8 U.S.C. § 1325(a)(1). (ECF No. 52-4, PageID.1565.) Rosales Borboa's criminal history consists of one conviction of driving without a license and one charge for carrying a concealed pistol. (ECF No. 52-5, PageID.1570.) Accordingly, as the Court found with Plaintiffs Alhalmi and Cardona Ramirez, the public's interest in preserving public health and Rodriguez Salabarria and Rosales Borboa's constitutional rights is greater than the public's interest in their

continued detention. (ECF No. 68, PageID.1952.) The public interest favors their release.

Because all four factors favor granting injunctive relief for Plaintiffs Rodriguez Salabarria and Rosales Borboa, the Court grants a preliminary injunction requiring their immediate release.

**CONCLUSION**

For the reasons stated above, the Court **GRANTS** a preliminary injunction requiring Plaintiffs Rodriguez Salabarria and Rosales Borboa's release from ICE Custody. Plaintiffs will be subject to the following restrictions: Plaintiffs are subject to fourteen days of home quarantine; Plaintiffs must comply with all Michigan Executive Orders; and Plaintiffs must appear at all hearings pertaining to their removal proceedings. Respondents may impose other reasonable nonconfinement terms of supervision.

Respondents are further **RESTRAINED** from arresting Petitioner for civil immigration detention purposes until the State of Emergency in Michigan (related to COVID-19) is lifted or until further Court Order stating otherwise.

IT IS SO ORDERED.

Dated: May 23, 2020                    s/Judith E. Levy
Ann Arbor, Michigan                    JUDITH E. LEVY
                                       United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 23, 2020.

                                       s/William Barkholz
                                       WILLIAM BARKHOLZ
                                       Case Manager