## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Janet Malam,

          Petitioner-Plaintiff,

                        Case No. 20-10829

and

                        Judith E. Levy

Qaid Alhalmi, *et al.*,

                        United States District Judge

          Plaintiff-Intervenors,   Mag. Judge Anthony P. Patti

v.

Rebecca Adducci, *et al.*,

          Respondent-Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AS PRELIMINARY INJUNCTION [98]

Plaintiffs Waad Barash, Lench Krcoska, Sergio Perez Pavon, Yohandry Ley Santana, Johanna Whernman, and William Whernman are the fourth group of civil immigration detainees in this case to seek emergency injunctive relief finding their continued detention at the Calhoun County Correctional Facility unconstitutional and requiring their immediate release because of the threat posed by the COVID-19

pandemic.[1] In this opinion, the Court will evaluate the continued threat COVID-19 poses to medically vulnerable detainees, the adequacy of current precautions taken by the Calhoun County Correctional Facility, and the legal standard applicable to Plaintiffs' claims. The Court finds that COVID-19 continues to create a high risk of irreparable injury to Plaintiffs absent an injunction. Because Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim and the public interest favors their release, the Court grants Plaintiffs' motion.

## BACKGROUND

On June 2, 2020, Plaintiffs moved to amend their joint proposed class action petition for a writ of habeas corpus and complaint for injunctive relief to include these six Plaintiffs as named putative class representatives. (ECF No. 91.) After the Court granted Plaintiffs leave to

---

[1] Plaintiff Leonard Baroi filed this motion alongside the six other named Plaintiffs. In their reply brief, Plaintiffs informed the Court that ICE had removed Baroi. (ECF No. 117, PageID.4020.) On June 22, 2020, counsel for Defendants informed the Court by email that ICE was unable to effectuate Baroi's removal and that he is currently detained in Texas awaiting the rescheduling of his removal. Because Baroi is no longer detained at the Calhoun County Correctional Facility and Plaintiffs' motion seeks as relief only immediate release from the Calhoun County Correctional Facility, the Court denies as moot Plaintiffs' motion with respect to Baroi. Should Plaintiffs' wish to seek additional relief for Baroi, they may seek to amend their complaint or file a separate motion.

amend on June 5, 2020 (ECF No. 96), Plaintiffs filed this motion for a temporary restraining order. (ECF No. 98.) Defendants responded on June 10, 2020 (ECF No. 101), and Plaintiffs replied on June 15, 2020. (ECF No. 117.)

Each Plaintiff alleges that because of their age and/or underlying medical conditions, they are at heightened risk of a dire outcome from COVID-19.

### **Waad Barash**

Plaintiff Waad Barash is fifty-six years old and tested positive for tuberculosis upon arriving at the Calhoun County Correctional Facility. (ECF No. 98, PageID.3368.) Barash has a ten-year history of smoking. (*Id.* at PageID.3369.) He suffers from hypertension, for which he alleges he has not received medication while in detention. (*Id.*)

### **Lenche Krcoska**

Plaintiff Lench Krcoska is fifty-two years old. (*Id.*) She suffers from rheumatoid arthritis and a heart arrythmia. (*Id.*) To treat her arthritis, Krcoska's doctor prescribed her a specific diet, which she alleges she is unable to follow while in detention at the Calhoun County Correctional Facility. (*Id.*)

### Sergio Perez Pavon

Plaintiff Sergio Perez Pavon is thirty-six years old. (*Id.*) He suffers from type 2 diabetes. (*Id.*) Since arriving at the Calhoun County Correctional Facility, Perez Pavon has become insulin dependent. (*Id.* at PageID.3371.)

### Yohandry Ley Santana

Plaintiff Yohandry Ley Santana is thirty-three years old. (*Id.*) He suffers from asthma, with which he was diagnosed at eight months of age and for which he has been hospitalized numerous times and intubated twice. (*Id.*) Most recently, Ley Santana was hospitalized in January 2019 with severe bronchitis and allergies. (*Id.*) Despite requesting both allergy medication and his prescribed inhaler, Ley Santana has been provided neither while at the Calhoun County Correctional Facility. (*Id.*)

### Johanna Whernman

Plaintiff Johanna Whernman is fifty-seven years old. (*Id.* at PageID.3372.) She suffers from asthma, for which she uses an inhaler. (*Id.*) Johanna Whernman has not consistently received her inhaler while at the Calhoun County Correctional Facility. (*Id.*) She has been

hospitalized multiple times—most recently in February 2020—due to side effects from her asthma medication. (*Id.*)

### William Whernman

Plaintiff William Whernman, son of Plaintiff Johanna Whernman, is twenty-two years old. (*Id.*) He suffers from asthma, for which he uses an inhaler. (*Id.*) William Whernman has not consistently received his inhaler while at the Calhoun County Correctional Facility. (*Id.*) He is clinically obese, with a body mass index of 30.85. (*Id.*)

## LAW AND ANALYSIS

### I.   Jurisdiction

In its April 6, 2020 Opinion and Order, the Court found that it had jurisdiction pursuant to 28 U.S.C. § 2441. (ECF No. 23, PageID.535.) In the alternative, the Court found that it had jurisdiction pursuant to 28 U.S.C. § 1331. (*Id.* at PageID.536.) The Court held that sovereign immunity did not apply (*Id.* at PageID.544) and that no other statute deprived the Court of jurisdiction. (*Id.* at PageID.547.) In *Wilson, et al. v. Williams, et al.*, the Sixth Circuit upheld habeas jurisdiction in a similar case, finding that "[b]ecause petitioners seek release from confinement, 'the heart of habeas corpus,' . . . jurisdiction is proper under § 2241." Case

No. 20-3447, 2020 WL 3056217, at *5 (6th Cir. June 9, 2020) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973)). Plaintiffs' current motion presents the same jurisdictional questions; Defendants raise no new jurisdictional arguments. With respect to jurisdiction, the Court adopts its April 6, 2020 Opinion and Order (ECF No. 23) in full.

## II.   Legal Standard

Plaintiffs seek a temporary restraining order. (ECF No. 98.) Nonetheless, Plaintiffs gave notice to Defendants and did not seek a ruling before Defendants could respond. A temporary restraining order, which can be issued without notice to the adverse party, is meant to preserve the status quo until a court can make a reasoned resolution of a dispute. Fed. R. Civ. P. 65(b)(1); *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). Here, because the Defendants are on notice and the Court allowed time for extensive briefing, the Court will treat the motion as one for a preliminary injunction rather than for a temporary restraining order. *See Perez-Perez v. Adducci,* No. 20-10833, 2020 WL 2305276, at *3 (E.D. Mich. May 9, 2020) (doing the same). (*See also* ECF No. 68, PageID.1911.)

"Preliminary injunctions are extraordinary and drastic remedies [] never awarded as of right." *Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015). In determining whether to grant such an order, courts evaluate four factors: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant would suffer irreparable injury absent an injunction; 3) whether granting the injunction would cause substantial harm to others; and 4) whether the public interest would be served by granting the injunction. *Ne. Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). These four factors "are not prerequisites that must be met, but are interrelated considerations that must be balanced together. For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Id.* (internal quotations omitted).

## III.  Analysis

The Court grants Plaintiffs' motion in part because the Court finds that Plaintiffs face a high risk of irreparable injury absent an injunction,

Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim, and the public interest favors each Plaintiffs' release.

## A. Irreparable Injury

Plaintiffs are likely to experience irreparable injury absent an injunction, both in the form of loss of health or life and in the form of an invasion of their constitutional rights. *See Fofana v. Albence*, Case No. 20-10869, 2020 WL 1873307, at *10 (E.D. Mich. Apr. 15, 2020) (citing *Thakkur v. Doll*, No. 1:20-cv-480, 2020 WL 1671563, at *8 (M.D. Pa. Mar. 31, 2020)) ("There can be no injury more irreparable than lasting illness or death."); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed.").

### 1. Loss of Health or Life from COVID-19

In seven prior opinions issued both before and after the emergence of confirmed cases of COVID-19 among detainees at the Calhoun County Correctional Facility, the Court held that noncitizen civil detainees faced a high risk of infection from COVID-19. (*See* ECF Nos. 23 (granting Petitioner Malam TRO), 29 (granting Plaintiff Toma TRO), 33 (converting Malam TRO into preliminary injunction), 41 (converting

Toma TRO into preliminary injunction); 68 (granting preliminary injunction for Plaintiffs Alhalmi and Cardona Ramirez); 90 (granting preliminary injunction for Plaintiffs Salabarria and Rosales Borboa); *Zaya v. Adducci*, Case No. 20-10921, 2020 WL 1903172 (E.D. Mich. Apr. 18, 2020) (granting Petitioner Zaya TRO); *Zaya v. Adducci*, Case No. 20-10921, 2020 WL 2487490 (E.D. Mich. Apr. 18, 2020) (converting Zaya TRO into preliminary injunction)). Evaluating the significant body of public health and medical evidence on the record regarding the pandemic, the Court repeatedly concluded that "in the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors, a 'generalized risk' is a 'substantial risk' of catching the COVID-19 virus for any group of human beings in highly confined conditions, such as [Plaintiffs] within the CCCF facility." (ECF No. 23, PageID.559; ECF No. 68, PageID.1914.) In each case, the Court ultimately found that the movants faced a high risk of irreparable injury absent an injunction.

