## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Janet Malam,

                    Petitioner-Plaintiff,

                                                Case No. 20-10829

and

                                                Judith E. Levy

Qaid Alhalmi, *et al.*,                         United States District Judge

                    Plaintiff-Intervenors,   Mag. Judge Anthony P. Patti

v.

Rebecca Adducci, *et al.*,

                    Respondent-Defendants.

_____/

## EIGHTH ORDER ON BAIL [311, 312, 315, 316, 317]

Between October 2, 2020 and October 6, 2020, Plaintiffs submitted bail applications for habeas litigation group members Boss Ntungane, Oscar Tejada, Omar Garcia-Banos, Francisco Fortin-Mayorga, and Felix Huesca Sosa. (ECF Nos. 311, 312, 315, 316, 317.) Between October 7, 2020 and October 9, 2020, Defendants filed responses. (ECF Nos. 318, 319, 320, 321, 322.) Between October 9, 2020 and October 13, 2020, Plaintiffs filed replies. (ECF Nos. 325, 326, 328, 329, 332.) On October 13,

Plaintiffs submitted a supplement to Ntungane's bail application. (ECF No. 331.) On that same day, the Court was informed that Tejada was no longer in custody at Calhoun County Correctional Facility after having flown to an out-of-state staging area in preparation for removal. E-mail from Bradley H. Darling, Assistant U.S. Att'y, to Cassandra J. Thomson, Law Clerk to Judge Judith E. Levy (October 13, 2020, 11:08 EST) (on file with the Court). On October 22, 2020, Defendants informed the Court that Tejada was removed to Peru. E-mail from Bradley H. Darling, Assistant U.S. Att'y, to Cassandra J. Thomson, Law Clerk to Judge Judith E. Levy (October 22, 2020, 12:49 EST) (on file with the Court).

After reviewing the applications and briefing, the Court grants bail for group members Ntungane, Garcia-Banos, and Huesca. The Court denies bail for group member Tejada. The Court requests supplemental briefing regarding bail for group member Fortin.

## I.     Eligibility for Bail

The Sixth Circuit has recognized the district court's "inherent authority" to grant a habeas petitioner release on bail pending adjudication of the petition's merits. *Nash v. Eberlin*, 437 F.3d 519, 526 n.10 (6th Cir. 2006). "The district court may release petitioners on bail if

there is a 'substantial claim of law' and the existence of 'some circumstance making [the motion for bail] exceptional and deserving of special treatment in the interests of justice.'" *Id.* (citing *Lee v. Jabe*, 989 F.2d 869, 871 (6th Cir. 1993)).

On August 4, 2020, the Court found that "[t]he habeas litigation group makes a substantial claim of law" because group members have consistently shown a likelihood of success on the merits. (ECF No. 168, PageID.5294.) Additionally, the Court found that "the COVID-19 pandemic constitutes an exceptional circumstance deserving special treatment in the interests of justice." (*Id.* at PageID.5295.) Calhoun County Correctional Facility ("CCCF") currently has twelve positive cases for COVID-19. E-mail from Jennifer L. Newby, Assistant U.S. Att'y, to Cassandra J. Thomson, Law Clerk to Judge Judith E. Levy (Sept. 16, 2020, 17:12 EST) (on file with the Court).

Although the Court repeatedly stated that it would no longer address Defendants' argument that habeas litigation group members will be safer in CCCF than upon release (ECF No. 210, PageID.6076–6076; ECF No. 276, PageID.7186–7189), Defendants continue to raise variations of this argument. (*See* ECF No. 318, PageID.8003–8004

(challenging the accuracy of the argument that the positivity rate is higher at CCCF than in Kent County, Michigan, on the basis of the lack of mass testing in Kent County generally); ECF No. 321, PageID.8142–8143 (same with respect to the lack of mass testing in Macomb County, Michigan).)

Defendants are correct that absent mass testing, it is impossible to know the exact positivity rate in a county so that that the comparative rate of infection between CCCF and that county can be determined with absolute certainty. (ECF No. 318, PageID.8003; ECF No. 321, PageID.8142–8143.) However, by attempting to liken the positivity rates between CCCF and the county in which a group member seeks to be released, Defendants obscure the unique risks posed to group members in mandatory congregate living.

