UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

JANET MALAM,

                Petitioner-Plaintiff,

    - against -

REBECCA ADDUCCI, *et al.*,

              Respondent-Defendants.

No. 5:20-cv-10829-JEL-APP

## PETITIONERS-PLAINTIFFS' MOTION FOR EMERGENCY RELIEF TO RESPOND TO COVID-19 OUTBREAK

### *Statement Regarding Concurrence*

Pursuant to the local rules, Plaintiffs have conferred with counsel for Defendants, who state that their position is that they do not concur at this time, but that they are still considering additional precautions. Plaintiffs have contacted counsel for separately-represented Plaintiff Janet Malam, who has not responded as of the time of filing.

**************************

At a hearing on October 26, 2020, this Court heard evidence regarding an outbreak of COVID-19 at the Calhoun County Correctional Facility (Calhoun). The Court has also received evidence throughout this case about conditions at Calhoun, including recently submitted evidence about conditions and about the outbreak, which is incorporated herein by reference. Additional evidence is attached to this brief in support of this motion. The evidence indisputably shows that COVID-19 is spreading rapidly through the facility and threatens the lives and safety of

immigration detainees there.

In light of this emergency, Petitioners-Plaintiffs seek the following relief:

**Relief for Conceded Members of the Habeas Litigation Group**

1. Like other courts confronted with outbreaks, this Court should expedite release decisions related to those individuals whom Defendants concede are at high risk of COVID infection.[1]

2. There are currently 22 detained class members whom Defendants have conceded are members of the Habeas Litigation Group ("Conceded Habeas Litigation Group"). These individuals are conceded to have medical conditions that make them at high risk of illness or death resulting from infection. A list of those class members is attached. *See* Exhibit 1.

3. For nine members of the Conceded Habeas Litigation Group, bail applications have been fully briefed or filed, and are currently pending. Those individuals

_____

[1] Multiple courts have ordered releases from detention when outbreaks were occurring. *See Rodriguez Alcantara v. Archambeault*, No. 20-cv-756-DMS (AHG), --- F. Supp. 3d ----, 2020 WL 2315777 (S.D. Cal. May 1, 2020); *Zepeda Rivas v. Jennings*, No. 20-cv-02731-VC, Dkt. 500 (N.D. Cal. Aug. 6, 2020); *Hernandez Roman v. Wolf*, No. 20-768-TJH, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020); *Hernandez Roman v. Wolf*, No. 5:20-cv-00768-TJH-PVC, 2020 WL 6107069 (C.D. Cal. Oct. 15, 2020) (attached as Exhibits 29–32). *See also Leandro R.P. v. Decker*, No. 20-3853 (KM), 2020 WL 1899791 (D.N.J. Apr. 17, 2020); *Durel B. v. Decker*, No. 2:20-cv-03430-KM, 2020 WL 1922140 (D.N.J. Apr. 21, 2020); *Kevin M.A. v. Decker*, No. 2:20-cv-04593-KM, 2020 WL 2092791 (D.N.J. May 1, 2020); *Juan E.M. v. Decker*, No. 20-4594 (KM), 2020 WL 2214586 (D.N.J. May 7, 2020).

are[2]: Francisco Fortin-Mayorga, Dkt. 315, 321, 329, 358; Mohamad Ahmad Murai, Dkt. 338, 337, 343; Estanislao Pulido-Chavez, Dkt. 350, 370; Abdelmohsin Osman, Dkt. 353; Gong Lee, Dkt. 363, 369; Joas Habimana, Dkt. 362; Jonathan Reyes Saucedo, Dkt. 364; Eddys Rosello Carranza, Dkt. 371; and Karar Munir Al-Sultan, Dkt. 372.

4.  Given the outbreak at Calhoun, Plaintiffs ask the Court to rule on those applications as rapidly as possible.

5.  For the remaining conceded Habeas Litigation Group members, Class Counsel have been working to prepare bail applications. However, the process is extremely time intensive. *See* generally Gardner Decl., Dkt. 130-7 (describing difficulties of reaching clients).

6.  In order to expedite the bail process in light of the emergency presented by the outbreak at Calhoun, Plaintiffs have prepared descriptions of those Conceded Habeas Litigation Group members for whom bail applications have yet to be filed. Exhibit 2. Those descriptions include information about their medical conditions, proposed custodians[3], immigration court history, criminal

---

[2]  In addition, the bail application of Fawzi Zaya, Dkt. 327, 334, 338, is pending. As Mr. Zaya is not detained, the Court can consider his application in due course.

[3]  Class counsel are still obtaining custodian information for several conceded Habeas Litigation Group members, and will provided updated information as soon as possible.

3

history (if any), and COVID test status (if known).

7.   In light of the urgency presented by the outbreak, Plaintiffs ask that the Court accept this expedited submission, which addresses the same information presented to the Court in the context of the full bail application procedure. *See* Order Re Bail Applications, Dkt. 178 (setting out information to be included in bail applications). Defendants can provide any information about those individuals that they want the Court to consider in their response to this motion.

8.   Plaintiffs ask that the Court find that there is a substantial claim of law and exceptional circumstances, and grant bail based on these expedited submissions.

9.   If the Court finds, after reviewing Plaintiffs' submission and the Defendants' response, that it does not have sufficient information to determine whether bail should be granted for specific applicants, the Court should order the parties to provide whatever additional information it needs to decide these applications. Alternately, the Court could defer decision, or deny the applications without prejudice, with respect to those specific individuals, and allow the Plaintiffs to submit a full bail application in those instances.

10.  Plaintiffs ask that the Court first consider release of those who have not yet tested positive for COVID-19 so that they can be released before they become

infected. Plaintiffs recognize that the release of individuals who have already become infected presents additional issues. As correctional expert, Dr. Homer Venters, explains in the attached supplemental declaration, releases of infected persons can be done in a safe manner. *See* Exhibit 8, ¶¶ 29(a), (b). However, Plaintiffs recognize that, in some cases, the Court may want more details than could be obtained in the last two days about the situation of the custodian, the release plan, and transport to the custodian's home.

### Relief for Individuals Whom Plaintiffs Have Identified as Members of the Habeas Litigation Group But Whom Defendants Have Not Conceded Are at High Risk

11.     Plaintiffs respectfully request that this this Court expedite its determination of which individuals are members of the Habeas Litigation Group and allow them to seek bail on an expedited basis.

12.     There are 13 class members whom Plaintiffs have identified as members of the Habeas Litigation Group but whom Defendants have not conceded are at high risk (Unconceded Habeas Litigation Group Members). *See* Exhibit 3.

13.     The vulnerability of such individuals is vividly demonstrated by the fact that two of them, Gisli Gislason and Oscar Xirum-Sanchez, were taken to the medical unit after becoming infected with COVID-19. *See* Exh. 26, Newby Email to Court; Xirum-Sanchez Decl., Dkt. 354-2.

14.     For two of those individuals, Andrei Skripov, Dkt. 233–235, 270–274, 282,

and Gisli Gislason, Dkt. 255–258, 277, 279, 296, motions for inclusion in the Habeas Litigation Group have been fully briefed and are pending. Plaintiffs ask that the Court adjudicate those two motions as rapidly as possible. In addition, Plaintiffs have included descriptions, similar to those for the Conceded Habeas Litigation Group members, so that the Court can move rapidly to consider bail for Mr. Skripov and Mr. Gislason if it finds them medically vulnerable.[4] *See* Exhibit 2.

