UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JANET MALAM, | |
| Petitioner-Plaintiff, | |
| and | |
| QAID ALHALMI, *et al.*, | No. 5:20-cv-10829-JEL-APP |
| Plaintiff-Intervenors, | |
| - against - | |
| REBECCA ADDUCCI, *et al.*, | |
| Respondent-Defendants. | |

**SUPPLEMENTAL BRIEF IN SUPPORT OF PETITIONER-PLAINTIFFS'
MOTION FOR EMERGENCY RELIEF TO RESPOND TO COVID-19
OUTBREAK**

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

BACKGROUND AND FACTS ............................................................................3

    I.      Defendants Have Failed to Protect Detainees at Calhoun, Leading to the Current Outbreak...........................................................3

    II.    Defendants' New Precautions are Inadequate to Protect Plaintiffs. ...................................................................................................7

         A.    Defendants Are Failing to Protect All Class Members and Slow the Spread of COVID-19. ..........................................................8

         B.    Defendants Have Failed to Protect High Risk Detainees. ........14

ARGUMENT .....................................................................................................18

    I.      LEGAL FRAMEWORK ....................................................................18

    II.    RELIEF IS REQUIRED UNDER THE PUNISHMENT STANDARD. ......................................................................................22

         A.    The Nature of Plaintiffs' Claims and the Punishment Standard. ..............................................................................22

         B.    This Court Correctly Applied the Punishment Standard. .........25

         C.    Continued Detention of Medically Vulnerable Immigration Detainees Is Punishment. ..........................................................27

         D.    The Conditions of Confinement for Class Members are Punitive ..............................................................................31

    III.   RELIEF IS REQUIRED UNDER ANY VERSION OF THE DELIBERATE INDIFFERENCE TEST. ...........................................32

         A.    Under the *Kingsley* Test, the Question is Whether Detention or Detention Conditions are Objectively Unreasonable. ..............32

         B.    Relief is Required Under the *Kingsley* Test..............................35

         C.    The Results Are No Different Even if the Court Applies the Subjective Component of the Deliberate Indifference Test. ....37

         D.    *Cameron* and *Wilson* Are Not to the Contrary. ........................40

CONCLUSION ...................................................................................................42

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Alderson v. Concordia Par. Corr. Facility*,
    848 F.3d 415 (5th Cir. 2017) ...............................................................34

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ............................................................................23

*Bryant v. Buck*,
    793 F. App'x 979 (11th Cir. 2019) ......................................................34

*Cameron v. Bouchard*,
    818 F. App'x 393 (6th Cir. 2020) ........................................................25

*Cameron v. Bouchard*,
    815 F. App'x 978 (6th Cir. 2020) .....................................25, 40, 41, 42

*Castillo v. Barr*,
    No. CV 20-00605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020) ....................22

*Castro v. Cty. of Los Angeles*,
    833 F.3d 1060 (9th Cir. 2016) (en banc) .............................................34

*Darnell v. Pineiro*,
    849 F.3d 17 (2d Cir. 2017) ..................................................................34

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ..............................................................................32

*In re Flint Water Cases*,
    960 F.3d 303 (6th Cir. 2020) ...............................................................38

*Foucha v. Louisiana*,
    504 U.S. 71 (1992) ..........................................................................23, 24

*Fraihat v. U.S. Immigration & Customs Enf't*,
    No. 5:19-cv-1546, Dkt. 240, slip. op. (C.D. Cal. Oct. 7, 2020) .........30

*Griffith v. Franklin Cty.*,
    975 F.3d 554 (6th Cir. 2020) ...............................................................26

*Gutierrez-Lopez v. Figueroa,*
    462 F. Supp. 3d 973 (D. Ariz. 2020) ...................................................31

*Hope v. Pelzer,*
    536 U.S. 730 (2002)........................................................................39

*Hope v. Warden York Cty. Prison,*
    972 F.3d 310 (3d Cir. 2020) ............................................................42

*Hutto v. Finney,*
    437 U.S. 678 (1978)....................................................................21, 22

*J.H. v. Williamson Cty.,*
    951 F.3d 709 (6th Cir. 2020) ...........................................................23

*Kennedy v. Mendoza-Martinez,*
    372 U.S. 144 (1963)........................................................................23

*Kingsley v. Hendrickson,*
    576 U.S. 389 (2015)...................................................................passim

*Love v. Franklin Cty.,*
    376 F. Supp. 3d 740 (E.D. Ky. 2019) ...............................................34

*Lynch v. Baxley,*
    744 F.2d 1452 (11th Cir. 1984) .......................................................22

*Martin v. Warren Cty.,*
    799 F. App'x 329 (6th Cir. 2020) .....................................................26

*Martinez-Brooks v. Easter,*
    No. 3:20-cv-00569, 2020 WL 2405350 (D. Conn. May 12, 2020)....................30

*Miranda v. Cty. of Lake,*
    900 F.3d 335 (7th Cir. 2018) ...........................................................34

*Rhinehart v. Scutt,*
    894 F.3d 721 (6th Cir. 2018) ...........................................................40

*Richko v. Wayne County,*
    819 F.3d 907 (6th Cir. 2016) ..................................................32, 35, 37

*Richmond v. Huq*,
   885 F.3d 928 (6th Cir. 2018) ........................................................26, 34

*Roberts v. City of Troy*,
   773 F.2d 720 (6th Cir. 1985) .................................................................33

*Roman v. Wolf*,
   977 F.3d 935 (9th Cir. 2020) (per curiam) ....................................21, 42

*Rosales-Garcia v. Holland*,
   322 F.3d 386 (6th Cir. 2003) (en banc) ...............................................23

*United States v. Salerno*,
   481 U.S. 739 (1987)...............................................................................24

*Stearns v. Inmate Servs. Corp.*,
   957 F.3d 902 (8th Cir. 2020) .................................................................34

*Strain v. Regalado*,
   977 F.3d 984 (10th Cir. 2020) ..............................................................34

*Torres v. Milusnic*,
   No. CV 20-4450-CBM-PVCX, 2020 WL 4197285 (C.D. Cal. July
   14, 2020) ...........................................................................................31, 32

*Unknown Parties v. Nielsen*,
   No. CV-15-00250, 2020 WL 813774 (D. Ariz. Feb. 19, 2020) .........22

*Wilson v. Williams*,
   961 F.3d 829 (6th Cir. 2020). ....................................25, 35, 40, 41

*Youngberg v. Romeo*,
   457 U.S. 307 (1982).................................................................21, 25, 33

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)...........................................................................22, 23

## OTHER AUTHORITIES

U.S. Const. amends. V, VII ..............................................................passim

The N.Y. Times, *Covid in the U.S.: Latest Map and Case Count*
    (updated Nov. 6, 2020 2:07PM),
    https://www.nytimes.com/interactive/2020/us/coronavirus-us-
    cases.html#clusters (last accessed Nov. 6, 2020) .................................................1

U.S. Immigration & Customs Enforcement, *ICE Guidance on
    COVID-19: ICE Detainee Statistics* (updated Nov. 5, 2020
    6:15PM), https://www.ice.gov/coronavirus (last accessed Nov. 6,
    2020) ................................................................................................................1

## INTRODUCTION

Congregate settings like the Calhoun County Correctional Facility ("Calhoun") are tinderboxes for COVID-19. Of the nation's largest outbreaks, the majority have occurred in jails and prisons.[1] There have been over 7,000 positive cases in immigration detention facilities, with over 400 current cases.[2] As Plaintiffs repeatedly predicted, that fate now plagues Calhoun, where positive cases have jumped by more than 40 in under two weeks. The source of the outbreak has still not been identified and the scope is still uncertain. What is clear, however, is that Defendants have not been able to provide for the reasonable safety of those detained.

Plaintiffs seek two basic forms of relief. First, for individuals whose medical conditions or age puts them at a high risk, Plaintiffs seek identification and immediate release. Second, Plaintiffs seek a safer Calhoun for everyone else. As the Centers for Disease Control and Prevention ("CDC") has warned, anyone can become seriously ill from COVID-19, not to mention also serve as vectors of the disease to those at highest risk. Absent proper social distancing and other protective measures, continued spread and continued suffering is inevitable. Reports of sick class

---

[1] The N.Y. Times, *Covid in the U.S.: Latest Map and Case Count* (updated Nov. 6, 2020 2:07PM), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#clusters (last accessed Nov. 6, 2020).

[2] U.S. Immigration & Customs Enforcement, *ICE Guidance on COVID-19: ICE Detainee Statistics* (updated Nov. 5, 2020 6:15PM), https://www.ice.gov/coronavirus (last accessed Nov. 6, 2020).

members have borne this out: both high risk individuals (many of whom were identified by Plaintiffs, not the government, *see* Ex. A) and others have been experiencing dire symptoms and the long-term impacts on their health are unknown.

