# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Janet Malam,

                  Petitioner-Plaintiff,

                                  Case No. 20-10829

and

                                  Judith E. Levy

Qaid Alhalmi, *et al.*,           United States District Judge

                  Plaintiff-Intervenors,  Mag. Judge Anthony P. Patti

v.

Rebecca Adducci, *et al.*,

                  Respondent-Defendants.

_____/

## NINTH ORDER ON BAIL
### [316, 327, 333, 350, 353, 362, 364, 371, 372, 405]

Between October 5, 2020 and November 10, 2020, Plaintiffs submitted bail applications for habeas litigation group members Francisco Fortin-Mayorga, Fawzi Zaya, Mohamad Murai, Estanislao Pulido Chavez, Abdelmohsin Osman, Joas Habimana, Jonathan Reyes-Saucedo, Eddys Alejandro Rosello-Carrazana, Karar Munir Al-Sultan, and Noe Chaparro-Alcantara. (ECF Nos. 316, 327, 333, 350, 353, 362, 364, 371, 372, 405.) Between October 8, 2020 and November 17, 2020,

Defendants filed responses. (ECF No. 321, 334, 337, 370, 375, 378–379, 385–386, 410.) Between October 9, 2020 and November 17, 2020, Plaintiffs filed replies. (ECF No. 329, 338, 343, 380, 390–392, 394–395, 413.) Additionally, pursuant to the Court's eighth bail order, Plaintiffs filed supplemental briefing regarding Fortin's bail application on October 26, 2020. (ECF No. 358.)

After reviewing the application and briefing, the Court grants bail for group members Fortin, Zaya, Murai, Pulido Chavez, Reyes-Saucedo, Rosello-Carrazana, Al-Sultan, and Chaparro-Alcantara. The Court will determine whether to grant bail for group members Osman and Habimana at an individualized bail hearing.

## I.    Eligibility for Bail

The Sixth Circuit has recognized the district court's "inherent authority" to grant a habeas petitioner release on bail pending adjudication of the petition's merits. *Nash v. Eberlin*, 437 F.3d 519, 526 n.10 (6th Cir. 2006). "The district court may release petitioners on bail if there is a 'substantial claim of law' and the existence of 'some circumstance making [the motion for bail] exceptional and deserving of

special treatment in the interests of justice.'" *Id.* (citing *Lee v. Jabe*, 989 F.2d 869, 871 (6th Cir. 1993)).

Circumstances have changed since the Court first found on August 4, 2020 that "[t]he habeas litigation group makes a substantial claim of law" and that "the COVID-19 pandemic constitutes an exceptional circumstance deserving special treatment in the interests of justice." (ECF No. 168, PageID.5295.) Over approximately the last month, Calhoun County Correctional Facility ("CCCF") has been in a COVID-19 outbreak. (*See* ECF Nos. 365, 388.) On November 2, 2020, Defendants reported that a total of 43 detainees and inmates tested positive for COVID-19 as a result of the outbreak at CCCF (for a cumulative total of 53 positive cases during the pendency of this case), in addition to 5 staff members and vendors. E-mail from Jennifer L. Newby, Assistant U.S. Att'y, to Cassandra J. Thomson, Law Clerk to Judge Judith E. Levy (November 2, 2020, 16:34 EST) (on file with the Court) (providing a master log of all tests administered through mass testing at CCCF in response to the outbreak); *see also* (ECF No. 381, PageID.10192.) Positive cases at CCCF have continued to rise, including as a result of additional intakes as well as through those who have been in close

contact with infected staff members. *See* E-mail from Jennifer L. Newby, Assistant U.S. Att'y, to Cassandra J. Thomson, Law Clerk to Judge Judith E. Levy (November 24, 2020, 10:27 EST) (on file with the Court) (stating there were seven new positives at CCCF identified on November 24, 2020). Although the outbreak first began in late October of 2020 (ECF No. 388, PageID.9048–9049), to the Court's knowledge, its source remains unidentified.

Following an October 26, 2020 emergency hearing at which the Court requested Defendants to consider adopting new protocols to address the risks posed by the outbreak (ECF No. 359, PageID.8844; ECF No. 365, PageID.9090, 9092), as well as the filing of Plaintiffs' motion for emergency relief (ECF No. 373), Defendants committed to instituting a significant number of voluntary precautionary measures affecting their overall COVID-19 management strategy and their particular protocols regarding high-risk detainees. (ECF No. 360, PageID.8847; ECF No. 381, PageID.10192–10193.)