In considering whether these Plaintiffs who are still detained at the Calhoun County Correctional Facility similarly face a high risk of irreparable injury, the Court must evaluate whether Plaintiffs have a

heightened risk of a dire outcome from COVID-19. The Court must also evaluate the current severity of the COVID-19 pandemic and the conditions at the Calhoun County Correctional Facility, including the extent to which any failure by Calhoun County Correctional Facility to implement precautionary measures increases the risk to Plaintiffs. Only by evaluating the totality of the circumstances can the Court properly assess the nature and degree of the risk to Plaintiffs.

### a. Plaintiffs' risk of dire outcome from COVID-19

In its most recent opinion in this case, the Court summarized its earlier decisions as,

> in concert, . . . holding that the presence of a risk factor for severe illness and/or death translates a high risk of infection into a high risk of irreparable injury and a substantial risk of serious harm such that no conditions of confinement at the Calhoun County Correctional Facility can ensure a civil detainee's reasonable safety.

(ECF No. 90, PageID.2711.) The parties do not contest that each Plaintiff seeking relief in this motion is at heightened risk of a dire outcome from COVID-19.[2] Each Plaintiff has at least one condition that appears on the

---

[2] Defendants contest the risk of COVID-19 only as to Plaintiff Baroi. Defendants argue in their response that Plaintiff "Bar[]oi cannot establish that he has a substantial risk of serious harm based on primary hypertension and a history

CDC's list of risk factors for severe illness from COVID-19 or that the Court has previously concluded constitutes a risk factor. *See People Who Are At Higher Risk For Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited June 25, 2020). Plaintiff Barash is fifty-six years old and has unmedicated hypertension, active or latent tuberculosis, and a ten-year history of smoking. (ECF No. 98, PageID.3368–3369.) Plaintiff Krcoska is fifty-two years old and suffers from rheumatoid arthritis—an autoimmune disease—and a heart arrythmia. (*Id.* at PageID.3370.) Plaintiff Perez Pavon suffers from type 2 diabetes, because of which he is insulin dependent. (*Id.* at PageID.3370–3371.) Plaintiff Ley Santana has asthma (*Id.* at PageID.3371), which Plaintiffs' uncontested medical expert has classified as "moderate persistent." (ECF No. 99, PageID.3534.) Plaintiffs William and Johanna Whernman similarly have asthma, which Plaintiffs' uncontested medical expert has classified as "moderate to severe persistent asthma. (ECF No. 99, PageID.3536–3537.) Additionally,

---

of smoking 1-2 cigarettes a day for 2 years." (ECF No. 101, PageID.3578.) Because Plaintiff Baroi is no longer detained at the Calhoun County Correctional Facility, his request for injunctive relief is moot.

Plaintiff Johanna Whernman shows symptoms that meet the diagnostic criteria for hypertension. (ECF NO. 99, PageID.3536.) Dr. Katherine C. McKenzie, faculty member at the Yale School of Medicine, Director of the Yale Center for Asylum Medicine, and attending physician at the Yale School of Medicine and Yale New Haven Hospital, reviewed the medical records and related declarations of each Plaintiff in this case. (ECF No. 99.) Based on the above characteristics and health conditions, Dr. McKenzie concluded that "the seven detainees in this report are at high risk of severe illness or death from COVID-19." (ECF No. 99, PageID.3536.)

Because Defendants do not contest Dr. McKenzie's conclusion, the Court finds that each Plaintiff is at high risk of severe illness and/or death should they contract COVID-19.

### b. Severity of the pandemic

Plaintiffs argue that the pandemic continues to pose a high risk of infection to noncitizen immigration detainees held in communal confinement, such that "Plaintiffs cannot be safe at Calhoun" and "only their immediate release will vindicate their Due Process rights." (ECF NO. 98, PageID.3381.) Defendants argue that any previously recognized

12

risks remain unrealized while future risks are sufficiently mitigated so as to justify Plaintiffs' continued detention:

> "[Plaintiff's] fear is based on the alleged possibility of a "tinderbox scenario," where there could be a rapid and uncontrolled outbreak of COVID-19 at Calhoun based on the nature of a congregate setting. Petitioners cite to outbreaks that have occurred in Michigan and other states, but ignore the many congregate settings where it has not occurred, despite being months into a pandemic and Michigan having moved past the peak of its cases. The facts are that Calhoun has not experienced an outbreak, has implemented significant precautions to reduce the risk of exposure, and having recently tested roughly a third of its population, only 2% tested positive, and those were asymptomatic cases."

(ECF No. 101, PageID.3567.)

The Court cannot rely on its earlier risk analysis to find the same risk to Plaintiffs today, given that approximately one month has passed since the Court's most recent decision in this case and the contours of the COVID-19 pandemic change often and significantly. Evaluating the new evidence on the record, the Court finds that COVID-19 remains an extraordinary threat to those both in and outside of communal detention at the Calhoun County Correctional Facility.

Globally and locally, COVID-19 continues to spread. A June 1, 2020 World Health Organization situation report records 6,057,853 cases and

371,166 deaths globally. (ECF No. 98-4, 2020). As of that date, the United States had reported 1,734,040 total confirmed cases, with 102,400 deaths. (*Id.*) As of June 25, 2020, the state of Michigan reported 62,306 COVID-19 cases with 5,887 confirmed COVID-19-related deaths. *Coronavirus*, Michigan.gov, https://www.michigan.gov/coronavirus/ (last updated June 25, 2020). Of 8,858 detainees in ICE detention tested as of June 19, 2020, 2,521 detainees tested positive, including five at the Calhoun County Correctional Facility (Defendants note in a supplemental declaration that as of June 17, 2020, a sixth detainee tested positive (ECF No. 120, PageID.4099)) and sixty-three total in detention centers under the jurisdiction of the Detroit Field Office. *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (last updated June 25, 2020). There are currently 871 confirmed COVID-19 positive detainees in ICE custody. *Id.* An additional forty-five ICE detention center employees had tested positive as of June 15, 2020. *Id.*

The term "second wave" is now vernacular, though many public health experts insist the United States remains in the midst of its first wave of the virus. As Plaintiffs allege, "states around the country have

begun to see new highs in daily infection rates as they reopen, . . . multiple waves of infections are predicted, and . . . the course of the pandemic in prisons and jails differs from that in society at large." (ECF No. 117, PageID.4023.) Dr. Anthony Fauci, the chief medical advisor for the White House coronavirus task force, anticipates a spike of cases "in closed environments like nursing homes, prisons and factories" as states continue to reopen. Donald G. McNeil Jr., *As States Rush to Reopen, Scientists Fear a Coronavirus Comeback*, NY Times (May 11, 2020), https://www.nytimes.com/2020/05/11/health/coronavirus-second-wave-infections.html. Plaintiffs attach to their reply the declaration of Gregg Gonsalves, Assistant Professor in Epidemiology of Microbial Diseases at the Yale School of Medicine, Associate Professor of Law at Yale Law School, and 2018 recipient of a MacArthur Fellowship from the John D. and Catherine T. MacArthur Foundation. (ECF No. 117-4.) Drawing on over three decades of public health experience researching epidemic diseases with a focus on the use of quantitative models to improve disease response, Gonsalves warns that "even in areas where it has been possible to successfully bend the curve, this does not mean that the deadliest part of the pandemic is past. . . . There is a strong likelihood that the COVID-

19 epidemic will return in at least one wave, rather than be eradicated completely after an initial burst." (*Id.* at PageID.4046.) Gonsalves quickly discredits the claim that a temporary, localized reduction in infections renders continued precautionary measures unnecessary: "A dramatic relaxation of social distancing just because the curve had bent would be akin to closing an umbrella during a rainstorm because one has not yet gotten wet." (*Id.*) Gonsalves concludes that "relaxed social distancing, seasonality, and immunity that weakens over time will likely produce at least one serious future wave of COVID-19 infections and deaths, if not more." (*Id.* at PageID.4047.)