As previously set forth, "in the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors, a 'generalized risk' is a 'substantial risk' of catching the COVID-19 virus for any group of human beings in highly confined conditions, such as [group members] within the CCCF facility." (ECF No. 23, PageID.559.) Both public health experts and

4

this Court have repeatedly found the condition of communal confinement itself to be a significant COVID-19 risk factor. (ECF No. 210, PageID.6076.) And, as the Court previously recognized when certifying the habeas litigation group, Plaintiffs sought class action status for protection from COVID-19 in part because "they allege that they cannot deploy the other methods of collective action available to those of us in the community." (ECF No. 162, PageID.5103.) The public-health minded precautionary techniques available in the face of this pandemic as it stands now—regularly wearing masks, employing social distancing, consistent sanitizing of communal spaces, and limiting gatherings—are precautions that group members allege they cannot fully avail themselves of while in communal confinement at CCCF.[1] (ECF No. 317, PageID.7975–7978.)

---

[1] Until the evidentiary hearing is held on the merits of this case, the extent of CCCF's implementation of precautionary measures targeted to protect against the spread of COVID-19, and the current and possible conditions of confinement at CCCF, remains unknown. (ECF No. 167, PageID.5290–5291.) The parties' recent bail applications contain conflicting information regarding the degree to which precautionary measures are currently implemented at CCCF. (*See* ECF No. 317, PageID.7975–7978; ECF No. 321, PageID.8141.) Nevertheless, Defendants' recent briefing in response to bail applications have not addressed the implementation of certain precautionary measures, including, for example, the testing schedule for staff members and contract tracing protocols in the wake of COVID-19 positive cases. And, the Court was informed that under the existing protocols in place at CCCF, a corrections officer at CCCF recently tested positive for COVID-19 and may have been at CCCF while infected. E-mail from Jennifer L. Newby, Assistant U.S.

For all of these reasons, individuals in confined custodial settings nationwide have been disproportionately likely to contract COVID-19: The staggering numbers nationwide bear this out. The statistics reported by ICE indicate that of the cumulative 50,105 detained individuals tested as of October 16, 2020, 6,717 of those individuals tested positive for COVID-19. *See ICE Detainee Statistics*, U.S. Immigration and Customs Enforcement, *https://www.ice.gov/coronavirus#wcm-survey-target-id* (last visited October 19, 2020) [https://perma.cc/CQE8-DCGA]. As of October 15, 2020, at least 147,100 people in prison had tested positive for COVID-19, and at least 1,246 of those individuals had died. *See A State-by-State Look at Coronavirus in Prisons*, The Marshall Project, *https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons* (last visited October 19, 2020) [https://perma.cc/9RSR-WSED]. Crucially, analysis of the reported COVID-19 case rates in federal and state prisons indicates the COVID-

Att'y, to Cassandra J. Thomson, Law Clerk to Judge Judith E. Levy (Oct. 16, 2020, 16:18 EST) (on file with the Court). Accordingly, even were the Court to assume CCCF fully implemented all the precautionary measures listed in Defendants' recent briefings, there remains the possibility of an outbreak at CCCF that, as is discussed later in this order, has the potential to result in the rapid and widespread infection of habeas litigation group members in a manner distinct from the general community.

6

19 case rate for prisoners is 5.5 times higher than the case rate of the United States population and this analysis recognized that this rate likely understated the actual prevalence of COVID-19 in prison settings. *See COVID-19 Cases and Deaths in Federal and State Prisons*, JAMA Network,

*https://jamanetwork.com/journals/jama/fullarticle/2768249* (last visited October 19, 2020) [https://perma.cc/S9P2-VF4S]. The higher positivity rate among the population of individuals in custodial settings demonstrates the accuracy of public health experts' clear warnings of the danger of exposure posed by communal confinement settings generally. The fact that CCCF has only had 12 positive cases thus far does not indicate that CCCF is not susceptible to these same risks as the pandemic continues.