15.  Along with this brief, Plaintiffs provide a chart of the Unconceded Habeas Litigation Group Members describing each individual's medical conditions, COVID-19 test status, and whether Plaintiffs have identified an expert who is reviewing that person's medical records. Exhibit 3. Expert review of medical records is extremely time consuming, but Plaintiffs have obtained expert reports regarding the medical vulnerability for Oscar Xirum-Sanchez and Guoyan Lin Castro, and those reports are attached. *See* Exhibit 5.

16.  The Unconceded Habeas Litigation Group members have significant health issues, and the outbreak at Calhoun means that these individuals can easily become infected before their motions for inclusion in the Habeas Litigation Group can be filed and decided.  Accordingly, Plaintiffs ask the Court to find

---

[4]  Class counsel is still confirming custodian information for Mr. Gislason and will provide the Court with that as soon as it is available.

6

that these individuals are members of the Habeas Litigation Group and allow them to file expedited bail applications as described in Paragraphs 6–10, *supra*. If Defendants continue to contest the medical vulnerability of these individuals, they can do so in responding to the bail requests. In the alternative, Plaintiffs ask the Court to establish an expedited process to resolve disputes about whether an individual falls within the Habeas Litigation Group.

17.   Plaintiffs further ask that the Court order that, pending a determination of membership in the Habeas Litigation Group, ICE ensure that all individuals in the Unconceded Habeas Litigation Group are given the same protections that this Court orders for members of the Conceded Habeas Litigation Group, *see* Paragraph 22, *infra*, including those that ICE has agreed to provide. *See* Dkt. 360, 361.

## Rapid Identification of All Members of the Habeas Litigation Group

18.   Plaintiffs respectfully request the Court to order that Defendants take proactive steps to identify all medically vulnerable individuals at Calhoun and to take all reasonable steps to protect those at high risk.[5]

19.   As Dr. Venters testified, in his experience, the percentage of detainee populations in similar settings who are high risk is between 35-55%. Exhibit

---

[5]   *See Alcantara v. Archambeault*, No. 3:20-cv-00756-DMS-AHG, Dkt. 38 (S.D. Cal. Apr. 30, 2020).

7

8, ¶ 27(b). At Calhoun, there are approximately 135 detainees, and Defendants have only conceded that 22, or approximately 16% are high risk. Exhibit 1. It seems highly likely that there are many more detainees who are at high risk. Exhibit 8, ¶¶ 21, 24–26 (describing issues with Calhoun's identification of high risk detainees).

20. Dr. Venters further testified that in order to identify individuals who are at high risk it is necessary to (a) review the chronic care list; (b) identify individuals who are taking certain medications; and (c) screen detainees for BMI and smoking history.  Exhibit 8, ¶ 27(b).

21. Defendants are failing to identify those at high risk.  For example, Defendants failed to identify Jose de Jesus Gutierrez-Tapia as high risk even though he has asthma, for which he has been prescribed medication and an inhaler.  *See* Exhibit 16, Daniel Declaration (describing asthmatic detainee who now has COVID-19 and whom Defendants failed to identify as high risk even though he informed intake staff of his condition). The evidence shows that Defendants are, at most, reviewing the chronic care list but are not providing instructions for protections that must be provided to those at high risk, such as consideration for release.

22. The Court should order that Defendants immediately to take the following steps to identify and protect all those who are at high risk, as recommended

by Dr. Venters, Exhibit 8, ¶¶ 27, 29:

a. Immediately consider all currently identified high risk detainees for release. Individuals who have not tested positive should undergo a symptoms, vitals and temperature check prior to being released. Those who have tested positive may be released from custody in coordination with the local Department of Health.

b. Undertake a thorough review of all ICE detainees at Calhoun to determine the remaining high risk individuals, by: (1) reviewing the chronic care list, (2) reviewing pharmaceutical records for people receiving medications, and (3) reviewing medical records for smoking history and elevated body mass index. Those individuals should then also be considered for release. The Court should set a deadline for completing the review and providing the names of all additional high risk individuals to the Plaintiffs and the Court.

c. Ensure higher levels of protection for those high risk patients who remain in custody with: (1) daily screenings for COVID-19 symptoms, (2) increased chronic care encounters, (3) protective single-cell housing (that is non-punitive), and (4) increased access to sick call.

d. Release remaining high risk patients after recovery given the possibility of reinfection.

9

**Relief to Protect the Class and Prevent Spread of the Virus**

23.    Plaintiffs respectfully request that this Court order Defendants to ensure that all individuals detained at Calhoun, not just those at highest risk, are reasonably safe and that they are not punished. COVID-19 can cause severe illness or death not just for those in the highest risk categories but for anyone. *See* Exhibit 8, ¶ 44.

24.    In addition, because any individual who has been exposed can become a vector to infect others, the more people who are protected from COVID-19 the slower the spread. Exhibit 8, ¶ 38. The slower the spread, the less likely that those most vulnerable will be infected.

25.    Accordingly, the Court should order Defendants take the following protections:

> **A. Order Requiring all Class Members Not Yet Infected to Be Housed So as to Allow for Continuous Social Distancing**

26.    Plaintiffs respectfully request that this Court order that all detainees who have tested negative, who have not yet been tested, whose test results are pending, and those who have recovered from the coronavirus be housed in a manner that allows for continuous social distancing, and to do so in a manner that does cause social isolation amounting to punishment.

27.    Social distancing is the cornerstone of COVID-19 prevention. Dkt. 127, PageID. 4194. The government has conceded that social distancing is not

possible at Calhoun.

28.   Absent strict social distancing, given the severity and breadth of the current outbreak it is highly likely that those who have not yet become infected will become infected unless they have the ability to social distance.

29.   Specifically, they should be housed in single cells or, if sufficient single cells are not available, in larger cells/dormitories where there is sufficient space to maintain six feet of distance, including while sleeping. Similar orders have been entered by other courts facing outbreaks in other immigration detention facilities.[6]

30.   Plaintiffs are concerned that single celling not turn into solitary confinement, which is another form of punishment and one that is particularly severe.  Some detainees have reported that they are being punished or threatened with "the hole" (solitary confinement) if they ask for protections from COVID-19 and medical treatment. *See* Exhibit 10, Second Cincotta Decl.; Exhibit 9, Xirum-Sanchez Decl., ¶ 11; Boggs Decl., Dkt. 226-3.

31.   Detainees should not be locked down in their cells, but should have the freedom to move in and out of their cells for significant periods of the day and

---

[6]   *Hernandez Roman v. Wolf*, No. 20-768-TJH, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020); *Hernandez Roman v. Wolf*, No. 5:20-cv-00768-TJH-PVC, 2020 WL 6107069 (C.D. Cal. Oct. 15, 2020) (attached as Exhibits 31–32).