Due to the outbreak, Plaintiffs sought emergency relief for both high risk individuals and everyone in the class. Many of the relief measures sought—a facility inspection, single celling, testing, PPE, and reporting—are to *slow* and *monitor* the outbreak. But the core of Plaintiffs' claims remains the same as they have throughout the litigation: (1) high risk individuals should be immediately identified and released because their detention is unjustified during a pandemic; and (2) Calhoun cannot provide for the reasonable safety of everyone else unless the population is brought down to a level that allows for social distancing and other essential precautions are put in place. Defendants still refuse to do either—in the middle of an outbreak.

The Court has repeatedly and correctly decided that the punishment standard applies. June 28, 2020 Opinion, Dkt. 127; Order Denying Defendants' Motion to Amend Judgment, Dkt. 212. However, Plaintiffs would also prevail under the deliberate indifference standard, which Defendants say applies. Defendants have completely bungled their response to the pandemic; demonstrated blatant misunderstandings of CDC guidelines; failed to take basic precautions; consistently refused to identify, protect or release high risk detainees; and somehow continued to insist—in the face of an outbreak—that people are safer inside Calhoun than if released.

Throughout this litigation, Defendants have argued that there is no need for the Court's intervention. Now that they have allowed an outbreak to occur and rapidly spread—the tragedy that Plaintiffs have been warning about from the start—they insist they have the situation under control. But the record in this case tells a different story and the Court should remain skeptical of Defendants' representations when detainees present a contrary picture of the facts on the ground and are pleading for their lives. Now is not the time to step back and let Defendants off the hook simply because they have taken intermediate measures that they should have taken long ago, and that are still insufficient to protect both the Habeas Litigation Group and the class as a whole. Plaintiffs not only continue to meet the standard for interim bail, but the current conditions at Calhoun and Defendants' failure to adequately respond underscore the necessity of expediting the processes for identifying high risk individuals and considering them for release, as well as granting other emergency relief.

## BACKGROUND AND FACTS

**I.     Defendants Have Failed to Protect Detainees at Calhoun, Leading to the Current Outbreak.**

It is important to understand how the current outbreak arose. As correctional health expert, Dr. Homer Venters, explains, many of the issues with the current protocols are the same or relate to problems at Calhoun that have been identified since April 2020, but not remedied. *See* Ex. C, ¶ 3.

From the outset, Defendants have insisted that their policies sufficiently miti-
gated the risk of COVID-19 infection amongst immigration detainees at Calhoun.
The current outbreak has laid bare what this Court has recognized for months:
Defendants' policies are inadequate and have failed to protect people for whose care
Defendants are responsible. As this Court noted, "the public health evidence on the
record continues to demonstrate the myriad ways in which precautionary measures
at [Calhoun] fail to sufficiently mitigate the pandemic's risk to medically vulnerable
detainees." June 28, 2020, Op. & Order, Dkt. 127, PageID.4192–93. The Court
systematically considered Defendants' precautionary measures and found they were
inadequate, noting that proper social distancing is "impossible", that Defendants'
testing regime "does not meet public health standards" as set by the Centers for
Disease Control (CDC), and that "many of [Defendants'] measures may exist as
policy only." *Id*., PageID.4193–98.  Indeed, this Court noted numerous detainee
reports of guards failing to wear masks or gloves, frequent violations of Calhoun's
own quarantine policies, and a shortage of soap for detainees. *Id.*, PageID.4198–99.

Defendants' failure to take adequate precautions has now resulted in a mass
outbreak. *See* Dkt. 373-9, ¶¶ 9–11, 44 (describing flaws). In addition to failing to
implement even their own inadequate measures, Defendants have either misunder-
stood or ignored guidelines from experts and the CDC, including: refusal to
acknowledge the importance of social distancing; over-reliance on an intake-

quarantine process for new admissions and on a flawed screening process for staff; lack of comprehensive testing outside the intake process; failure to provide adequate PPE, among other issues. Ex. C, ¶ 3. As Dr. Venters notes, Defendants' insufficient precautions to date—the failure to implement social distancing, universal mask-wearing and mass testing—has laid the grounds for COVID-19 to spread quickly. *Id*., ¶ 17. And now, "[b]ecause there has been an outbreak, in part due to the lack of adequate protections, the risks to individuals in [Calhoun] has greatly increased," at the same time that it has become more difficult to manage the spread of infections. *Id*. The current conditions threaten not only high-risk individuals, but all detainees. *Id*. ¶¶ 11–13, 16. As explained below, Defendants new measures—even to the extent that they are actually being implemented—fail to protect Plaintiffs.

For medically vulnerable detainees, Defendants' inadequate precautions have proven particularly dangerous. ICE has insisted on detaining individuals who are at higher risk of serious illness or death from COVID-19 despite the well-documented risks they face in congregate settings. ICE also has an extremely limited view of who is high risk, contradicting the CDC, and failed to screen for risk factors.

As revealed during the hearing on October 26, 2020, even as the outbreak was rapidly spreading, ICE failed to coordinate and communicate with Calhoun to identify and protect high-risk individuals; indeed, Calhoun's medical staff only identified *one* individual as high risk. Dkt. 365, 58:4–13; Dkt. 388, PageID.10489

(noting "[t]estimony illustrating the discrepancy between [Calhoun] and Defendant[s] regarding the identification of medically vulnerable detainees during the pendency of this case was particularly distressing."); Dkt. 373-9, Venters Decl. ¶¶ 21–22 ("This lack of coordination . . . is not only disturbing, it may reflect larger systemic issues in terms of health care provision and oversight at the facility.").

At least 40 detainees and inmates have reportedly tested positive in the last few weeks. Ex. O, Email from J. Newby to M. Aukerman (Nov. 2, 2020). Seven are high risk individuals whom Defendants have conceded as members of Habeas Litigation Group. *Id.* At least an additional five infected individuals had been identified by Plaintiffs' counsel as high risk. *See id.*; Dkt. 373-4. Notably, one of these individuals, Mr. Oscar Xirum-Sanchez, was brought to Defendants' attention on September 9, but Defendants refused to concede he is high risk, forcing Plaintiffs to go through the time-consuming process of obtaining an expert declaration for an inclusion motion. Brennan Bollman Decl., Dkt. 373-6. In that period, Mr. Xirum-Sanchez contracted COVID-19 and experienced such severe symptoms that he had to be isolated in the medical unit. Xirum-Sanchez Decl., Dkt. 373-4. On November 4, Defendants, without acknowledging their change in position, conceded that he is high risk. Ex. S, Email from J. Newby to M. Aukerman. Unfortunately for Mr. Xirum-Sanchez, Defendants' near-2-month delay—during which he could have submitted a bail application and been released—led him to fall ill to COVID-19.

Mr. Xirum-Sanchez's case is symptomatic of a larger problem: Defendants' failure to adequately screen for and identify high risk detainees. Through the survey process, Plaintiffs have identified at least 25 class members whom Defendants had failed to identify through their screening, but who they conceded are high risk once Plaintiffs brought them to Defendants' attention. Ex. A. As this Court is aware, Defendants failed between August 11 and September 21 to provide updated lists of conceded members of the group, even as Plaintiffs kept identifying new medically vulnerable detainees. Ex. P, Emails Between M. Aukerman and J. Newby (September 11–21, 2020). Although Defendants have now stipulated to providing weekly updates, Dkt. 299, PageID.7536, they nonetheless continue to under-identify high-risk detainees.[3] *See also infra* at II.B. In addition to 25 detainees Plaintiffs have identified who Defendants concede are high risk, Plaintiffs had identified other high-risk individuals whose vulnerability Defendants did not concede. See Dkt. 374 (listing 13 high-risk detainees whose vulnerability Defendants had not conceded).

## II.   Defendants' New Precautions are Inadequate to Protect Plaintiffs.

Defendants claim that they are employing new precautions to address the ongoing outbreak, but these measures are inadequate. Not only is it far from clear

---

[3] *See* Second Updated Notice of Undisputed Habeas Litigation Group Members, Dkt. 398 at 4–5; Ex. Q, Emails Between J. Newby & D. Gardner (Oct. 8–16, 2020) (conceding three high risk detainees); Stip. & Order, Dkt. 227 (conceding one).

that Defendants are implementing these protocols, as thoroughly explained by Dr. Venters, these measures "continue to reflect critical gaps and misunderstanding about COVID-19." Ex. C ¶ 18. Despite Defendants' delayed reporting, multiple COVID-19 tests have come back positive and the source of the outbreak remains unidentified. This much is clear: the outbreak is far from contained. *Id*. ¶ 20(b). The new protections—to the extent that they are being implemented—have failed to manage the spread. Calhoun was already susceptible to COVID-19 because of its very nature as a crowded, enclosed space where people cannot social distance and live with poor ventilation, facilitating airborne transmission of the coronavirus. *Id*. ¶¶ 15–16 (noting how the CDC recognizes that smaller particles carrying the virus can travel long distances greater than 6 feet and remain suspended in the air for extended periods of time, typically hours). The outbreak at Calhoun puts all class members now at even greater risk to infection, serious illness or death. *Id*. ¶ 23.