The Court sought briefing regarding, in part, "whether the habeas litigation group continues to raise substantial claims of law in light of the new precautionary measures and conditions at CCCF, including the

4

presently-active COVID-19 outbreak." (ECF No. 388, PageID.10497–10498.) The parties have submitted numerous statements in response. (ECF Nos. 400, 403, 417.) After consideration of the supplemental briefing, the Court finds that the habeas litigation group members continue to raise substantial claims of law. Medically vulnerable detainees continue to show a likelihood of success on the merits of their due process claim challenging their continued detention at CCCF during the COVID-19 pandemic.

Plaintiffs have presented evidence suggesting that, despite Defendants' best intentions, there is inconsistent implementation of, and failure of execution regarding, these newly adopted precautionary measures. *See* (ECF No. 417-2, PageID.11065–11072) (alleging detainees are being held for weeks before being identified as high risk; not all conceded high-risk detainees are provided single cells; close contacts and individuals reporting COVID-19 symptoms are not fully quarantined while awaiting test results; staff, vendors, visitors are not consistently wearing face masks properly; there is only sporadic provision of new surgical masks and laundering of cloth masks; there is only sporadic

daily screenings of temperature and vitals and sporadic questioning regarding COVID-19 symptoms for high-risk detainees).

Additionally, regardless of whether the initial outbreak remains active or has subsided, staff members have continued to be a source of new spread of COVID-19 throughout CCCF in the weeks following Defendants' agreement to voluntarily implement precautionary measures. *See* E-mail from Jennifer L. Newby, Assistant U.S. Att'y, to Cassandra J. Thomson, Law Clerk to Judge Judith E. Levy (November 24, 2020, 10:27 EST) (on file with the Court) (stating that the three inmates in Pod E who tested positive for COVID-19 were identified and tested as part of the contact tracing for an infected staff member). Calhoun County continues to be designated as having an active or imminent outbreak of COVID-19, which suggests that the risk of additional staff members becoming infected and introducing further spread of COVID-19 remains high. *See Calhoun County, MI,* Covid Act Now (Nov. 24, 2020), *https://covidactnow.org/us/mi/county/calhoun_county?s=1178286* [https://perma.cc/844X-9YA3]. Furthermore, there is evidence to suggest that the state of Michigan's health-care system is under severe stress as

6

a result of the immense surge in recent COVID-19 cases—including Bronson Battle Creek, CCCF's primary hospital (ECF No. 365, PageID.9047), which is reported as being at 92% capacity. *See 6 Michigan hospitals at 100% capacity; 18 more at 90% or higher as coronavirus crisis deepens,* MLive (Nov. 25, 2020), *https://www.mlive.com/public-interest/2020/11/6-michigan-hospitals-at-100-capacity-18-more-at-90-or-higher-as-coronavirus-crisis-deepens.html* [https://perma.cc/BFC9-N7V3].

The Court believes that a medical expert inspection of the facility will be crucial to evaluate the current conditions at CCCF and inform the Court regarding what, if any, additional relief may be needed for the class. Yet based upon the known and unknown conditions at CCCF at this time, in tandem with the surge in COVID-19 cases throughout Michigan, the Court finds that habeas litigation group members remain in substantially the same conditions—if not worse conditions—that the Court has repeatedly found are likely to violate these members' Fifth Amendment rights.

Additionally, the Court continues to find that the COVID-19 pandemic presents special circumstances making the bail applications

exceptional. Indeed, there is no doubt that the COVID-19 pandemic rages on and is getting worse. *See Michigan's worst week: COVID-19 cases, deaths soar as shutdowns loom and holidays approach*, Detroit Free Press (Nov. 15, 2020), *https://www.freep.com/story/news/health/2020/11/15/covid-19-michigan-shutdowns-thanksgiving-christmas/6286320002/* [https://perma.cc/QE7Y-LNHV]. ("The state [of Michigan] is now seeing exponential growth in newly confirmed cases that is nearly four times higher than it was during the peak of the virus surge in early April.").

Accordingly, the Court has reviewed the testimony and briefs very carefully and continues to find that group members raise substantial claims of law and that COVID-19 presents special circumstances making the bail applications exceptional. The Court will continue to evaluate individual bail applications on a conditional basis while awaiting the completion of an expert inspection of CCCF.

## II.   Individual Bail Applications

The Court makes the following findings with respect to individual bail applications:

<u>*Francisco Fortin-Mayorga*</u> (ECF No. 316)

8

The Court previously considered Fortin's bail application in detail. (ECF No. 346, PageID.8636–8639.) The Court requested supplemental briefing from Plaintiff detailing Fortin's plan to work through family disputes and to obtain counseling for the family generally and the children specifically if he were released. (*Id.* at PageID.8638–8639.)