Of particular relevance to Plaintiffs, Gonsalves articulates COVID-19 concerns specific to conditions of communal confinement: "It will take longer to combat the pandemic in jails and prisons" (*Id.* at PageID.4048); "[j]ails and prisons can serve as reservoirs of COVID-10" (*Id.*); "[j]ails and prisons will serve as accelerants during any future wave" (*Id.* at PageID.4049); and "[r]educing these risks requires decreasing jail and prison populations, particularly when it comes to individuals at highest risk from COVID-19." (*Id.* at PageID.4050.) Defendants do not rebut these conclusions but instead argue only that "Calhoun has implemented

precautions that reduce the opportunity for introduction of COVID-19 to the facility and those precautions have evolved over the course of the pandemic." (ECF No. 101, PageID.3572.)

The Court will address below the extent to which current precautionary measures mitigate the risk of COVID-19 to Plaintiffs, but to suggest that the threat from COVID-19 has diminished mischaracterizes the nature of the pandemic as understood by public health and medical experts. The Court finds a continued high risk of COVID-19 infection, particularly for Plaintiffs who are living in communal confinement.

### c. Impact of precautionary measures

While Plaintiffs argue that *no* conditions of confinement satisfy constitutional constraints during the COVID-19 pandemic, Plaintiffs' current conditions of confinement bear on the extent to which Plaintiffs face a high risk of irreparable injury absent an injunction.

Since this litigation began, Defendants have insisted that, in the absence of a significant outbreak, precautionary policies issued by ICE and adopted by the Calhoun County Correctional Facility sufficiently mitigate the risk of COVID-19 to detainees: "Petitioner is not at an

immediate risk of harm. There are no cases of COVID-19 at CCDC, and 25 confirmed cases in the surrounding county" (ECF No. 11, PageID.184) (April 3 Response); "[t]here are no suspected cases of COVID-19 at CCDC, which tends to suggest the measures are reasonably effective. . . . The possibility that COVID-19, by nature of its asymptomatic transmission, could enter CCDC, and make its way to Malam, is simply insufficient under *Helling* and *Wooler* to establish a substantial risk of exposure" (ECF No. 30, PageID.653) (April 10 Response); "the facts are that Calhoun continues to have zero confirmed cases of COVID-19 and has concrete plans in place to reduce the risk of exposure and spread." (ECF No. 52, PageID.1527) (April 29 Response).

However, the—according to Defendants—improbable soon occurred. On May 11, 2020, counsel for Defendants informed the Court by email that one detainee at the Calhoun County Correctional Facility tested positive for COVID-19. On May 14, 2020, counsel for Defendants informed the Court that another detainee—one who had been in contact with the first detainee to test positive—also tested positive. On May 23, 2020, voluntary testing of fifty detainees, forty-seven inmates, and sixteen staff members revealed two additional positive detainees, raising

the total number of positive cases to five (somewhere along the line, a third detainee tested positive (*see* ECF No. 101, PageID.3572)). On June 17, 2020, the Court learned from Defendants' supplemental declaration that a sixth detainee has tested positive. (ECF No. 120, PageID.4099.) Defendants seek to minimize the scope of the outbreak at Calhoun: "In the time that the state of Michigan has seen nearly 65,000 confirmed cases, Calhoun has seen only [6]." (ECF No. 101, PageID.3567). However, Defendants' attempt to contrast these infection rates reveals the gravity of the situation. 65,000 Michiganders represent 0.65 percent of the state's population of 9,986,857, *see QuickFacts Michigan*, United States Census Bureau, *https://www.census.gov/quickfacts/MI* ((last visited June 23, 2020), whereas the six confirmed cases at the Calhoun County Correctional Facility constitute 1.4 percent of the center's 349 inmates and detainees—a disease prevalence more than twice that of the state as a whole. Considering Michigan's COVID-19 statistics, Governor Gretchen Whitmer recently extended the State of Emergency until July 16. *Governor Whitmer Extends State of Emergency to Continue Protecting the Health and Safety of Michiganders*, Michigan.gov (June 18, 2020), https://www.michigan.gov/whitmer/0,9309,7-387-90499-532360--

,00.html. By this measure, the Calhoun County Correctional Facility faces a similar, if not greater, state of emergency.

Defendants stand by the precautionary measures in place at the Calhoun County Correctional Facility. They emphasize that ICE guidance tracks CDC recommendations (ECF No. 101, PageID.3570) and that "Calhoun's success is due in part to its strict quarantine procedures." (*Id.* at PageID.3573.) Defendants provide the declaration of James Jacobs, Assistant Field Officer Director with the Detroit Field Office of Enforcement and Removal Operations. (ECF No. 101-8, PageID.3628.) Assistant Director Jacobs explains that "[s]ince the onset of reports of Coronavirus Disease 2019 (COVID-19), ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees." (*Id.* at PageID.3630.) He lists the precautionary measures adopted by ICE and employed by the Calhoun County Correctional Facility, including mandatory quarantine for all arriving detainees; required use of masks by staff involved in transport, intake, and booking; testing of detainees consistent with CDC and Michigan Department of Health and Human

20

Services guidelines; symptom screening of staff and vendors upon entering the facility; education for staff and detainees on proper hygiene; daily cleaning of cells and hourly cleaning of common areas using a disinfectant; continual access to antibacterial soap for detainees and hand sanitizer for staff; a reduced facility population; education on social distancing; and review of the detainee population for risk of dire outcomes from COVID-19. (ECF No. 101-8.) Courtesy of the Michigan National Guard, the Calhoun County Correctional Facility recently tested fifty detainees, forty-seven inmates, and sixteen staff members (each of whom volunteered for testing), identifying two cases of COVID-19 in the process. (ECF No. 101, PageID.3573.) In a supplemental declaration, Assistant Director Jacobs notes that as of June 11, 2020, the Calhoun County Correctional Facility has been testing all incoming detainees and inmates for COVID-19 upon completion of a mandatory 14-day quarantine before placing them in the general population. (ECF No. 120, PageID.4099.)

The Court recognizes that Defendants and the Calhoun County Correctional Facility have done much to prevent the spread of COVID-19. However, the public health evidence on the record continues to

demonstrate the myriad ways in which precautionary measures at the Calhoun County Correctional Facility fail to sufficiently mitigate the pandemic's risk to medically vulnerable detainees. Once again, Plaintiffs provide a declaration from Dr. Homer Venters, a physician, internist and epidemiologist with over a decade of experience in providing, improving, and leading health services for people in incarceration. (ECF No. 98-3.) Dr. Venters reviewed the significant body of evidence both on the record and produced through discovery (*Id.* at PageID.3413–3414) identifying several areas in which Defendants' response falls short. The Court will discuss each area in turn.

### i.    Social Distancing

Adequate social distancing is impossible at the Calhoun County Correctional Facility. As the CDC defines it, "[s]ocial distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic)." *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers        for        Disease        Control        and        Prevention,

22

https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last reviewed May 7, 2020). The CDC calls proper social distancing "a cornerstone of reducing transmission of respiratory diseases such as COVID-19." *Id.*

> Defendants write,

> There are specific measures implemented at Calhoun to increase social distancing. Calhoun is not overcrowded and currently houses 349 inmates and detainees, though it has a capacity to house 640. . . .  None of the Petitioners named as part of this motion are in a housing unit that is at capacity. Detainees are educated on the need for social distancing and practices that reduce exposure. . . . In accordance with ICE Detained Docket Review guidance, ICE reviews detainees who are considered high risk under CDC guidelines to determine if continued detention is appropriate.

(ECF No. 101, PageID.3575–3576.) Defendants' insistence that Calhoun is not overcrowded is inadequate: population reduction is important during a pandemic because a reduced population would allow detainees—even those who are asymptomatic—to remain six feet apart at all times. Whether the Calhoun County Correctional Facility has a detainee population of three or 300, it fails to meet public health standards if those detainees cannot socially distance themselves. And despite Defendants' efforts, such distancing remains illusory. The record is replete with

23

declarations citing continued close quarters and closer contacts: Plaintiff Baroi, prior to his removal, reported that social distancing was impossible due to the facility's sleeping arrangements (ECF No. 98-3, PageID.3417); Plaintiff Krcoska is housed in a cell with five other detainees, with beds spaced three feet apart (*Id.*); Plaintiff Perez Pavon shares a cell with six other detainees in bunkbeds, preventing social distancing (*Id.*); Plaintiff Santana reports being housed in a pod with 46 other detainees. (*Id.*) Plaintiffs Baroi and Krcoska report that detainees cannot socially distance themselves during meals, as they "eat meals at communal tables" "in such close quarters that their elbows touch." (*Id.*) Plaintiff Baroi expressed concern that "similarly close contact occurs in line to receive meals." (*Id.*)

Even Plaintiffs who previously had single-cell housing can no longer socially distance. Defendants noted in their response that pending removal, Plaintiffs Johanna and William Whernman both resided in single cells. (ECF No. 101, PageID.3570.) However, Plaintiffs returned to the general population on June 16, 2020. (ECF No. 122, PageID.4123.) Plaintiff Johanna Whernman now shares a cell with a detainee who is currently ill with a high fever and a common space with 46 other

detainees. (*Id.*) Plaintiff William Whernman shares a dormitory with 20 to 30 other detainees who sleep in beds spaced 1.5 feet apart. (*Id.* at PageID.4123.)