Furthermore, the conditions of confined communal living have allowed for the extremely rapid onset of outbreaks in multiple custodial settings. *See COVID-19 cases among Marquette prison staff double in one day*, Detroit Free Press, *https://www.freep.com/story/news/local/michigan/2020/10/15/marquette-prison-coronavirus-staff-shortage/3660352001/* (last visited

October 19, 2020) [https://perma.cc/Y97U-PX58] (reporting that infections among staff members at Michigan Department of Corrections' Marquette Branch Prison doubled over the course of one day); *See Stanford researchers find COVID-19 spreads faster in American jails than on cruise ships*, Stanford News, *https://news.stanford.edu/2020/09/24/covid-19-spread-american-prisons/* (last visited October 19, 2020) [https://perma.cc/P6NT-3AWS] ("the virus spread 3.6 times faster in [an anonymous large urban] jail than it did aboard the Princess Diamond [cruise ship] in February and over 4 times faster than in Wuhan[, China]"); ECF No. 29, PageID.635 (recognizing that cases of COVID-19 among inmates in the Cook County Jail exploded from two to 167 in eight days). Accordingly, although CCCF has not had a sustained outbreak of COVID-19 during the pandemic thus far, the examples offered from other custodial settings suggest that CCCF may similarly be at risk of a future escalation of COVID-19 infections as a consequence of being a communal confinement environment.

Defendants point to CCCF's comprehensive testing of incoming detainees and previous voluntary testing for all detainees and staff to

suggest that CCCF presents a much lower risk of exposure than the community setting. (ECF No. 321, PageID.8143.) However, Defendants' argument fails to address the testing among, and concomitant risk posed by, CCCF staff who come and go from the facility each day. While Defendants allege that CCCF has a "100% testing rate" for having tested all of its incoming population of detainees since June of 2020 (ECF No. 318, PageID.8003), Defendants do not identify the frequency at which its staff members—who move regularly between the congregate setting at CCCF and the general population—are tested. *See Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html* (last visited October 20, 2020) ("Because staff move between the facility and the community daily, the risks of introducing infection into the facility from the community and/or bringing infection from the facility back into the community is ongoing."). Indeed, a corrections officer at CCCF recently tested positive for COVID-19. E-mail from Jennifer L. Newby, Assistant U.S. Att'y, to Cassandra J. Thomson, Law Clerk to Judge Judith E. Levy (Oct. 16, 2020, 16:18 EST)

(on file with the Court). Calhoun County, where the CCCF is located, is currently deemed as having an active or imminent outbreak of COVID-19. This suggests that the risk of staff members becoming infected remains high. *See Calhoun County, MI*, Covid Act Now, *https://covidactnow.org/us/mi/county/calhoun_county?s=1178286* (last visited October 21, 2020) [https://perma.cc/5KVK-K8DT]. Defendants' testing of incoming detainees has not eliminated the significant risk that detainees could be infected within CCCF as a result of a staff member—which, as previously stated, can result in the swift escalation of an outbreak within a short timeframe due to the circumstances of congregate living.

The likelihood of exposure to COVID-19 depends on much more than the number of individuals in the surrounding environment who are infected: one's ability to isolate from infected persons and one's capacity to employ precautionary measures are crucial variables that affect the probability of contracting COVID-19. Detained group members thus do not share the same risk of being infected with COVID-19 as that of a member of the general population. CCCF poses no exception. Accordingly, any comparison of the absolute number of infections or

positivity rates between CCCF and external counties to determine the likelihood of an individual group member's exposure to COVID-19 is unhelpful without also considering the *conditions* of that environment.

Additionally, Defendants once again argue that the impact of private action on the likelihood of a group member's exposure to COVID-19 if released should be considered by the Court when evaluating bail applications. (ECF No. 318, PageID.8004; ECF No. 321, PageID.8143–8144.) Defendants repeatedly point to the possible conduct of individuals who will interact with a group member upon their release (e.g., their employment, social interactions, religious observances), and factors that may indicate a possible uptick in community spread (i.e., the recent Michigan Supreme Court case striking down executive orders addressing COVID-19 response measures)[2] to suggest that a group member is more

---

[2] Defendants reference the Michigan Supreme Court's recent decision striking down certain of Governor Gretchen Whitmer's executive orders addressing the COVID-19 pandemic, *In re Certified Questions From United States Dist. Court , W. Dist. of Michigan, S. Div.*, No. 161492, 2020 WL 5877599, at *24 (Mich. Oct. 2, 2020), as well as the political climate generally, to allege that congregate living in custody at CCCF presents a lower risk of COVID-19 exposure to group members. (ECF No. 321, PageID.8143–8144.) Defendants' argument implies that the uncertainty regarding the status of state government-mandated measures to tackle the pandemic may result in a higher degree of community spread. The exact ramifications of this Michigan Supreme Court decision on infection rates remain to be seen. Nevertheless, the Court recognizes that recent orders entered by the Michigan Department of Health and Human Services (MDHHS) generally track the public health mandates set forth in the former executive orders at issue. *See*

at risk of being infected in the community and, thus, should not be released. (*Id.*) As set forth previously, this argument is irrelevant to the determination of whether to grant release from CCCF. (ECF No. 276, PageID.7186–7189.) The risks of contracting COVID-19 faced by habeas litigation group members on release—those stemming from the actions of private actors and those from interaction in the community generally—do not implicate unconstitutional punishment.