11

should have access to common spaces in a manner that still allows for social distancing. *See* Venters Declaration, Exhibit 8, ¶ 39; Dkt. 354-8 (Photos and Schematics of Calhoun facility); Dkt, 365, Transcript, at PageID# 9094-96 (describing common areas).

32.   At the October 26 hearing, Chief Deputy Randy Hazel testified that there are approximately 135 immigration detainees currently at Calhoun, but no more than 78 immigration detainees can be housed in single cells. Dkt, 365, Transcript, at PageID# 9048. The testimony was not sufficient to establish what other units may be available to allow for sharing of larger cells/unit with sufficient space for social distancing.

33.   To be clear, Plaintiffs are not asking that the Court require that individuals who have tested positive for COVID-19 and are currently infected must be housed such that they are socially-distanced from one another. Accordingly, the number of individuals who will need socially-distanced housing will depend on the number of individuals not yet infected and the number who have recovered, as well as the number of individuals for whom the Court grants bail, as requested above.

34.   Under Plaintiffs' proposal, Calhoun, in conjunction with ICE, would determine the specific measures needed to ensure that non-infected immigration detainees are able to socially distance. ICE can work with Calhoun to

determine how this can best be accomplished, given facility numbers, facility layout, the number of COVID-19 cases, security classifications and other considerations. ICE, in its discretion, can also remove individuals who have final orders and are otherwise removable, or it can release individuals. For example, despite the pandemic and despite the recent outbreak, ICE is continuing to detain individuals, including medically vulnerable individuals, where it is clear that continued detention is unnecessary. *See* Exhibit 15, Gabarra Declaration (describing continued detention of individual whom ICE has conceded is medically vulnerable and whom ICE will soon have to release because he has won his immigration case but for whom paperwork from the Board of Immigration Appeals has not yet arrived); Exhibit 23, Robinson Declaration (describing continued detention of individuals who cannot be removed because their country of nationality will not accept them, including four-year detention of Iraqi national). ICE should release such individuals, as they are being needlessly and pointlessly detained. But Plaintiffs are not asking the Court to order such releases. All Plaintiffs are asking is that the Court set a standard that non-infected immigration detainees held in a jail experiencing a COVID-19 outbreak be housed in a manner that allows for continuous social distancing, but is not solitary confinement.

**B. Testing and PPE**

35.   The Court, like other courts confronting outbreaks[7], should order that ICE ensure that all detainees be tested once a week until there are no new positive cases.

36.   For individuals who had COVID-19 or test positive for COVID-19, individuals must receive two negative tests in a row before being cleared from isolation or quarantine.

37.   If subsequent outbreaks occur, any close contacts, whether staff or detainees, must quarantine while awaiting testing results.

38.   The Court should also order that all ICE detainees receive either one new surgical mask each day or one 3-ply cloth mask each week, and as needed for replacements.

**C. Prohibition on New Admissions and Limitation on Transfers**

39.   Like other courts confronting outbreaks, this Court should bar ICE from bringing additional detainees to Calhoun until further order of the Court, and the Court limit transfers, as set out below.

40.   In light of the current outbreak, bringing new detainees into the current

---

[7]   *Hernandez Roman v. Wolf*, No. 20-768-TJH, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020) (ordering weekly testing for detainees) (attached as Exhibit 31).

environment would be dangerous and constitute a form of punishment. Some of those newly detained will be high risk, and it can take time to determine whether they are high risk. Moreover, at a time where there is a surge of cases in the greater Michigan and U.S. community, there is a heightened risk that new detainees may have been exposed to COVID-19 and may bring it with them into the facility where it can spread rapidly. In addition, adding even more detainees to the jail population when there is not sufficient space for the existing detainee population to socially distance is dangerous.

41.   Similarly, if individuals from Calhoun are transferred to other facilities, they are likely to spread the virus to those other facilities. Exhibit 8, ¶ 41 (noting that federal officials from the Department of Homeland Security acknowledged that transfers contributed to spread of COVID-19).

42.   The Court should order that ICE notify the Court 48 hours in advance of any transfer, explaining the purpose of the transfer, the person's COVID-19 test status and the most recent test date, and the precautions that will be taken during the transfer to prevent spreading the virus. For high risk individuals (Conceded and Unconceded Habeas Litigation Group members), the Court should bar ICE from transferring them out of Calhoun, unless it is for the purpose of removal and the Court has explicitly approved their transfer.

43.   For example, Class Counsel were informed by immigration counsel for

Estanislao Pulido Chávez, a Habeas Litigation Group member with a pending bail application, Dkt. 350, that ICE has informed Mr. Pulido Chávez that he is to be transferred shortly to California. Mr. Pulido Chávez has a stay of removal, and cannot currently be removed, *id.*, so any transfer would not be for the purpose of removal. Class Counsel are concerned that Defendants may be seeking to transfer Mr. Pulido Chávez to avoid this Court's decision on his bail application, as plaintiffs in other similar litigation have faced.[8] Class Counsel are also concerned that moving him during the outbreak could be dangerous to him and/or cause him to spread the virus if he is already infected.

44. Courts in other cases where outbreaks occurred have halted transfers,[9] and this Court should do the same.

**D. Staff with Pending Tests Must Be Confirmed Negative to Work**

45. At the hearing, Defendants' witnesses admitted that staff are continuing to work after they have been tested for COVID-19, but before test results have

---

[8] *Santos Garcia v. Wolf*, No. 1:20-cv-00821-LMB-JFA, Dkt. 44 (E.D. Vir. Aug. 11, 2020) (enjoining defendants from retaliating against plaintiffs for filing the civil action and from transferring plaintiffs out of the facility without consent of the plaintiff and counsel) (attached as Exhibit 34).

[9] *Santos Garcia v. Wolf*, No. 120CV821LMBJFA, 2020 WL 4668189, at *1 (E.D. Va. Aug. 11, 2020) (enjoining defendants from retaliating against plaintiffs for filing the civil action and from transferring plaintiffs out of the facility without consent of the plaintiff and counsel) (attached as Exhibit 34)

come back. Dkt, 365, Transcript, at PageID# 9042-43. Without having confirmed negative tests, staff can create additional and unnecessary risk to detainees and one another.

46.   The Court should order that ICE ensure that Calhoun staff and vendors are not permitted to work at Calhoun while their tests are pending.[10] Thereafter, staff must be tested on a weekly basis, like detainees, until there are no new positive tests from a round of testing. During outbreaks, staff must quarantine pending testing results.

### E. Facility Inspection and Recommendations

47. The Court should order Defendants to provide for an inspection by Dr. Homer Venters to be conducted at the earliest opportunity. Defendants should provide Dr. Venters with full access to the Calhoun County Correctional Facility and all necessary records, as well as the opportunity to speak confidentially with detainees and staff. Given Defendants' likely failure to review sick call records for signs of COVID-19 since early October, despite detainees' reports of such sick calls and reports of symptoms, Dr. Venters is also willing to review sick call records from the first couple weeks of October 2020.

48.   The Court has expressed grave concern about the adequacy of the steps

---

[10]   *See Zepeda Rivas v. Jennings*, No. 20-cv-02731-VC, Dkt. 500 (N.D. Cal. Aug. 6, 2020) (ordering weekly testing for staff), attached as Exhibit 30.

currently being taken at Calhoun to prevent the spread of COVID-19 and to contain the outbreak. The Court has also encouraged Defendants and Calhoun to seek advice from persons experienced in handling outbreaks.