### A. Defendants Are Failing to Protect All Class Members and Slow the Spread of COVID-19.

Over eight months into the pandemic, three principles are now commonly recognized: first, congregate settings like ICE detention centers are inherently more dangerous because of the nature of COVID-19 spread and inability to social distance, practice strict hygiene and sanitation, Dkt. 346, PageID.8623–31; second, some people are at heightened risk, but the CDC recognizes that even young individuals without an underlying condition can get very sick or die from COVID-

19, and the long-term side effects from even mild COVID-19 are unknown, Ex. C, ¶¶ 11–13;[4] and, third, the CDC has recognized that immunity from COVID-19 is not ever-lasting and reinfection is possible. *Id.* ¶ 14.[5] Defendants' response to the outbreak, however, ignores these basic principles. By failing to enact protocols to protect *all* detainees at Calhoun, Defendants are not only putting more individuals at risk of infection and potentially long-lasting consequences, they are also creating more vectors for spreading the disease within the facility, through detainees, inmates and staff. *Id.* ¶ 20(a). In other words, Defendants have adopted a haphazard response to the outbreak that still overlooks basic principles for addressing COVID-19.

*First* and foremost, social distancing remains impossible at the facility. In Pod L, where some infected detainees are quarantined, 21 people share one room and bunk beds are spaced a few feet apart. Ex. G, ¶ 4(e); Ex. I, ¶¶ 12–13; Ex. J, ¶¶ 2(g)–(h); Ex. N, ¶¶ 2-3. The same is true in other housing units, some of which house 40 or more people, who must be in close contact with others while waiting in line for

---

[4] For example, Qiwei Li, a detainee who got COVID-19 in April 2020, is still suffering long-lasting consequences including trouble breathing, nausea, lung damage, and, until a few weeks ago, coughing up blood. Ex. K, Li Decl. ¶¶ 6–7.

[5] For example, one high risk individual who was previously infected with and hospitalized for COVID-19, Juan Rincon, has recently retested positive for COVID-19. Supp. Venters Decl. ¶ 14. High risk individuals can not only face severe manifestations of COVID-19, they can also experience lingering or ongoing symptoms that manifest into new morbidities or even disability, rendering them more vulnerable to worse outcomes from a second COVID-19 infection. *Id.* ¶ 19(b).

food, medication or phone usage, and while sleeping. Ex. K, ¶¶ 13–15; Ex. M, ¶¶ 5(a)–(c). Detainees do not wear masks when they eat together, use the phones (which are less than two feet apart) or sleep. Ex. M, ¶¶ 5(a)-(c); Ex. N, ¶ 5. As Dr. Venters noted, there are several issues with this: first, Defendants appear not to be giving single-celled housing to high risk individuals who have tested positive, but social distancing for high-risk individuals is "a routine first step to implement social distancing" to protect those very individuals. Ex. C, ¶ 19(g). Moreover, social distancing is the best way to reduce the spread of COVID-19, especially in enclosed, inadequately ventilated spaces like Calhoun. *Id*. ¶ 20(a). Because an individual can be exposed to COVID-19 and fall ill, acting as a vector for the disease, social distancing for *all* detainees is key to preventing the spread of COVID-19. *Id*.

Defendants both continue to accept new detainees and fight against additional releases. Dkt. 381, PageID.10194; Ex. C, ¶¶ 20(e). Yet, as previously briefed, ICE has numerous ways to reduce the population level to allow for social distancing, including removing individuals with final orders, releasing individuals needlessly detained, or limiting admissions. Dkt. 381-1, PageID.20367.

*Second*, Defendants continue to inadequately monitor and respond to COVID-19 symptoms. Medical staff still take days to respond to detainee reports of illness or COVID-19 symptoms. Ex. E, ¶ 4(d)–(e); Ex. G, ¶ 4(b)–(c); Ex. I, ¶¶ 4, 13; Ex. J, ¶¶ 2(n)–(p); Ex. N, ¶ 8. And of course, if detainees reporting symptoms are not tested

and quarantined, they can spread the virus. Moreover, while Defendants aver that staff in Pod H, the epicenter of the outbreak, did not discourage detainees from reporting symptoms, they do not identify what, if any, steps the facility is taking to ensure that detainees who report symptoms receive immediate medical attention and testing, and are quarantined pending test results. Dkt. 382-6, Hazel Decl. ¶ 25. This continued failure to respond promptly to symptomatic detainees reflects exactly the same practices that contributed to the current outbreak. Ex. E, ¶ 4(f) (staff ignored reports of severe cough by detainee who is now infected). Additionally, at the onset of the outbreak, staff downplayed as "seasonal allergies" detainee reports that they were experiencing COVID-19 symptoms, Tr. 59: 3-12, and the facility has yet to conduct a structured review of such sick call requests—a "basic element of outbreak investigations." Dkt. 373-9, Venters Decl. ¶ 11; *see also* Ex. C, ¶ 20(c).

Relatedly, Defendants' system of monitoring symptoms is also inadequate. Detainees in quarantine must use paper forms to submit medical requests which are reviewed only once a day. Dkt. 382-6, Hazel Decl. ¶ 23. This results in delays in responding to urgent requests. Ex. I, ¶ 15; Ex. E, ¶ 4(e). Troublingly, Calhoun appears to be limiting detainees' means of reporting symptoms. Ex. F, ¶ 4 (describing removal of "kiosk" that is detainees' means of seeking medical treatment); *see also* Dkt. 373-15, Rincon Decl. ¶ 11 ("The staff has removed our Kite program, a system we had before in order to send notices to the sergeant, to the

medical unit, or to log in any concerns."). Detainees also report that medical screenings are cursory, and sometimes the nurse "may drop off medication at the door" without doing a temperature, blood pressure, or blood oxygen check. Ex. I, ¶ 17; Ex. N, ¶ 6. This falls short of the daily screening for vitals and COVID-19 symptoms that Dr. Venters explains is so critical. Ex. C, ¶¶ 19(i), 20(c). Defendants also admit that, during a rapidly-spreading outbreak, some housing units are not continually supervised by staff. Dkt. 382-6, Hazel Decl. ¶¶ 24, 25. Detainees who require urgent medical attention must press an emergency button and wait for an unspecified amount of time before they receive attention, or attempt to find a deputy to notify. *Id*. ¶ 24. As Dr. Venters notes, "ICE's unwillingness to adopt appropriate monitoring procedures going forward is particularly concerning in light of the outbreak." Ex. C, ¶ 20(c). Moreover, Defendants have not provided any information about increasing medical staffing, even though prevention and management of COVID-19 requires additional resources to identify those at risk and monitor all detainees for symptoms for testing and isolation. *Id*. The fact that multiple detainees have reported individuals with symptoms, without follow up testing or isolation, is particularly "disturbing." *Id*. ¶ 20(d); *see also* Ex. D, ¶ 8; Ex. M, ¶¶ 5(f)–(h).

*Third*, testing and contact-tracing protocols similarly fall short. As this Court has noted, Defendants' contact-tracing procedures are cause for "serious concern."

Dkt. 388 PageID.10488. Contrary to CDC guidelines, Defendants are only investigating those who have had 15 minutes of constant exposure to a symptomatic individual rather than 15 minutes of *cumulative* exposure. Dkt. 365, PageID.9065, 9067–68. *See also* Dkt. 373-9, Venters Decl. ¶ 15 (explaining CDC guidance). And, more than two weeks since the start of the outbreak, Defendants still have not been able to identify the source of the outbreak. Dkt. 388, PageID. 10488, n. 3.

Defendants testing protocols are no better. After the wide spread of the outbreak forced the facility to do universal testing, they did only one round and do not plan to do additional rounds, Dkt. 382-6, Hazel Decl. ¶ 10; Ex. N, ¶ 7, even though there should be "repeat rounds of mass testing until there are no positive tests." Ex. C, ¶ 20(b); *see also* Dkt. 373-9, Venters Decl. ¶ 32. Moreover, detainees waiting for test results are not quarantined but remain in their pods, potentially infecting other detainees and staff. Ex. D, ¶ 6; Ex. F, ¶¶ 2, 8; Ex. I, ¶ 5; Ex. C, ¶ 20(b).