Plaintiffs' supplement indicates that if Fortin is released, he and his common law wife will attend virtual couples counseling sessions conducted by a specialist in Spanish. (ECF No. 358, PageID.8832; ECF No. 358-1, PageID.8839.) Plaintiffs also state that Fortin's wife is working with this specialist and a social worker at their son's school to identify an affordable, Spanish-speaking therapist for their children. (ECF No. 358, PageID.8832.) Plaintiffs explain that the family believes working with these professionals will help them develop healthy conflict resolution skills and allow them to overcome future disputes in a constructive manner. (*Id.* at PageID.8832–8833.)

Plaintiffs also assert that Fortin and his wife have taken steps to reduce the financial stress that precipitated their previous conflict. (*Id.* at PageID.8833.) Fortin's wife explains that friends and family have provided financial assistance for necessities, and the family friend

providing them housing is not charging them rent. (ECF No. 358-1, PageID.8840–8841.) She also contends that if Fortin is released, she will begin working outside the home while Fortin cares for their children. (*Id.* at PageID.8841.)

Based on the factual allegations discussed at length in the Court's October 22, 2020 order and the supplemental information provided by Plaintiffs, the Court finds Fortin is neither a flight risk nor a danger to the community given his proposed release plan. Accordingly, Fortin's application for bail is granted.

*Fawzi Zaya* (ECF No. 327)

This Court previously ordered Zaya released on April 18, 2020, under a temporary restraining order, which was extended on April 30 and converted to a preliminary injunction on May 14. *See Zaya v. Adducci*, No. 20-10921, 2020 WL 2487490, at *1–2 (E.D. Mich. May 14, 2020). Zaya, a citizen of Iraq, was forty-two-years-old at the time and had prior convictions for delivery of over 50 grams of cocaine, domestic violence, and second-degree murder. *Id.* at *1. Zaya uses a wheelchair for mobility, must wear adult diapers for incontinence, and has several serious medical conditions, including obesity, high blood pressure,

diabetes, neural foraminal stenosis, and asthma. *Id.*; *see also* (ECF No. 327, PageID.8262–8263).

In granting the preliminary injunction, the Court found that Zaya's "obesity and diabetes place him at a high risk of serious illness and/or death from COVID-19." *Id.* at *4. The Court determined that Zaya's "current condition, educational achievements, and completion of his criminal sentences mitigate his danger and risk of flight." *Id.* at *8. Additionally, the Court considered "the severity of the public health crisis created by COVID-19" and Zaya's full compliance with the terms of his release during the preceding 25 days. *Id.* at *7–8. While the respondents—who are Defendants in this case—offered to provide Zaya with individual housing upon his return to CCCF, the Court found that this condition "would still be insufficient to guarantee [Zaya]'s reasonable safety" because Zaya's medical disabilities required him to rely on CCCF staff members to maintain his personal hygiene and otherwise attend to his basic care needs. *Id.* at *4–5.

Zaya is again before the Court having submitted a bail application through this case. Plaintiffs assert that, in the six months since he was released, Zaya has fully complied with both his ICE and parole

requirements, leaving the house only for appointments with ICE and his doctors or as required by his parole officer. (ECF No. 327, PageID.8260–8261.) Plaintiffs also state that Zaya's medical condition is "even more precarious and limiting" than at the time of his release. (*Id.* at PageID.8261.) They note that Zaya continues to use a wheelchair for mobility, was hospitalized for four days in August, has now been diagnosed with Type 2 diabetes, requires four shots daily which he is unable to administer himself, and is reliant on his wife to maintain his personal hygiene. (*Id.*)

Defendants respond that Zaya is a danger to the community based on his violent criminal history (including physical violence against his girlfriend and orchestrating a robbery that led to a murder) as well as misconduct citations while detained. (ECF No. 334, PageID.8463.) Additionally, Defendants argue that Zaya is a flight risk because he has fled in previous legal settings and violated his probation. (*Id.*) Defendants also indicate that they have previously agreed to individual housing for Zaya if detained to reduce the risk of COVID-19 transmission. (*Id.* at PageID.8462.)

12

Plaintiffs refer to the Court's previous determination that individual housing was insufficient to guarantee Zaya's safety in the Court's decision granting Zaya release under a preliminary injunction. (ECF No. 338, PageID.8555.) Plaintiffs argue that Zaya's severely deteriorated condition and constant need for medical supervision preclude the possibility that he would pose a danger or flight risk on release. (*Id.* at PageID.8556.)

The Court finds Zaya is neither a flight risk nor a danger to the community given his conduct over the past six months of his release from custody, his current deteriorated medical condition, and his proposed release plan. Accordingly, Zaya's application for bail is granted.