Dr. Venters concludes,

As a result, while there may be educational posters and signage at Calhoun warning detainees about the importance of social distancing and other measures, they do not address the basic issue that is the physical impossibility, as reflected in the personal recounts of Plaintiffs, for detainees to maintain a six-foot distance from others at all times.

(ECF No. 98-3, PageID.3417.) As one District Court recently analogized, a jail establishing COVID-19 precautions without ensuring adequate social distancing is the equivalent of "a NASCAR driver who spurns a seatbelt and helmet because she plans not to crash." *Savino v. Souza*, Case No. 1:20-10617-WGY (D. Mass. June 18, 2020), ECF No. 225.

## ii. Testing

While the Calhoun County Correctional Facility recently employed testing courtesy of the Michigan National Guard, the overall level of testing does not meet public health standards. The May 23 testing occurred on a voluntary basis: only fifty detainees and forty-seven inmates—roughly one-third of the facility's population—signed up for

testing. (ECF No. 101-8, PageID.3631.) On June 13, 2020, the CDC formally recommended testing of *all* persons in "settings that house vulnerable populations in close quarters for extended periods of time," including "correctional and detention facilities," in order to enable "early identification of asymptomatic individuals." *Overview of Testing for SARS-CoV-2*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html#asymptomatic_without_exposure (last updated June 13, 2020). The CDC further recommends "initial testing of everyone residing and/or working in the setting, [r]egular (e.g., weekly) testing of everyone residing and/or working in the setting, and [t]esting of new entrants into the setting and/or those re-entering after a prolonged absence (e.g., one or more days)." *Id.* Two days prior to this updated guidance, the Calhoun County Correctional Facility implemented testing of all incoming detainees and inmates. (ECF No. 120, PageID.4099.) While this policy addresses the third recommended precaution, there continues to be no evidence that ICE or the Calhoun County Correctional Facility is considering universal testing of staff and detainees. To the contrary, on May 7, 2020, Defendants explained to the Court in another case that

"Calhoun does not have plans to implement mandatory COVID-19 testing for all staff and detainees." *Zaya v. Adducci¸* Case No. 20-10921 (E.D. Mich. May 7, 2020), ECF No. 13.

Dr. Venters concludes that until initial and periodic testing is provided for all detainees, inmates, and staff, the Calhoun County Correctional Facility is not following Michigan Department of Health and CDC guidance on testing. (ECF No. 98-3, PageID.3415.) And particularly given that limited testing revealed two additional asymptomatic COVID-19 cases, Defendants cannot reasonably assert without universal testing that the current outbreak is limited to only six cases.

### iii.  Implementation

Even where Defendants have imposed precautionary measures, the record before the Court indicates that many of these measures may exist as policy only. Plaintiff Krcoska reports that detainees in his cell go two to three days without soap when their supply runs out; only detainees with more than $15 in their commissary account can afford a personal supply. (ECF No. 98-9, PageID.3511.) Plaintiff Krcoska alleges that the "regular guards that are in Calhoun every day rarely wear masks. They also do not always wear gloves." (*Id.*) Plaintiff Yohandry Ley Santana

27

similarly alleges that "the staff at Calhoun does not typically wear masks, and they only wear gloves when they come into contact with the detainees." (ECF No. 98-10, PageID.3515.)

Detainees are also frequently moved throughout the facility in violation of their own quarantine policy. Plaintiffs provide a declaration analyzing daily housing reports produced by Defendants from April 15, 2020 to May 15, 2020. (ECF No. 98-5.) Plaintiffs identified eighteen detainees who did not remain in a single quarantine area for fourteen days prior to being transferred to other areas of the facility and 20 detainees who were not placed into a designated quarantine area upon intake. (*Id.* at PageID.3493.) Two detainees were moved from non-quarantine areas into quarantine areas and then back again within a single week. (*Id.* at PageID.3494.) During the month that Defendants produced housing reports, detainees were transferred between pods at least 250 times. (*Id.*) Dr. Venters concludes that these policy failures represent "a lack of adherence to basic CDC guidelines regarding infection control in detention settings." (ECF No. 98-3, PageID.3417.)

Despite this being Dr. Venters' third supplemental declaration pinpointing disparities between Defendants' precautionary measures

and a sound public health response, Defendants have yet to provide the Court with any public health or medical evidence—other than references to CDC standards—defending the existing precautionary measures as being either sufficient or sufficiently implemented. Because each Plaintiff is at heightened risk of a dire outcome from COVID-19, the risk of COVID-19 infection remains high, and precautionary measures at the Calhoun County Correctional Facility do not mitigate the risk to Plaintiffs, the Court finds that Plaintiffs are at a high risk of irreparable injury in the form of loss of health or life absent an injunction.

## 2. Violation of Constitutional Rights

Plaintiffs have additionally shown a high risk of irreparable injury in the form of infringement on their Fifth Amendment rights. Plaintiffs argue that "Defendants have violated, and continue to violate, Plaintiffs' constitutional Due Process rights by detaining them in conditions that in no way 'reasonably relate[] to a legitimate governmental purpose.'" (ECF No. 98, PageID.3384–3385 (citing *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)).) The finding that a constitutional violation is likely establishes irreparable harm. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired,

29

irreparable injury is presumed."); *Overstreet v. Lexington-Fayette Urban Cty. Gov.*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)); *see also Rhinehart v. Scutt*, 408 F. App'x 510, 514 (6th Cir. 2018) (suggesting that allegations of "continuing violation of . . . Eighth Amendment rights" would trigger a finding of irreparable harm). Below, the Court finds Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim. Accordingly, "no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.")

## B. Likelihood of Success on the Merits

Plaintiffs bring a claim for "Violation of Fifth Amendment Right to Substantive Due Process: Impermissible Punishment and Inability to Ensure Reasonable Safety for the Medically Vulnerable." (ECF No. 87, PageID.3346.) The heart of Plaintiffs' claim is the allegation that "there are no conditions of confinement that would permit the safe detention (or re-detention) of [medically vulnerable detainees]." (*Id.*) Accordingly, the Court understands Plaintiffs' lawsuit as challenging their conditions of

30

confinement in civil detention for the duration of the COVID-19 pandemic. As discussed below, this characterization places Plaintiffs' claim in the gray area between two distinct threads of legal precedent.

### 1. Legal Standard

As civil detainees, Plaintiffs are protected by the Fifth Amendment's Due Process Clause. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Daniels v. Woodside*, 396 F.3d 730, 735 (6th Cir. 2005). In *Bell v. Wolfish*, the Supreme Court analyzed the scope of Fifth Amendment Protections as they pertain to civil detainees. 441 U.S. 520 (1979). The Court held that

> [i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.

*Id.* at 535. To determine whether a condition or restriction constitutes punishment, the Court held that "absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to

which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id.* at 538. Accordingly, the Court concluded that

> if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 539. In *Youngberg v. Romeo*, the Supreme Court applied *Bell* to a conditions of confinement claim brought by a person with an intellectual disability in state custody. 457 U.S. 307 (1982). In *Block v. Rutherford*, the Supreme Court again affirmed *Bell's* application to conditions of confinement claims and applied the *Bell* framework to a pretrial detainee's claim that a policy prohibiting contact visits violated the Fourteenth Amendment. 486 U.S. 576 (1984).

Where the Fifth Amendment protects civil detainees from punishment, the Eighth Amendment protects post-conviction criminal detainees from cruel and unusual punishment. In *Estelle v. Gamble*, the Supreme Court held that deliberate indifference to the serious medical

32

needs of prisoners entailed "unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." 429 U.S. 97, 104. (1976). In *Helling v. McKinney*, the Supreme Court applied the deliberate indifference standard to a prisoner's claim regarding prison conditions. 509 U.S. 25 (1993). A prisoner challenged his exposure to second-hand smoke as being in violation of the Eighth Amendment. The Court, applying *Estelle*'s deliberate indifference test, reiterated that "it is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." 509 U.S. 25, 30–31. In *Farmer v. Brennan*, the Court again applied *Estelle's* deliberate indifference test to claims challenging conditions of confinement, finding that the Eighth Amendment mandates "humane conditions of confinement" and that "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" 511 U.S. 825, 832 (1994) (internal citations omitted).  The Court explained that the deliberate indifference test requires a subjective and objective component. *Id.* at 834.