The Court continues to find that group members raise substantial claims of law and that COVID-19 presents special circumstances making the bail applications exceptional.

## II. Individual Bail Applications

The Court makes the following findings with respect to the individual bail applications:

---

*Gathering Prohibition and Face Covering Order*, Michigan.gov, *https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-541962--,00.html* (last visited October 20, 2020) [https://perma.cc/YY4E-F96F]; *see also Michigan Health Department Issues Sweeping Covid-19 Regulations That Mirror Whitmer Orders*, Detroit Free Press, *https://www.freep.com/story/news/local/michigan/2020/10/09/michigan-coronavirus-laws-rules-covid-19/5936779002/* (last visited October 20, 2020) [https://perma.cc/942R-SWH6]. Thus, even were the degree of community spread relevant to the determination of a group member's release, it is reasonable to assume that the MDHHS orders may result in a substantially-similar level of influence on the degree of community spread as did the previously levied executive orders.

### *Boss Ntungane* (ECF No. 311)

Plaintiffs write that Ntungane has lived in the United States for approximately eight years. (ECF No. 311, PageID.7726.) Plaintiffs acknowledge that Ntungane was convicted of operating under the influence ("OUI") and felony assault but note that he has since completed courses in anger management and substance abuse, did not engage in misconduct during his jail sentence, and was released several months early for good behavior. (*Id.* at PageID.7725, 7728.) If released, Ntungane will stay with his siblings and parents in Grand Rapids, Michigan. (*Id.* at PageID.7726.) Defendants argue that Ntungane should be presumed to be a danger because he is subject to mandatory detention. (ECF No. 318, PageID.8002–8003.) Defendants further note the severity of the injuries suffered by the victim in the conduct leading to Ntungane's felony assault conviction, as evidence that Ntungane would pose a danger to the community. (*Id.* at PageID.8002.) Defendants do not argue that Ntungane is a flight risk. (*Id.*)

Plaintiffs reply that Ntungane was deemed safe for release on bond pending trial and pre-sentencing of his felony assault conviction, and further argue that Defendants have failed to identify any conduct after

his arrest for the assaultive conduct as to why Ntungane poses a danger. (ECF No. 326, PageID.8243.) Plaintiffs also note the Board of Immigration Appeals ("BIA") denied the government's appeal of the grant of deferral of removal under the Convention Against Torture ("CAT"). (*Id.* at PageID.8242.)

Although the Court finds Ntungane is neither a flight risk nor a danger to the community given his proposed release plan, the Court will release Ntungane on bail only with the conditions that he (1) have no direct contact with the victim of the conduct leading to his felony assault conviction for the pendency of this case; (2) abstain from consuming any alcohol during his release; and (3) comply with all terms of his probation. Accordingly, Ntungane's application for bail is granted with these additional conditions.

## *Oscar Tejada* (ECF No. 312)

On October 13, 2020, Defendants informed the Court that Tejada is no longer in custody at CCCF after having flown to an out-of-state staging area in preparation for removal. E-mail from Bradley H. Darling, Assistant U.S. Att'y, to Cassandra J. Thomson, Law Clerk to Judge Judith E. Levy (October 13, 2020, 11:08 EST) (on file with the Court). On

October 22, 2020, Defendants informed the Court that Tejada was removed to Peru. E-mail from Bradley H. Darling, Assistant U.S. Att'y, to Cassandra J. Thomson, Law Clerk to Judge Judith E. Levy (October 22, 2020, 12:49 EST) (on file with the Court). In light of Tejada's departure from CCCF, the Court finds Tejada is no longer subject to the conditions of confinement at CCCF that the Court has found to constitute unconstitutional punishment. Accordingly, Tejada's application for bail is denied.