49.   Dr. Venters, who is a correctional health expert with extensive experience in reviewing and developing plans to manage COVID-19 outbreaks in detention facilities, is prepared to do an in-person inspection at Calhoun within the next few weeks. *See* Venters c.v., attached to Venters Declaration, Exhibit 8.

50.   The inspection would identify what protections are needed to identify and protect medically vulnerable detainees while releases are being considered, and well as any other questions the Court would like addressed.

## **Order Barring Retaliation**

51.   The Court should order that Defendants to be barred from retaliating against detainees who seek protections from or treatment of COVID-19, who complain about the lack of such protections or treatment, or who file declarations, bail applications, or other documents in this litigation, and to take reasonable measures to ensure that Calhoun staff do not retaliate against such detainees.

52.   Several class members have reported retaliation or threatened retaliation if they ask for resources to protect themselves from COVID-19, or if they seek treatment for potential COVID-19 symptoms. *See*, *e.g.*, Exhibit 9, Xirum-

Sanchez Decl., ¶ 11 ("One officer told us to stop saying we had coronavirus and to stop asking for medicine because if we did, we would be moved to a punishment cell."); Exhibit 11, Second Cincotta Decl., ¶¶ 3.u-y (detainee who had filed a declaration prior to evidentiary hearing was "cut off" from receiving Zyrtek; other detainees were put in the hold after they asked for oxygen measuring devices to be sanitized or who complained about being required to wash laundry without knowing it was from individuals who were infected); Boggs Decl. ¶¶ 9–10, 13, 17, Dkt. 226-3 (discussing detainee who believed he was beaten and retaliated against because of his involvement with this litigation, as well as for asking for medication).

53.    Defendants will likely dispute that there has been any such retaliation against individuals because they have requested protections from COVID-19, have complained about the lack of protections, or have filed declarations in this litigation. But Defendants cannot dispute that such retaliation would be impermissible.  If retaliation is occurring, it should immediately be prohibited. If it is not occurring, Defendants are not harmed by an order barring retaliation.

**Reporting Requirements**

54.    Because timely and accurate information is critical for the ability of the Court and the parties to respond to the rapidly evolving situation at Calhoun, the

Court should order ICE to report the following information to the Court and Plaintiffs on a daily basis:

    a. Total facility population and total ICE detainee population, including transfers, releases, and removals.

    b. Number of staff (and, if known, vendors), ICE detainees, and criminal detainees who are currently positive or awaiting results.

    c. For ICE detainees, the names, A numbers, pod location, all tests taken to date, all test results to date, and all hospitalizations or movements to a medical observation cell/unit.

    d. Any changes in protocols to deal with the outbreak or any other COVID-related concerns.

55. The Court should also order ICE to respond promptly to all other reasonable information requests from class counsel regarding safety conditions at Calhoun. The requirement to file daily reports does not preclude class counsel from seeking and obtaining additional information (or the same information more rapidly) if the situation calls for it.[11]

---

[11] *See, e.g.*, *Hernandez Roman v. Wolf*, No. 20-768-TJH, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020) (attached as Exhibit 31); *Zepeda Rivas v. Jennings*, No. 20-cv-02731-VC, Dkt. 500 (N.D. Cal. Aug. 6, 2020) (attached as Exhibit 30); *Garcia v. Wolf*, No. 120CV821LMBJFA, 2020 WL 4668189, at *1 (E.D. Va. Aug. 11, 2020); *Gomez v. DHS*, No. 1:20-CV-453-LM, 2020 WL 2598180, at *2 (D.N.H. May 21, 2020); *Yanes v. Martin*, No. 120CV00216MSMPAS, 2020 WL 3046019, at *1

**Such Other Relief as the Court Finds Just and Proper**

56.     Finally, the Court should order any other relief it finds just and proper in light

of the rapidly evolving and dangerous conditions at Calhoun.

_____

(D.R.I. May 19, 2020); *Savino v. Souza*, No. CV 20-10617-WGY, --- F. Supp. 3d ----, 2020 WL 2404923, at *11 (D. Mass. May 12, 2020).

Dated:  October 28, 2020

Respectfully submitted,

/s/ Miriam J. Aukerman

Miriam J. Aukerman (P63165)
American Civil Liberties Union
    Fund of Michigan
1514 Wealthy Street SE, Suite 260
Grand Rapids, MI 49506
Telephone: (616) 301-0930
maukerman@aclumich.org

Daniel S. Korobkin (P72842)
Monica C. Andrade (P81921)
American Civil Liberties Union
    Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Telephone: (313) 578-6824
dkorobkin@aclumich.org

David C. Fathi
Eunice H. Cho
American Civil Liberties Union
    Foundation, National Prison
    Project
915 15th Street NW, 7th Floor
Washington, D.C.  20005
Telephone: (202) 548-6616
dfathi@aclu.org
echo@aclu.org

Anand V. Balakrishnan
Michael K.T. Tan
Omar C. Jadwat*
ACLU Foundation Immigrants'
    Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2660
abalakrishnan@aclu.org
mtan@aclu.org
ojadwat@aclu.org

My Khanh Ngo
ACLU Foundation Immigrants'
    Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
mngo@aclu.org

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

 /s/ Jeannie S. Rhee
Jeannie S. Rhee
Mark F. Mendelsohn
Rachel M. Fiorill
Peter E. Jaffe
Darren S. Gardner
2001 K Street NW
Washington, D.C. 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
jrhee@paulweiss.com
mmendelsohn@paulweiss.com
rfiorill@paulweiss.com
pjaffe@paulweiss.com
dgardner@paulweiss.com

Jonathan M. Silberstein-Loeb
Oleg M. Shik
Katharine W. Gadsden
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
jsilberstein-loeb@paulweiss.com
oshik@paulweiss.com
kgadsden@paulweiss.com

*Attorneys for Plaintiffs*


*Application for admission forthcoming

CUNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

JANET MALAM,

                Petitioner-Plaintiff,

    - against -

REBECCA ADDUCCI, *et al.*,

           Respondent-Defendants.