As to the testing of staff, Defendants are also deficient. The facility is "attempting to procure" testing capacity to test staff every two weeks, but admit that they may have to resort to testing once a *month*. Dkt. 382-6, Hazel Decl. ¶¶ 12-13. This is contrary to the regular staff testing that is needed. Dkt. 373-9, Venters Decl. ¶ 32. Staff awaiting test results, including those who are asymptomatic and those who meet Defendants' flawed contact-tracing protocols, will continue to report to work, exposing others to risk of infection. *Cf.* Dkt. 382-6, Hazel Decl. ¶ 14. *See also*

Dkt. 373-9, Venters Decl. ¶ 9 (staff who are "close contacts of suspected or confirmed cases" should be quarantined while they await test results); Ex. C, ¶ 15.

### B.   Defendants Have Failed to Protect High Risk Detainees.

Defendants' precautions as to high-risk detainees are equally deficient. As an initial matter, Defendants have without exception resisted the release of high-risk detainees. Yet, high risk individuals must be prioritized for release because of the severe consequences they face if infected. Ex. C, ¶¶ 19(a)–(b).  Defendants point to the fact that there have been no hospitalizations or deaths, but this both underestimates the ability for individuals' symptoms to quickly exacerbate and ignores the long-term impact that COVID-19 can have on people with chronic health issues. *Id.* The risk of rapid deterioration and poor monitoring in the detention setting means that Calhoun's medical staff and the local health infrastructure can be overwhelmed quickly in treating sick high-risk individuals. *Id*. ¶ 19(a). Moreover, high-risk individuals are more likely to suffer long-term consequences like new morbidities or disabilities if they do not receive appropriate treatment in the first instance. *Id*. ¶ 19(b). Yet, Defendants insist that the current bail process is sufficient—all while continuing to oppose release for each and every bail application. *See, e.g.*, Dkt. 370, 375, 377, 378, 379, 385, 386, 393.

Defendants have consistently under-identified high-risk detainees throughout this litigation, and offer no assurance that this pattern will change. They continue to

inadequately screen for CDC-recognized risk factors. [6] Ex. C, ¶ 19(c). ICE's screening process suffers from several flaws: (1) it does not screen for certain CDC-recognized risk factors, such as BMI or smoking history; (2) the chronic care report includes individuals that ICE does not consider high-risk (without explanation); (3) initial screenings appear to be conducted by non-medical staff; and (4) there is no review of pharmaceutical records. Dkt. 381-7, Whalen Decl. ¶¶ 4-6; Ex. C, ¶ 19(d).

Further, Defendants continue to be dilatory in reporting of new cases to the Court and Plaintiffs' counsel. For example, over the weekend, 10 detainees, including Gouyan Lin Castro, part of the unconceded Habeas Litigation Group, tested positive. *See* Ex. E, ¶¶ 4(a)–(f); Dkt. 373-4, 373-6, Decl. of Dr. Cara Taubman. Plaintiffs learned of Ms. Castro's test results through her attorney and only after they raised the matter with the Court did Defendants provide an updated list of positive test results. Ex. O (Email from J. Newby to M. Aukerman (Nov. 2, 2020)). This delay in reporting is an ongoing pattern. Dkt. 373-28.

Medical screening and care for high-risk detainees falls short of what Defendants claim they are providing. While Defendants assert that detainees are "monitored

---

[6] This is vital, as CDC guidance is constantly evolving. As an example, the CDC now recognizes that a Body Mass Index (BMI) of 25—not 30—may place individuals at increased risk if they become infected. *See* Ex. C, ¶ 7. Thus, the CDC's list of risk factors provides a helpful baseline for determining risk, but it is neither comprehensive nor exhaustive, and it is prudent to classify individuals as high risk even if they are on the margins of multiple factors. *Id*. ¶¶ 9–10.

for symptoms daily," Dkt. 381 PageID.10193, these screenings are "generalized" and do not include questions about COVID-19 symptoms. Dec. D, ¶ 7; Ex. F, ¶ 5. The failure to "proactively screen[ ] for COVID-19 symptoms" leaves many individuals "under the radar." Ex. C, ¶ 19(i). Responses to requests for care are also delayed—and sometimes outright ignored. Ex. E, ¶ 4(e). Medical screening is impaired by lack of access to translation services and, contrary to ICE's own policies, detainees often resort to translating for each other. Ex. I, ¶ 16; Ex. L, ¶¶ 7–8; Ex. K, ¶ 12; Ex. F, ¶ 6; Ex. E, ¶ 4(e); *see also* Ex. C, ¶ 19(i). Inadequate screening procedures combined with lack of proper translation services is especially concerning because it limits detainees' ability to report symptoms. Ex. C, ¶ 19(i).

Defendants' quarantine and testing protocols also leave high-risk individuals unprotected. Detainees are tested every 14 days, Dkt. 361, Hazel Decl. ¶ 8, and are not quarantined while they await test results. Ex. D, ¶ 6 (stating he was in "constant contact with Pod-mates, the guards, and the staff" in Pod M while waiting for test results). Dr. Venters notes that the facility is not properly implementing quarantine of close contacts. Ex. C, ¶ 19(e).  For example, Mr. Pulido Chavez explains that, after two potentially infected individuals were removed from his pod, others in the pod who had been in contact with the infected individuals were not quarantined. Ex. F, ¶ 10.  Alarmingly, high-risk detainees who exhibit COVID-19 symptoms are not immediately tested and quarantined. Ex. D, ¶ 8 (describing witnessing several

detainees with "loss of breath," "sore throats, and headaches" in Pod M). Further, these detainees are housed in Pod M, right next to Pod L where infected individuals are being held. This proximity raises concerns about spread to high-risk individuals, but Defendants have not indicated that they are taking any additional precautions. *See* Ex. C, ¶ 19(j) (describing mitigation measures the facility should take). Moreover, it appears that detainees who have tested positive and are ostensibly quarantined in Pod L are nevertheless still moving in and out of their unit to attend immigration court, with no apparent additional protections. Ex. G, ¶ 4(g).

As is the case throughout Calhoun, it is impossible for detainees to social distance in the pods where high-risk individuals have been ostensibly provided accommodations. Despite being housed in single-cells, Mr. Fortin-Mayorga explains that detainees cannot stay six feet apart, "particularly when we are waiting for medication, in line for food, or receiving a check-up from the medical staff." Ex. D, ¶ 5; *see also* Ex. F, ¶ 7. Guards also do not enforce social distancing, and sometimes do not adhere to it themselves. Ex. D, ¶ 5. And, as discussed above, high risk individuals who have tested positive, like Mr. Denis Martinez Cordero, appear not to have been provided single-celled housing. Ex. I, ¶¶ 13–14.

While Defendants claim that all high-risk detainees are provided two new surgical masks daily, Dkt. 361, Hazel Decl. ¶ 7, detainees have reported that this policy is not being implemented. Ex. D, ¶ 3 (has been several days since he received

a new mask); Ex. F, ¶ 3; Ex. L, ¶ 4; *see also* Ex. J, ¶ 12; Ex. K, ¶ 17. And while

Defendants point to internal communication to enforce mask-compliance by guards,

detainees continue to be exposed to guards who fail to properly wear masks when

close to others. Ex. L, ¶ 6; Ex. J, ¶ 10; Hahn Decl. ¶ 5(d); *see also* Ex. G, ¶ 4(a).

*Finally*, retaliation continues to be a threat. Detainees are afraid to

communicate with their attorneys about the outbreak or ask questions to staff

because they have witnessed others being placed in lockdown for doing the same.

Ex. D, ¶ 10; Ex. G, ¶ 6; Ex. J, ¶¶ 16–17; Ex. I, ¶ 16.

## ARGUMENT

## I.    LEGAL FRAMEWORK

As the Court knows, this is a hybrid case, and the present motion seeks both

interim bail relief and preliminary injunctive relief. The Court has recognized its

"inherent authority" to grant bail, pending final relief on the merits, "if there is a

substantial claim of law and the existence of some circumstance making the motion

for bail exceptional and deserving of special treatment in the interests of just-

ice." Aug. 4, 2020 Order, Dkt. 168, PageID.5294 (quoting *Nash v. Eberlin*, 437 F.3d

519, 526 n.10 (6th Cir. 2006)). The Court has found that "the COVID-19 pandemic

constitutes an exceptional circumstance deserving special treatment in the interests

of justice," *id.* at PageID.5294–95, and "continues to find that COVID-19 presents

special circumstances making the bail applications exceptional," November 2, 2020

Order, Dkt. 388, PageID.10497. The Court has based its finding that there is a sub-
stantial claim of law on the conditions at Calhoun at the time it granted each bail
order, and has asked the parties to address the impact of current conditions at Cal-
houn, namely the outbreak that has infected dozens and Defendants' assertions that
they will now take additional precautions. *Id.* PageID.10497-98.