### *Mohamad Murai* (ECF No. 333)

Plaintiffs write that Murai has resided in the United States for approximately four years, after having arrived as a refugee from Syria. (ECF No. 333, PageID.8403.) Plaintiffs acknowledge that Murai was previously convicted of criminal sexual conduct in the fourth degree but allege that he is compliant with his annual reporting to the Michigan State Police and has expressed willingness to seek mental health treatment as a condition of release. (*Id.* at PageID.8401, 8404.) Plaintiffs

allege that Murai's only other conviction was non-violent: he was convicted in 2019 of permitting a person with a suspended license to drive a vehicle. (*Id.* at PageID.8401.) Additionally, Plaintiffs note that Murai is in immigration proceedings seeking relief from removal by withholding of removal and protection under the Convention Against Torture ("CAT"). (*Id.* at PageID.8399.) If released, Murai will stay with his friend in Detroit, Michigan. (*Id.* at PageID.8402.)

Defendants offer more details regarding the conduct giving rise to Murai's conviction of criminal sexual conduct to support their contention that he is a danger to the community. (ECF No. 337, PageID.8539.) Defendants note that Murai failed to disclose his criminal charges when he filed to adjust his immigration status in June of 2018 and that he has not completed any intensive treatment since his conviction of criminal sexual conduct. (*Id.* at PageID.8539–8540.) Additionally, Defendants note that Murai has sought habeas relief from detention previously in May of 2020, in which Judge Robert H. Cleland denied Murai habeas relief under the Fifth Amendment. (*Id.* at PageID.8540.) Defendants do not argue that Murai is a flight risk. (*Id.*)

14

Plaintiffs reply that Defendants' depiction of the events leading to Murai's criminal sexual conduct conviction was based on a police report that does not contain Murai's account of the events. (ECF No. 343, PageID.8606.) Additionally, Plaintiffs argue that Murai's previous habeas petition has no bearing on Murai's current bail application now before the Court. (*Id.* at PageID.8607.) At the time, CCCF had two confirmed cases of COVID-19, neither of which were in the general population. *See Murai v. Adducci*, 461 F.Supp.3d 599, 607 (E.D. Mich. 2020). Additionally, the respondents—who are Defendants in this case— did not concede that Murai was at high risk. *Id.* The Court found Murai was "comparatively healthy" even assuming Murai had asthma and depression, and that Murai had "no prior medical history that predispose[d] him to serious complications from contracting COVID-19." *Id.* Plaintiffs point out that conditions have materially changed in the interim since Judge Cleland denied habeas relief to Murai: Defendants now concede that Murai is at a heightened risk, and CCCF has more than

two[1] confirmed cases of COVID-19, including individuals in the general population. (*Id.*)

The Court finds Murai is neither a flight risk nor a danger to the community given his proposed release plan. Further, the Court previously declined to limit the class definition to exclude detainees who brought individual habeas petitions that were denied. (ECF No. 162, PageID.5148–5149.) Accordingly, Murai's application for bail is granted.

### *Estanislao Pulido Chávez* (ECF No. 350)

Plaintiffs write that Pulido Chávez has lived in the United States for approximately 32 years and has not left the United States in 17 years. (ECF No. 350, PageID.8653.) According to Plaintiffs, Pulido Chávez maintains strong ties with his large family, including his children who all live in the United States. (*Id.* at PageID.8657) Pulido Chávez is seeking immigration relief under the CAT and has obtained a temporary stay from removal from the Ninth Circuit while his appeal is pending. (*Id.* at PageID.8653.) Although Plaintiffs indicate that Pulido Chávez has

---

[1] The Court recognizes that at the time Plaintiffs filed the reply brief for Murai's bail application, CCCF had only 11 detainees and one staff member test positive for COVID-19 during the pendency of this case. (ECF No. 343, PageID.8607.) As stated previously, CCCF has now experienced an outbreak of COVID-19 and the number of cases has dramatically increased. Circumstances are thus even more distinct from those that existed during the adjudication of Murai's previous habeas petition.

been convicted for multiple federal offenses, including drug related offenses and offenses related to an attempt to obtain a U.S. passport, he has no violent criminal history. (*Id.* at PageID.8652.) Plaintiffs allege that Pulido Chávez is remorseful for his conduct and has since undergone "years of rehabilitative classes and programs while incarcerated[,]" including professional training and educational programs, a parenting class, and exercise classes. (*Id.* at PageID.8652, 8658.) Pulido Chávez will reside with his son in Santa Maria, California, if released. (*Id.* at PageID.8656.)

Defendants argue that Pulido Chávez should be presumed to be a danger because he is subject to mandatory detention. (ECF No. 370, PageID.9446.) Defendants further note that after pleading guilty to felony drug charges, Pulido Chávez also pleaded guilty to providing a false name, falsely claiming he was a U.S. citizen, and providing a false social security number, all as part of an effort to obtain a U.S. passport. (*Id.*) Defendants argue that "[t]his demonstrates a lack of remorse for his crime and belies his claim that caring for his family was his utmost concern after his drug conviction." (*Id.*) Defendants additionally argue that Pulido Chávez is a flight risk because he previously failed to appear

for his criminal sentencing on the federal drug charge and subsequently remained a fugitive for several years. (*Id.*) Defendants note that Pulido Chávez may be motivated to flee considering that he previously fled to remain with his family, claims to fear torture if removed, and previously attempted to obtain a U.S. passport while he was a fugitive. (*Id.* at PageID.9446–9447.)