Although the Eighth Amendment does not apply to civil detainees, the Sixth Circuit has imported much of the Supreme Court's deliberate indifference analysis into its adjudication of Fifth and Fourteenth Amendment claims by civil and pretrial detainees. In *Thompson v. Cty. of Medina*, the Sixth Circuit acknowledged *Bell's* holding that, under the Fourteenth Amendment, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." 29 F.3d 238, 242 (6th Cir. 1994) (citing *Bell*, 441 U.S. 520 at 535). The Court then stated that "such detainees are thus entitled to the same Eighth Amendment rights as other inmates" and proceeded to apply only Eighth Amendment analysis to pretrial detainees' claims challenging the conditions of their confinement. *Id.* In *Spencer v. Bouchard*, the court addressed the Fifth, Eighth, and Fourteenth Amendments' respective prohibitions on punishment. 449 F.3d 721, 727 (6th Cir. 2003.) Citing to *Bell*, the court recognized that the Fifth and Fourteenth Amendments "provide[] similar if not greater protections than the Cruel and Unusual Punishments Clause" but wrote—without further explanation—that "[f]or the sake of simplicity, we refer to the Eighth Amendment in the following discussion." *Id.* In *Villegas v. Metro. Gov't*, the Sixth Circuit

34

held that "[p]retrial detainee claims, though they sound in the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment . . . are analyzed under the same rubric as Eighth Amendment claims brought by prisoners" because "the concept underlying the Eighth Amendment is nothing less than the dignity of humankind." 709 F.3d 563, 568 (6th Cir. 2013).

This Court has employed a similar approach in order to meet the demands of urgent litigation. The Court issued its first injunction in this case on April 5, 2020, six days after Petitioner Malam first filed a motion for a temporary restraining order. (ECF No. 22.) The Court relied on the factual similarities between this case and *Helling v. McKinney*, in which the Supreme Court addressed a prisoner's claim that second-hand smoke exposure violated his Eighth Amendment rights. (*Id.* at PageID.519.) The Court also looked to *Basank v. Decker*, an opinion from the Southern District of New York and one of the first judicial writings on the constitutionality of civil detention during the novel coronavirus pandemic. Case No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020). In part because both *Helling* and *Basank* applied a deliberate indifference standard, the Court did the same. However, the Court gave

passing reference to *Bell*, writing that "Petitioner's continued detention cannot 'reasonably relate[] to any legitimate government purpose.'" (ECF No. 22, PageID.523.)

The Sixth Circuit does not use a deliberate indifference framework to analyze every Fifth or Fourteenth Amendment detention claim. The Sixth Circuit has applied *Bell's* punishment standard, without reference to deliberate indifference, to claims involving excessive force, *see U.S. v. Budd*, 496 F.3d 517, 529 (6th Cir .2007), use of solitary confinement, *see J.H. v. Williamson Cty.*, 951 F.3d 709, 717 (6th Cir. 2020), and the transfer of psychiatric detainees, *see Turner v. Stumbo*, 701 F.2d 567, 571 (6th Cir. 1983).

Supreme Court precedent helps to explain the application of varying legal standards to claims brought by civil detainees. In *Deshaney v. Winnebago Cty. Dep't of Social Servs.*, the Court cited to *Youngberg*— a Due Process Clause case—and *Estelle*—an Eighth Amendment case— before concluding that, "[t]aken together, [these precedents] stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and

36

general well-being." 489 U.S. 189, 199–200 (1989). *Deshaney* articulated a more general duty to care that exists in both civil and criminal detention: "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200.

Ultimately, Sixth Circuit precedent supports finding that the Fifth and Eighth Amendment protections are coextensive—justifying the application of a deliberate indifference test—and distinct—requiring a punishment standard. In a table decision, the Sixth Circuit applied *Bell* to conditions of confinement claims by pretrial detainees. *Gay Inmates of Shelby Cty. Jail v. Barksdale*, 819 F.2d 289, 1987 WL 37565 (6th Cir. June 1, 1987) (table decision). The court held that "[t]he conditions of confinement of convicted inmates are evaluated under an eighth amendment standard, but a somewhat different standard applies to pretrial detainees because, 'under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt.'" *Id.* at *2. The court concluded that

> [s]ince this is a class action in which the majority of the
> members of the class are presumptively pretrial detainees, we

must examine the inmate classification procedures and the conditions of detention, as they appear from the record, in light of standards established in *Wolfish* to determine whether plaintiffs' constitutional rights are being violated.

*Id.* In contrast, the court in *Ruiz-Bueno v. Scott* recognized a perceived equivalency between the two standards. 639 F. App'x 354 (6th Cir. 2016). Addressing a pretrial detainee's claim that the conditions of his confinement fell below the minimal standard of decency, the court held that "[Due Process] rights encompass the Eighth Amendment rights of prisoners. . . . Thus, Supreme Court precedents governing prisoners' Eighth Amendment rights also govern the Fourteenth Amendment rights of pretrial detainees." *Id.* at 359. In other instances, the court has not addressed the question at all. The court wrote in *Leary v. Livingston Cty.* that "[w]hile there is room for debate over whether the Due Process Clause grants pretrial detainees more protections than the Eighth Amendment does, . . . we need not resolve that debate here." 528 F.3d 438, 443 (6th Cir. 2008).

The Sixth Circuit is not the only circuit to suggest ambiguity on when and how punishment and deliberate indifference standards apply to claims under the Fifth and Fourteenth Amendments. In *Hare v. City*

*of Corinth*, the Fifth Circuit analyzed the "peripatetic route" of its efforts to sort out those precise questions. 74 F.3d 633, 643 (5th Cir. 1996). The court concluded that "the *Bell* test retains vitality only when a pretrial detainee attacks general conditions, practices, rules, or restrictions of pretrial confinement. When, by contrast, a pretrial detainee's claim is based on a jail official's episodic acts or omissions, the *Bell* test is inapplicable, and hence the proper inquiry is whether the official had a culpable state of mind in acting or failing to act." *Id.*

For now, the Court looks to the parties for their interpretation of this legal landscape, and they interpret Sixth Circuit precedent as supporting dueling frameworks for the classification of the pending claims. Despite excellent briefing from both sides and the submission of an *amicus* brief, the Court cannot discern a universal rule to govern all Fifth Amendment claims. For the reasons set forth below, the Court makes the limited decision that claims challenging the conditions of confinement in civil detention are governed by the *Bell* punishment test.

Defendants argue that civil detainees' claims may be sorted using an action/inaction binary. "Since *Bell*, the Sixth Circuit has drawn a distinction among pretrial detainee claims challenging the government's

39

failure to protect those in its custody, which are evaluated under a deliberate indifference standard, and challenges to affirmative acts of prison officials, which are evaluated under *Bell*'s punishment standard." (ECF No. 80, PageID.2372.) Defendants rely on *Roberts v. City of Troy*, where the Sixth Circuit upheld a jury instruction on deliberate indifference for a pretrial detainee's due process claim alleging a failure "to promulgate and enforce procedures to identify potential suicides and prevent their occurrence." 773 F.2d 720, 722 (6th Cir. 1985). *Roberts* interpreted *Bell* as "deal[ing] with actions rather than the failure to act," but further elaborated that

> if we transpose the *Bell v. Wolfish* standard to failures to act, we would also arrive at a deliberate indifference requirement. If a failure to act is reasonably related to a legitimate governmental objective, the failure to act cannot have the purpose of punishment unless the failure to act was deliberate. *Bell v. Wolfish* requires an intent to punish.

*Id.* at 726.

*Roberts* does not support Defendants' proposed framework because it misconstrues *Bell* in two critical ways. First, *Bell* involved a challenge to "numerous conditions of confinement," some of which could be articulated as government action (improper searches), some of which

40

could be articulated as a failure to act (overcrowded conditions), and some of which could be both an act and an omission (an imposition of undue length of confinement is a failure to grant release, while employing insufficient staff is a failure to hire additional employees). *Bell*, 441 U.S. at 527. Plaintiffs challenge the fact of their confinement, which is defined by a similar array of actions and inactions. Moreover, *Deshaney* acknowledges that government action is always present in Fifth and Fourteenth Amendment cases: "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." 489 U.S. at 200. Second, *Bell* does not require an explicit intent to punish. Although demonstrating intent was one way in which a plaintiff could succeed on the merits of a Fifth Amendment claim, *Bell* also recognized that "[a]bsent a showing of an expressed intent to punish on the part of detention facility officials," a plaintiff may nonetheless show that a restriction or condition is not rationally connected or is excessive in relation to a legitimate government purpose. *Id.* at 538.