### *Omar Garcia-Banos* (ECF No. 315)

Plaintiffs write that Garcia-Banos has lived in the United States for approximately seventeen years and has no violent criminal history excepting a conviction for driving under the influence ("DUI") in 2012. (ECF No. 315, PageID.7894, 7896.) Plaintiffs note that Garcia-Banos has a pending charge for a felony traffic offense from conduct occurring on August 16, 2020, but was released on bond and had his arraignment postponed as a result of the pandemic. (*Id*. at PageID.7896.) If released, Garcia-Banos will live with his cousin-in-law and her children in Goshen, Indiana. (*Id*. at PageID.7897.)

Defendants argue that Garcia-Banos is a flight risk and a danger to the community because an Immigration Judge denied bond to Garcia-Banos after finding him to be both at risk of flight and a danger. (ECF No. 320, PageID.8108.) Defendants offer more details regarding Garcia-Banos' pending felony traffic charge, including that he was arrested for drunk driving after police officers responded to a call regarding an ongoing fight in a parking lot. (*Id*. at PageID.8108–8109.) At that time, Garcia-Banos was found to have been driving with a blood alcohol content above the legal limit. (*Id*.) Defendants urge the Court to impose two conditions were Garcia-Banos to be released: (1) abstaining from drinking alcohol; and (2) refraining from any driving. (*Id*. at PageID.8109.)

Plaintiffs reply that the Immigration Judge's denial of bond was based on the misunderstanding that Garcia-Banos had no ties to the United States. (ECF No. 328, PageID.8357.) Plaintiffs indicate that Garcia-Banos has developed strong ties to family who reside in the United States, including his wife and children who live in Tennessee, and his cousin-in-law who is a United States citizen. (*Id*.) Plaintiffs further argue that Garcia-Banos has no incentive to abscond because he is

exploring relief from removal and is in the early stages of his removal proceedings. (*Id.*) Additionally, Plaintiffs argue that Garcia-Banos' pending charge does not demonstrate that he is a danger to the community, particularly when considering that he has expressed willingness to abide by the conditions suggested by Defendants as well as to participate in nearby alcohol treatment programs. (*Id.* at PageID.8358.)

Although the Court finds Garcia-Banos is neither a flight risk nor a danger to the community given his proposed release plan, the Court will release Garcia-Banos on bail only with the conditions that he: (1) abstain from consuming any alcohol during his release; and (2) refrain from driving during his release. Accordingly, Garcia-Banos' application for bail is granted with these additional conditions.

### *Francisco Fortin-Mayorga* (ECF No. 316)

Plaintiffs write that Fortin has lived in the United States for approximately six years. (ECF No. 316, PageID.7916.) Plaintiffs acknowledge that Fortin has two misdemeanor traffic convictions as well as a conviction for disorderly person. (*Id.*) Plaintiffs indicate that this disorderly person conviction arose out of an incident involving his

17

common law wife in July of 2020, in which Fortin was initially charged with domestic violence. (*Id.* at PageID.7919.) Plaintiffs note that Fortin received a sentence of time served (i.e., 30 days), and Fortin would have been allowed to return to living with his family if not for being in ICE custody. (*Id.*) Fortin has presented two possible release plans: (1) staying with his common law wife, two of their children, a family friend, and the family friend's children in Sterling Heights, Michigan; (2) finding alternate housing through friends in the Sterling Heights community. (*Id.* at PageID.7920–7921.)

Defendants provide more details surrounding the incident between Fortin and his wife. (ECF No. 321, PageID.8142.) Defendants note that Fortin's common law wife expressed regret over having contacted the police after the incident and lied to police after they arrived on the scene about Fortin's location, allegedly stating that she was afraid Fortin would harm her were she to be truthful. (*Id.*) Noting that Fortin claims his actions were unprecedented and triggered by severe stress, Defendants express concern that there may be future incidents of domestic violence were Fortin to be released to live with his common law wife because the catalyst stressors mentioned by Fortin—the family's financial status, the

18

ongoing pandemic, and his removal proceedings—remain active. (*Id*.) Defendants do not contend that Fortin is a flight risk. (*Id*.)

Plaintiffs reply that Fortin should not be deemed a danger in light of the fact that the criminal court deemed it suitable for Fortin to return to his family, without any post-conviction conditions, following the completion of his sentence for the disorderly person conviction were he not detained. (ECF No. 329, PageID.8363–8364.) Plaintiffs further note that Defendants' claims rely on hearsay statements in police reports without any supportive declarations. (*Id*. at PageID.8364.) Additionally, Plaintiffs refer to the declaration of Fortin's common law wife, who affirms that she wishes to be reunited with Fortin and will seek professional help for their children and family. (*Id*. at PageID.8364; ECF No. 329-1, PageID.8369.)