No. 5:20-cv-10829-JEL-APP

**BRIEF IN SUPPORT OF PETITIONER-PLAINTIFFS'
MOTION FOR EMERGENCY RELIEF TO RESPOND TO COVID-19
OUTBREAK**

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

BACKGROUND AND FACTS ...........................................................................2

    1.    Defendants' Deficient Precautionary Measures Contributed to the Outbreak. .......................................................................................2

    2.    Defendants' Response to the COVID-19 Outbreak has Been Inadequate. ...........................................................................................6

    3.    Defendants' Inadequate Response Places Medically-Vulnerable Detainees at Even Higher Risk.................................................................9

    4.    There is a High Probability of Continued COVID-19 Spread at Calhoun. ............................................................................................12

    5.    Calhoun Is Unable to Support a Worse Outbreak.............................14

ARGUMENT AND RELIEF REQUESTED ......................................................15

CONCLUSION ..................................................................................................19

## INTRODUCTION

There is a full-fledged COVID-19 outbreak at Calhoun.  Over 16% of the immigration detainee population is infected, and several inmates and four staff members are infected too.  Defendants' precautionary measures, which this Court already found "do not sufficiently mitigate" the "heightened risk of a dire outcome from COVID-19," have utterly failed.  June 28 Op. & Order, Dkt. 127, PageID.4225-26.   Lack of social distancing, staff intransigence to wearing face masks, delayed medical response times, failure to test and monitor symptoms, and improper quarantine protocols have undoubtedly contributed to the outbreak. Defendants' belated effort to contain the spread and protect high-risk individuals has been similarly deficient.  Although the outbreak appears to have begun weeks ago, Defendants have yet to properly identify, test, and isolate all medically-vulnerable Plaintiffs.  Defendants' testing and contact-tracing protocols continue to fall short, despite their eleventh-hour concession that mass testing is necessary now that it is undeniable that the outbreak has touched every part of the facility. Calhoun has no plans to increase medical capacity, even as detainees wait for days after reporting COVID-19 symptoms to be seen by medical staff.  Remarkably, the facility continues to bring in new detainees.  These factors and others make continued spread highly likely, and Defendants have acknowledged that Calhoun does not have the capacity to support a bigger outbreak.  Thus far, at least 19 class

members have contracted the virus, including at least three who are conceded to be medically vulnerable and at least five more whom Plaintiffs believe to be at high risk. Continued detention of medically vulnerable Plaintiffs in the midst of this outbreak constitutes unconstitutional punishment. The Court's intervention is urgently needed.

## BACKGROUND AND FACTS

**1. Defendants' Deficient Precautionary Measures Contributed to the Outbreak.**

As Plaintiffs have detailed extensively in prior briefing, Calhoun's protective measures fall short of adequately protecting detainees from COVID-19. Indeed, these inadequate protections likely contributed to the current outbreak.

It is impossible for Plaintiffs to socially distance at Calhoun. Detainees sleep in communal dorms with less than six feet of space between beds. Ex. 9, ¶ 5; Ex. 21, ¶ 16. In Pod H, the epicenter of the recent outbreak, eight detainees sleep in four bunk beds that are squeezed into a cell measuring 18 feet by 8 feet; this leaves just two feet of space between beds. Ex. 25, ¶¶ 7, 8. *See also* Ex. 24, ¶ 6 (two detainees in Pod D sharing bunk bed in cell measuring 4 feet by 6 feet); Ex. 21, ¶¶ 15-16 (within six feet of cellmate "at all times" in Pod G). During the several hours of the day when everyone is required to be in their cell, detainees cannot maintain six feet of distance from each other. Ex. 25, ¶ 8; Ex. 24, ¶ 7; Ex. 21, ¶ 17. Detainees are similarly unable to socially distance in the cafeterias,

recreational areas, and communal bathrooms.  *See, e.g.*, Ex. 25, ¶ 11-12; Ex. 24, ¶ 24; Ex. 21, ¶ 23.  In Pod H, 42 detainees were sharing three working showers, five sinks, and three toilets. Ex. 25, ¶ 17. *See also* Ex. 24, ¶ 19 (three showers for 56 detainees in Pod D; four showers for 20 detainees in Pod B quarantine); Ex. 21, ¶ 20 (four showers for 30 detainees in Pod G).  "Implementation of social distancing in housing areas and common spaces" is a "critical area of work" yet Calhoun has done little to facilitate it.  Ex. 8, ¶ 14; *see also id*. ¶ 27(c) (ability to social distance "is crucial to delaying the spread of COVID-19 inside a congregate setting like Calhoun").

Defendants also admit that, prior to October 27, 2020, they did not require detainees to wear face masks inside the general housing units.  Tr. at 29:3-9 ("it's almost like, you know, as a family we wouldn't be wearing masks in the house"); Hazel Decl. ¶ 5.  *See also* Ex. 25, ¶ 14 (detainees not required to wear masks except in the hallways); Ex. 21, ¶ 11.  This approach contradicts basic Centers for Disease Control ("CDC") guidance and standard correctional practices.  Ex. 8, ¶ 13; Tr. at 76:22–77:18.  However, even if detainees were required to wear masks inside their pods, Calhoun provided them with just two surgical masks upon intake that were replaced only "as needed."  Tr. at 28:12–21.  *See also* Ex. 9, ¶ 7 (provided one mask since August).  Defendants have not indicated that this

3

practice has changed in response to the outbreak. *Cf.* Hazel Decl., Dkt. 361, ¶ 7 (only high-risk detainees get two new masks daily).

Adequate hygiene and sanitation materials are also lacking. Detainees do not have access to hand sanitizer and have limited access to hand soap. Ex. 25, ¶ 18; Ex. 24, ¶¶ 16-17; Ex. 21, ¶ 24. Common areas such as bathrooms and cafeterias are cleaned infrequently and incompletely in between uses. Ex. 25, ¶¶ 20-21; Ex. 24, ¶¶ 14, 20; Ex. 21, ¶¶ 22-23.

Throughout mid-October, when detainees reported feeling ill, including with COVID-19 symptoms, it would take days for medical staff to examine them or administer a COVID-19 test. Kmet Decl. ¶ 13. Detainees with pending test results remained in their pods, meaning that if they are infected, they will likely infect those around them. Several detainees reported this delay:

- Mr. Xirum-Sanchez reported a fever on October 16, was not tested until October 20, and was removed from Pod H on October 22. Ex. 9, ¶¶ 9, 12, 15.

- Mr. Hernandez-Guerrero reported sick on October 16, was not tested until October 17, and was removed from Pod H on October 21. Ex. 10, ¶ 3.b-e.

- Mr. Cordero reported COVID-19 symptoms on October 16, was not tested until October 19, and was transferred from Pod H to Pod L on October 22. Ex. 13, ¶ 2-5.

4

- Mr. Soto complained of COVID-19 symptoms on October 14, was not tested until October 20, and was transferred to a quarantine unit on October 23. Ex. 21, ¶¶ 4-7.[1]

Defendants' testing protocols were similarly deficient. Immigrations and Customs Enforcement ("ICE") detainees were tested upon arrival and when they left the 14-day quarantine. Tr. 25:7-10; 29:7-9. Beyond this, only symptomatic detainees were tested. Ex. 24, ¶ 22. When someone tested positive for COVID-19, their pod was not quarantined and all others in the pod were not tested, despite the shared use of common spaces. *Id.* ¶¶ 11-12. The roving detainee workers and staff that Calhoun employs "can serve as potent vectors of COVID-19 transmission," yet they were not regularly tested. Ex. 8, ¶ 10.

New detainees—which the facility continues to accept—are improperly quarantined. Ex. 8, ¶ 10 n.4; Ex. 10, ¶ 3.k. Detainees are not immediately housed in a quarantine pod, are transferred to another pod before the 14-day period is complete, and exposed to newcomers in the middle of their quarantine period. Ex. 8, ¶ 10 n.4. Often, they are quarantined in the same cell with another detainee. Ex. 25, ¶ 5; Ex. 24, ¶¶ 4, 5. Even when single-celled, detainees shower and make phone calls daily alongside several others. Ex. 25, ¶ 4; Ex. 24, ¶ 4; Ex. 21, ¶ 9.