Motions for preliminary injunctive relief must meet a separate standard.
"[C]ourts evaluate four factors: 1) whether the movant has a strong likelihood of
success on the merits; 2) whether the movant would suffer irreparable injury absent
an injunction; 3) whether granting the injunction would cause substantial harm to
others; and 4) whether the public interest would be served by granting the
injunction." June 28, 2020 Order, Dkt. 127, PageID.4178 (citing *Ne. Ohio Coal. For
the Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999,
1009 (6th Cir. 2006)). The four factors "are not prerequisites that must be met, but
are interrelated considerations that must be balanced together," and the "probability
of success that must be demonstrated is inversely proportional to the amount of
irreparable injury" that Plaintiffs will suffer absent relief. *Id.*

This Court has repeatedly held that "COVID-19 poses a high risk of irreparable
injury" to medically vulnerable detainees. *Id.* PageID.4236. The Court has also
already held, with respect to the final two factors, that the government can pursue

removal regardless of whether a noncitizen is detained, and that for high risk plaint-iffs "who are not a flight risk and who do not pose a danger to the community, the public's interest in the enforcement of immigration laws therefore must give way to its interest in preserving constitutional rights and protecting public health." *Id.* PageID.4231. Thus, with respect to the four injunction factors, the remaining quest-ion for high risk detainees is whether, in light of the evolving conditions at Calhoun, they are likely to prevail on the merits.

The class as a whole likewise faces irreparable harm, as COVID-19 can cause severe illness, long-term health consequences and death even for younger and healthier individuals. Ex. C ¶¶ 11–12. For them too, the public interest factors weigh in favor of relief. Not only does the Constitution require and does the public have an interest in ensuring that people held in custody are reasonably safe, but the spread of COVID-19 within Calhoun also threatens the health and safety of correctional officers and the communities they go home to, and the availability of scarce hospital and public health resources. *Id.* ¶¶ 19(a), 23. Here too the remaining question is whether Plaintiffs are likely to prevail on the merits.

On the merits of Plaintiffs' due process claim, this Court previously recognized that multiple strands of jurisprudence come together in this case. The Court's initial decisions were under the deliberate indifference framework, and its subsequent decisions were under the punishment standard. Dkt. 127, PageID.4206,

4222. The Court has also recognized that "Plaintiffs are entitled to 'conditions of reasonable care and safety.'" *Id*. PageID.4220 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982)). Other courts evaluating COVID-19 detention conditions have described this as a "reasonable safety" standard. *See Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020) (per curiam) (affirming district court's holding that immigration detention center failed to provide for reasonable safety where social distancing was impossible, detainees had inadequate access to masks and cleaning, quarantining and testing protocols were insufficient, and COVID-19 outbreak occurred).

For the reasons this Court has articulated, the punishment test is the correct standard. But the result would be the same and the relief requested equally justified under the deliberate indifference standard, which the Court has indicated that it will apply in the alternative, in light of Defendants' appeal. Dkt. 388, PageID.10496.

Finally, the Court is not writing on a blank slate. Essentially, the Court has asked the parties whether, as a result of Defendants' belated adoption of basic precautions, "past constitutional violations [have] been remedied." *Hutto v. Finney*, 437 U.S. 678, 687 (1978). As set out above, they have not been. Moreover, as Dr. Venters has said, it is "deeply concern[ing] that 7 to 8 months into the COVID-19 pandemic, ICE and the Calhoun administrators are only now considering measures that the CDC has long identified as critical." Dkt. 373-9, PageID. 9634. As a result, he has "little confidence in the ability of Calhoun to accurately ascertain or

effectively manage the outbreak." *Id.*, PageID. 9628. This Court has "given the [Defendants] repeated opportunities to remedy" the unconstitutional conditions, and should consider Defendants' past failure to do so and "the long and unhappy history of the litigation" in considering what relief is necessary. *Hutto*, 437 U.S. at 687.

## II.  RELIEF IS REQUIRED UNDER THE PUNISHMENT STANDARD.

### A.  The Nature of Plaintiffs' Claims and the Punishment Standard.

Plaintiffs are not serving sentences for crimes. Nor are they being held pursuant to criminal process where, amongst other procedural protections, a judge has individually determined there are public safety reasons for their detention pending trial. Rather Plaintiffs are civil detainees being held to facilitate removal, in many cases without even an administrative (much less judicial) determination that detention is necessary.[7]

---

[7] As previously briefed, the analysis for pretrial detainees and immigration detainees is not necessarily the same. *See* Opp'n to Mot. to Amend, Dkt. 163, PageID.5161 n.2. Several courts have held that individuals detained pursuant to a civil scheme such as immigration detention "must be afforded more considerate treatment than even pretrial detainees, who are being criminally detained prior to trial." *Unknown Parties v. Nielsen*, No. CV-15-00250, 2020 WL 813774, at *4 (D. Ariz. Feb. 19, 2020); *Castillo v. Barr*, No. CV 20-00605, 2020 WL 1502864, at *4 (C.D. Cal. Mar. 27, 2020); *Lynch v. Baxley*, 744 F.2d 1452, 1460 (11th Cir. 1984). Unlike for pretrial detainees, for immigration detainees the "sole procedural protections" are administrative, and there is no right to counsel. *Zadvydas v. Davis*, 533 U.S. 678, 691–92 (2001). Additionally, unlike in criminal pretrial detention, the "basic purpose" of civil immigration detention is to "assur[e] the alien's presence at the moment of removal." *Id*. at 699. Thus, in determining whether an individual's non-punitive detention is "rationally connected to a legitimate government purpose and whether it is excessive in relation to that purpose," Dkt. 127, Pg.ID 4220, 4223,

As civil detainees, Plaintiffs "may not be punished." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). This prohibition on punishment applies in two ways. *First*, it applies to the fact of detention itself. Civil detention is permitted only "in certain special and narrow nonpunitive circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint."[8] *Rosales-Garcia v. Holland*, 322 F.3d 386, 414 (6th Cir. 2003) (en banc) (quoting *Zadvydas*, 533 U.S. at 690). Civil detention becomes impermissible punishment if it does not "bear[] [a] reasonable relation to the purpose for which the individual [was] committed," *Zadvydas*, 533 U.S. at 690, or if it is "excessive in relation to the alternative [non-punitive] purpose" used to justify it. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963).

*Second*, the conditions of confinement themselves cannot be punitive. *See Kingsley*, 135 S. Ct. at 398; *Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979). The

---

the analysis for immigration detainees necessarily differs from that in the pretrial context. While the government also has a subsidiary interest in protecting public safety during immigration proceedings, the lack of procedural protections in the immigration system means that people are frequently detained irrespective of risk to the community or where public safety concerns could be addressed through readily available alternatives to detention.

[8] *See also Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (pretrial detainee can demonstrate punishment by showing that "the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose"); *J.H. v. Williamson Cty.*, 951 F.3d 709, 717 (6th Cir. 2020) (same).

nature of confinement can determine whether the fact of confinement is punitive. *United States v. Salerno*, 481 U.S. 739, 748 (1987); *Foucha*, 504 U.S. at 79.

Here, Plaintiffs seek relief under both aspects of the punishment test. Even though Defendants assert that they are implementing certain, limited protective measures against the spread of COVID-19 at Calhoun, the facts presented by the current outbreak make abundantly clear that the conditions of confinement—in which detainees, especially those who are most vulnerable, are literally in fear for their lives—constitute punishment. This is especially so where, as in the immigration context in general, alternative non-life-threatening means to detention are available to secure the government's purpose of ensuring that class members can be removed when possible. Schriro Decl., Dkt. 44-5 ¶¶ 46–48, 53–54.

For those at highest risk, Plaintiffs allege that there are no conditions of confinement at Calhoun that will allow them to be safely detained. For them, civil detention—while it might be reasonably related to the purpose of removal in normal times—is excessive *during the pandemic*, at least absent an individualized finding that the individual cannot be safely released into the community. For other detainees, the conditions of confinement at Calhoun are punitive absent precautions to ensure their reasonable safety, precautions that are still not in place.

**B.      This Court Correctly Applied the Punishment Standard.**

On June 28, 2020, this Court issued an exhaustive decision finding "claims challenging the conditions of confinement in civil detention are governed by the *Bell* punishment test." Dkt. 127, PageID.4210. The Court distilled Sixth Circuit precedent to "find[] that the Fifth and Eighth Amendment protections are coextensive—justifying the application of a deliberate indifference test—and distinct—requiring a punishment standard." *Id.* PageID.4208. The Court reaffirmed that decision in denying the government's motion to amend judgment. Dkt. 212. Both opinions explain that under *Youngberg*, *see supra*, civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Dkt. 127, PageID.4214–15 (internal quotation marks omitted). The Court found support for that holding in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), which "explicitly rejected the use of Eighth Amendment precedent in evaluating Due Process claims," and therefore distinguished *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). Dkt. 127, PageID.4215-16. The Court also distinguished the two unpublished decisions in *Cameron v. Bouchard*, 818 F. App'x 393 (6th Cir. 2020), 815 F. App'x 978 (6th Cir. 2020), as they do not address the punishment standard, Dkt. 127, PageID.4216–17, and employ a constitutional shorthand to equate the Fifth and Eighth Amendment protections, when in fact the

Eighth Amendment merely "'establishe[s] a floor.'" Dkt. 212, PageID.6134 (quoting *Hubbard v. Taylor*, 399 F.3d 150, 165–66 (3d Cir. 2005)).