Plaintiffs reply that there is no statutory presumption of danger for individuals held under mandatory detention. (ECF No. 380, PageID.10180–10181.) Plaintiffs also argue that Pulido Chávez is not a flight risk because he is subject to vastly different circumstances than he was 13 years prior when he failed to appear for his criminal sentencing. (*Id.* at PageID.10181.) Plaintiffs note that Pulido Chávez's children are now all self-sufficient adults. (*Id.*) Additionally, Plaintiffs allege that Pulido Chávez was attempting to obtain a passport to qualify for work on an overseas project, and not in an attempt to flee the United States. (*Id.*)

The Court finds that Pulido Chávez does not pose a flight risk in light of his motivation to stay in the jurisdiction to continue to pursue relief from removal under the CAT. The Court also finds that Pulido Chávez is not a danger to the community given his proposed release plan

18

and in light of the fact that he has served his sentence for his drug-related convictions. However, the Court will release Pulido Chávez on bail only with the condition that he follow all terms of his federal probation. Accordingly, Pulido Chávez's application for bail is granted.

*Abdelmohsin Osman* (ECF No. 353)

Plaintiffs allege that Osman was tortured by Sudanese military forces as a result of his affiliation and membership with the group Girifna, leading to his development of post-traumatic stress disorder ("PTSD") and spurring him to flee to the United States in 2011. (ECF No. 353, PageID.8696.) Plaintiffs indicate that Osman was previously granted asylum from Sudan in 2012 and is now applying for relief from removal under the CAT. (*Id.* at PageID.8695.) According to Plaintiffs, Osman's struggle with his PTSD contributed to the conduct resulting in his recent convictions, including controlled substance use, domestic violence, and stalking. (*Id.* at PageID.8696-8697, 8699.) Osman has since completed an anger management course, begun the process toward divorce with his wife, and started working with a mitigation specialist to formulate a release plan that includes obtaining medical and mental health services and participating in Alcoholics Anonymous ("AA") and

Narcotics Anonymous ("NA") groups. (*Id.* at PageID.8697.) If released, Osman will reside with his son in Belleville, Michigan. (*Id.* at PageID.8698.)

Defendants note that Osman has an extensive criminal history, having been convicted of 23 offenses between the years 2014 and 2019. (ECF No. 375, PageID.10024–10026.) While recognizing that the majority of his convictions are for traffic offenses, Defendants argue that the trajectory of his criminal activity has increased in severity to include recent drug, domestic violence, and stalking convictions. (*Id.* at PageID.10024.) Additionally, Defendants note that the issue of whether Osman provided material support to an undesignated terrorist immigration (i.e., the Sudan's People Liberation Movement, or SPLM) is pending in Osman's immigration proceedings, which would render him ineligible for asylum under INA § 212(a)(3)(B). (*Id.* at PageID.10027.) Defendants do not argue that Osman is a flight risk. (*Id.*)

Plaintiffs reply that there is no allegation that Osman engaged in terrorist activity, but rather, an argument by the Department of Homeland Security ("DHS") that Osman provided material support to an undesignated terrorist organization by educating the community about

20

governmental corruption in Sudan. (ECF No. 390, PageID.10505.) Plaintiffs allege that the questions of whether SPLM is an undesignated terrorist organization, whether educating the community is material, and whether Osman was involved with the SPLM, are open questions to be resolved in Osman's immigration proceedings. (*Id.*)

Because of the serious nature of some of Osman's criminal convictions and his past drug and alcohol problems, the Court will require an individualized hearing to assess Osman's bail application. At this bail hearing, the Court will take testimony from Osman to assess his credibility and hear argument from both parties pertaining to whether Osman would pose a risk of flight or danger to the community upon release.

### *Joas Habimana* (ECF No. 362)

Plaintiffs write that Habimana spent twelve years living in a Rwandan refugee camp before he resettled in the United States in 2014. (ECF No. 362, PageID.8852.) Plaintiffs acknowledge that Habimana was charged with aggravated assault in 2018 but note that the charge against him was dismissed after he completed probation pursuant to the Holmes Youthful Trainee Act ("HYTA"), MCL 762.11. (*Id.* at PageID.8854.)