Plaintiffs proposed approach similarly fails to provide a generally applicable rule this Court can apply. Plaintiffs argue that the Sixth Circuit distinguishes among claims based on the nature of the claim in question: "conditions claims have been evaluated under the punishment test and medical claims under deliberate indifference." (ECF No. 82, PageID.2431.) Plaintiff's illustrative examples fit this mold: in *Turner*, the Sixth Circuit applied a punishment test to a conditions of confinement claim, 701 F.2d at 568, 572–73, and in *J.H. v. Williamson Cty.*, the court applied a punishment test to a claim challenging the use of solitary confinement, 951 F.3d 709, 717 (2020); in *Villegas*, 709 F.3d at 568–69, and *J.H.*, 951 F.3d at 722 –23, the court applied a deliberate indifference to medical claims**.** However, in *Wilson v. Seiter*, the Supreme Court held that "the medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates." 501 U.S. 294, 304 (1991). Plaintiffs' proposed categories thus blur at their edges, as at least some medical care claims may also be construed as conditions of confinement claims.

On May 18, 2020, with the Court's leave, Rights Behind Bars and the Roderick & Solange MacArthur Justice Center filed an *amicus* brief in support of Plaintiffs on the issue of the punishment and deliberate indifference standards. (ECF No. 81.) Unlike the parties, *amici* did not propose a generally applicable rule; instead, they argued only that the punishment test is the appropriate standard for this case. *Amici* argue that *Youngberg v. Romero* is dispositive here. 457 U.S. 307 (1982). In *Youngberg*, the Supreme Court, addressing a conditions of confinement claim brought by a person with an intellectual disability in civil custody, held it was legal error for the court to instruct the jury that an Eighth Amendment standard applied. 457 U.S. at 325.

The Court agrees with *amici*. In *Youngberg*, the Court held that civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. *Cf. Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)." *Id.* at 322. By recognizing an Eighth Amendment jury instruction as legally erroneous and contrasting its holding with *Estelle*, *Youngberg* stands for the proposition that a

43

deliberate indifference framework does not apply to conditions of confinement claims brought by civil detainees.

More recent Supreme Court precedent affirms this conclusion. In *Kingsley v. Hendrickson*, the Supreme Court addressed the legal standard that applied to a pretrial detainees' excessive force claim under the Fourteenth Amendment's Due Process Clause. 135 S. Ct. 2466 (2015). The Court applied *Bell* to hold that the plaintiff need only show that the use of force was objectively unreasonable. *Id.* at 2470. Although *Kingsley* did not address a conditions of confinement claim, it affirmed the application of *Bell* to such claims: "The *Bell* Court applied this latter objective standard to evaluate a variety of prison conditions, including a prison's practice of double-bunking." *Id.* at 2474.

*Kingsley* also explicitly rejected the use of Eighth Amendment precedent in evaluating Due Process claims. Respondents in *Kingsley* cited to *Whitley v. Albers*, 475 U.S. 312 (1986), and *Hudson v. McMillian*, 503 U.S. 1 (1992), for the proposition that pretrial detainees must show a subjective element for excessive force claims. *Id.* But the Court was quick to point out that "these cases, however, concern excessive force claims brought by convicted prisoners under the Eighth Amendment's

Cruel and Unusual Punishment Clause, not claims brought by pretrial detainees under the Fourteenth Amendment's Due Process Clause." *Id.* As the Court explained, "The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Id.*

*Bell*, *Youngberg*, and *Kingsley* lead to the conclusion that *Bell's* punishment standard applies to Plaintiffs' claims in this case.

Sixth Circuit precedent addressing the COVID-19 pandemic does not mandate a different result. Defendants, in a supplemental notice, point the Court to two recent Sixth Circuit opinions addressing conditions of confinement claims related to COVID-19. (ECF No. 109 (citing *Wilson, et al. v. Williams, et al.*, No. 20-3447, 2020 WL 3056217 (6th Cir. June 9, 2020) and *Cameron, et al. v. Bouchard, et al.,* No. 20-1469, 2020 WL 3100187 (6th Cir. June 11, 2020)).) In *Wilson*, the Sixth Circuit applied a deliberate indifference standard to a group of medically vulnerable prisoners' Eighth Amendment claims arising from their confinement in a federal prison. 2020 WL 3056217, at *7. In *Cameron*, the court applied *Wilson* to a conditions of confinement claim filed by a

group of pretrial detainees and convicted prisoners in a county jail. 2020 WL 3100187, at \*2. *Wilson* is an Eighth Amendment case and does not apply here. Although *Cameron* applied an Eighth Amendment deliberate indifference standard to some pretrial detainees, the majority did not address the alternative applicability of a punishment standard; the opinion does not cite to *Bell*. Writing in dissent, Chief Judge Cole raises this issue: "Moreover, the pretrial detainees at the Jail bring their claims under the Fourteenth Amendment, and, as such, I am not convinced that they must satisfy the deliberate indifference standard that doomed the petitioners' Eighth Amendment claims in *Wilson*." 2020 WL 3100187, at \*3 (Cole, J., dissenting) (citing *Kingsley v. Hendrickson*, 135 S. Ct. at 2473; *J.H. v. Williamson Cty.*, 591 F.3d at 717, and *Bell v. Wolfish*, 441 U.S. at 535, 538–39). Nothing in *Cameron* precludes today's result.[3]

Only *Thompson v. Cty. of Medina* stands in contradiction to the Court's holding today. 29 F.3d at 242 (applying Eighth Amendment standard to pretrial detainee's conditions of confinement claims).

---

[3] Plaintiffs point out that even if *Cameron* had rejected the applicability of a punishment standard to claims brought by pretrial detainees, *Cameron* was neither recommended for publication nor selected for publication in a federal reporter. Unpublished opinions lack precedential force and are not binding. *See United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007).

However, a close reading of *Thompson* demonstrates that the court recognized the application of *Bell* but proceeded to apply an Eighth Amendment standard as shorthand. As *Thompson* stated,

> conditions of pretrial detention that implicate only the protection against deprivation of liberty without the due process of law, and no other express guarantee of the Constitution, are constitutional if they do not 'amount to punishment of the detainee.' *Bell*, 441 U.S. at 535[.] . . . Absent a showing of an expressed intent to punish on the part of jail officials, if such a condition or restriction of pretrial detention 'is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'

*Id.* Although *Thompson* did not proceed to engage in a *Bell* analysis, it supports applying *Bell* here.

The Court acknowledges that today's decision diverges from its earlier opinions in this case. (*See* ECF No. 23, PageID.563 (applying deliberate indifference standard); ECF No. 29, PageID.641 (applying deliberate indifference standard but questioning need for Plaintiffs to show subjective component); ECF No. 68, PageID.1932 (applying deliberate indifference standard but ordering supplemental briefing on whether punishment standard applies).) But Sixth Circuit and Supreme Court precedent compels this result, and a district court's opinion is

never binding precedent. *See Camreta v. Greene*, 563 U.S. 692, 709 (2011) (internal citation omitted) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."). Moreover, in each opinion, the Court found that the Plaintiffs satisfied an Eighth Amendment deliberate indifference standard. Conditions that constitute an Eighth Amendment violation necessarily constitute a Fifth Amendment violation. *See Youngberg*, 457 U.S. at 322 (civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish); *Hubbard v. Taylor*, 399 F.3d 150, 165–66 (3d Cir. 2005) ("[T]he Eighth Amendment [is] relevant to conditions of pretrial detainees only because it establishe[s] a floor."); *Jones v. Blanas*, 393 F.3d 918, 933 (9th Cir. 2004) ("[P]urgatory cannot be worse than hell."). Therefore, the application of the punishment standard in any of the Court's earlier opinions would not have led to a different result.

The Court will apply *Bell* to Plaintiffs' current and future claims. "[U]nder the Due Process Clause, [Plaintiffs] may not be punished." *Bell*

441 U.S. 520, 535 (1979). *Youngberg* mandates that Plaintiffs are entitled to "conditions of reasonable care and safety." 457 U.S. at 324. The Court finds that Defendants have not expressed an intent to punish Plaintiffs; accordingly, under *Bell*, the Court must determine whether Plaintiffs' detention is rationally connected to a legitimate government purpose and whether it is excessive in relation to that purpose. *Id.* at 538.

The *Bell* standard does not require consideration of Defendants' subjective evaluation of Plaintiffs' conditions of confinement. As *Kingsley* explained,

> the *Bell* Court applied [an] objective standard to evaluate a variety of prison conditions, including a prison's practice of double-bunking. In doing so, it did not consider the prison officials' subjective beliefs about the policy. . . . Rather, the Court examined objective evidence, such as the size of the rooms and available amenities, before concluding that the conditions were reasonably related to the legitimate purpose of holding detainees for trial and did not appear excessive in relation to that purpose.