The Court takes incidents and allegations of domestic violence very seriously. In light of paragraph 9 of the supplemental declaration of Fortin's common law wife, (ECF No. 329-1, PageID.8369), in which she indicates an intent to seek out professional counseling for herself and Fortin, as well as for their two children in the United States, the Court will require supplemental briefing regarding the proposed structure in

place to work through any possible family disputes or conflicts that arise were Fortin to be released to live with his family. Accordingly, Plaintiffs are to submit supplemental briefing outlining the proposed plan, including any counseling for the family generally, and for the children specifically.

### *Felix Huesca Sosa* (ECF No. 317)

Plaintiffs state that Huesca has lived in the United States for over twenty years, and during that time, has had four convictions: (1) misdemeanor reckless driving in 2016; (2) misdemeanor OUI in 2018; (3) misdemeanor OUI in 2020; and (4) domestic violence in 2020. (ECF No. 317, PageID.7960, 7962.) Plaintiffs indicate that Huesca's domestic violence conviction arose out of a fight with Huesca's former roommate, which resulted in no injuries. (*Id.* at PageID.7962.) Plaintiffs contend that Huesca is not a danger to the community despite his recent domestic violence conviction, because Huesca was released on bond for several months, fully complied with all conditions of release, and was only sentenced to two days in custody. (*Id.* at PageID.7960.) Huesca will stay with his niece in Lake Odessa, Michigan, if released. (*Id.* at PageID.7963.)

Defendants allege that Huesca withdrew his request for a bond hearing in front of an Immigration Judge. (ECF No. 322, PageID.8161.) Defendants challenge Huesca's description of the events leading to his domestic violence conviction, alleging that Huesca's conduct resulted in injuries to his roommate's shoulder. (*Id.*) Defendants note that all of Huesca's convictions involved Huesca being intoxicated; Defendants further argue that there is a concern that Huesca will continue to drink because of his failure to complete any substance abuse treatment program to date. (*Id.*)

Plaintiffs reply to clarify that Huesca did not withdraw his request for a bond hearing, but rather, was granted the ability to reset the hearing date to allow Huesca to find representation. (ECF No. 332, PageID.8393.) Plaintiffs claim that Defendants rely on hearsay statements in police reports for their contention that the conduct leading to the domestic violence charge resulted in an injury to Huesca's former roommate. (*Id.* at PageID.8394.) Plaintiffs indicate that Huesca plans to enroll in a substance abuse program if released and has expressed willingness to accept any conditions of release, including abstaining from alcohol and driving. (*Id.*)

Although the Court finds Huesca is neither a flight risk nor a danger to the community given his proposed release plan, the Court will release Huesca on bail only with the conditions that he: (1) abstain from consuming any alcohol during his release; (2) refrain from driving during his release; and (3) participate in substance abuse treatment if requested by ICE. Accordingly, Huesca's application for bail is granted with these additional conditions.

## III.  Conclusion

For the reasons stated above, the Court grants bail for habeas litigation group members Ntungane, Garcia-Banos, and Huesca. Each habeas litigation group member set for release is subject to the conditions outlined in this Court's August 12, 2020 order. (ECF No. 179.) Additionally, habeas litigation group member Ntungane is subject to the additional conditions that he (1) have no direct contact with the victim of the conduct leading to his felony assault conviction for the pendency of this case; (2) abstain from consuming any alcohol during his release; and (3) comply with all terms of his probation. Group member Garcia-Banos is subject to these additional conditions: (1) abstaining from consuming any alcohol during his release; and (2) refraining from driving during his

release. Group member Huesca is subject to these additional conditions: (1) abstaining from consuming any alcohol during the pendency of this case; (2) refraining from driving during his release; and (3) participating in substance abuse treatment if requested by ICE. Release under the bail process is to follow the bail process and standard Conditions of Release previously set forth. (*See* ECF Nos. 166, 177, 179, 243.)

The Court requests supplemental briefing from Plaintiffs regarding bail for group member Fortin. Briefing is due by October 28, 2020.

The Court denies habeas litigation group member Tejada's bail application.

**IT IS SO ORDERED.**

Dated: October 22, 2020        s/Judith E. Levy
Ann Arbor, Michigan          JUDITH E. LEVY
                             United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 22, 2020.

                    s/William Barkholz
                    WILLIAM BARKHOLZ
                    Case Manager