---

[1] *See also* Ex. 14, ¶¶ 4-5 (detainees reporting illness not examined until about a week later).

5

During the quarantine period, there is no requirement that they wear masks or socially distance. Ex. 24, ¶ 4.

## 2. Defendants' Response to the COVID-19 Outbreak has Been Inadequate.

Defendants' response to the COVID-19 outbreak has been wholly inadequate. They have failed to take basic steps to prevent the outbreak from spreading and to protect those who have already been infected.

As an initial matter, Defendants do not contest infrequent or improper mask wear by staff. They simply reiterate that staff are already supposed to wear masks in the housing units. Hazel Decl., Dkt. 361, ¶ 6. This statement ignores declarations by multiple detainees that staff rarely wear masks or wear them incorrectly, *see, e.g.,* Ex. 25, ¶ 15; Ex. 24, ¶¶ 15, 21; Ex. 21, ¶¶ 12-13;, and contradicts their own admission that it has been a "struggle" to get staff to wear masks, Tr. at 29:20. Defendants have not explained how they will enforce the staff mask requirement and ensure that Calhoun's practices actually align with representations made to the Court. *See* Mem. Regarding High Risk Detainees, Dkt. 360, PageID.8847.

With regard to testing and contact-tracing, Defendants are also deficient. Only recently, on October 28, did Defendants agree to conduct mass testing because it became undeniable that the outbreak had spread to all parts of the facility. Ex. 26. Even so, Defendants have not explained how regularly tests will

6

be conducted for those who are not considered high risk.  *Cf.* Mem. Regarding

High Risk Detainees, Dkt. 360, PageID.8847.  *See also* Ex. 8, ¶ 32 ("regular testing

. . . is necessary both to understand and to contain the scope of the outbreak").

Prior to October 28, Defendants did not agree to test everyone who may have been

in contact with an infected individual.  For example, Mr. Hernandez-Guerrero, who

works as a tray runner and delivers food to eight pods, tested positive for COVID-

19 on October 20. Ex. 10, ¶ 3.h.  Despite his widespread exposure to detainees, as

of October 26, Defendants conducted mandatory testing in only one of the pods

where he delivered food and have not done complete contact tracing of Mr.

Hernandez-Guerrero's movements.  Tr. 15:9-15; 21:15-21.  When Defendants

reported in the late afternoon of October 28 that they would begin mass testing, Dr.

Venters noted how this step should have been taken much earlier to ascertain the

scope of the outbreak before it became self-evident that the infection is now "quite

widespread for multiple groups of staff and detainees." Ex. 8, ¶ 18.

Further, Defendants' contact-tracing practices are incorrect.  Dr. Troost

testified that they only contact-trace on individuals exposed to a symptomatic

carrier for more than fifteen minutes of constant contact.  Tr. at 55:12–21; 57:24–

58:3.  This approach is inconsistent with CDC guidelines, which do not distinguish

between constant or cumulative contact.  Tr. at 79:14–80:12; Ex. 8, ¶ 15.  As a

result of inadequate testing and contact tracing, Defendants have still not been able

to identify source of the outbreak—more than one week after it began.  Tr. at 26:5–12.

Despite the recent outbreak, Defendants have not changed many of the practices that contributed to the spread in the first place.  Inexplicably, Calhoun continues to admit new detainees and transfers.  Tr. at 39:17-19; Ex. 10, ¶ 3.k; Ex. 26 (describing new detainee tested positive for COVID-19 at intake on October 27, 2020).  Detainees have been moved between pods without testing.  Ex. 20, ¶¶ 3-4.  Guards with pending COVID-19 tests continue to work as scheduled, Tr. at 32:16–33:2, and the facility has not made any changes to staffing assignments in response to the outbreak, Tr. at 44:7-9.  This means that roving staff members continue to circle through pods.  Tr. at 43:4-6.  There is no indication that Defendants are doing anything differently to ensure that staff actually wear their masks while inside housing units, nor have they committed to providing non-high-risk detainees daily access to new masks.[2]  Hazel Decl., Dkt. 361, ¶¶ 6-7.  These practices created the dangerous potential for the virus to spread uncontrolled throughout the facility in the first place.  By failing to identify and alter these practices, Defendants have not remediated the risk.

---

[2] Defendants' counsel represented to Plaintiffs' counsel that they may be amenable to this mask accommodation but could not confirm prior to this motion's filing.

Finally, Defendants have not increased their medical capacity and have made no plans to do so. Tr. at 36:9–18. The lone doctor responsible for overseeing Calhoun is still only scheduled for one shift per week, and medical checks are still conducted just once per day. Tr. at 35:16–22; 37:1–3. These medical visits are typically conducted without the assistance of interpreters, making it less likely that detainees' descriptions of their symptoms are properly understood. Tr. at 43:7–10. And, despite the spike in cases, Calhoun has only two negative pressure units—both of which are currently occupied. Tr. at 34:11–17.

**3.  Defendants' Inadequate Response Places Medically-Vulnerable Detainees at Even Higher Risk.**

Defendants' inadequate response to the outbreak is even more dangerous for medically vulnerable detainees, who this Court found are already at "heightened risk of a dire outcome from COVID-19." June 28 Op. & Order, Dkt. 127, PageID.4200. *See also* Ex. 8, ¶¶ 19-30. Despite this unconstitutionally high risk, testimony at the emergency hearing made clear that Defendants have failed to properly identify and protect known medically vulnerable detainees. While Defendants have now proposed "additional precautions" for high-risk detainees, Dkt. 360, PageID.8847, those minimal steps are still insufficient to mitigate the grave risk these detainees face.

As the Court rightly noted with alarm during the emergency hearing, Defendants have failed to even identify—let alone protect—all medically-

vulnerable detainees at Calhoun. Tr. at 68:23- 69:11.  Over the last several months,

pursuant to the Court's order, Defendants have identified dozens of detainees

whom they concede are "high-risk" yet had inexplicably failed to share that

information with staff at Calhoun.  *See* Aug. 24, 2020 Notice of Undisputed

Habeas Litigation Group Members, Dkt. 203; Oct. 2, 2020 Updated Notice of

Undisputed Habeas Litigation Group Members, Dkt. 310.  Indeed, Dr. Troost

testified that there was only "one" medically vulnerable detainee in his care,

whereas ICE concedes that there are at least 15 high-risk detainees currently at

Calhoun.  *Compare* Tr. 47:13-15 *with* 68:13-19; *see* Exs. 1, 2.

This discrepancy highlighted an even bigger problem: Calhoun has not

adhered to the CDC guidelines in identifying medically vulnerable detainees.

Although Defendants have agreed that anyone with a condition on the CDC's list

falls within the Habeas Litigation Group, this has apparently been an empty

exercise that has not translated into actual accommodations on the ground because

it has not been conveyed to Calhoun nor resulted in any meaningful protections.

Ex. 8, ¶ 22 ("This lack of coordination between ICE and Calhoun is not only

disturbing, it may reflect larger systemic issues in terms of health care provision

and oversight at the facility.").  Calhoun—and effectively, ICE—has adopted a

much more limited and underinclusive approach to identifying high-risk detainees.