Defendants try yet again to challenge the punishment standard, pointing to *Griffith v. Franklin Cty.*, 975 F.3d 554 (6th Cir. 2020). Dkt. 381, PageID.10202 n.3. But all *Griffith* holds is that in the context of a Section 1983 claim brought by a pretrial detainee alleging deliberate indifference to his medical needs, something more than ordinary negligence is required to find a constitutional violation. 975 F.3d at 571 n.6. *Griffith* explained that pre-*Kingsley* Sixth Circuit jurisprudence had often imported the Eighth Amendment deliberate indifference framework to Due Process claims, but the court then explicitly declined to answer whether that framework, particularly its subjective component, is still valid. *Id*. at 570. Instead, the court held that the plaintiff "cannot prevail under either test," and "reserve[d] the question for another day." *Id*. Other Sixth Circuit decisions have cast serious doubt on whether that framework is still appropriate for due process cases. *See, e.g.*, *Martin v. Warren Cty.*, 799 F. App'x 329, 338 n.4 (6th Cir. 2020) ("[W]e have noted that *Kingsley* 'calls into serious doubt' the application of the subjective component of the deliberate-indifference test usually applied to pretrial detainees' claims." (quoting *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018))). *Griffith* also emphasized that its decision was based entirely on avoiding an unnecessary constitutional question. 975 F.3d at 569 n.5. Nothing in *Griffith* alters this Court's analysis.

26

This Court found that because Defendants have not expressed an intent to punish, "under *Bell*, the Court must determine whether Plaintiffs' detention is rationally connected to a legitimate government purpose and whether it is excessive in relation to that purpose." Dkt. 127, PageID.4220. "The *Bell* standard does not require consideration of Defendants' subjective evaluation of Plaintiffs' conditions of confinement." *Id.* Plaintiffs "can prevail by providing only objective evidence" of the unreasonable or excessive nature of their detention and conditions of confinement. *Id.* (quoting *Kingsley*, 576 U.S. at 398). In short, the punishment standard "requir[es] only an objective showing that government action is excessive in relation to a legitimate governmental objective . . . ." Dkt. 212, PageID.6134. And by that objective standard, Plaintiffs must prevail.

### C. Continued Detention of Medically Vulnerable Immigration Detainees Is Punishment.

As this Court previously noted, Plaintiffs are not challenging the lawfulness of immigration detention per se, but rather contend that during the pandemic the detention of people who are at high risk of severe illness or death constitutes punishment because, among other things, it is not reasonably related to, and is excessive in relation to, the government's interest in ensuring their availability for deportation. Dkt. 127, PageID.4223. This Court has repeatedly found that detention is punishment for high risk individuals who can be safely released into the community, because the dangers presented by continued detention make it

27

"excessive in relation to the Government's interest." *Id.*, PageID.4224; *see also, e.g.*, Dkt. 168, PageID.5294–95; Dkt. 346, PageID.8624, 8631.

Defendants themselves concede that members of the Habeas Litigation Group are at high risk of severe illness or death if infected. Dkt. 398. As explained above, medically vulnerable individuals should be prioritized for release "because of the severe consequences they face if infected." Ex. C ¶¶ 8, 19(a). Yet Defendants inexplicably argue that continued detention of medically vulnerable people during the pandemic is not punishment and can be done safely, Dkt. 381, despite the current outbreak. Defendants cannot deny, however, that at least seven conceded high risk individuals and five others identified by Plaintiffs, have been infected and are showing severe symptoms. And despite Calhoun's extremely belated adoption of some additional precautions, as Dr. Venters explains, those precautions are insufficient. Ex. C ¶¶ 19(a)–(j). Moreover, "[b]ecause there has now been an outbreak, in part due to the lack of adequate precautions, the risk to individuals in the facility has greatly increased while the facility's ability to prevent further spread has significantly decreased." *Id.* ¶ 17. In short, Defendants fail to justify detention where high risk individuals face near-certain risk of grave infection.

Defendants next argue that, despite the danger Habeas Litigation Group members face, detention is not excessive in relation to the government's interest in ensuring appearances at removal proceedings and protecting the public. Dkt. 381.

28

But Defendants entirely fail to explain how it is not excessive to detain those who present no flight or public safety risk during the pandemic.[9] Defendants claim they are reviewing high risk individuals for release. Whalen Decl., Dkt. 381-7, Ex. 9. But they fail to identify a single individual actually released from Calhoun as a result of that process, despite several obvious candidates. *See, e.g.* Ex. H, Dikeh Decl. (high risk detainee with no criminal history released only under this Court's order, who subsequently reported for removal); Dikeh Bail Application, Dkt. 283; Hilt Decl., Dkt. 373-29 (describing two high risk detainees with no criminal history released under this Court's orders, who subsequently reported for removal; Johanna and William Whernman Decls., Dkt. 98-11, 98-12; Rosello-Carrazana Reply, Dkt. 394 (ICE refused to release medically vulnerable individual with no criminal history whom immigration judge found not to be a flight risk or danger and who cannot be removed to Cuba); Dkt. 346, PageID.8633 (granting release to Mr. Ntungane, whose deferral of removal was affirmed by the Board of Immigration Appeals).

This Court has repeatedly found, after thorough review of bail applications, that individuals whom ICE contends are a flight risk or danger, can in fact safely be

---

[9] The Court routinely weighs public safety and flight risk in the context of pretrial release, and knows that there is no crystal ball. This is true concerning both the consequences of continued detention—severe illness or death—and the consequences of release, which thus far has resulted in only one individual out of the 32 total released failing to report. The Court can manage this uncertainty through appropriate supervision conditions, on top of what ICE already imposes.

released into the community. This underscores ICE's failure to conduct a meaningful review. *See, e.g.*, *Martinez-Brooks v. Easter*, No. 3:20-cv-00569, 2020 WL 2405350, at *23 (D. Conn. May 12, 2020) ("[B]y failing to make meaningful use of her home confinement authority, the Warden has failed to implement what appears to be the sole measure capable of adequately protecting vulnerable inmates[.]").

Defendants also argue that they are statutorily barred from releasing certain detainees. *See* Dkt. 381, PageID.10193–94. Yet Defendants are required both under their own COVID-19 Pandemic Response Requirements and under the injunction in *Fraihat v. U.S. Immigration & Customs Enf't*, No. 5:19-cv-1546, Dkt. 240, slip. op. at 15 (C.D. Cal. Oct. 7, 2020), to consider such individuals for release. *See* Plaintiffs' Reply, Dkt. 383-1, PageID.10368-69. Defendants' argument that they cannot release individuals where detention "is ordered by an immigration judge" Dkt. 381, PageID 10205, is similarly meritless. Immigration judges are not ordering people to be detained; rather they are considering whether to grant bond *after* ICE has decided to detain in the first place. There is nothing restraining ICE from releasing them.

In sum, in light of the grave dangers that medically vulnerable individuals face at Calhoun—dangers that have become only more acute as a result of the outbreak—their detention is excessive in relation to the government's interest in removal, and hence punitive, unless this Court finds flight risk or danger.

**D.**     **The Conditions of Confinement for Class Members are Punitive**

Although Defendants tout their new precautionary measures as sufficient to contain the spread of COVID-19, these measures continue to reflect a fundamental misunderstanding about containing COVID-19. This failure to develop an adequate response plan places all class members in harm's way, risking illness and death.

*First*, the failure to take steps to ensure proper social distancing undermines "a cornerstone of reducing transmission of respiratory disease." *Torres v. Milusnic*, No. CV 20-4450-CBM-PVCX, 2020 WL 4197285, at *15 (C.D. Cal. July 14, 2020) (internal quotation marks omitted). Despite Defendants' claim that they have taken steps to ensure social distancing, detainees continue to report that they are currently housed in units with dozens of others, where they are forced to congregate while waiting for basic necessities and sleeping. Li Decl. ¶¶ 13-15; Hahn Decl. ¶¶ 5(a)-(c). Compounding this problem, Defendants have neglected to follow through with basic sanitation protocols. Fortin-Mayorga Decl. ¶ 5 (documenting that 19 detainees in Pod M must share a sink that is not regularly disinfected). While promising guard compliance with mask-wearing, hand sanitizer stations and increased cleanings, Defendants provide no evidence that those protocols are being implemented regularly or effectively. *See Gutierrez-Lopez v. Figueroa*, 462 F. Supp. 3d 973 (D. Ariz. 2020) (crediting petitioner's account in the absence of evidence to contrary).