According to Plaintiffs, Habimana denies the allegations behind the current charges against him in the 17th Circuit Court stemming from his alleged conduct on December 15, 2019 (i.e., unlawful driving away of an automobile and operating while intoxicated) and is contesting these charges. (*Id.* at PageID.8854.) Plaintiffs also note that Habimana is pursuing asylum and withholding of removal under the CAT. (*Id.* at PageID.8856.) Habimana will stay with his uncle, aunt, and cousins in Wyoming, Michigan, if released. (*Id.* at PageID.8853.)

Defendants argue that Habimana is a danger to the community because an Immigration Judge denied bond to Habimana after finding him to be a danger. (ECF No. 378, PageID.10138.) Defendants also provide more details surrounding the 2018 aggravated assault charge as well as the events on December 15, 2019 giving rise to the pending charges against Habimana. (*Id.* at PageID.10138–10139.) Defendants refer to the police report following the 2018 incident for their contention that Habimana threw a metal chair at a youth development specialist and young child at a group home, and then attempted to stab several specialists using two butter knives Habimana found in the home. (*Id.*) With regard to the 2019 incident, Defendants contend that Habimana

was involved in a hit-and-run accident in which he drove a stolen vehicle into another vehicle in a shopping mall parking lot. (*Id.* at PageID.10139.) Habimana allegedly was found to have a blood alcohol content sufficient to meet the super drunk driving designation. (*Id.*) Defendants do not argue that Habimana is a flight risk. (*Id.*)

Plaintiffs reply that Defendants' claims regarding the 2018 events rely on hearsay statements in a police report that were quoted selectively and whose veracity is questionable because they offer conflicting accounts of the events described therein. (ECF No. 392, PageID.10516.) Plaintiffs further note that Habimana was allowed to return to and live at the group home following these events; Plaintiffs argue that Habimana would not have been allowed to return were there serious concerns about the danger he posed to the community. (*Id.* at PageID.10516–10517.) Additionally, Plaintiffs allege that Habimana has begun taking medication to address his mental health needs since his 2018 arrest and plans to seek both counseling and substance abuse treatment upon release. (*Id.* at PageID.101517.)

The Court will require an individualized hearing to assess Habimana's bail application. At this bail hearing, the Court will take

testimony from Habimana to assess his credibility and hear argument from both parties pertaining to whether Habimana would pose a risk of flight or danger to the community upon release.

### *Jonathan Reyes-Saucedo* (ECF No. 364)

Plaintiffs state that Reyes-Saucedo is 22 years old and has no criminal convictions. (ECF No. 364, PageID.8892.) While Reyes-Saucedo was charged with assault with intent to murder in March of 2020, the case against him was dismissed upon motion of the prosecuting attorney for the "best interest of justice." (*Id.*) Plaintiffs indicate that Reyes-Saucedo is undergoing removal proceedings represented by counsel, and further note that he is seeking voluntary departure in order to allow him to return to the United States through proper legal channels. (*Id.* at PageID.8991, 8993.) If released, Reyes-Saucedo will stay with his sister in Battle Creek, Michigan. (*Id.* at PageID.8992.)

Defendants clarify that Reyes-Salcedo arrived in the United States on an unknown date in 2013. (ECF No. 379, PageID.10166.) Defendants allege that Reyes-Saucedo withdrew his request for a bond hearing in front of an Immigration Judge. (*Id.* at PageID.10165.) Defendants offer more detail surrounding the events leading to the dismissed charge of

assault with intent to murder, arguing that "the underlying conduct is extremely serious" such that it be should be considered when evaluating whether Reyes-Saucedo poses a danger. (*Id.* at PageID.10165.) Defendants further assert that the investigation clearly indicated Reyes-Saucedo's car was used in this crime and that he was present at the scene, implying that there is a strong indication that Reyes-Saucedo participated in the events. (*Id.* at PageID.10165–10166.) Defendants do not argue that Reyes-Saucedo is a flight risk. (*Id.*)

Plaintiffs reply to clarify that Reyes-Saucedo did not withdraw his request for a bond hearing, but rather, filed a motion for reconsideration of voluntary departure after the charges against him were dismissed. (ECF No. 391, PageID.10511.) Plaintiffs allege that this motion for reconsideration was misidentified by the Immigration Judge as a motion for bond redetermination. (*Id.*) Plaintiffs further note that the Board of Immigration Appeals ("BIA") granted Reyes-Saucedo's appeal and remanded his case for additional fact-finding in light of the dismissal of the criminal charge. (*Id.*) Additionally, Plaintiffs dispute Defendants' depiction of the events as described in the police report and argue that

25

the charge would not have been dismissed were there adequate grounds for prosecution. (*Id.* at PageID.10510–10511.)

The Court finds Reyes-Saucedo is neither a flight risk nor a danger to the community given his proposed release plan. Reyes-Saucedo's application for bail is granted.