135 S.Ct. 2466, 2473 (2015). *Kingsley* concludes that "as *Bell* itself shows (and as our later precedent affirms), a pretrial detainee can prevail by providing only objective evidence that the challenged governmental

action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 2473–2474.

This application is consistent with the distinction between Fifth and Eighth Amendment protections. *Estelle* recognized that the subjective component of deliberate indifference claims derived from the Eighth Amendment's prohibition against "unnecessary and *wanton* infliction of pain." 429 U.S. at 103 (emphasis added). The Court reiterated this conclusion in *Wilson*. Citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986), the Court wrote that "'after incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.' . . . These cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." 501 U.S. at 298–299. By contrast, *Bell* proscribes all punishment of civil and pretrial detainees. 441 U.S. at 535. As the Fifth Circuit explains in *Hare,*

> In true jail condition cases, an avowed or presumed intent by the State or its jail officials exists in the form of the challenged condition, practice, rule, or restriction. A State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction. Likewise, even where a State may not want to subject a detainee to inhumane conditions of confinement or

50

> abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices. Thus, a true jail condition case starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation.

74 F.3d at 644–645.[4] Indeed, it is Defendants' affirmative act of detaining these medically vulnerable Plaintiffs during the COVID-19 pandemic that triggers Plaintiffs' substantive Due Process rights and that Plaintiffs challenge here. *Deshaney*, 489 U.S. at 200. Defendants do not contest their intent both to initially detain Plaintiffs and to continue their detention.

Having established that the *Bell* punishment standard applies and having traced the contours of that standard, the Court turns to Plaintiffs' likelihood of success on the merits.

## 2. Application

Plaintiffs' Fifth Amendment claim does not challenge the lawfulness of their initial detention but instead its continuation during

---

[4] Above, the Court declined to adopt *Hare*'s system for applying the punishment or deliberate indifference standards to claims brought by civil and pretrial detainees because it relied on specific Fifth Circuit precedent. Here, the Court finds *Hare* persuasive because it directly interprets *Bell*, a Supreme Court precedent binding on courts in both the Fifth and Sixth Circuits.

the COVID-19 pandemic. In their words, "Plaintiffs contend that, as medically vulnerable people who are at high risk of severe illness or death, their detention during the pandemic is not reasonably related to, and excessive in relation to, the government's interest in ensuring their availability for deportation." (ECF No. 117, PageID.4029.)

The record does not show that Defendants intended to punish Plaintiffs, and so the Court must determine whether Plaintiffs' detention is rationally connected to a legitimate government purpose and whether it is excessive in relation to that purpose. Defendants have a legitimate government interest in civil immigration detention to "assur[e] [a noncitizen's] presence at the moment of removal" and, where a detainee would pose a danger, to "protect[] the community." *Zadvydas v. Davis*, 533 U.S. 678, 690, 699 (2001); *see also Demore v. Kim*, 538 U.S. 510, 523 (2003) ("[D]etention during deportation proceedings [is] a constitutionally valid aspect of the deportation process. As we said more than a century ago, deportation proceedings would be vain if those accused could not be held in custody pending the inquiry into their true character.") Below, the Court finds that, with reasonable terms of supervision, no Plaintiff would pose a danger to the community upon

release. The Court concludes that Plaintiffs' continued detention is likely in violation of Plaintiffs' Fifth Amendment rights because it is excessive in relation to the Government's interest in ensuring Plaintiffs' presence during the removal process. *Bell*, 441 U.S. at 538; *see also Kingsley*, 135 S.Ct. at 2473–2474.

Defendants are afforded some deference in implementing policies to mitigate the risk of COVID-19. *Bell* holds that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to . . . maintain institutional security." 441 U.S. at 547. *Youngberg* similarly instructs that "[i]n determining whether the State has met its obligations [with respect to reasonable care and safety], decisions made by the appropriate professional are entitled to a presumption of correctness. Such a presumption is necessary to enable institutions of this type— often, unfortunately, overcrowded and understaffed—to continue to function." 457 U.S. at 324. In creating the guidance that dictates Plaintiffs' conditions of confinement, ICE drew on the expertise of medical professionals, disease control specialists, detention experts, and field operators. (ECF No. 101, PageID.3571.) Additionally, ICE guidance

largely—though imperfectly—tracks CDC guidance for detention centers during the COVID-19 pandemic. As the Supreme Court and Sixth Circuit have recognized, CDC public health and medical determinations are to be given significant weight. *See Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ([T]he views of public health authorities, such as the . . . CDC . . . are of special weight and authority."); *Estate of Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 404 (6th Cir. 1998) (deferring to the "medical judgment expressed in the Report of the Centers for Disease Control in evaluating the district court's ruling on whether Mauro posed a direct threat in the essential functions of his job."). *Bell* and *Youngberg* grant Defendants' response a "presumption of correctness." However, presumptions may be rebutted, and, once rebutted, they must be reestablished to have force.

Plaintiffs have rebutted any presumption that the conditions of their continued detention provide reasonable care or safety during the COVID-19 pandemic. Above, the Court found that Plaintiffs each have a heightened risk of a dire outcome from COVID-19; Plaintiffs face a significant risk of COVID-19 infection while at the Calhoun County Correctional Facility; and Defendants' precautionary measures, even

where followed, do not sufficiently mitigate that risk. The finding that Plaintiffs' current detention constitutes punishment flows logically from the Court's finding that Plaintiffs face irreparable injury absent an injunction. As the District Court for the Western District of Washington found in analyzing a similar claim,

> Although Petitioner's initial detention could not be described as punitive, the situation has drastically changed given the unique and unprecedented threat posed by COVID-19. . . . Petitioner has established a likelihood that he is being held in conditions that create a substantial risk of serious and potentially permanent, irreparable harm due to his age and underlying health conditions. These conditions create far more serious consequences for Petitioner than are justified by Respondent's need to ensure his presence at removal, should that be the ultimate outcome of his proceedings.

*Pimental-Estrada v. Barr*, Case No. 20-495, 2020 WL 20092430, at *17 (W.D. Wash. Apr. 28, 2020). Because Defendants have yet to provide evidence that could revive the presumptive validity of Plaintiffs' continued detention, the Court finds that the current conditions at Calhoun County Correctional Facility do not satisfy *Youngberg*'s mandate that Plaintiffs are entitled to "conditions of reasonable care and safety." 457 U.S. at 324.

The more difficult question is whether there are *any* conditions of confinement such that Plaintiffs' continued detention would not be excessive in relation to Defendants' interest. If such conditions exist, release would be inappropriate relief under the Court's habeas jurisdiction. But as set forth above, detainees remain in close contact with one another in both dormitory-style rooms and common spaces. The lack of adequate social distancing—the "cornerstone" of any effective COVID-19 preventative response—four months into the pandemic strongly suggests that such distancing may be impossible. The Calhoun County Correctional Facility is designed for physically efficient communal confinement, fitting hundreds of detainees into pod-style housing where dozens of detainees sleep in bunkbeds spaced close together, share toilets and showers, and eat side by side. Based upon the evidence submitted thus far, even as Calhoun County signals compliance with many CDC guidelines, the facility is structurally unable to provide dormitory and mealtime accommodations that ensure safe social distancing. (*See* ECF No. 98-3, PageID.3417 (plaintiffs cannot eat at mealtimes without their elbows touching other detainees, are housed in cells with multiple other detainees, and sleep in bunkbeds spaced three

feet apart.)) By all accounts, Calhoun County may have to restructure or even rebuild its correctional facility to house medically vulnerable civil detainees in a manner that comports with the Fifth Amendment during the COVID-19 pandemic.[5] Accordingly, the Court finds that any conditions of confinement at the Calhoun County Correctional Facility, as it exists today, are likely to be unconstitutionally punitive.

The Court makes two additional findings with respect to Plaintiffs' claim. First, the fact that detention is statutorily mandated for some Plaintiffs does not change the Court's punishment calculus. (*See* ECF No. 101, PageID.3588 ("Further, many of the Petitioners were either subject to statutorily mandated detention or denied bond in a separate proceeding before an immigration judge.") All Plaintiffs are civil detainees entitled to protection under the Fifth Amendment. Statutes authorizing immigration detention, whether discretionary or mandatory, give way when constitutional rights are impaired.

Second, the Constitution may require a detainee's release even as it allows for an inmate's continued detention. Noting that the Sixth

---

[5] Indeed, federal courts throughout the country are redesigning jury boxes and other facilities, including holding cells, so that constitutionally mandated work can continue during the pandemic.