In Dr. Troost's view, detainees with co-morbidities that the CDC has identified as

10

clear risk factors are not at "higher [risk] than other people" unless those conditions are "uncontrolled." Tr. 70:17-71:21. In other words, Dr. Troost does not consider detainees to be high-risk if they are receiving any treatment for their co-morbidity. *Id.* Because Defendants have not enforced their own guidance and have failed to share crucial information about who should be considered high-risk, staff at Calhoun did not take any additional precautions to protect medically vulnerable detainees until days into an outbreak, when admonished to do so by the Court. Tr. at 69:1-11. *See generally* Mem. Regarding High Risk Detainees, Dkt. 360.

In any case, the minimal precautions Defendants have proposed for high-risk detainees fail to describe how they will protect these detainees and fall well short of what Dr. Venters recommends. To start, Defendants have not explained whether Calhoun medical staff will adopt ICE and CDC guidance going forward to proactively identify any additional "high-risk" detainees, or whether they will simply wait to receive the weekly list of high-risk individuals from ICE. Dkt. 360. Dr. Venters stresses the importance of properly identifying detainees who are at high risk for serious illness or death. Ex. 8, ¶ 21. The facility should follow CDC guidelines as implemented at other facilities and should "err on the side of caution in terms of who may be at higher risk." *Id.* ¶ 25. Second, any individuals who are identified as high risk should be considered for immediate release. *Id.* ¶¶ 20, 27(a).

11

Short of release, for those who remain in detention, Defendants should conduct daily COVID-19 screenings and provide other protections, such as regularly-monitored single-cell housing, increased chronic care encounters, and increased access to sick call. *Id*. ¶ 27(c). Defendants propose none of these measures. They simply state that they will detain medically vulnerable individuals in single cells in Pod M "to the extent possible," but have not explained how they will further ensure their adequate protection. Mem. Regarding High Risk Detainees, Dkt. 360, PageID.8847. Nor do they provide any guarantee that such housing will be non-punitive. Ex. 8, ¶ 39 (describing importance of offering single-cell housing to detainees in no way that resembles punitive confinement like administrative segregation). Moreover, Pod M is adjacent to Pod L, where all positive cases are being held, and this physical proximity necessitates more rigorous protective measures than Defendants have offered. Ex. 8, ¶ 16.

As a result of Defendants' failed protective practices, at least three detainees whom Defendants agree are high-risk have already tested positive for COVID-19. *See* Exhibit 1; Ex. 14; Ex. 13; Ex. 12.

**4.   There is a High Probability of Continued COVID-19 Spread at Calhoun.**

Due to Defendants' inadequate response to the outbreak thus far, there is a high probability of continued spread. To date, detainees in two separate pods have tested positive for COVID-19, and Calhoun has been unable to determine the vector

12

for the outbreak.  Further, information provided by detainees and Calhoun officials indicates that individuals the vast majority of pods may have been exposed to COVID-19.  *See* Ex. 7.

For instance, Alberto Hernandez-Guerrero, a detainee tray runner residing in Pod H who tested positive for COVID-19, reported that he delivered food to detainees in pods A, B, C, D, E, F, I, and M, and for a pod of female detainees.  Ex. 10, ¶ 3(h); Ex. 11, ¶ 3(g).  This included delivering trays *after reporting COVID-19 symptoms to Calhoun staff*.  Ex. 11, ¶ 3(a)-(g).  In addition, Chief Deputy Hazel testified that Calhoun's staff "rover" who worked in pods F, E, and D, as well as the medical unit, tested positive for COVID-19.  Tr. at 26:21-25.  In an October 23, 2020 email, Defendants' counsel represented that another deputy who worked in pods E, I, and intake tested positive for COVID.  Ex. 26.  COVID-positive detainees also worked in the laundry unit, the kitchen, and as tray runners.  Ex. 14, ¶¶ 8-9.  Finally, Defendants' counsel reported in an October 28, 2020 email that a staff member who worked in the commissary "and had contact with several units" tested positive, as well as an inmate in Pod G.  Ex. 26.  Test results for dozens of staff members are still pending.  *Id*.  In total, at least twelve units—and possibly more—have been exposed to the virus.  Given this widespread exposure, Defendants have belatedly agreed to conduct mass testing of the entire facility.  *Id*.  However, had they acted sooner, this rapid spread may have been prevented.

**5.      Calhoun Is Unable to Support a Worse Outbreak.**

Calhoun has very limited capacity to deal with the existing outbreak, *see*
*supra* Section 3.  At the emergency hearing, Chief Deputy Hazel testified that
Calhoun has three cells in the medical unit (Pod Q), only two of which are negative
pressure rooms.  Tr. 34:11–14.  Both negative pressure rooms are currently
occupied, and Calhoun has no additional capacity for medical observations. Tr.
34:15–25.  Instead, Calhoun has been putting individuals who are positive for
COVID-19 into locked cells.  Tr. 35:18-22 (medical staff only check on infected
detainees once a day).  This does not allow medical staff to closely monitor
individuals who have tested positive for COVID-19, which Dr. Venters stressed is
important especially for those who are medically vulnerable.  Ex. 8, ¶ 27(a) (noting
that "high-risk patients may appear relatively stable at one time, and become
gravely ill hours later").  When asked whether Calhoun was doing anything to
increase its capacity for medical observation, Chief Deputy Hazel said that he was
"not sure there's much more that [Calhoun] can do in terms of medical response."
Tr. 36:15–17.  Indeed, in at least one pod (Pod L) staff have replaced the Kite
program that the detainees used to send notices to the medical unit with an
"emergency" button that is only to be used if detainees are experiencing extreme
symptoms.  Ex. 14, ¶ 11.

14

Further, Calhoun has not been implementing necessary precautions to prevent the virus from spreading, such as immediate and regular screening of staff or detainees. Ex. 8, ¶¶ 31, 34. Calhoun has also not taken any steps to ensure social distancing or to provide effective training and education to staff and detainees on infection control. *Id*. ¶ 36-40. And remarkably, Defendants continue to oppose the release of high-risk detainees, insisting that the current outbreak is "contained." Dkt. 370. But the evidence speaks for itself: at least 24 detainees or inmates across three different housing units and four employees have exposed 12 housing units. Ex. 7; Ex. 8, ¶ 18.

This growing outbreak is far from "contained" and these exigent circumstances demand, as this Court stated, a reaction. Tr.100:21–25 ("We want to react to new information and the new information we have is that there's a dramatic increase in COVID at Calhoun County Correctional Facility. That requires all of us to be reactionary and to jump into this effort to sort out what needs to be done with all of the resources we can bring to bear.").

## ARGUMENT AND RELIEF REQUESTED

With over 360 docket entries and counting, this Court is fully familiar with the applicable law. Plaintiffs will not repeat it here. Moreover, the relief requested in this motion is largely self-explanatory and is fully supported by the record, which is summarized above. Accordingly, Plaintiffs will make only a few brief points.