*Second*, as discussed above, Defendants fail to adequately screen detainees for COVID-19 symptoms, or to respond when detainees report symptoms. Cordero Decl. ¶¶ 13 15; Castro Decl. ¶ 4.e; De Graaf Decl. ¶ 4.e; Ex. C ¶ 11. Other courts have found similar circumstances as evidencing an objectively unreasonable risk of harm. *See Torres*, 2020 WL 4197285, at *12–13.

*Third*, the inadequacies with Defendants' testing and tracing protocols further reflect the failure to control the spread of COVID-19. Defendants have still not identified the source of the outbreak. Dkt. 388, PageID.10488, n.3. And Defendants fail to isolate those with pending results, allowing for potential infections of other detainees and staff. Fortin-Montoya Decl. ¶ 6; Pulido Chavez Decl. ¶¶ 2, 8; Martinez Cordero Decl. ¶ 5. Moreover, Defendants fail to assure any testing for individuals who have tested positive before releasing them from quarantine, potentially leading to exposure while those individuals are still infectious. Ex. C ¶ 22.

## III. RELIEF IS REQUIRED UNDER ANY VERSION OF THE DELIBERATE INDIFFERENCE TEST.

### A. Under the *Kingsley* Test, the Question is Whether Detention or Detention Conditions are Objectively Unreasonable.

The deliberate indifference standard, as developed under the Eighth Amendment, requires an objectively unreasonable risk of serious harm and subjective awareness of that harm. *Richko v. Wayne County*, 819 F.3d 907, 915 (6th Cir. 2016). The subjective component derives from the Eighth Amendment's prohibition of "wanton" punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In *Farmer v.*

32

*Brennan*, for example, the Supreme Court applied a subjective standard to a prisoner's failure-to-protect claim because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment" and so "a prison official must have a sufficiently culpable state of mind." 511 U.S. 825, 834 (1994) (citations omitted). The Supreme Court has otherwise never applied the subjective test to a treatment claim in non-punitive detention, instead emphasizing that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321–22.

The Sixth Circuit nevertheless previously imported the Eighth Amendment's subjective component to deliberate indifference claims brought under the Due Process Clause in order "to avoid the anomaly of extending greater constitutional protection to a convict than to one awaiting trial." *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985). However, the Supreme Court in *Kingsley v. Hendrickson* recently clarified that claimants under the Due Process Clause "can prevail by providing *only objective evidence* that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." 576 U.S. at 400 (emphasis added).

*Kingsley*'s logic is not limited to excessive force claims. Rather, the Supreme Court noted that "[t]he *Bell* Court applied this latter objective standard to evaluate a

33

*variety* of prison conditions . . . In doing so, it did not consider the prison officials'

subjective beliefs about the policy." *Id.* at 398 (emphasis added). Although the Sixth

Circuit has left the question open, it has acknowledged that *Kingsley* "calls into

serious doubt whether [Plaintiffs] need even show that the individual defendant-

officials were subjectively aware of [] serious medical conditions and nonetheless

wantonly disregarded them." *Richmond*, 885 F.3d at 938 n.3; *see also Love v.

Franklin Cty.*, 376 F. Supp. 3d 740, 746 (E.D. Ky. 2019) (applying objective test

after concluding that the Sixth Circuit has not addressed the application of *Kingsley*

to deliberate indifference claims). Three other Circuits to consider this issue post-

*Kingsley* have also concluded that only an objective test applies for deliberate

indifference claims by pretrial detainees.[10] *See Miranda v. Cty. of Lake*, 900 F.3d

335, 350–54 (7th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 33–36 (2d Cir. 2017);

*Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc).

---

[10] The Fifth, Eighth, and Eleventh Circuits have left the issue open. *See Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 908 (8th Cir. 2020); *Bryant v. Buck*, 793 F. App'x 979, 983 n.3 (11th Cir. 2019); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 n.4 (5th Cir. 2017). Only the Tenth Circuit has refused to extend *Kingsley* beyond the excessive force context. *Strain v. Regalado*, 977 F.3d 984 (10th Cir. 2020). The Tenth Circuit's decision, however, ignores that *Kingsley* "did not limit its holding to 'force' but spoke to 'the challenged governmental action' generally." *Castro*, 833 F.3d at 1070 (quoting *Kingsley*, 576 U.S. at 398).

## B.     Relief is Required Under the *Kingsley* Test.

Applying *Kingsley*, Plaintiffs have shown that absent the requested relief, they are exposed to a "substantial risk of serious harm." *Richko*, 819 F.3d at 915 (citation omitted). Indeed, in the COVID-19 context, the Sixth Circuit has found that "the objective prong is easily satisfied." *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020). Such a result comports with the conclusions this Court has previously reached using the punishment standard, holding that detention of the Habeas Litigation Group is excessive in relation to any stated government interest, unless the individual presents a risk of flight or risk to public safety that cannot be addressed through appropriate release conditions. Dkt. 127, PageID.4222–30.

Here, the facts show that Defendants remain deliberately indifferent. *First*, as discussed above, although releases are necessary to adequately protect medically vulnerable detainees from the grave danger of infection, severe illness and death, Defendants are continuing to detain them and are doing so without regard to whether there is any justification for detention, much less a justification that outweighs the danger they face. *See* Section II-C, *supra*. High risk patients who are not released are prone to rapid deterioration if they contract COVID-19, which can be exacerbated by medical isolation in detention settings. Ex. C, ¶ 19(a). As this Court has already observed, Calhoun also lacks the proper infrastructure to properly treat and address these individuals' symptoms. *See id.*; *see also* Dkt. 127, PageID.4228

("By all accounts, Calhoun County may have to restructure or even rebuild its correctional facility to house medically vulnerable civil detainees in a manner that comports with the Fifth Amendment during the COVID-19 pandemic."); Ex. C ¶ 19(j) (noting issues with high risk detainees being housed next to positive cases).

*Second*, until the recent court hearing, there was no coordination between Defendants and Calhoun medical staff in terms of identifying or protecting medically vulnerable detainees. Indeed, Calhoun was aware of only one such detainee as of October 26, 2020—a fact this Court found "particularly distressing," *see* Dkt. 388, PageID.10489–92—despite the fact that Defendants had conceded that 15 detainees are high risk.[11] Even with Defendants' belated commitment to provide weekly updates to Calhoun staff of individuals ICE has identified as high risk, Defendants' procedures for identifying members of the medically vulnerable group remain insufficient. Defendants refuse to recognize many CDC risk factors, including a BMI of 25–30 and smoking history. *See* Ex. C ¶¶ 19(c)–(d). The reliance only on a chronic care list ignores that other easily accessible records, like pharmaceutical records, are also necessary to screen for risk factors. *Id.* And Defendants still do not classify an

---

[11] The number current detainees whom Defendants concede are vulnerable fluctuates over time as Plaintiffs alert Defendants to individuals Defendants failed to identify, and as detainees enter and leave Calhoun. At the time of the hearing there were 15 detainees and there currently are another seven such detainees. Dkt. 398.

individual at high-risk even if they are on the margins of multiple CDC factors, which is contrary to common practice at many facilities. *Id*. ¶ 10.

*Third*, Defendants' treatment of high-risk individuals pending release determinations falls well short of what is objectively reasonable. *See* Ex. C ¶¶ 19(e)–(j) (explaining deficiencies). And that assumes those precautions are followed, which the evidence shows they are not. *See supra*. Moreover, no special protections are provided to individuals whose vulnerability is in dispute, e.g., Mr. Xirum-Sanchez.

*Fourth*, the conditions of confinement for the class as a whole are objectively unreasonable. As explained by Dr. Venters, absent social distancing, universal periodic testing, proper quarantining for staff and detainees, and monitoring of symptoms for all detainees, class members cannot be reasonably safe. Ex. C, ¶¶ 20(a)–(f). *See also* Background, Section II, *supra*.

### C. The Results Are No Different Even if the Court Applies the Subjective Component of the Deliberate Indifference Test.

Even if the Court were to find that the subjective component of the deliberate indifference test applies, Plaintiffs would still prevail. The subjective component requires Plaintiffs "to show that (1) the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner, (2) the official did in fact draw the inference, and (3) the official then disregarded that risk." *Richko*, 819 F.3d at 915 (citations and internal quotation marks omitted). This component "may be demonstrated in the usual ways, including inference from circumstantial evidence."

*Id.* (citations and internal quotation marks omitted).