### *Eddys Alejandro Rosello-Carrazana* (ECF No. 371)

Plaintiffs write that Rosello-Carrazana's criminal record in the United States is limited to his attempt to seek asylum; Rosello-Carrazana has no criminal record in Cuba. (ECF No. 371, PageID.9468.) Plaintiffs allege that Rosello-Carrazana voluntarily surrendered himself to Customs and Border Patrol ("CBP") upon entry to the United States. (*Id.*) While Plaintiffs acknowledge that Rosello-Carrazana is subject to an April 22, 2020 final removal order, they argue that Rosello-Carrazana's removal is unlikely in the near future as a result of Cuba's current and demonstrated resistance to removals from the United States. (*Id.* at PageID.94692.) Rosello-Carrazana will stay with his aunt and uncle in Miami, Florida, upon release. (*Id.*)

Defendants argue that Rosello-Carrazana is a flight risk and a danger to the community because an Immigration Judge denied bond to

Rosello-Carrazana after finding him to be both at risk of flight and a danger. (ECF No. 386, PageID.10458.) Additionally, Defendants note that Rosello-Carrazana was determined to be a danger to the community by ICE after Rosello-Carrazana was found guilty of assaulting another ICE detainee during a disciplinary hearing while in custody. (*Id.*) Specifically, Rosello-Carrazana held another detainee down while two other detainees attacked that detainee. (*Id.*) Defendants assert that ICE is attempting to obtain travel documents for Rosello-Carrazana pursuant to his final order of removal. (*Id.*)

Plaintiffs reply to clarify that the Immigration Judge did not find Rosello-Carrazana to be either a flight risk or a danger, but rather, granted Rosello-Carrazana bond. (ECF No. 394, PageID. 10540.) Rosello-Carrazana remained detained because the bond was unpaid. (*Id.*) Additionally, Plaintiffs challenged Defendants' description of the incident leading to Rosello-Carrazana's ICE disciplinary infraction, noting that the facts of the incident were disputed and Rosello-Carrazana was unable to properly describe the incident to investigating staff because no Spanish-language assistance was provided during the investigation. (*Id.* at PageID.10541.)

27

The Court finds Rosello-Carrazana is neither a flight risk nor a danger to the community given his proposed release plan. The Court recognizes that Rosello-Carrazana's release plan involves his release into the custody of an individual who is not the custodian listed in the bail request, and approves the alternative arrangements as set forth in Rosello-Carrazana's bail application. Accordingly, Rosello-Carrazana's application for bail is granted.

### *Karar Munir Al-Sultan* (ECF No. 372)

Plaintiffs write that Al-Sultan has lived in the United States for 21 years, since he was approximately 10 years old. (ECF No. 372, PageID.9484.) Before arriving in the United States, Al-Sultan lived in a refugee camp in Saudi Arabia for approximately nine years following his family's flight from Iraq. (*Id.*) Plaintiffs highlight several traumatic experiences Al-Sultan faced while living at this refugee camp to help explain in part Al-Sultan's resulting mental health struggles. (*Id.* at PageID.9489.) While acknowledging that Al-Sultan has been convicted of numerous misdemeanors, Plaintiffs argue that Al-Sultan's criminal history was the result of his unaddressed mental health needs. (*Id.* at PageID.9484–9485.) Plaintiffs argue that Al-Sultan is not a danger to the

28

community because his family now understands Al-Sultan's need for mental health treatment, has investigated available treatment options suitable for Al-Sultan's individual mental health needs, and is willing to dedicate financial and other resources toward Al-Sultan's treatment. (*Id.*) Additionally, Plaintiffs note that his lengthy criminal record nevertheless mostly includes dismissed charges. (*Id.*) If released, Al-Sultan will stay with his parents and several siblings in Lansing, Michigan. (*Id.* at PageID.9487.)

Defendants highlight portions of Al-Sultan's recent criminal history, including August 2019 arrests for aggravated assault and domestic violence as well as his May 2019 conviction for stalking and violation of a personal protection order ("PPO"), to argue that Al-Sultan poses a danger. (ECF No. 385, PageID.10455.) Defendants note that the details of the events leading to these 2019 offenses were absent from Al-Sultan's bail application; Defendants thus urge the Court to require Plaintiffs' counsel to explain the circumstances of these crimes and to present appropriate additional conditions of release to protect the individual who obtained the PPO against Al-Sultan should he be granted release. (*Id.*) Defendants do not argue that Al-Sultan is a flight risk. (*Id.*)