Circuit in *Wilson* did not find an Eighth Amendment violation from conditions similar to those at Calhoun, Defendants argue that "[i]t would be an odd result if immigration detainees at Calhoun were nonetheless entitled to greater safety from COVID-19 under *Bell* than the inmates at Calhoun where 'reasonable safety' is a 'basic human need.'" (ECF No. 101, PageID.3586–3587 (citing *Butler v. Fletcher*, 465 F.3d 340, 344-45 (8th Cir. 2006) (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)).) But the court in *Wilson* recognized that the "objective prong [of the plaintiffs' deliberate indifference claim] is easily satisfied." 2020 WL 3056217, at *7. The Court denied relief because plaintiffs had not shown prison officials' subjective deliberate indifference; Plaintiffs do not need to show a subjective element here. Moreover, this purported anomalous result is in fact supported by Supreme Court precedent: civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 322.

Because Plaintiffs' continued detention at the Calhoun County Correctional Facility during the COVID-19 pandemic constitutes

punishment, Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim.

### B. Public Interest

When the government opposes the issuance of preliminary injunctive relief, as Defendants do here, the final two factors—the balance of equities and the public interest—merge, because "the government's interest is the public interest." *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The public has an interest in preserving Plaintiffs' constitutional rights and in protecting public health. *See G & V Lounge Inc. v. Mich. Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir.1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights); *Neinast v. Bd. Of Trustees*, 346 F.3d 585, 592 (6th Cir. 2003) (recognizing public health and safety as legitimate government interests). The Court must balance these interests against the public interest in enforcement of the United States' immigration laws. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The

Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant.").

Regardless of whether a noncitizen is detained, the government may pursue their removal. For Plaintiffs who are not a flight risk and who do not pose a danger to the community, the public's interest in the enforcement of immigration laws therefore must give way to its interest in preserving constitutional rights and protecting public health. Defendants do not argue that Plaintiffs Krcoska, Johanna Whernman, and William Whernman are either a flight risk or a danger to the community. Accordingly, the Court finds that the public interest favors their release.

Defendants argue that Plaintiff Barash is a flight risk. (ECF No. 101, PageID.3549–3450.) On September 12, 2017, Barash did not report to ICE as required; on December 19, 2017, Barash was deemed to have absconded from ICE. (ECF No. 102, PageID.3655.) Barash also failed to appear after a December 15, 2014 arrest for operating while intoxicated, resulting in the issuance of a warrant for his arrest. (ECF No. 102, PageID.3657.) Although these incidents are relevant to flight risk analysis, Plaintiffs explain that Barash also "lived openly in his longtime

home, subsequently went to immigration court, and believed he was in compliance with his obligations. . . . Barash has every incentive to appear as, after an almost three-year wait, his immigration case is finally scheduled to be heard in July." (ECF No. 117, PageID.4034.) The Court finds that reasonable conditions of supervision mitigate any concern that Barash will fail to appear for removal proceedings.

Defendants also argue that Barash poses a danger to the community because he has what Defendants describe as a "lengthy and sustained criminal history." (ECF No. 101, PageID.3549–3450.) But Barash's convictions—larceny less than $100, larceny in a building, delivery of cocaine, breaking and entering an automobile with damage, possession of marijuana, controlled substance delivery/manufacture, possession of cocaine, possession of analogues, and operating while intoxicated (*see* ECF No. 102, PageID.3657)—are each more than five years old and do not involve violence against another person Additionally, Barash's only conviction in the past decade was for driving while intoxicated in 2014. Accordingly, the Court finds that Barash is not a danger to the community.

Defendants claim that Plaintiff Perez Pavon would also pose a danger to the community. (ECF No. 101, PageID.3589.) Defendants allege that "Pavon has convictions for domestic violence, and there is some indication that Pavon regularly abuses his wife." (ECF No. 101, PageID.3590.) Plaintiffs counter that "Mr. Perez Pavon has only been convicted of . . . one inciden[t] of misdemeanor domestic violence," and that "[i]f Perez Pavon is released, he will reside with his mother in her home–not with his wife." (ECF No. 117, PageID.4034.) The Court takes domestic violence allegations seriously—particularly given evidence that "domestic abuse is . . . flourishing in the conditions created by the pandemic." Amanda Taub, *A New Covid-19 Crisis: Domestic Abuse Rises Worldwide*, NY Times (last updated Apr. 14, 2020), ECF No. 101-11. However, the Court finds that Perez Pavon's release plan mitigates concerns that he will commit further domestic violence. Accordingly, the Court finds that Perez Pavon is not a danger to the community.

Defendants contend that Plaintiff Ley Santana is a flight risk. (ECF No. 101, PageID.3590.) On September 13, 2019, an immigration judge found Santana to be a flight risk. (ECF No. 106, PageID.3679.) Plaintiffs argue that "[o]ther than a prior conviction for misdemeanor illegal entry

into the United States," Ley Santana "has no criminal history whatsoever[] and presents no indicia of flight risk." (ECF No.117, PageID.4034.) Without knowing the reasoning underlying the Immigration Judge's decision and with no specific allegations regarding Ley Santana's risk of flight today, the September 2019 ruling cannot be dispositive here. The Court finds that the record does not support a finding that Ley Santana is a flight risk.

Finally, Defendants argue that "none of the Petitioners adequately address how they will avoid exposure from COVID-19 if released." (ECF No. 101, PageID.3590.) In *Wilson*, the Sixth Circuit,  recognizing the BOP's "legitimate concerns about public safety and that the district court's injunction "would result in release of some prisoners," found that "the district court's response does not address the BOP's concerns about how the released inmates would look after themselves." 2020 WL 3056217, at *11. Unlike the petitioners in *Wilson*, each Plaintiff here has provided the Court with a release plan demonstrating Plaintiffs' ability to mitigate their risk of getting or spreading COVID-19. (*See* ECF No. 99-1, PageID.3540 (Plaintiff Barash); ECF No. 99-3, PageID.3547 (Plaintiff Perez Pavon); ECF No. 99-4, PageID.3552 (Plaintiff Krcoska); ECF No.

99-5, PageID.3556 (Plaintiff Ley Santana); ECF No. 99-6, PageID.3560 (Plaintiff Johanna Whernman); ECF No. 99-7, PageID.3562 (Plaintiff William Whernman)). The Court finds that these individual release plans adequately address Defendants' concerns.

Accordingly, the public interest favors each Plaintiff's release.

Because all four factors weigh in favor of issuing emergency injunctive relief, the Court grants Plaintiffs' motion as a preliminary injunction.

## CONCLUSION

As the Court previously set forth,

> Judges, by and large, are neither mathematicians nor medical experts, and the undersigned is neither. Still, adjudicating questions of constitutional law in relation to the ongoing COVID-19 pandemic requires mapping precise calculations of medical risk onto the more nebulous legal standards of high likelihood of irreparable harm. . . . To do so, the Court must rely on evidence submitted by the parties—declarations from medical experts, scientific publications, and guidance from public health agencies. For judicial determinations to have integrity and consistency, justice must be guided by science.

(ECF No. 90, PageID.2708.)

In the course of three months, this litigation has spawned 122 docket entries totaling more than 4,100 pages. Plaintiffs have submitted

a body of public health and medical evidence detailing the general and specific risks that COVID-19 posed and continues to pose to noncitizen civil detainees at the Calhoun County Correctional Facility. Defendants, rather than contesting the veracity of Plaintiffs' evidence, have argued that the Constitution does not mandate Plaintiffs' release: "Regardless of whether Petitioners and their experts assert that as a matter of policy Respondents should suspend lawful immigration detention to protect detainees, what is the best policy is not at issue. The only thing at issue is whether Respondents have violated Petitioners' constitutional rights." (ECF No. 101, PageID.3567–3568.)

Science makes clear that COVID-19 poses a high risk of irreparable injury to these Plaintiffs. Their continued detention, in light of this risk, is excessive in relation to any legitimate government purpose. Supreme Court precedent thus deems Plaintiffs' continued detention punishment, which the Constitution expressly forbids.

For the reasons stated above, the Court GRANTS a preliminary injunction requiring Plaintiffs Waad Barash, Lench Krcoska, Sergio Perez Pavon, Yohandry Ley Santana, Johanna Whernman, and William Whernman's immediate release from ICE Custody. Plaintiffs will be

subject to the following restrictions: Plaintiffs are subject to fourteen days of home quarantine; Plaintiffs must comply with all Michigan Executive Orders; and Plaintiffs must appear at all hearings pertaining to their removal proceedings. Defendants may impose other reasonable nonconfinement terms of supervision. Defendants are further RESTRAINED from arresting Petitioner for civil immigration detention purposes until the State of Emergency in Michigan (related to COVID-19) is lifted or until further Court Order stating otherwise.

The Court DENIES Plaintiffs' motion with respect to Plaintiff Leonard Baroi.

IT IS SO ORDERED.

Dated: June 28, 2020                    s/Judith E. Levy
Ann Arbor, Michigan                     JUDITH E. LEVY
                                        United States District Judge