15

As this Court has repeatedly found, immigration detainees are entitled to reasonable safety and may not be punished. *See*, *e.g.*, Dkt. 212, Order Denying Defendants' Motion to Amend Judgment.[3]   The record is clear: Defendants have failed to provide for the reasonable safety of both medically vulnerable detainees and the class as a whole.   It is punitive to lock up civil immigration detainees in a jail where a deadly disease is spreading rapidly when they cannot social distance, are not provided adequate PPE, and are not regularly tested, and indeed are not even tested when they report symptoms.

For those at highest risk – the Habeas Litigation Group – Plaintiffs are asking that the Court, pursuant to 28 U.S.C. §§ 2241, 2243, and its inherent authority, order enlargement of custody pending final adjudication of their claims as members of the multiparty habeas litigation group. *See Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990).   In light of the outbreak and the length of time it takes to prepare and adjudicate bail applications (3-5 weeks), Plaintiffs are asking that the bail process

---

[3]   Because Defendants have appealed this Court's decision applying the punishment standard, *see* Am. Notice of Appeal, Dkt. 308, this Court may wish to explain that the relief requested here would also be fully justified under any version of the deliberate indifference standard. The evidence shows that Defendants failed to take basic preventative measures, such as providing sufficient masks to detainees, ensuring that staff wear masks, testing individuals who reported COVID-19 symptoms, or providing additional protections to people they know are at high risk. Indeed, at the hearing it became clear that Defendants had failed even to inform Calhoun about the individuals that the Defendants themselves have recognized are at high risk.

16

be expedited for those for whom bail applications are not yet pending.  In addition, it is dangerous to continue detaining individuals who have significant health vulnerabilities but whose precise level of risk Defendants dispute.  Accordingly, the Court should find that individuals whom Plaintiffs have identified as high risk are members of the Habeas Litigation Group, and allow them to file expedited bail applications. Finally, the Court should order the procedures requested that will allow all members of the Habeas Litigation Group to be quickly identified.

For detainees who do not fall in the highest risk group, Plaintiffs are asking for basic measures to ensure they are reasonably safe and are not subjected to punitive conditions of confinement.  Specifically, Plaintiffs ask the Court to (a) require that detainees to be housed in a manner that allows for continuous social distancing (but is not solitary confinement); (b) require adequate testing and provision of PPE; (c) prohibit new admissions, bar transfers of Conceded and Unconceded Habeas Litigation Group members without Court approval, and require notice of other transfers during the outbreak; (d) adopt requirements to prevent staff and vendors from working in the facility while potentially infected; (e) order a facility inspection; and (f) prohibit retaliation against detainees.  The relief requested here is similar too, and indeed more modest than, relief ordered in other ICE detention facilities where there were outbreaks.  *See*, *e.g.*, *Rodriguez Alcantara v. Archambeault*, No. 20-cv-756-DMS (AHG), --- F. Supp. 3d ----, 2020 WL 2315777 (S.D. Cal. May 1, 2020);

17

*Zepeda Rivas v. Jennings*, No. 20-cv-02731-VC, Dkt. 500 (N.D. Cal. Aug. 6, 2020); *Hernandez Roman v. Wolf*, No. 20-768-TJH, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020); *Hernandez Roman v. Wolf*, No. 5:20-cv-00768-TJH-PVC, 2020 WL 6107069 (C.D. Cal. Oct. 15, 2020) (attached as Exhibits 29–32).

Finally, Plaintiffs seek regular reporting to ensure the parties and Court can respond appropriately to a rapidly evolving situation.

Defendants argued at the hearing that the relief requested would be an improper grant of final relief based an emergency hearing. Not so. Plaintiffs are seeking temporary, emergency relief in light of a COVID-19 outbreak at the facility. For Habeas Litigation Group members, that temporary interim relief is a bail order granting release while their habeas petition is pending. The circumstances here are exceptional—the rapid spread of a deadly disease in congregate environment housing high risk people in close quarters. *Dotson*, 900 F.2d at 79. And there is a substantial question of law about whether their detention violates their Due Process rights. *Id.* Even before the outbreak, the Court found that interim bail orders are appropriate for high risk individuals. What Plaintiffs are requesting here is simply to speed up that process.

For the class as a whole, the four factors of the familiar preliminary injunction test are easily satisfied. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Plaintiffs face irreparable harm in the form of serious injury or death, absent urgent

18

relief.  Plaintiffs are likely to succeed on the merits of their claim that Defendants are not ensuring their reasonable safety and are detaining them in punitive conditions in violation of their rights under the Fourteenth Amendment.  The balance of the equities and the public interest also favor Plaintiffs.  Indeed, the outbreak at Calhoun threatens the lives and safety not only of those detained and those who work at the facility, but of those in the community when correctional officers become infected or scarce hospital and public health resources need to be devoted to caring for individuals infected at Calhoun.

The outbreak—one hopes—will be over by the time this Court decides on final relief.  And final relief may well look different for that reason.  The emergency relief requested here is based on, and tailored to, the current, urgent circumstances.

## CONCLUSION

Wherefore Plaintiffs-Petitioners respectfully request that their motion be granted.

Dated: October 28, 2020

Respectfully submitted,

 /s/ Miriam J. Aukerman
Miriam J. Aukerman (P63165)
American Civil Liberties Union
   Fund of Michigan
1514 Wealthy Street SE, Suite 260
Grand Rapids, MI 49506
Telephone: (616) 301-0930
maukerman@aclumich.org

Daniel S. Korobkin (P72842)
Monica C. Andrade (P81921)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Telephone: (313) 578-6824
dkorobkin@aclumich.org

David C. Fathi
Eunice H. Cho
American Civil Liberties Union
   Foundation, National Prison
   Project
915 15th Street NW, 7th Floor
Washington, D.C.  20005
Telephone: (202) 548-6616
dfathi@aclu.org
echo@aclu.org

Anand V. Balakrishnan
Michael K.T. Tan
Omar C. Jadwat*
ACLU Foundation Immigrants'
   Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2660
abalakrishnan@aclu.org
mtan@aclu.org
ojadwat@aclu.org

My Khanh Ngo
ACLU Foundation Immigrants'
   Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
mngo@aclu.org

20

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

 /s/ Jeannie S. Rhee
_____
Jeannie S. Rhee
Mark F. Mendelsohn
Rachel M. Fiorill
Peter E. Jaffe
Darren S. Gardner
2001 K Street NW
Washington, D.C. 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
jrhee@paulweiss.com
mmendelsohn@paulweiss.com
rfiorill@paulweiss.com
pjaffe@paulweiss.com
dgardner@paulweiss.com

Jonathan M. Silberstein-Loeb
Oleg M. Shik
Katharine W. Gadsden
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
jsilberstein-loeb@paulweiss.com
oshik@paulweiss.com
kgadsden@paulweiss.com

*Attorneys for Plaintiffs*

        *Application for admission forthcoming

## CERTIFICATE OF SERVICE

I, Jeannie S. Rhee, certify that on October 28, 2020, I caused a true and correct copy of the foregoing document to be filed and served electronically via the ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. I also caused true and correct copies of the foregoing document as well as un-redacted copies of the declarations and exhibits filed therewith to be served by electronic mail on counsel for Defendants.

Respectfully submitted,

/s/ Jeannie S. Rhee