In light of the damning testimony that Defendants failed to take even the most basic precautions—like communicating with Calhoun about high risk detainees, requiring masks, testing and quarantining individuals with symptoms—Defendants can scarcely dispute that their past conduct meets the subjective prong of the deliberate indifference test. But Defendants may argue that they now recognize the gravity of situation, and so the Court should excuse their past disregard of the risk COVID presents, and should trust them to be better in the future. That argument fails for two reasons. First, the Sixth Circuit has made clear that relief can be appropriate based on past deliberate indifference, even absent a showing that "defendants will be deliberately indifferent again in the future," where "the past deliberate indifference has continuing effects." *In re Flint Water Cases*, 960 F.3d 303, 334 (6th Cir. 2020). *See also Farmer*, 511 U.S. at 845 ("[T]he subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct, *their attitudes and conduct at the time suit is brought and persisting thereafter*." (citations and internal quotation marks omitted) (emphasis added)).

Second, Defendants continue to disregard the substantial risk Plaintiffs face. Defendants have long understood the potential risk of serious harm to Calhoun detainees from exposure to COVID-19. Indeed, as of November 6, a total of 41 detainees and five staff have tested positive recently. Detainees have reported

symptoms such as high fevers, chills, loss of taste and appetite, constant headaches, and difficulty breathing. *See, e.g.*, Xirum-Sanchez Decl., Ex. 374-9, ¶¶, 6, 9–10. Such harms provide further evidence from which the Court may infer the existence the necessary state of mind. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).

For months, Defendants have known that their treatment of the medically vulnerable was unreasonable. Since the beginning of April, the Court has stated that release of vulnerable detainees was "the only reasonable response" to their serious risks from COVID-19. Am. Op. and Order Granting TRO, Dkt. 23, PageID.568. Defendants have nonetheless kept constant the detainee population and continue to oppose releases, even during the middle of the outbreak. Defendants have failed even to communicate with Calhoun about *who* is at high risk, and their belated promises to do so mean little when Defendants are not taking basic, necessary steps to screen and identify those at highest risk.  Ex. C, ¶¶ 19(c)–(d).

Defendants have similarly disregarded the risk to the class as a whole by failing to employ proper precautions. As explained, Defendants have not imple-mented proper social distancing protocols, failed to follow CDC testing and contact tracing guidelines, and refused to institute regular cleanings. *See id*. ¶¶ 20(a), (f). Detainees report that they are not screened for symptoms, and when they report symptoms they are not tested or isolated. *Id*. ¶¶ 20(b), (c). Detainees who have contracted COVID-19 report that they are being denied medication and blankets

despite notifying Calhoun staff of their conditions. *See, e.g.*, De Graaf Decl., ¶ 4. Such evidence amply demonstrates that Defendants have not only perceived the risks of COVID-19, but disregarded that risk by failing to take reasonable measures to abate them. *See Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018).

### D.   *Cameron* and *Wilson* Are Not to the Contrary.

Contrary to Defendants' assertions, Calhoun's response falls far short of what the Sixth Circuit found sufficient in *Wilson* and *Cameron*. *Wilson* is an Eighth Amendment case and, as noted, the Sixth Circuit found that objective test was easily met because "[t]he transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other— and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death."[12] 961 F.3d at 840.  As explained above, if the Court uses the *Kingsley* test, the objective test is similarly easily satisfied here.

 But even if adopts the Eighth Amendment deliberate indifference tests, *Wilson* and *Cameron* present very different facts. In both cases, the facilities took steps to properly isolate and quarantine those suspected of having COVID-19 or in contact with those who did.  *See Wilson*, 961 F.3d at 841; *Cameron*, 815 F. App'x

---

[12] Oddly, *Cameron*—which of course is unpublished—failed to follow that framework. *Cameron*, 815 F. App'x at 985.

at 985. Here, however, detainees report that those awaiting test results are still allowed to interact with other detainees in their pods, guards, and Calhoun staff. *See* Fortin-Mayorga Decl. ¶ 6; *see also* Ex. C ¶ 20(d) (explaining that COVID-19 can spread from one detainee to another while results are pending). Detainees are also not asked to report if they are exhibiting COVID-19 symptoms and those with symptoms are not immediately quarantined. *See id.* ¶ 7; *see also* Ex. C ¶ 21. And, the facility's attempt at contact tracing sharply diverges from the CDC's guidelines, as Defendants have not even committed to isolating those who have had 15 minutes of cumulative exposure with a COVID-19 case. *See* Dkt. 373-9, ¶ 15.

It was also important in both *Wilson* and *Cameron* that the facilities had robust protocols for cleaning, social distancing, and testing. *See Wilson*, 961 F.3d at 841; *Cameron*, 815 F. App'x at 985. Such is not the case here, as discussed above. Medically vulnerable detainees also report that it is not possible to social distance because they have to wait together for medication, for food, or to receive a checkup. *Id.* ¶ 5. Defendants only commit to testing staff and high-risk detainees once every two weeks, although weekly PCR testing of *all* detainees and staff during an outbreak should be done. *See* Dkt. 373-9, ¶¶ 31–36; Ex. C ¶¶ 19(e), 20(b), 22.

Finally, the protections for medically vulnerable detainees and the treatment for those with COVID-19 sharply differ from *Wilson* and *Cameron*. Not only have Defendants failed to properly identify all medically vulnerable detainees to Calhoun

medical staff, Order Regarding Mot. for Emergency Relief, Dkt. 388, PageID.10489–92, they discount the relevant CDC criteria, such as for BMI and smoking, in making such determinations and therefore under-include those who are a high risk, *see* Dkt. 373-9, ¶¶ 19–38. Defendants have also failed to commit to releases and facility population reductions, both of which are necessary to control the spread of COVID-19. *See id.* ¶¶ 27–30.   In *Cameron*, for example, the jail proactively initiated a release program, through "which 110 inmates were released by Michigan state courts." 815 F. App'x at 985. By contrast here, Defendants refuse to commit to any reduction of the detainee population. *See* Dkt. 381, at 10–11. And, Defendants remain disinterested in treating those detainees who have already contracted COVID-19. *See* De Graaf Decl. ¶ 4(e); Cordero Decl. ¶¶ 4, 6.[13]

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that their motion be granted.

---

[13] Defendants repeatedly cite to the Third Circuit's decision in opposing Plaintiffs' motion. *Hope v. Warden York Cty. Prison*, 972 F.3d 310 (3d Cir. 2020). But, as evidenced by the variety of conclusions reached by different circuits, "each case must be evaluated on its specific factual record because 'objective reasonableness turns on the facts and circumstances of each particular case.'" *Roman*, 977 F.3d 935, n.5 (quoting *Kingsley*, 576 U.S. at 397). And unlike in *Hope*, Defendants have been provided with opportunities to present evidence, and the Court has made specific findings. *See* 972 F.3d at 320–21 (critiquing the district court for not permitting the government to offer evidence or have an opportunity to be heard before ordering relief); *id.* at 331 (critiquing lack of "specific findings").

Dated: November 6, 2020

Respectfully submitted,

/s/ Miriam J. Aukerman

Miriam J. Aukerman (P63165)
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy Street SE, Suite 260
Grand Rapids, MI 49506
Telephone: (616) 301-0930
maukerman@aclumich.org

Daniel S. Korobkin (P72842)
Monica C. Andrade (P81921)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Telephone: (313) 578-6824
dkorobkin@aclumich.org

David C. Fathi
Eunice H. Cho
American Civil Liberties Union
  Foundation, National Prison
  Project
915 15th Street NW, 7th Floor
Washington, D.C.  20005
Telephone: (202) 548-6616
dfathi@aclu.org
echo@aclu.org

Anand V. Balakrishnan
Michael K.T. Tan
Omar C. Jadwat*
ACLU Foundation Immigrants'
  Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2660
abalakrishnan@aclu.org
mtan@aclu.org
ojadwat@aclu.org

My Khanh Ngo
ACLU Foundation Immigrants'
  Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
mngo@aclu.org

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

/s/ Jeannie S. Rhee
_____
Jeannie S. Rhee
Mark F. Mendelsohn
Rachel M. Fiorill
Peter E. Jaffe
Darren S. Gardner
2001 K Street NW
Washington, D.C. 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
jrhee@paulweiss.com
mmendelsohn@paulweiss.com
rfiorill@paulweiss.com
pjaffe@paulweiss.com
dgardner@paulweiss.com

Jonathan M. Silberstein-Loeb
Oleg M. Shik
Katharine W. Gadsden
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
jsilberstein-loeb@paulweiss.com
oshik@paulweiss.com
kgadsden@paulweiss.com

*Attorneys for Plaintiffs*

*Application for admission forthcoming

## CERTIFICATE OF SERVICE

I, Jeannie S. Rhee, certify that on November 6, 2020, I caused a true and correct copy of the foregoing document to be filed and served electronically via the ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. I also caused true and correct copies of the foregoing document as well as un-redacted copies of the declarations and exhibits filed therewith to be served by electronic mail on counsel for Defendants.


Respectfully submitted,


 /s/ Jeannie S. Rhee