29

Plaintiffs' reply offered more detail regarding the underlying conduct behind Al-Sultan's 2019 charges. (ECF No. 395, PageID.10551.) Plaintiffs allege that the PPO protectee is a former girlfriend of Al-Sultan and that Al-Sultan violated the PPO when he visited her place of employment without recognizing that this constituted a PPO violation. (*Id.*) Plaintiffs further assert that the aggravated assault and domestic violence charges were based on an incident with Al-Sultan's brother, who declined to file charges and has submitted a letter of support for Al-Sultan's release. (*Id.*)

Although the Court finds Al-Sultan is neither a flight risk nor a danger to the community given his proposed release plan, the Court will release Al-Sultan on bail only with the conditions that he: (1) abstain from consuming any alcohol during his release; (2) refrain from driving during his release; (3) receive psychiatric treatment and remain on all prescribed medications in the doses and at the frequency prescribed; and (4) have no contact with his former girlfriend for the pendency of this case. Accordingly, Al-Sultan's application for bail is granted with these additional conditions.

### *Noe Chaparro-Alcantara* (ECF No. 405)

30

Plaintiffs allege that Chaparro-Alcantara has lived in the United States for nearly fifteen years and does not have a violent criminal history. (ECF No. 405, PageID.10925–10926.) Plaintiffs recognize that Chaparro-Alcantara has had three misdemeanor convictions for driving with an expired license and one misdemeanor conviction of driving under the influence ("DUI"), in addition to a pending DUI charge. (*Id.* at PageID.10926.) If released, Chaparro-Alcantara will live alone but near his brother and his parents in Garden City, Michigan. (*Id.* at PageID.10929.)

Defendants argue that Chaparro-Alcantara is a danger to the community because an Immigration Judge denied bond to Chaparro-Alcantara after finding him to be a danger. (ECF No. 410, PageID.10973.) Additionally, Defendants argue that Plaintiffs failed to provide sufficient evidence that Chaparro-Alcantara has an effective release plan, because he will not be subject to sufficient monitoring for compliance with the Court's order of release and its required conditions were he to be released to live alone. (*Id.* at PageID.10974.) Defendants do not argue that Chaparro-Alcantara is a flight risk. (*Id.*)

31

Plaintiffs reply that Chaparro-Alcantara will engage in counseling and alcohol abuse treatment immediately upon release. (ECF No. 413, PageID.11000.) According to Plaintiffs, Chaparro-Alcantara's participation in these services, willingness to comply with any additional conditions imposed by the Court, and lack of access to a car collectively mitigate any concerns about reoffending. (*Id.*) Additionally, Plaintiffs argue that Chaparro-Alcantara's release plan is effective because he will be living in the home he owns with regular check-ins and support provided by his brother and his brother's wife. (*Id.*)

Although the Court finds Chaparro-Alcantara is neither a flight risk nor a danger to the community given his proposed release plan, the Court will release Chaparro-Alcantara on bail only with the conditions that he: (1) abstain from consuming any alcohol during his release; (2) refrain from driving during his release; (3) receive substance abuse treatment from AA or an equivalent substance abuse treatment program; and (4) address any and all pending charges, including the May 27, 2020 charge of misdemeanor of operating a motor vehicle while intoxicated. Accordingly, Chaparro-Alcantara's application for bail is granted with these additional conditions.

## III.   Conclusion

For the reasons stated above, the Court grants bail for habeas litigation group members Fortin, Zaya, Murai, Pulido Chavez, Reyes-Saucedo, Rosello-Carrazana, Al-Sultan, and Chaparro-Alcantara. Each habeas litigation group member set for release is subject to the conditions outlined in this Court's August 12, 2020 order. (ECF No. 179.) Additionally, the following habeas litigation group members are subject to the additional conditions outlined below:

(1) Habeas litigation group member Pulido Chavez must follow all terms of his federal probation;

(2) Habeas litigation group member Al-Sultan must: (1) abstain from consuming any alcohol during his release; (2) refrain from driving during his release; (3) receive psychiatric treatment and remain on all prescribed medications in the doses and at the frequency prescribed; and (4) have no direct contact with his former girlfriend for the pendency of this case;

(3) Habeas litigation group member Chaparro-Alcantara must: (1) abstain from consuming any alcohol during his release; (2) refrain from driving during his release; (3) receive substance

abuse treatment from AA or an equivalent substance abuse treatment program; and (4) address any and all pending charges, including the May 27, 2020 charge of misdemeanor of operating a motor vehicle while intoxicated.

Release under the bail process is to follow the bail process and standard Conditions of Release previously set forth. (*See* ECF Nos. 166, 177, 179, 243.)

The Court will determine whether to grant bail for group members Osman and Habimana at a hearing.

**IT IS SO ORDERED.**

Dated: November 30, 2020            s/Judith E. Levy
Ann Arbor, Michigan                     JUDITH E. LEVY
                                                      United States District Judge


<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 30, 2020.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager